## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| IMERYS TALC AMERICA, INC., *et al.*,[1] | Case No. 19-10289 (LSS) |
| Debtors | (Jointly Administered) |
| IMERYS TALC AMERICA, INC. and IMERYS TALC VERMONT, INC., | |
| Plaintiffs, | Adv. Pro. No. _____ |
| v. | |
| JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC., | |
| Defendants. | |

## **COMPLAINT**

1.     Plaintiffs Imerys Talc America, Inc. ("ITA") and Imerys Talc Vermont, Inc. ("ITV"), by and through their undersigned counsel, respectfully file this Complaint against Defendants Johnson & Johnson ("JNJ") and Johnson & Johnson Consumer Inc. ("JJCI" and together with JNJ, "J&J") seeking declaratory judgments regarding J&J's obligations under a series of contracts in which J&J agreed to indemnify ITA, ITV, and their affiliates and predecessors for all losses, liabilities, damages, costs, and expenses in connection with product liability claims arising out of the sale of talc or talc-containing products by J&J or its affiliates , and damages for J&J's breach of those same contracts.  Plaintiffs allege as follows:

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc  Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, GA 30076.

**Preliminary Statement**

2.      In the decades leading up to their bankruptcy, Plaintiffs were the sole supplier of cosmetic talc to J&J. During that time, and pursuant to various agreements, J&J repeatedly agreed to indemnify Plaintiffs, their affiliates, and their predecessors for all liability resulting from Plaintiffs' supply of talc to J&J. J&J made those promises in a series of contracts it entered into over the course of more than 20 years. Yet when Plaintiffs faced such liability—in the form of thousands of personal injury claims alleging that the claimants' use of J&J products containing Plaintiffs' talc caused ovarian cancer, mesothelioma and other diseases—J&J simply refused to defend or pay the claims, forcing Plaintiffs to file for bankruptcy protection. In this adversary proceeding, Plaintiffs ITA and ITV seek declaratory judgments and damages relating to J&J's indemnity obligations.

3.      The commercial relationship between Plaintiffs and J&J is governed by a series of contracts entered into between 1989 and 2011, under which J&J agreed to indemnify Plaintiffs, their affiliates, and their predecessors against all liabilities in connection with any product liability based claim arising out of J&J's talc-containing products. The obligations set forth in these contracts contain no monetary cap and are subject to few conditions. For example, J&J agreed to indemnify against "any product-liability based claim" (i) "arising out of the sale of cosmetic talc products" manufactured by Debtor ITV prior to January 6, 1989 or (ii) "for which [J&J] is directly or indirectly responsible" as a result of its use of talc supplied pursuant to the agreement. (1989 Supply Agreement § 11.) As J&J acknowledged to this Court, its indemnification obligations amount to "billions of dollars in potential liability." (Sept. 22, 2020 Hr'g Tr. at 10:22, Dkt. No. 2252.)

RLF1 25741801v.1

4.     In the years since J&J first agreed to indemnify Plaintiffs (and their affiliates and predecessors) for any product liability based claims brought against Plaintiffs that arise out of exposure to J&J's talc-based products, the number of lawsuits alleging the talc that Plaintiffs supplied to J&J caused ovarian cancer, mesothelioma, and other diseases increased dramatically. In 2011, there were approximately eight personal injury claims relating to the use of talc pending against one or more of the Plaintiffs.  By 2019, there were over 14,000.  Just as the number of pending claims increased, so did the resulting defense costs, settlements, and verdicts.

5.     Plaintiffs repeatedly demanded that J&J indemnify them against these talc-based product liability claims.  Beginning in 2015 and continuing through 2018, Plaintiffs made several attempts in writing, in person, through mediation, and by phone to obtain indemnification from J&J.  Plaintiffs' requests were always rebuffed or ignored.

6.     J&J refused to acknowledge or accept its indemnification obligations, even after Plaintiffs informed J&J that they would be forced to seek bankruptcy protection unless J&J honored the indemnities.  Nonetheless, Plaintiffs continued to provide notice of additional claims to J&J and continued to demand that J&J indemnify Plaintiffs.

7.     On February 13, 2019, based in large part on J&J's refusal to honor its indemnity obligations, Plaintiffs filed for bankruptcy protection.  (*Declaration of Alexandra Picard, Chief Financial Officer of the Debtors in Support of Chapter 11 Petitions and First Day Pleadings* ("Picard Decl.") ¶ 10, Dkt. No. 10.)

8.     Throughout Plaintiffs' bankruptcy, J&J has continued to ignore its obligations and instead has pursued a strategy of delay and avoidance.  For example, two months after Plaintiffs filed their Chapter 11 petitions, J&J attempted to have thousands of personal injury claims transferred to the District of Delaware on the theory that these claims ***against J&J*** were

3

"related to" Plaintiffs' bankruptcy.  J&J's basis for "related to" jurisdiction included, among other things, an argument that **Plaintiffs** were required to indemnify **J&J**—not the other way around. The District Court denied J&J's motion.

9. On January 9, 2020, J&J filed Proofs of Claim asserting that ITA owes indemnification obligations under one of the contracts between JJCI and ITA.  However, J&J has admitted that it never requested that ITA defend or hold J&J harmless for any talc claim, never sought to have ITA assume J&J's defense of any such claim, never provided notice of any indemnifiable claim to ITA, and never formally demanded that ITA indemnify J&J against any claim.  J&J has also never submitted evidence of a necessary predicate for such an indemnity: the presence of any asbestos in its talc.

10. In another reversal of its position, on March 20, 2020, J&J filed a motion (the "Lift Stay Motion") asking this court to modify the automatic stay to:

a. permit J&J to assume the defense of all claims against Plaintiffs based on exposure to J&J's products that contained the Plaintiffs' talc and agreeing to indemnify Plaintiffs for all such claims;

b. waive any indemnity claims that J&J purports to have against ITA, and withdraw with prejudice all claims that J&J filed against ITA;

c. waive any rights of Plaintiffs to assert indemnification against J&J with respect to any claim resolved by Plaintiff without J&J's participation; and

d. reserve J&J's purported rights to seek reimbursement from Plaintiffs' insurance carriers.

(*See* Lift Stay Motion, Dkt. No. 1567.)

11. However, the Lift Stay Motion was, in fact, simply another attempt by J&J to shirk its indemnification obligations, including, but not limited to, as specified in paragraphs 10(c) and 10(d) above.  Through its motion, J&J sought to impose various conditions that were

not part of the parties' original agreements.  The Court denied the Lift Stay Motion on September 25, 2020.  (Dkt. No. 2253.)

12.    Plaintiffs, the Official Committee of Tort Claimants (the "<u>Committee</u>"), the Future Claimants' Representative (the "<u>FCR</u>") and Imerys S.A. (collectively, the "<u>Plan Proponents</u>") continued productive negotiations during J&J's disruptions and formulated a proposed Plan of Reorganization that preserves J&J's purported indemnity defenses.  And yet, J&J continues to try to stand between the Plan Proponents and confirmation, all while continuing to deny its indemnification and related obligations to the Plaintiffs.

13.    As a result of its delay, obstruction, and outright refusal, J&J has not paid one penny of its indemnity obligations to Plaintiffs.  Accordingly, faced with continuing uncertainty regarding one of the largest assets of Plaintiffs' estates, Plaintiffs seek declaratory judgments regarding J&J's and Plaintiffs' respective rights and obligations under the parties' indemnity agreements.  Specifically, Plaintiffs seek declarations establishing that under the applicable contracts, J&J is obligated to indemnify Plaintiffs (and their affiliates and predecessors) and that Plaintiffs are not obligated to indemnify J&J.

## THE PARTIES

14.    Plaintiffs filed their petitions for relief pursuant to chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") on February 13, 2019 (the "<u>Petition Date</u>"). Plaintiffs continue to manage and operate their businesses as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner with expanded powers has been appointed in Plaintiffs' cases.

15.     Defendant JNJ is a multinational corporation that manufactures medical devices, pharmaceuticals and consumer packaged goods.  On information and belief, JNJ is a New Jersey corporation with its principal place of business in the State of New Jersey.

16.     Defendant JJCI (formerly known as Johnson & Johnson Consumer Companies Inc.) is a wholly-owned subsidiary of JNJ.  On information and belief, JJCI is a New Jersey corporation with its principal place of business in the State of New Jersey.

## JURISDICTION AND VENUE

17.     This is an adversary proceeding, brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure, which arises in and relates to Plaintiffs' cases before this Court under chapter 11 of the Bankruptcy Code.  This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334, as well as the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

18.     This action is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C) and (O).  Accordingly, any forum selection or arbitration clause contained in any of the parties' agreements is not enforceable in this proceeding.  Plaintiffs consent to the entry of final orders or judgment by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## BACKGROUND

**A.  The Debtors' Corporate History**

20.     From 1965 to 1989, Windsor Minerals, Inc. ("Windsor," now known as Debtor ITV) was a wholly-owned subsidiary of J&J and supplied talc to its corporate parent.

21.    In 1989, J&J sold Windsor to Cyprus Mines Corporation ("<u>Cyprus Mines</u>") through a stock purchase agreement (the "<u>1989 SPA</u>").[2]

22.    In 1992, Cyprus Mines and its affiliates transferred the stock of Windsor and all of the other assets in the talc business to a newly formed subsidiary, Cyprus Talc Corporation ("<u>CTC</u>," now known as Debtor ITA) through an asset transfer and assumption agreement, dated June 5, 1992 (the "<u>1992 ATA</u>").[3]    Under the 1992 ATA, Cyprus Mines transferred to CTC, "all of Cyprus' right, title and interest in the assets, properties, rights and businesses of every type and descriptions used primarily in or relating primarily to Cyprus' talc business," including, among other things, "[a]ll right, title and interest in, to and under all contracts . . . to which Cyprus is a party or entitled to any right or interest."  (1992 ATA §§ 2, 2(h).) Contemporaneously, the outstanding stock of CTC was purchased by RTZ America Inc. (now known as Rio Tinto America, Inc. ("<u>Rio Tinto</u>")) through a stock purchase agreement, dated June 5, 1992 (the "<u>1992 SPA</u>").[4]  CTC was subsequently renamed Luzenac America, Inc.

23.    In August 2011, "Imerys Group," a French multinational corporation comprised of over 360 affiliated entities directly and indirectly owned by Imerys S.A., acquired all of Rio Tinto's talc business through an agreement between Rio Tinto and Mircal S.A., an Imerys Group holding company, dated June 10, 2011.  Through the agreement, Imerys Group acquired Windsor, which subsequently changed its name to ITV, and Luzenac America, Inc., which subsequently changed its name to ITA, among other entities.

---

[2]    The 1989 SPA is attached hereto as Exhibit 1.

[3]    The 1992 ATA is attached hereto as Exhibit 2.

[4]    The 1992 SPA is attached hereto as Exhibit 3.

24.     On October 29, 2020, Plaintiffs obtained approval from this Court to sell substantially all of their talc operations to Magris Resources Canada Inc., a Canadian mining investment corporation, for $223 million subject to certain purchase price adjustments.  (*Ordering (I) Approving the Debtors' Designation of Magris Resources Canada Inc. As Stalking Horse Bidder And Related Bid Protections And (II) Granting Related Relief,* Dkt. No. 2439.)  The sale closed on February 17, 2021.  J&J's indemnification obligations were not included among the assets acquired in the sale.

**B.  For Decades, Plaintiffs And Their Predecessors Supplied Cosmetic Talc To J&J.**

25.     Historically, Plaintiffs have been J&J's sole supplier of the talc used in J&J products, such as Johnson's Baby Powder and Shower to Shower, except for a short period of time during a strike at the Windsor mine.  Prior to 1989, talc was supplied by ITV (then known as Windsor) through its direct subsidiary relationship with J&J.  Since 1989, Plaintiffs have supplied talc to J&J through four supply agreements relevant to this Complaint:  the "1989 Supply Agreement," the "2001 Supply Agreement," the "2010 Supply Agreement," and the "2011 Supply Agreement" (collectively, the "Supply Agreements").[5]

**C.  J&J Repeatedly Agreed To Indemnify Plaintiffs Against Talc Liability.**

26.     Under each of the Supply Agreements and the 1989 SPA, J&J agreed to indemnify one or more of the Plaintiffs against certain claims arising out of Plaintiffs' supply of talc to J&J.

27.     In the 1989 SPA, J&J agreed that it would retain sole responsibility and indemnify Cyprus Mines against "any product liability-based claim, suit, demand or cause of

---

[5]     The 1989 Supply Agreement, the 1996 Amendment to the 1989 Supply Agreement, the 2001 Supply Agreement, the 2004 Amendment to the 2001 Supply Agreement, the 2010 Supply Agreement and the 2011 Supply Agreement are attached hereto as Exhibits 4–9, respectively.

action directed against [Cyprus Mines], [ITV] or Western or any of their affiliates arising out of the sale of talc or talc-containing products manufactured by [ITV], Western, J&J or the affiliates of [ITV], Western or J&J, prior to Closing."  (1989 SPA § 11.2.)  The 1989 SPA provides that J&J's indemnification obligation "shall survive the Closing forever," and that the 1989 SPA "shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and permitted assigns."  (*Id.* §§ 11.2, 13.1.)

28.     On the same date as the SPA, ITV and the entity currently known as JJCI entered into a talc supply agreement dated January 6, 1989 (the "1989 Supply Agreement") under which JJCI agreed to purchase talc from ITV.  Section 11 of the 1989 Supply Agreement contains a similarly comprehensive indemnity provision, requiring JJCI and its affiliates:

> to indemnify, defend and hold harmless [ITV], and its affiliates, and each of their respective directors, officers, employees, and agents from and against all liabilities arising out of any product liability-based claim, suit, demand or cause of action directed against [ITV] or any of [ITV]'s affiliates: (i) **arising out of the sale of cosmetic talc products to consumer markets, which products were manufactured by [ITV] prior to [January 6, 1989]**; or (ii) **for which [JJCI] is directly or indirectly responsible as a result of [JJCI's] possession, use or processing of Talc delivered to [JJCI] pursuant to this Agreement, or as the result of [JJCI's] manufacture, shipment and sale of Talc-containing product** (including, without limitation, baby powder and adult powder) derived from Talc delivered to [JJCI] pursuant to this Agreement;

(1989 Supply Agreement § 11 (emphasis added).)

29.     The same section of the 1989 Supply Agreement contains the following exception to J&J's indemnification obligation:

> *provided, however*, that [JJCI] shall have no obligation of indemnification . . . in the event that the Talc delivered to [JJCI] hereunder did not conform to the specifications for such Talc then in effect, and such variance from such specifications was a material contributing factor in the claim, suit, demand or cause of action being asserted.

(*Id.*)

30.     J&J never rejected any talc supplied by ITV under the 1989 Supply Agreement on the basis of asbestos contamination or otherwise, nor has it admitted that its products containing Plaintiffs' talc caused any injury—let alone injury resulting from the failure of such talc to "conform to . . . specifications[.]"

31.     The 1989 Supply Agreement provided for an initial term of ten years.  (*Id.* § 2(a).)  The term was subsequently extended through December 31, 2000.  (1996 Amendment Agreement § 3; 2000 Termination Letter.)  J&J's indemnification obligations survive termination or expiration of the 1989 Supply Agreement.  (1989 Supply Agreement § 11.)

32.     J&J has admitted that the contractual right to indemnification granted to Cyprus Mines under the 1989 SPA was transferred to ITA in 1992 when Cyprus Mines transferred all of its assets related to the talc business to CTC under the 1992 ATA.[6]

33.     In 2001, JJCI and ITA entered into a new contract for the supply of talc dated April 15, 2001 (the "2001 Supply Agreement").  Under the 2001 Supply Agreement, J&J continued to indemnify ITA:

> [J&J] shall be solely liable for, and shall indemnify [ITA] for any cost, loss, damage or expense suffered by [ITA] arising out of the failure of the [talc] to conform to the microbiological quality standards established therefor, as the same may be amended from time to time.

(2001 Supply Agreement § 7(a)(iii).)

34.     Additionally, ITA agreed to indemnify J&J for "any cost, loss, damage or expense" arising from talc failing to meet specifications (other than microbiological specifications) or ITA's failure to sample and test talc, up to a cap of $20 million, or $40 million for gross

---

[6]     *See* Opening Brief in Support of Johnson & Johnson and Johnson & Johnson Consumer Inc.'s Motion to Dismiss the Claims Against Them for Lack of Subject Matter Jurisdiction, or, in the Alternative, to Abstain, or to Sever and Transfer, p. 3 ("Multiple provisions in the ATA make clear that CTC became the new owner of any indemnity rights under the 1989 Agreements.").  [AP Dkt. 10; Case 20-50626-LSS.]

negligence or willful misconduct.  (*Id.* § 7(a)(i).)  J&J never rejected any talc under the 2001

Supply Agreement on the basis of asbestos contamination or failure to meet specifications, nor has

it admitted that its products containing ITA's talc caused any injury—let alone injury caused by

failing to meet specifications.  (Exhibit 10 (May 19, 2020 Press Release ("J&J remains steadfastly

confident in the safety of talc-based Johnson's Baby Powder.").)

35.    ITA also agreed to indemnify J&J for:

> all liabilities arising out of any violation by [Debtor ITA] of any law, ordinance,
> regulation or rule or the order of any court or administrative agency, and from and
> against all liabilities arising out of any claim by an employee, agent, or contractor
> of [Debtor ITA] arising in connection with this Agreement; provided, however, that
> [Debtor ITA] shall not indemnify [J&J] for any such liabilities to the extent that
> such liabilities arise from:  (i) acts or omissions of [J&J]; or (ii) the acts or omissions
> of [Debtor ITA] which were directed by [J&J].

(*Id.* § 7(a)(iv).)  Prior to Plaintiffs' bankruptcy filing in 2019, J&J never sought indemnification

from ITA under any provision of the 2001 Supply Agreement.

36.    The 2001 Supply Agreement provided for an initial term of three years.  (*Id.*

§ 8(a).)  By amendment, the parties extended the initial three-year term through December 31,

2006.  (2004 Amendment to Supply Agreement ¶ 12.)  The indemnity in the 2001 Supply

Agreement survives the termination or expiration of the agreement.  (2001 Supply Agreement §

7(b).)

37.    JJCI and ITA subsequently entered into a material purchase agreement

effective during the 2010 calendar year (the "2010 Supply Agreement").  Under the 2010 Supply

Agreement, J&J agreed to "assume[] all risk of handling the [talc] at the point of delivery and

[J&J] agrees to indemnify [ITA] for claims by it or by third parties arising from such handling."

(2010 Supply Agreement, Attachment D § 4.)

11

38.    JJCI and ITA later entered into a new agreement covering the 2011 calendar year (the "2011 Supply Agreement").  Under that agreement JJCI agreed to: "indemnify, defend and hold harmless [ITA] for any third-party claims brought against [ITA] based on the use of the [talc] by [J&J]."  (2011 Supply Agreement, Attachment D § 6.)

39.    Taken together, the contractual indemnities under the 1989 SPA and the four Supply Agreements obligate J&J to indemnify Plaintiffs against all product liability claims arising from exposure to talc manufactured and distributed to consumers prior to 1989, between 1989 and December 2000, and during the 2011 calendar year, and for certain of those claims arising from exposure to talc manufactured between April 2001 through December 2010.

**D. Thousands Of People Alleging They Were Injured By J&J's Talc Products Sued Plaintiffs (And J&J).**

40.    Beginning in 2009, lawsuits were filed in state and federal courts throughout the country against J&J, Plaintiffs, and others.  Several years later, additional lawsuits were filed by or on behalf of people alleging ovarian cancer or mesothelioma.

41.    Each claimant alleges that exposure to J&J's talc-containing products— such as Johnson's Baby Powder and Shower to Shower—caused the claimant to develop cancer. To date, the injuries alleged are primarily (i) ovarian cancer or other gynecological diseases and (ii) mesothelioma, lung cancer, and other respiratory diseases (collectively, the "Talc Personal Injury Claims").  Each claimant alleges state law, product-liability claims that seek damages against J&J for its own alleged misconduct and Plaintiffs (and their predecessors) for their own alleged misconduct.

42.    Since 2009, J&J has been sued by over 30,000 individual tort claimants alleging personal injury and wrongful death claims arising from exposure to J&J's talc-containing products.  Because Plaintiffs have historically been J&J's sole supplier of talc, prior to the Petition

12

Date and the imposition of the automatic stay, one or more of the Plaintiffs have been named as a co-defendant in many of these actions.  As of June 21, 2021, there are 29,050 ovarian cancer cases, totaling 29,416 claimants, pending against J&J in the multidistrict litigation in the United States District Court for the District of New Jersey (the "MDL").  This is in addition to the more than 2,000 ovarian cancer and mesothelioma cases pending in state courts around the country that are not part of the MDL.

43.     On May 19, 2020, J&J announced that it will stop selling talc-based products in the United States.  (Exhibit 10 (May 19, 2020 Press Release).)

**E.  Plaintiffs Repeatedly Demanded That J&J Honor Its Indemnity Obligations.**

44.     Prior to seeking chapter 11 protection, Plaintiffs repeatedly demanded that J&J indemnify them for the Talc Personal Injury Claims arising out of exposure to J&J's products. On June 23, 2015, ITA demanded indemnification from J&J for legal defense costs and reasonable attorneys' fees arising out of the "numerous lawsuits . . . in various jurisdictions alleging bodily injury as a result of the long-term use of certain talc-based body powders manufactured by J&J with talc delivered by Imerys/Luzenac."  (Exhibit 11 (Letter from R. Van Meter to J&J).)  ITA's demand was based on J&J's indemnification obligations under the 1989 SPA, 1989 Supply Agreement, and 2011 Supply Agreement.

45.     On July 10, 2015, J&J acknowledged receipt and ITA's demand, but refused to provide indemnification.  (Exhibit 12 (Letter from D. Houghton to R. Van Meter).)

46.     On September 18, 2015, Plaintiffs again demanded indemnity from J&J and requested copies of insurance policies issued to J&J.  (Exhibit 13 (Letter from A. Elbert to D. Houghton).)

RLF1 25741801v.1

47.     Having not received a response from J&J, Plaintiffs wrote another letter to J&J on November 30, 2015 to follow up on Plaintiffs' demand.  J&J did not respond.

48.     On March 24, 2017, Plaintiffs provided J&J with copies of additional complaints filed against Plaintiffs and demanded indemnity from J&J.  Plaintiffs also made another request for copies of insurance policies issued to J&J.  J&J did not respond to Plaintiffs' demand. (Exhibit 14 (Letter from G. Harris to D. Houghton).)

49.     On June 5, 2017, Plaintiffs provided J&J with copies of additional complaints filed against Plaintiffs and demanded indemnity from J&J.  (Exhibit 15 (Letter from G. Harris to D. Houghton).)

50.     In June 2017, Plaintiffs and J&J met to discuss Plaintiffs' indemnity demands.  Shortly thereafter, Plaintiffs provided J&J with a proposal regarding J&J's obligation to indemnify Plaintiffs in connection with pending and future Talc Personal Injury Claims.

51.     In December 2017, Plaintiffs and J&J met again to further discuss Plaintiffs' indemnity demands.  Shortly thereafter, J&J provided Plaintiffs with a proposal regarding Plaintiffs' past losses in connection with Talc Personal Injury Claims, but made no proposal regarding pending or future claims.

52.     Less than a month later, however, J&J withdrew its proposal.  While the parties continued to engage in discussions and mediation in 2018, J&J never acknowledged its indemnity obligations, never agreed to reimburse Plaintiffs for any past losses, and never agreed to uphold its indemnity obligations in connection with pending or future Talc Personal Injury Claims.  Even after counsel for Plaintiff informed counsel for J&J that Plaintiffs would be required to seek bankruptcy protection if J&J did not uphold its indemnity obligations, J&J still refused.

14

53.     Between July 20, 2018 and February 12, 2019, Plaintiffs provided notice of additional Talc Personal Injury Claims to J&J, as well as copies of the complaints filed in those cases.  J&J did not respond to any of Plaintiffs' notices.

54.     As of the date of filing this Complaint, J&J has not indemnified Plaintiffs or agreed to indemnify Plaintiffs as required under the parties' agreements, for any of the tens of thousands of Talc Personal Injury Claims asserted against Plaintiffs for injuries allegedly caused by J&J's products incorporating Plaintiffs' talc.

**F.  Faced With Mounting Talc Litigation And J&J's Refusal To Honor Its Contractual Obligations, Plaintiffs Filed For Bankruptcy.**

55.     Faced with mounting tort claims in courts across the country, on February 13, 2019, Plaintiffs filed for chapter 11 protection in the United States Bankruptcy Court for the District of Delaware.  As of the Petition Date, one or more of the Plaintiffs had been named as a defendant in thousands of actions brought by approximately 14,650 individual claimants asserting Talc Personal Injury Claims.  (Picard Decl. ¶ 9.)

56.     In the bankruptcy filings, Plaintiffs explained that they filed for chapter 11 protection to negotiate a court-approved consensual plan of reorganization pursuant to sections 105(a), 524(g), and 1129 of the Bankruptcy Code that channels all of the present and future talc-related liabilities to a trust vested with substantial assets and provides for a channeling injunction prohibiting claimants from asserting against Plaintiffs and their affiliates any claims arising from talc mined, produced, sold or distributed by any of the Plaintiffs prior to their emergence from bankruptcy.  (Picard Decl. ¶ 56.)

RLF1 25741801v.1

**G. Postpetition, J&J Asserted That Plaintiffs Must Indemnify J&J—Not The Other Way Around.**

57.    In addition to the specific indemnities for product liability described previously, the 1989 and 2001 Supply Agreements also contain limited indemnity provisions that require Plaintiffs to indemnify J&J to the extent J&J incurred liability flowing from Plaintiffs' actions in violation of "any law, ordinance, regulation or rule" and expressly carved out any such liabilities to the extent they arose from "(i) the acts or omissions of [J&J], or (ii) the acts or omissions of [Plaintiffs] which were directed by [J&J]." (1989 Supply Agreement § 10; 2001 Supply Agreement ¶ 7(a)(iv).)

58.    Prior to Plaintiffs' petitions for bankruptcy, J&J never once requested that Plaintiffs defend or hold J&J harmless for any Talc Personal Injury Claim, never sought to have Plaintiffs assume J&J's defense of any Talc Personal Injury Claim, never provided notice of any indemnifiable Talc Personal Injury Claim to Plaintiffs, never demanded that Plaintiffs indemnify J&J against any Talc Personal Injury Claim, and never sought Plaintiffs' participation in the settlement of any Talc Personal Injury Claim.

59.    After the bankruptcy commenced, however, J&J filed Proof of Claim Nos. 915, 922, and 926 (collectively, "J&J Claim") asserting a claim for indemnification against Plaintiffs under Paragraph 7 of the 2001 Supply Agreement.  J&J asserts that Plaintiffs' indemnity obligations under the 2001 Supply Agreement were "triggered" as a result of claimants' allegations that "[ITA]'s supply of talc for use in [J&J]'s products violated various state common and statutory laws, including negligence, strict liability, failure to warn, failure to adequately test, products liability acts, and state laws and regulations defining negligence per se."  (J&J Claim ¶ 7.)

60.    However, no court has concluded that any Plaintiff has liability to J&J as a result of any alleged indemnification obligation owed by one or more of the Plaintiffs to J&J, and

16

aside from mere allegations, J&J has offered no evidence to support a finding that Plaintiffs violated any law, ordinance, or regulation.  In fact, J&J takes precisely the opposite position in its defense of the same claims, asserting vigorously that the alleged violation—the presence of harmful asbestos in talc—is flatly untrue.  Moreover, J&J's ability to recover from Plaintiffs with respect to the indemnification provisions in the 2001 Supply Agreement requires a showing that such liabilities did not arise from (i) the acts or omissions of J&J and/or (ii) the acts or omissions of ITA as directed by J&J.  (2001 Supply Agreement, at § 7(a)(iv).)

61.    While the 2001 Supply Agreement was in effect, J&J provided ITA with specifications and set forth the very specific methodologies to be used in supplying and testing the talc sold by ITA, including which mines to utilize at different periods of time.  (*Id.* at Annex A.) J&J's specifications included several pages of required testing and included tests to determine the presence of microbes and tests for color and particle size, among other things.  (*Id.*)  Throughout the term of the 2001 Supply Agreement, ITA supplied J&J with talc that satisfied J&J's requirements and reported all testing results to J&J.

## H.  J&J Has Repeatedly Attempted to Disrupt and Prolong Plaintiffs' Bankruptcy Proceedings to Avoid its Indemnity Obligations.

62.    Two months after driving Plaintiffs into Chapter 11, J&J tried to use Plaintiffs' own bankruptcy cases as a hook to have 2,400 claims ***pending against J&J*** transferred from state and federal courts around the country to federal court in the District of Delaware.

63.    On April 18, 2019, J&J filed a motion for an order fixing venue in the United States District Court for the District of Delaware over approximately 2,400 personal injury and wrongful death claims originally filed in federal and state courts across the country.  J&J argued the Delaware District Court had jurisdiction over the claims pursuant to 28 U.S.C. §§ 157(b)(5) and 1334(b) because the claims were "related-to" Plaintiffs' bankruptcy based on

contractual indemnities owed to J&J by Plaintiffs, shared insurance policies, and a purported "identity of interest" between J&J and Plaintiffs.  Simultaneously, J&J launched a massive campaign to remove hundreds of state court cases to federal court.

64.     The motion was opposed by a myriad of claimants, the Committee, and the FCR.  Opponents to the motion argued, in relevant part, that Plaintiffs had no obligation to indemnify J&J for the Talc Personal Injury Claims under the limited indemnities in the 1989 and 2001 Supply Agreements.  The briefing made clear that while J&J expressly agreed to take full responsibility for product liability claims, Plaintiffs' indemnification obligations are circumscribed, arising only, if at all, from the Plaintiffs' violation of law.  (1989 Supply Agreement § 10; 2001 Supply Agreement ¶ 7(a)(iv).)

65.     The District Court for the District of Delaware denied J&J's motion, finding it did not have related-to jurisdiction and, in any event, discretionary abstention was appropriate. Regarding J&J's indemnification rights, the court held that J&J "fail[ed] to make a cogent argument supporting a clearly established and accrued right to indemnification or defense from the [Plaintiffs]" and that J&J "has no right to indemnification from [Plaintiffs] if the liabilities relate to the acts or omissions of [J&J] or those directed by [J&J]."  (Memorandum Opinion at 5-6, *In re Imerys Talc America, Inc*., Case No. 19-103 (D. Del.) [Dkt No. 96].)

## I.  Eventually, J&J Made Several Belated and Deficient Indemnity Proposals.

66.     After its motion to fix venue was rejected and nearly nine months after Plaintiffs commenced their chapter 11 cases, J&J finally approached Plaintiffs with a proposal purporting to address J&J's indemnity obligations.  On November 1, 2019, J&J proposed to (i) "assume the defense of litigation of all Talc Claims where plaintiffs allege exposure in any year prior to April 15, 2001;" and (ii) "waive[] all indemnification claims that it may have against

[Plaintiffs] in connection with Talc Claims."  (Exhibit 16 (Letter from M. Goldstein to R. Levy, dated Nov. 1, 2019 at Exhibit B).)

67.    On December 12, 2019, Plaintiffs sent J&J a letter explaining the deficiencies in J&J's proposal, including that the proposal purported to offer only a partial resolution of the issues at stake in these cases, and reiterating their desire to achieve a global resolution of J&J's obligation to indemnify Plaintiffs' talc liability.  (Exhibit 17 (Letter from R. Levy to M. Goldstein, dated Dec. 12, 2019).)

68.    On February 7, 2020, J&J made a second proposal, in the form of a term sheet, to indemnify Plaintiffs for any and all claims against Plaintiffs involving a J&J product. Under J&J's term sheet, J&J would "agree[] to indemnify [Plaintiffs] fully for, and assume the defense of, and assume all costs of litigation for [t]alc [c]laims where plaintiffs allege use of J&J/talcum powder products prior to January 1, 2020, . . . and where [Plaintiffs have] not reached a final resolution (e.g., a settlement has been entered or a non-appealable final judgment has been entered against [Plaintiffs] in a court of competent jurisdiction) as to such [t]alc [c]laim . . .". (Exhibit 18 (Letter from R. Berkovich to R. Levy, dated Feb. 7, 2020 at Exhibit 1).)

### J.    J&J Asked This Court To Order It To Indemnify Plaintiffs, But Only On J&J's (New) Terms.

69.    Plaintiffs repeatedly attempted to engage with J&J while they evaluated J&J's offer, including via teleconference and a letter to J&J dated March 4, 2020.

70.    Rather than engage with Plaintiffs, on March 20, 2020, J&J filed the Lift Stay Motion seeking to modify the automatic stay to permit J&J to assume the defense and indemnify Plaintiffs for certain Talc Personal Injury Claims.  (Dkt. No. 1567.)  Specifically, J&J proposed, among other things, "to assume the defense of and indemnify [Plaintiffs]" for "all claims against [Plaintiffs] alleging harm caused by [Plaintiffs'] talc based on the alleged use of J&J

product prior to January 1, 2020 that have not reached a final resolution." (Lift Stay Motion at 1.) J&J also proposed to waive any indemnity claims that J&J purports to have against Plaintiffs and withdraw with prejudice all claims that J&J filed against Plaintiffs. (*Id.* ¶ 25.)

71.     Despite proposing to assume the defense and indemnify Plaintiffs for all Talc Personal Injury Claims, J&J nevertheless purported to have numerous "strong defenses to its indemnity obligations." (*Id.* ¶ 4.) J&J articulated seven such defenses in their Lift Stay Motion, including:

a.      by rejecting J&J's offers to assume liability for the J&J Talc Claims and ignoring J&J's rights under the J&J Indemnity Provisions to assume the defense of the Debtors and to control settlement decisions involving the J&J Talc Claims, the Debtors breached their obligations under the J&J Indemnity Provisions, relinquishing J&J of any duty to indemnify the Debtors for J&J Talc Claims settled without J&J's participation, and resulting in incurable defaults by the Debtors that render the supply agreements unassumable by the Debtors;

b.      if a settlement, judgment, or recovery from a trust is procured by bad faith, collusion, or fraud, it is not subject to indemnity under the applicable agreement and other principles of indemnity law;

c.      the claimant did not actually use a J&J product;

d.      the products of a company other than J&J to which the Debtors also supplied talc caused the claimant's injury or some other factor or exposure caused the J&J Talc Claimant's injury;

e.      settlements of J&J Talc Claims for large dollar amounts are not subject to indemnity by J&J given the lack of reliable scientific evidence of causation of the applicable injury;

f.      While J&J denies that the applicable J&J products contained asbestos, if the Debtors are responsible for providing J&J with contaminated talc in a manner not conforming to J&J's specifications per the supply agreements, J&J would not owe contractual indemnification; and

g.      Allegations of other acts or omissions of the Debtors in production, testing, and delivery of the talc resulted in the injury.

(*Id.* ¶ 16(c).)

72.     On May 19, 2020, Plaintiffs objected to the Lift Stay Motion on the grounds that it was not procedurally proper and contained significant deficiencies that would be detrimental to the Plaintiffs' estates.  (Dkt. No. 1731.)  The Committee and the FCR also filed responses to the Lift Stay Motion identifying deficiencies in J&J's proposed relief.  (Dkt. Nos. 1732, 1734.)

73.     On May 28, 2020, J&J filed its reply and a revised proposed order.  (Dkt. No. 1769.)

74.     J&J, Plaintiffs, the Committee, and the FCR engaged in private negotiations seeking a global resolution of the indemnity issues raised by the Lift Stay Motion.  That negotiation included exchanging draft term sheets and proposed forms of order and discussions to attempt to narrow the issues among the parties.  These negotiations stalled, however, when J&J insisted that it would only honor its obligations if it was granted a litany of new rights, which Plaintiffs, the Committee and the FCR believed were not appropriate.

75.     On July 10, 2020, recognizing that the private negotiations had stalled, the Committee and the FCR filed a revised proposed order in an attempt to reach a resolution of the issues raised in the Lift Stay Motion.  Plaintiffs filed their own statement supporting the revised proposed order filed by the Committee and the FCR.

76.     Thereafter, in another attempt to resolve their disputes, J&J, Plaintiffs, the Committee and the FCR participated in a mediation.  The parties were unable to reach a settlement and, on September 10, 2020, J&J filed a sur-reply in opposition to the July 10, 2020 proposed order.

77.     On September 23, 2020, during a hearing on the merits, this Court denied the Lift Stay Motion.  An order to that effect was entered on September 25, 2020.

**FIRST CAUSE OF ACTION**

**(Declaratory Judgment – 1989 SPA)**

78.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

79.     The 1989 SPA requires JNJ to indemnify, defend, and hold harmless Cyprus Mines against "any product liability-based claim, suit, demand or cause of action directed against Cyprus, [ITV] . . . or any of their affiliates arising out of the sale of talc or talc-containing products manufactured by Windsor, . . . [JNJ] or the affiliates of [ITV], . . . or [JNJ], prior to [January 6, 1989]." (1989 SPA § 11.2.) J&J has admitted that Cyprus Mines transferred its rights under the 1989 SPA to CTC, which is the predecessor of ITA. Thus, J&J expressly agreed to indemnify ITA and its affiliates, and take full responsibility for product liability claims arising from the sale of talc prior to January 6, 1989.

80.     As of the Petition Date, ITA, ITV, or one of their affiliates, was named as a defendant in thousands of actions brought by over 14,650 plaintiffs asserting Talc Personal Injury Claims. Plaintiffs have spent millions of dollars defending, satisfying judgements, and/or settling those actions, along with the costs incurred in pursuing Chapter 11 protection following J&J's multiple refusals to indemnify Plaintiffs.

81.     The Talc Personal Injury Claims allege state law product liability claims that seek damages for injuries allegedly arising from exposure to JNJ's talc-containing products. To the extent the claims arise from exposure that occurred prior to January 6, 1989, J&J is obligated under the 1989 SPA to indemnify and defend ITA.

82.     JNJ disputes that it owes any duty to indemnify, defend, or hold harmless ITA.

22

83.     An actual controversy exists between Plaintiffs and JNJ as to JNJ's obligation to indemnify, defend, and hold harmless ITA against the Talc Personal Injury Claims under the 1989 SPA.

84.     A declaration of the Court is necessary and appropriate at this time to settle the matter in controversy.

85.     Therefore, Plaintiffs request a judicial determination that JNJ is obligated to defend and indemnify ITA under the 1989 SPA for all losses in connection with all current and future Talc Personal Injury Claims arising out of exposure to J&J's talc-containing products manufactured and distributed prior to January 6, 1989.

## SECOND CAUSE OF ACTION

### (Declaratory Judgment – 1989 Supply Agreement)

86.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

87.     The 1989 Supply Agreement requires JJCI to indemnify, defend, and hold harmless ITV and its affiliates against "all liabilities arising out of any product liability-based claim, suit, demand or cause of action directed against [ITV] or any of [ITV]'s affiliates: (i) arising out of the sale of cosmetic talc products to consumer markets, which products were manufactured by [ITV] prior to [January 6, 1989]; (ii) for which [JJCI] is directly or indirectly responsible as a result of [JJCI's] possession, use or processing of Talc delivered to [JJCI] pursuant to this Agreement, or as the result of [JJCI's] manufacture, shipment and sale of Talc-containing product (including, without limitation, baby powder and adult powder) derived from Talc delivered to [JJCI] pursuant to this Agreement." (1989 Supply Agreement § 11.)  Thus, JJCI expressly agreed

to take full responsibility for product liability claims arising from the sale of talc under the 1989 Supply Agreement.

88.     As of the Petition Date, ITA, ITV, or one of their affiliates, was named as a defendant in thousands of actions brought by over 14,650 plaintiffs asserting Talc Personal Injury Claims.  Plaintiffs have spent millions in defending, satisfying judgments, and/or settling those actions, along with the costs incurred in pursuing Chapter 11 protection following J&J's multiple refusals to indemnify Plaintiffs.

89.     The Talc Personal Injury Claims allege state law product liability claims that seek damages for injuries allegedly arising from exposure to J&J's talc-containing products. To the extent the claims arise from exposure that occurred between January 6, 1989 through April 15, 2001, JJCI is obligated under the 1989 Supply Agreement to indemnify and defend Plaintiffs.

90.     JJCI disputes that it owes any duty to indemnify, defend, or hold harmless Plaintiffs.

91.     An actual controversy exists between Plaintiffs and JJCI as to JJCI's obligation to indemnify, defend, and hold harmless Plaintiffs against the Talc Personal Injury Claims under the 1989 Supply Agreement.

92.     A declaration of the Court is necessary and appropriate at this time to settle the matter in controversy.

93.     Therefore, Plaintiffs request a judicial determination that JJCI is obligated to defend and indemnify Plaintiffs under the 1989 Supply Agreement for all losses in connection with all current and future Talc Personal Injury Claims arising out of exposure to J&J's talc-containing products manufactured and distributed prior to January 6, 1989 and between January 6, 1989 and December 30, 2000.

24

## THIRD CAUSE OF ACTION

### (Declaratory Judgment – 1989 Supply Agreement)

94.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

95.     The 1989 Supply Agreement only requires ITV to indemnify JJCI for "liabilities arising out of any violation by [ITV] of any law, ordinance, regulation or rule"—i.e., derivative liabilities.  In contrast, the indemnification provisions in the agreement allocate any product liability to JJCI.  While JJCI expressly agreed to take full responsibility for products liability claims, Plaintiffs' indemnification obligations arise only, if at all, from ITV's violation of law.

96.     JJCI cannot establish that this indemnity applies to the Talc Personal Injury Claims because no such liability has been asserted, let alone established, in these cases.  The Talc Personal Injury Claims are based on state product liability law and allege claims for direct liability against J&J.  The Talc Personal Injury Claims do not allege derivative liability against J&J based on a violation of law by ITV.

97.     An actual controversy exists between Plaintiffs and JJCI as to ITV's obligation to indemnify, defend, and hold harmless JJCI for Talc Personal Injury Claims under the 1989 Supply Agreement

98.     A declaration of the Court is necessary and appropriate at this time to settle the matter in controversy.

99.     Therefore, Plaintiffs request a judicial declaration that ITV is not obligated to defend and indemnify JJCI under the 1989 Supply Agreement for all current and future Talc Personal Injury Claims.

## FOURTH CAUSE OF ACTION

### (Declaratory Judgment – 2001 Supply Agreement)

100.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

101.    Under the 2001 Supply Agreement, JJCI agreed to "be solely liable for, and shall indemnify [ITA] for any cost, loss, damage or expense suffered by [ITA] arising out of the failure of the [talc] to conform to the microbiological quality standards established therefor, as the same may be amended from time to time."  (2001 Supply Agreement § 7(a)(iii).)  To the extent the Talc Personal Injury Claims are based on a failure of the talc supplied by ITA to conform to microbiological quality standards, JJCI has agreed to assume sole responsibility.

102.    JJCI disputes that it owes any duty to indemnify, defend, or hold harmless ITA under the 2001 Supply Agreement.

103.    An actual controversy exists between Plaintiffs and JJCI as to JJCI's obligation to indemnify, defend, and hold harmless ITA against the Talc Personal Injury Claims.

104.    A declaration of the Court is necessary and appropriate at this time to settle the matter in controversy.

105.    Therefore, Plaintiffs request a judicial declaration that JJCI is obligated to defend and indemnify ITA under the 2001 Supply Agreement for all losses in connection with all current and future Talc Personal Injury Claims arising out of exposure to talc that failed to conform to the microbiological quality standards manufactured and distributed between April 16, 2001 through December 31, 2006.

26

**FIFTH CAUSE OF ACTION**

**(Declaratory Judgment – 2001 Supply Agreement)**

106.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

107.    The 2001 Supply Agreement only requires ITA to indemnify JJCI for "liabilities arising out of any violation by [ITA] of any law, ordinance, regulation or rule"—i.e., derivative liabilities.  In contrast, the indemnification provisions in the agreement allocate any product liability to JJCI.  While JJCI expressly agreed to take full responsibility for product liability claims, ITA's indemnification obligations arise only, if at all, from ITA's violation of law.

108.    JJCI cannot establish that this indemnity applies to the Talc Personal Injury Claims because no such liability has been asserted, let alone established, in these cases.  The Talc Personal Injury Claims are based on state product liability law and allege claims for direct liability against J&J.  The claims do not allege derivative liability against J&J based on a violation of law by ITA.

109.    ITA's obligation to indemnify JJCI for "any cost, loss, damage or expense" arising from talc failing to meet specifications (other than microbiological specifications) or ITA's failure to sample and test talc is similarly not applicable to the Talc Personal Injury Claims.

110.    An actual controversy exists between Plaintiffs and JJCI as to ITA's obligation to indemnify, defend, and hold harmless JJCI against the Talc Personal Injury Claims under the 2001 Supply Agreement.

111.    A declaration of the Court is necessary and appropriate at this time to settle the matter in controversy.

112.    Therefore, Plaintiffs request a judicial declaration that ITA is not obligated to defend and indemnify JJCI under the 2001 Supply Agreement for all current and future Talc Personal Injury Claims.

## SIXTH CAUSE OF ACTION

**(Declaratory Judgment – 2010 Supply Agreement)**

113.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

114.    Pursuant to the 2010 Supply Agreement, JJCI "assumes all risk of handling the [talc] at the point of delivery and [JJCI] agrees to indemnify [ITA] for claims by it or by third parties arising from such handling."  (2010 Supply Agreement, Attachment D § 4.)

115.    JJCI disputes that it owes any duty to indemnify, defend, or hold harmless ITA.

116.    An actual controversy exists between Plaintiffs and JJCI as to JJCI's obligation to indemnify, defend, and hold harmless ITA against the Talc Personal Injury Claims under the 2010 Supply Agreement

117.    A declaration of the Court is necessary and appropriate at this time to settle the matter in controversy.

118.    Therefore, Plaintiffs request a judicial declaration that JJCI is obligated to defend and indemnify ITA under the 2010 Supply Agreement for all losses in connection with all current and future Talc Personal Injury Claims arising out of exposure to J&J's talc-containing products manufactured and distributed between January 1, 2010 through December 31, 2010.

## SEVENTH CAUSE OF ACTION

### (Declaratory Judgment – 2011 Supply Agreement)

119.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

120.    Under the 2011 Supply Agreement, JJCI agreed to "indemnify, defend and hold harmless [ITA] for any third party claims brought against [ITA] based on the use of the [talc] by [JJCI]." (2011 Supply Agreement, Attachment D § 6.) Because the Talc Personal Injury Claims are all third party, product liability claims arising from JJCI's use of talc in certain of its products, including Johnson's Baby Powder, JJCI is obligated to indemnify ITA under this agreement.

121.    JJCI disputes that it owes any duty to indemnify, defend, or hold harmless ITA.

122.    An actual controversy exists between Plaintiffs and JJCI as to JJCI's obligation to indemnify, defend, and hold harmless ITA against the Talc Personal Injury Claims under the 2011 Supply Agreement

123.    A declaration of the Court is necessary and appropriate at this time to settle the matter in controversy.

124.    Therefore, Plaintiffs request a judicial declaration that JJCI is obligated to defend and indemnify ITA under the 2011 Supply Agreement for all losses in connection with all current and future Talc Personal Injury Claims arising out of exposure to J&J's talc-containing products manufactured and distributed between January 1, 2011 through December 31, 2011.

29

## EIGHTH CAUSE OF ACTION

### (Breach of Contract – 1989 SPA)

125.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

126.    The 1989 SPA requires J&J to indemnify ITA for all liabilities or losses, including costs and expenses, in connection with product-liability-related claims arising out of the sale of products containing talc manufactured by ITV or its affiliates prior to January 6, 1989.

127.    ITA has incurred significant out-of-pocket costs and expenses, including settlement payments and legal costs and expenses, in connection with lawsuits alleging harm caused by exposure to J&J's talc-containing products prior to January 6, 1989.  ITA also has incurred significant bankruptcy-related fees and costs as a result of J&J's breaches of the 1989 SPA.

128.    Despite ITA's repeated demands, J&J has refused to indemnify ITA and has refused to pay the costs and expenses incurred by ITA.

129.    Accordingly, J&J has breached the 1989 SPA by failing to indemnify, defend, and hold harmless ITA and is liable for an amount to be determined at trial.

## NINTH CAUSE OF ACTION

### (Breach of Contract – 1989 Supply Agreement)

130.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

131.    The 1989 Supply Agreement requires JJCI to indemnify ITV and its affiliates for liabilities or losses, including costs and expenses, in connection with product-liability-related claims arising out of the sale talc to J&J prior to January 6, 1989 and arising out of the sale of talc pursuant to that agreement.

30

132.     ITA and ITV have incurred significant out-of-pocket costs and expenses, including settlement payments and legal costs and expenses, in connection with lawsuits alleging harm caused by exposure to J&J's talc-containing products prior to January 6, 1989 and between January 6, 1989 and December 31, 2000.  ITA and ITV also have incurred significant bankruptcy-related fees and costs as a result of J&J's breaches of the 1989 Supply Agreement.

133.     Despite ITA and ITV's repeated demands, J&J has refused to indemnify ITA and ITV and has refused to pay the costs and expenses incurred by ITA and ITV.

134.     Accordingly, J&J has breached the 1989 Supply Agreement by failing to indemnify, defend, and hold harmless ITA and ITV and is liable for an amount to be determined at trial.

## TENTH CAUSE OF ACTION

### (Breach of Contract – 2001 Supply Agreement)

135.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

136.     The 2001 Supply Agreement requires JJCI to indemnify ITA for any cost, loss, damage or expense arising out of the failure of the talc supplied by ITA to conform to microbiological quality standards.

137.     ITA has incurred significant out-of-pocket costs and expenses, including settlement payments and legal costs and expenses, in connection with lawsuits alleging harm caused by exposure to J&J's talc-containing products manufactured and distributed between April 16, 2001 through December 31, 2006.  ITA also has incurred significant bankruptcy-related fees and costs as a result of J&J's breaches of the 2001 Supply Agreement.

RLF1 25741801v.1

138.     Despite ITA's repeated demands, J&J has refused to indemnify ITA and has refused to pay the costs and expenses incurred by ITA.

139.     Accordingly, J&J has breached the 2001 Supply Agreement by failing to indemnify, defend, and hold harmless ITA and is liable for an amount to be determined at trial.

### ELEVENTH CAUSE OF ACTION

### (Breach of Contract – 2010 Supply Agreement)

140.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

141.     The 2010 Supply Agreement requires JJCI to assume all risk of handling the talc at the point of delivery and indemnify ITA for claims by third parties arising from such handling.

142.     ITA has incurred significant out-of-pocket costs and expenses, including settlement payments and legal costs and expenses, in connection with lawsuits alleging harm caused by exposure to J&J's talc-containing products manufactured and distributed between January 1, 2010 through December 31, 2010.  ITA also has incurred significant bankruptcy-related fees and costs as a result of J&J's breaches of the 2010 Supply Agreement.

143.     Despite ITA's repeated demands, J&J has refused to indemnify ITA and has refused to pay the costs and expenses incurred by ITA.

144.     Accordingly, J&J has breached the 2010 Supply Agreement by failing to indemnify, defend, and hold harmless ITA and is liable for an amount to be determined at trial.

### TWELFTH CAUSE OF ACTION

### (Breach of Contract – 2011 Supply Agreement)

145.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

146.    The 2011 Supply Agreement requires JJCI to indemnify, defend and hold harmless ITA for liabilities or losses, including costs and expenses, in connection with product-liability-related claims arising out of the sale talc to J&J pursuant to that agreement.

147.    ITA has incurred significant out-of-pocket costs and expenses, including settlement payments and legal costs and expenses, in connection with lawsuits alleging harm caused by exposure to J&J's talc-containing products manufactured and distributed between January 1, 2011 through December 31, 2011.  ITA also has incurred significant bankruptcy-related fees and costs as a result of J&J's breaches of the 2011 Supply Agreement

148.    Despite ITA's repeated demands, J&J has refused to indemnify ITA and has refused to pay the costs and expenses incurred by ITA.

149.    Accordingly, J&J has breached the 2011 Supply Agreement by failing to indemnify, defend, and hold harmless ITA and is liable for an amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION

### (Attorneys' Fees and Costs)

150.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

151.    ITA is entitled to "attorneys' fees and costs incurred in connection with pursuing claims under . . . Section 11.2" of the 1989 SPA.  Section 11.2 of the 1989 SPA provides ITA with a right to indemnity against J&J.  This is an action to enforce ITA's right to indemnification under section 11.2 of the 1989 SPA; thus, J&J is obligated to pay Plaintiffs' reasonable attorneys' fees and costs.

152.    Additionally, under the 2010 and 2011 Supply Agreements, "[JJCI] agree[d] to pay reasonable attorneys' fees and together with costs" in any suit brought at law or in

33

equity to enforce the provisions of the agreements.  (Attachment D, § 6.)  As this is a suit to enforce the JJCI's obligation to indemnify ITA under the 2010 and 2011 Supply Agreements, JJCI is obligated to pay Plaintiffs' reasonable attorneys' fees and costs.

153.    Therefore, Plaintiffs seeks their reasonable attorneys' fees and costs incurred in connection with this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court enter judgment in its favor and against J&J and grant the following relief:

A.    Declaratory judgment that:

i.    JNJ is obligated to defend and indemnify ITA under the 1989 SPA for all losses in connection with compensable current and future Talc Personal Injury Claims arising out of exposure to J&J's talc-containing products manufactured and distributed prior to January 6, 1989;

ii.    JJCI is obligated to defend and indemnify ITV and its affiliates under the 1989 Supply Agreement for all losses in connection with compensable current and future Talc Personal Injury Claims arising out of exposure to J&J's talc-containing products manufactured and distributed prior to January 6, 1989 and between January 6, 1989 and December 30, 2000;

iii.    ITV is not obligated to defend and indemnify JJCI under the 1989 Supply Agreement for any compensable current or future Talc Personal Injury Claims;

iv.    JJCI is obligated to defend and indemnify ITA under the 2001 Supply Agreement for all losses in connection with compensable current and future Talc Personal Injury Claims arising out of exposure to talc that failed to conform to the microbiological quality standards manufactured and distributed between April 16, 2001 to December 31, 2006;

v.    ITA is not obligated to defend and indemnify JJCI under the 2001 Supply Agreement for any compensable current or future Talc Personal Injury Claims.

vi.    JJCI is obligated to defend and indemnify ITA under the 2010 Supply Agreement for all losses in connection with compensable current and future Talc Personal Injury Claims arising out of exposure to talc manufactured and distributed between January 1, 2010 to December 31, 2010;

34

vii.    JJCI is obligated to defend and indemnify ITA under the 2011 Supply Agreement for all losses in connection with compensable current and future Talc Personal Injury Claims arising out of exposure to talc manufactured and distributed during the 2011 calendar year;

B.    Damages in an amount to be determined at trial for J&J's breach of the 1989 SPA, the 1989 Supply Agreement, the 2001 Supply Agreement, the 2010 Supply Agreement, and the 2011 Supply Agreement;

C.    Attorneys' fees and costs incurred by Plaintiffs in connection with this litigation; and

D.    Such other relief as the Court deems just and proper.

Dated: July 27, 2021
     Wilmington, Delaware

Respectfully submitted,

*/s/    Marcos A. Ramos*

**RICHARDS, LAYTON & FINGER, P.A.**

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Marcos A. Ramos (No. 4450)
Amanda R. Steele (No. 5530)
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
E-mail:  collins@rlf.com
        merchant@rlf.com
        ramos@rlf.com
        steele@rlf.com

- and -

**NEAL, GERBER & EISENBERG LLP**

Angela R. Elbert (admitted *pro hac vice*)
Jason A. Frye (admitted *pro hac vice*)
Two North LaSalle Street, Suite 1700
Chicago, Illinois  60602-3801
Telephone:  (312) 269-5995
Facsimile:  (312) 578-8396
E-mail:  aelbert@nge.com
        jfrye@nge.com

*Counsel for Debtors and Debtors-in-Possession*

35