# EXHIBIT 1

AGREEMENT

BETWEEN

CYPRUS MINES CORPORATION

AND

JOHNSON & JOHNSON

DATED

JANUARY 6, 1989

AG8805B07

TABLE OF CONTENTS

| Section | | | Page |
|---|---|---|---|
| 1. | Sale of Stock | | 2 |
| 2. | Purchase Price and Payment | | 2 |
| | 2.1 | Base Purchase Price | 2 |
| | 2.2 | Adjustment of Base Purchase Price | 3 |
| 3. | Representations and Warranties of J & J, Windsor and Western | | 5 |
| | 3.1 | Organization and Existence | 5 |
| | 3.2 | Articles and Bylaws | 6 |
| | 3.3 | Minute Books and Stock Certificate Books and Records | 6 |
| | 3.4 | Capitalization | 7 |
| | 3.5 | Authority and No Violations | 8 |
| | 3.6 | Interest in Other Entities | 9 |
| | 3.7 | Financial Statements of Windsor and Western | 10 |
| | 3.8 | Undisclosed Liabilities | 11 |
| | 3.9 | Tangible Personal Property | 11 |
| | 3.10 | Real Property | 13 |
| | 3.11 | Transfers of Real and Personal Property | 14 |
| | 3.12 | Environmental Matters | 14 |
| | 3.13 | Permits and Compliance with Other Laws | 15 |
| | 3.14 | Litigation and Proceedings | 16 |
| | 3.15 | Contracts | 17 |
| | 3.16 | Customers | 17 |
| | 3.17 | Taxes | 18 |
| | 3.18 | Insurance and Bonds | 18 |
| | 3.19 | Banking and Personnel Matters | 19 |
| | 3.20 | Events Since Balance Sheet Date | 20 |
| | 3.21 | Brokers | 21 |
| | 3.22 | Disclosures | 22 |
| | 3.23 | Underground Storage Tanks; PCB's | 23 |
| | 3.24 | Pension and Benefit Matters | 23 |
| | 3.25 | Intellectual Property | 29 |
| 4. | Representations and Warranties of Cyprus | | 30 |
| | 4.1 | Organization and Existence | 30 |
| | 4.2 | Authority and No Violations | 30 |
| | 4.3 | Brokers | 31 |
| | 4.4 | Purchase for Investment | 31 |
| | 4.5 | Salaried Pension Plan | 31 |
| 5. | Covenants | | 32 |
| | 5.1 | Assumption of Obligations | 32 |
| | 5.2 | Windsor and Western Obligations | 32 |
| | 5.3 | Due and Uncollected Receivables; Petty Cash | 33 |
| | 5.4 | Change of Ownership | 33 |
| | 5.5 | Corporate Records | 33 |
| | 5.6 | Employee Matters | 33 |

AG8805B07

TABLE OF CONTENTS (Continued)

| Section | | | Page |
|---|---|---|---|
| | 5.7 | Tax Matters Agreement | 41 |
| | 5.8 | Tax Liabilities and Refunds | 41 |
| | 5.9 | Insurance | 42 |
| | 5.10 | Articles and Bylaws | 43 |
| | 5.11 | Financial Statements of Windsor and Western | 43 |
| | 5.12 | Sale of Real Property and Personal Property | 44 |
| | 5.13 | Permits | 44 |
| | 5.14 | Banking and Personnel Matters | 44 |
| | 5.15 | Additional Permits | 45 |
| | 5.16 | Railroad Right-of-Way | 48 |
| 6. | Access to Records | | 50 |
| | 6.1 | Cyprus' Access | 50 |
| | 6.2 | J & J's Access | 51 |
| 7. | Closing | | 52 |
| 8. | Mutual Conditions Precedent to Closing | | 52 |
| | 8.1 | No Injunctions | 53 |
| | 8.2 | Approvals; Consents | 53 |
| | 8.3 | Board Approval | 53 |
| | 8.4 | Due Diligence | 54 |
| | 8.5 | Talc Supply Agreement | 54 |
| | 8.6 | Tax Matters Agreement | 55 |
| | 8.7 | Roger Miller Agreement | 55 |
| 9. | Conditions to Obligations of Cyprus | | 55 |
| | 9.1 | Representations and Warranties True | 55 |
| | 9.2 | No Adverse Change | 56 |
| | 9.3 | No Loss | 56 |
| | 9.4 | Certificates | 56 |
| | 9.5 | Opinion of Counsel | 56 |
| | 9.6 | Resignations | 57 |
| | 9.7 | Stock Certificates | 57 |
| | 9.8 | J & J Certificate of Good Standing | 58 |
| | 9.9 | Windsor Certificate of Good Standing | 58 |
| | 9.10 | Western Certificate of Good Standing | 58 |
| | 9.11 | Release of Escrowed Funds | 58 |
| 10. | Conditions to Obligations of J & J | | 58 |
| | 10.1 | Payment | 59 |
| | 10.2 | Representations and Warranties True | 59 |
| | 10.3 | Certificate | 59 |
| | 10.4 | Opinion of Counsel | 59 |
| 11. | Survival and Indemnification | | 60 |
| | 11.1 | Survival | 60 |
| | 11.2 | Indemnification by J & J | 61 |

-ii-

AG8805B07

<u>TABLE OF CONTENTS</u> (Continued)

<u>Section</u>                                                                    <u>Page</u>

        11.3    Indemnification by Cyprus......................    62
        11.4    Indemnification Procedure; Defense.............    63
        11.5    Exclusive Remedy...............................    64

12.   Operation of Business....................................    64

13.   Miscellaneous............................................    65
        13.1    Parties in Interest; Assignment................    65
        13.2    Expenses.......................................    66
        13.3    Confidentiality................................    66
        13.4    Notices........................................    67
        13.5    Further Assurances.............................    68
        13.6    Entire Agreement...............................    68
        13.7    Modification...................................    68
        13.8    Delay..........................................    69
        13.9    Governing Law..................................    69
        13.10   Severability...................................    69
        13.11   No Merger......................................    69
        13.12   Obligations of Windsor and Western.............    70
        13.13   Headings.......................................    70
        13.14   Mutual Negotiation.............................    71

<u>EXHIBITS</u>

Exhibit A    1987 Balance Sheet
Exhibit B    Debt Instruments
Exhibit C    Undisclosed Liabilities
Exhibit D    Personal Property
Exhibit E    Real Property
Exhibit F    Transfers of Real Property and Personal Property
Exhibit G    Environmental Matters
Exhibit H    Permits
Exhibit I    Litigation
Exhibit J    Contracts
Exhibit K    Customers
Exhibit L    Insurance and Bonds
Exhibit M    Banking and Personnel Matters
Exhibit N    Encumbrances
Exhibit O    Transfers
Exhibit P    Underground Storage Tanks; PCB's
Exhibit Q    Employee Matters
Exhibit R    Patents, Trademarks, Trade Names and Licenses
Exhibit S    License Agreements
Exhibit T    Tax Matters Agreement
Exhibit U    Letter of Intent
Exhibit V    Talc Supply Agreement
Exhibit W    Release of Escrow Instructions
Exhibit X    Escrow Agreement
Exhibit Y    Confidentiality Agreement

AG8805B07

## AGREEMENT

**THIS AGREEMENT** is made this sixth day of January, 1989 (the "Agreement") by and between Cyprus Mines Corporation, a Delaware corporation ("Cyprus"), and Johnson & Johnson, a New Jersey corporation ("J & J").

## W I T N E S S E T H:

**WHEREAS,** J & J is the owner of all of the issued and outstanding shares of the capital stock of Windsor Minerals Inc., a Vermont corporation ("Windsor")(which capital stock shall hereinafter be referred to as the "Windsor Stock");

**WHEREAS,** Windsor is the owner of all of the issued and outstanding shares of the capital stock of Western Source Inc., a California corporation ("Western")(which capital stock shall hereinafter be referred to as the "Western Stock");

**WHEREAS,** J & J desires to sell and deliver all of the Windsor Stock to Cyprus, and Cyprus desires to purchase and receive all of said Windsor Stock from J & J, upon the terms and conditions provided herein; and

**WHEREAS,** J & J and Cyprus desire to enter into a Talc Supply Agreement (as such term is defined in Section 8.5 hereof), wherein Windsor agrees to sell and deliver, and J & J agrees to purchase and receive, talc pursuant to the terms and conditions set forth in the Talc Supply Agreement.

-1-

AG8805B07

NOW, THEREFORE, IN CONSIDERATION of the rights, obligations and covenants set forth herein, the parties hereby agree as follows:

1.    <u>Sale of Stock</u>.    At the Closing (as such term is defined in Section 7 hereof), J&J shall sell, assign and transfer to Cyprus, and Cyprus shall purchase, receive and accept, the Windsor Stock.   In addition, J & J  and Cyprus, or affiliates of J & J and Cyprus, shall enter into a Talc Supply Agreement (as such term is defined in Section 8.5 hereof) as of the Closing Date (as such term is defined in Section 7 hereof).

2.    <u>Purchase Price and Payment</u>.

2.1    <u>Base Purchase Price</u>.   Subject to adjustment as provided in Section 2.2 hereof, as consideration for the execution of the Talc Supply Agreement by J&J or affiliates of J&J, and the exchange of all of the issued and outstanding shares of Windsor Stock, Cyprus agrees to pay to J&J the amount of Thirty-Seven Million Five Hundred Thousand Dollars ($37,500,000) (the "Base Purchase Price").   Payment of the Base Purchase Price shall be made at the Closing by Cyprus to J&J by wire transfer of immediately available funds to J&J's Account Number 910-4-00640 at Chase Manhattan Bank N.A., 1 Chase Manhattan Plaza, New York, NY 10081 (A.B.A. Number 021000021).

AG8805807

2.2   Adjustment of Base Purchase Price.   If, at the Closing Date (as such term is defined in Section 7 hereof), the Net Worth (as such term is defined in this Section 2.2) of Windsor and Western, as determined by the agreement of the parties hereto, and as represented on the adjusted balance sheet dated as of the Closing Date (the "Closing Balance Sheet"), is less than or greater than the Net Worth represented in the adjusted balance sheet dated December 31, 1987, attached hereto as Exhibit "A" and by this reference incorporated herein (the "1987 Balance Sheet"), then, on a date not later than sixty (60) days following the Closing Date (the "Settlement Date"), the Base Purchase Price likewise shall be reduced (or increased, as may be applicable) on a dollar-for-dollar basis by the amount of such difference; provided, however, that the adjustment for gross property, plant, and equipment capital expenditures (as represented in the line item entitled "Fixed Assets - Property Plant - Equipment" in Exhibit "A") during the period from December 31, 1987 to the Closing Date shall be limited to One Million Six Hundred Thousand Dollars ($1,600,000). The amount of any net increase in Net Worth as of the Closing Date shall be paid by Cyprus to J&J on the Settlement Date by wire transfer in immediately available funds in accordance with the provisions of Section 2.1 hereof, and the amount of any net decrease in Net Worth as of the Closing Date shall be paid by J & J to Cyprus on the Settlement Date by wire transfer of immediately available funds to Cyprus Minerals Company's Account Number 2-024604 at

-3-

Pittsburgh National Bank, Pittsburgh, Pennsylvania (A.B.A. Number 043000096). The foregoing adjustment, if any, shall be made as of the Closing Date and shall include interest from the Closing Date to the Settlement Date at the prime interest rate quoted by Chemical Bank, New York, New York on the Closing Date.

Cyprus shall have the right to audit the Closing Balance Sheet and recent profit and loss statements to ensure their conformity with generally accepted accounting principles applied on a consistent basis. A draft of the Closing Balance Sheet will be provided by J&J to Cyprus no later than January 31, 1989 to use as a basis for such audit. If the parties are unable to agree on the Net Worth as of the Closing Date, then the matter shall be submitted to a mutually agreeable national certified public accounting firm, and the parties shall be bound by such firm's determination, with costs to be shared equally between the parties.

As used in this Agreement, the term "Net Worth" shall mean reported assets of Windsor and Western, excluding cash and temporary investments (except for petty cash accounts as noted in Exhibit "A") which shall be transferred to J&J at the Closing, less all of Windsor's and Western's reported liabilities (excluding certain liabilities as noted in Exhibit "A").

-4-

3.    Representations and Warranties of J & J.    J&J hereby represents and warrants to Cyprus as set forth in this Section 3, which representations and warranties shall be true and correct as of the Closing Date.    Any disclosure contained in this Agreement or in any Exhibit attached hereto and incorporated herein shall suffice for disclosure of the same information required to be disclosed in any other Exhibit attached hereto and incorporated herein.

3.1    Organization and Existence.

(a)    J&J.    J&J is a corporation duly organized, validly existing and in good standing under the laws of the State of New Jersey, and has the corporate power to own its property and to carry on its business as presently conducted by it.

(b)    Windsor.    Windsor is a corporation duly organized, validly existing and in good standing under the laws of the State of Vermont, and has the corporate power to own its property and to carry on its business as presently conducted by it.    Windsor is duly qualified and in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary.

AG8805B07

(c)    **Western**.  Western is a corporation duly organized, validly existing and in good standing under the laws of the State of California, and has the corporate power to own its property and to carry on its business as presently conducted by it.  Western is duly qualified and in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it make such qualification necessary.

3.2   **Articles and Bylaws**.  The copies of the Articles of Association and Bylaws of Windsor, and the Articles of Incorporation and Bylaws of Western, which have heretofore been furnished by J&J to Cyprus, are true, correct and complete copies thereof and include all amendments to the date hereof.

3.3   **Minute Books and Stock Certificate Books and Records**.  The minute books of Windsor and Western contain a true and correct record of all material corporate action taken at the meetings of shareholders and directors and committees thereof. The stock certificate books and records of Windsor and Western accurately reflect the ownership of the Windsor Stock and the Western Stock by J&J and Windsor, respectively, and in the amounts set forth in Section 3.4 hereof.

-6-

3.4    **Capitalization**.    Windsor has authorized capital stock consisting of fifty thousand (50,000) shares of capital stock, par value One Hundred Dollars ($100) per share, of which forty thousand seven hundred and fifty (40,750) shares are issued and outstanding.  Western has authorized capital stock consisting of two million (2,000,000) shares of capital stock, without par value, of which one million (1,000,000) are issued and outstanding.  J&J and Windsor own and hold beneficially and of record, the entire right, title and interest in and to the shares of Windsor Stock and Western Stock, respectively, set forth above, free and clear of any claim, suit, proceedings, call, commitment, voting trust, proxy, restriction, limitation, security interest, pledge, lien or encumbrance of any kind or nature whatsoever, and J&J and Windsor have full power and authority to transfer and dispose of the Windsor Stock and Western Stock, respectively, to Cyprus, such stock now and on the Closing Date constituting, in the aggregate, all of the issued and outstanding shares of capital stock of Windsor and Western. All of such issued and outstanding shares of Windsor Stock and Western Stock have been duly authorized and validly issued, and are fully paid and non-assessable.  There are no outstanding options, warrants, rights, calls, commitments, conversion rights or other agreements of any character providing for the purchase or issuance of any additional shares of capital stock of Windsor

-7-

or Western.    There are no liens or encumbrances upon any shares of Windsor Stock or Western Stock, and there are no limitations or restrictions of any kind on the right of J&J or Windsor to sell the Windsor Stock or Western Stock, respectively, in accordance with the terms of this Agreement.

3.5    **Authority and No Violations.**    J&J has full power, corporate or otherwise, to enter into, deliver and perform this Agreement and to consummate the transaction contemplated herein.    The execution, delivery, and performance of this Agreement by J&J has been duly authorized by all requisite corporate action.    This Agreement has been duly executed and delivered by J&J; and, assuming due authorization, execution, and delivery by Cyprus, constitutes the legal, valid and binding obligation of J&J.    The execution and delivery of this Agreement does not, and the consummation of the transaction contemplated herein shall not:  (i) violate any provision of the charters or Bylaws of J&J, Windsor or Western; (ii) to the knowledge of J&J, Windsor and Western, require the approval, consent or authorization of or notice to any federal, state or local governmental authority other than the approval required by the Hart-Scott-Rodino Antitrust Improvements Act of 1976; or (iii) materially violate, breach, terminate, constitute a default under, or accelerate the maturity of, or result in the creation of any lien upon any material properties or assets of J&J,

AG8805B07

Windsor or Western pursuant to, any loan or similar agreement, contract, mortgage, deed of trust, note, lien, license, permit, lease, instrument, order, judgment, decree, statute, law, or regulation to which J&J, Windsor or Western, or any of them, are a party, or by which J&J, Windsor or Western, or any of them, are bound or to which any of the property utilized by Windsor or Western is subject. Except as described on Exhibit "B", attached hereto and by this reference incorporated herein, neither J&J, nor Windsor, nor Western is a party to, or otherwise subject to any provision contained in any instrument evidencing indebtedness of Windsor or Western, any agreement relating thereto or any other contract or agreement (including their charters) which restricts or otherwise limits the incurring of debt.

   3.6 <u>Interest in Other Entities</u>. Other than Western, Windsor has no subsidiaries and no equity interest in any other corporation, joint venture, partnership or other entity. Western has no subsidiaries and no equity interest in any corporation, joint venture, partnership or other entity. Windsor and Western have not contracted, nor are they otherwise under any obligation by operation of law or otherwise, to purchase or subscribe for any interest in, loan monies to, or in any way make investments in any other person or entity.

AG8805B07

3.7    <u>Financial Statements of Windsor and Western.</u>
The 1987 Balance Sheet fairly presents the combined financial
position of Windsor and Western as of the date of the 1987
Balance Sheet, and has been prepared from financial statements
which were prepared in conformity with generally accepted
accounting principles consistently applied.    All financial
obligations, including without limitation, tax liabilities of
Windsor and Western, have been paid or provided for in the 1987
Balance Sheet, subject to audit by the appropriate taxing
authorities.    There has been no material adverse change in the
financial condition, assets or liabilities of Windsor or Western
from the date of the 1987 Balance Sheet to the date hereof.
Since the date of the 1987 Balance Sheet, Windsor and Western
have conducted their businesses in a normal and customary manner,
except as required to consummate the transaction contemplated
herein, and except as requested by Cyprus.    Since April 24, 1968,
in the case of Windsor, and since June 25, 1979, in the case of
Western, neither Windsor nor Western has issued any shares,
warrants or options respecting its stock, or distributed any
dividend, capital, surplus or profit with respect to its shares,
except in the ordinary course of the business of J & J, Windsor
and Western.    The books and records of Windsor and Western from
which the 1987 Balance Sheet was prepared properly and accurately
record the transactions and activities which they purport to
record.

-10-

AG8805B07

3.8    <u>Undisclosed Liabilities</u>.    Neither Windsor nor Western have any liabilities, debts, obligations or claims against them of any kind, whether accrued, absolute, contingent or otherwise which are known or which should be known to Windsor and/or Western as a result of its or their operation of their business in the ordinary and prudent course, and which exceed Fifty Thousand Dollars ($50,000) in the aggregate, except:    (i) as and to the extent reflected in the 1987 Balance Sheet; (ii) as specifically disclosed in Exhibit "C" attached hereto and by this reference incorporated herein, or as otherwise described or disclosed in this Agreement; and (iii) as incurred, consistent with past practices, in the ordinary course of their businesses since the date of the 1987 Balance Sheet.    Except as disclosed herein, including any Exhibits hereto, neither Windsor nor Western, nor J&J on behalf of Windsor or Western, has guaranteed or become surety for or assumed any debt, obligation or dividend of any person or entity (other than by endorsements made in the ordinary course of business in connection with the deposit of an item for collection, or in connection with any intercompany agreements between Windsor and Western).

3.9    <u>Tangible Personal Property</u>.    Windsor and Western have good title to all of the tangible personal property owned by Windsor or Western reflected on their books and records, as more

-11-

specifically described in Exhibit "D" attached hereto and by this reference incorporated herein, and Windsor and Western own or lease such tangible personal property (the "Personal Property") free and clear of all liens and encumbrances, except for liens for ad valorem and property taxes not yet due and payable, purchase money security interests arising in the ordinary course of the business of Windsor and Western, and liens and encumbrances which are not materially adverse or do not materially interfere with the present and continued use of such tangible personal property in the ordinary course of the business of Windsor and Western.  Windsor and Western are entitled to possession of their material leased tangible personal property, with all such leases being valid and in full force and effect, and such leases are not in default as to payment of rent, royalty or otherwise.  True, correct and complete copies of such leases have heretofore been delivered by Windsor and Western to Cyprus.  With respect to certain equipment owned by Windsor known as the "Shear Disc," such equipment is: (i) in good condition and repair; and (ii) suitable for use in the processing of talc products meeting those specifications more specifically described in Section 6 of the Talc Supply Agreement (as such term is defined in Section 8.5 hereof) in quantities sufficient to meet Windsor's obligation to supply the talc requirements of Buyer (as such term is defined in the Talc Supply Agreement) described in Sections 3(a) and 3(c) of the Talc Supply Agreement.

AG8805B07

3.10  <u>Real Property</u>.  Windsor and Western own or lease certain real property or interests as more specifically described in Exhibit "E" attached hereto and by this reference incorporated herein, subject only to those liens, encumbrances, limitations, exceptions and reservations set forth in Exhibit "E" (the "Real Property").  Windsor and Western warrant that no material failings, defects or infirmities of title to the Real Property have been created by Windsor or Western since the Real Property was conveyed or leased to Windsor or Western, and that Windsor and Western, respectively, have good and marketable title thereto.  True, correct and complete copies of the deeds and leases to the Real Property have heretofore been delivered by Windsor and Western to Cyprus.  Said leases are valid and binding and in full force and effect and are not in default as to the payment of rents and royalties, and are not in material default of other obligations thereof.  Except as noted in Exhibit "E", none of the Real Property is so-called "Glebe Land", and no payment of rent, royalty or otherwise is in default as to any such "Glebe Land".  The leased and owned real property and interests of Windsor and Western are without any material latent adverse conditions or characteristics which are known or which should be known to Windsor or Western as a result of its or their operation of their business in the ordinary and prudent course, and constitute all of the leased and owned real property required to operate the business of Windsor and Western.

-13-

3.11 **Transfers of Real and Personal Property**. Except as set forth on Exhibit "F" attached hereto and by this reference incorporated herein, none of the Real Property or Personal Property, nor any interest therein, necessary to the conduct of the present business of Windsor and Western has been sold, conveyed, leased, subleased or otherwise transferred to any third party since the date of the 1987 Balance Sheet.

3.12 **Environmental Matters**. Except as disclosed in Section 5.15 and in Exhibit "G", attached hereto and by this reference incorporated herein, Windsor and Western: (i) are currently in compliance with all applicable environmental laws, and have obtained all permits and other authorizations needed to operate their facilities; (ii) have not violated any applicable environmental law; and (iii) are unaware of any present requirements of any applicable environmental law which is due to be imposed upon either of them which will materially increase their cost of complying with the environmental laws. In addition: (a) all past on-site generation, treatment, storage and disposal of waste, including hazardous waste, by Windsor and Western was done in compliance with the then- or currently-applicable environmental laws, or is grandfathered in the event that no law or regulation was applicable to Windsor or Western at the time of such activities; and (b) all past off-site treatment, storage and disposal of waste, including hazardous waste, generated by Windsor and Western was done in compliance with the then- or currently-applicable environmental laws. As used in

-14-

AG8805807

this Agreement, the term "environmental laws" include but are not limited to any federal, state or local law, statute, charter or ordinance, and any rule, regulation, binding interpretation, binding policy, permit, order, court order or consent decree issued pursuant to any of the foregoing, which pertains to, governs or otherwise regulates any of the following activities, including without limitation: (a) the emission, discharge, release or spilling of any substance into the air, surface water, groundwater, soil or substrata; and (b) the manufacturing, processing, sale, generation, treatment, storage, disposal, labeling or other management of any waste, hazardous substance or hazardous waste; and the terms "Waste," "Hazardous Substance," and "Hazardous Waste" include any substance defined as such by any applicable environmental law.

3.13  **Permits and Compliance with Other Laws.** Except as described in Sections 5.15 and 5.16 and as described on Exhibit "H" attached hereto and by this reference incorporated herein, Windsor and Western are and have been in compliance in all respects with all laws, statutes, rules, regulations, orders and engineering standards of, and have secured or applied for all necessary permits, franchises, authorizations and licenses issued by, federal, state, local and foreign agencies and authorities, including all required "Act 250" permits and licenses (collectively, the "Permits"), free from burdensome restrictions threatening the ability of Windsor or Western to operate their businesses as presently conducted, applicable to their

AG8805807

businesses, properties and operations (including, but not limited to, those concerned with control of foreign exchange, energy, environmental protection and pollution control, franchising and other distribution arrangements, antitrust and trade regulation, civil rights, labor and discrimination, safety and health, zoning and land use), the violation of which (or, in the case of necessary permits, authorizations or licenses, the failure to secure) could have a material adverse effect on the business of Windsor or Western.  With respect to Permits applied for as of the Closing Date, J&J, Windsor and Western are unaware of any fact, circumstance or reason why such Permit applied for is not likely to be issued.  A complete list of all such Permits, is included in Exhibit "H".  Such list constitutes all of the Permits required to operate the business of Windsor and Western, as currently conducted.  All of the Permits listed on Exhibit "H" are valid and are in full force and effect.  Exhibit "H" further includes a schedule of all notices of violation received within the past five (5) years with respect to each permit, license or other authorization listed on Exhibit "H".  True, correct and complete copies of the permits, authorizations and licenses, or the applications therefor, have heretofore been delivered by J&J to Cyprus.

3.14  Litigation and Proceedings.  Except as specifically described in Exhibit "I", attached hereto and by this reference incorporated herein, there are no claims or investigations, actions at law or equity, arbitrations or

-16-

judicial or administrative proceedings pending or, to the knowledge of J&J, threatened against or which would materially and adversely affect Windsor and/or Western, or their operations or assets, by or before any court, governmental department, agency, mediator, arbitrator or other person or instrumentality; and except as more specifically described in Exhibit "I", Windsor and Western are not subject to, or in default under, any court or administrative order, writ, injunction or decree applicable to Windsor or Western.

3.15 **Contracts.** All material contracts and agreements, oral and written, to which Windsor and/or Western are a party or are parties, or by which either or both are bound, are more specifically described in Exhibit "J", attached hereto and by this reference incorporated herein. Windsor and Western are not in material breach or default under any of such contracts. J&J has heretofore delivered to Cyprus: (a) true, correct and complete copies of each written contract and agreement listed in Exhibit "J", including all amendments or modifications thereto; and (b) a written summary of all oral contracts described in Exhibit "J".

3.16 **Customers.** Attached hereto and by this reference incorporated herein as Exhibit "K" is a true and correct list setting forth each customer of Windsor and Western, the purchases of which from Windsor or Western equaled or

-17-

exceeded five percent (5%) of the revenues of Windsor or Western, respectively, for the calendar year ended December 31, 1987.

3.17  _Taxes_.    Windsor and Western have timely and properly filed all federal, state, local, foreign and other tax returns which they are or were required to file, including but not limited to, income, profits, franchise, sales, use, occupation, property, excise, ad valorem and payroll (including employee taxes withheld), and have paid or provided for the payment in full of all taxes, including penalties and interest, if any, and neither the Internal Revenue Service nor any other taxing authority is asserting against Windsor or Western, or, to the best knowledge of J&J, threatening to assert against Windsor or Western, any deficiency or a claim for additional taxes, interest or penalties, subject to audit by any appropriate taxing authority.    The Internal Revenue Service has examined Windsor's and Western's federal income tax returns for all years up to and including the year ended December 31, 1982, and has finally determined all taxes, penalties and interest due thereon, all of which have been paid.

3.18  _Insurance and Bonds_.    Exhibit "L", attached hereto and by this reference incorporated herein, is a true and correct schedule listing all surety and other bonds to which Windsor and/or Western are a party, or to which J & J is a party on behalf of Windsor and/or Western, and all policies of liability (excluding excess coverage policies) and workers'

-18-

compensation insurance, from which coverage has been extended to Windsor and/or Western. Exhibit "L" also includes a true and correct schedule listing all non-product liability retentions which potentially could become the responsibility of Windsor and/or Western, and a true and correct schedule listing all claims made during the past five (5) years against any captive insurance underwritten or reinsured in whole or in part by J&J or its affiliates, which claim relates to the business or employees of Windsor or Western. All policies and bonds have included Windsor and Western as additional insureds since the date of J&J's acquisition or incorporation thereof. To the best knowledge of J&J, Windsor and Western, no claim has been made, or notice given, and there exists no ground other than as a matter of law, to cancel or avoid any of said policies or bonds or to reduce the coverage provided thereby. All of said insurance policies and bonds which are now in effect shall continue to remain in full force and effect to and including the Closing Date. Copies and summaries of all such insurance policies, sureties and other bonds have been made available to Cyprus prior to the Closing.

3.19 **Banking and Personnel Matters.** Exhibit "M", attached hereto and by this reference incorporated herein, is a true and correct schedule setting forth as of the date hereof: (i) a list of all banks and other financial institutions (with draft and account numbers) in which Windsor or Western has an account or safe deposit box, and of all brokerage firms and other

AG8805807

entities and persons holding funds or investments of Windsor or Western and the names of all persons authorized to draw thereon or have access thereto; (ii) the names of all incumbent directors and officers of Windsor and Western; (iii) the names, job designations, and locations of all consultants, distributors, sales agents, freight or product brokers, or lobbyists of Windsor or Western, or any other agent of Windsor or Western receiving an annual remuneration (including, without limitation, cash, fringe benefits, bonuses, fees or other non-cash compensation of any kind) of at least Thirty Thousand Dollars ($30,000), the current remuneration of each, including fringe benefits, and the basis for determining such remuneration if other than a fixed salary rate; and (iv) the names of all persons holding powers of attorney from Windsor and Western and a summary statement of the terms thereof.

3.20  <u>Events Since 1987 Balance Sheet Date</u>. Since the date of the 1987 Balance Sheet, to the date hereof, except as otherwise disclosed in any Exhibit attached to this Agreement or otherwise described, provided for or permitted under this Agreement, neither Windsor nor Western, nor J&J on behalf of Windsor or Western, has:  (i) issued or authorized the issuance of any stock, bonds or other corporate securities or authorized any split or any other recapitalization; (ii) discharged or satisfied any lien or encumbrance or paid any obligation or liability (absolute or contingent) other than the current liabilities shown on the 1987 Balance Sheet, and current

liabilities incurred since the date of the 1987 Balance Sheet in the ordinary course of business; (iii) declared or made any payment or distribution, or purchased or redeemed any of the stock of Windsor or Western; (iv) mortgaged, pledged or subjected to any lien or other encumbrance any of their assets or properties, tangible or intangible, except in the ordinary course of business and set forth on Exhibit "N" attached hereto and by this reference incorporated herein; (v) sold, transferred, assigned, removed or granted any rights with respect to any of its manufacturing assets, properties, tangible or intangible, or its business, or cancelled or compromised any of its debts or claims, except in the ordinary course of business and set forth on Exhibit "O" attached hereto and by this reference incorporated herein; (vi) suffered any extraordinary loss or waived any rights of material value; (vii) entered into any transaction not in the ordinary course of business; or (viii) agreed to do any of the foregoing.

3.21  **Brokers.**  Neither J&J, nor Windsor, nor Western has engaged or used the services of a broker, finder, or other similar person in connection with the transaction contemplated herein; and no person shall be entitled to a brokerage commission, finder's fee, or like payment in connection with this Agreement or in connection with the consummation of the transaction contemplated herein, based upon the actions of J&J, Windsor or Western, or any of them, or the actions of their

-21-

employees,    officers,    directors,    agents,    contractors    or
affiliates.

3.22  **Disclosures**.  J&J  has  made  available  to  Cyprus
during  Cyprus'  due  diligence  investigation,  or  has  disclosed  in
this  Agreement  and  the  Exhibits  attached  hereto,  all  matters
involving  Windsor  and  Western  which  J&J  reasonably  believes  have
or  in  the  future  will  have  an  adverse  effect  on  Windsor  and
Western,  or  the  businesses,  conditions  or  prospects  of  either,  or
which  is  necessary  for  a  full  understanding  of  the  financial
condition  and  operations  of  Windsor  and  Western.   Neither  this
Agreement  nor  any  document,  certificate  or  statement  furnished  or
to  be  furnished  to  Cyprus  by  or  on  behalf  of  J  &  J,  Windsor  and
Western  in  connection  with  the  transactions  provided  for  herein
contains  or  will  contain  any  untrue  statement  of  material  fact  or
omits  or  will  omit  to  state  a  material  fact  necessary  in  order  to
make  the  statements  contained  herein  or  therein  not  misleading.
With  respect  to  the  representation  made  in  the  immediately
preceding  sentence,  Cyprus  and  J  &  J  recognize  that  certain  of
the  representations  set  forth  in  this  Section  3  are  limited  to
the  best  knowledge  of  the  party  making  the  representation,  or  to
that  information  which  is  known  or  which  should  have  been  known
to  the  party  making  the  representation;  and,  accordingly,  Cyprus
and  J  &  J  agree  that  in  the  event  of  conflict  between  such
representations  and  the  representation  given  in  the  preceding
sentence,  the  more  limited  representation  shall  govern.

AG8805807

3.23  Underground Storage Tanks; PCB's.  Exhibit "P"
attached hereto and by this reference incorporated herein,
constitutes a complete list of underground storage tanks owned by
Windsor and Western.  Such tanks are described by location,
serial or identification number, if any, volume and depth.
Exhibit "P" further includes a complete list of all transformers
or other containers containing polychlorinated biphenyls
("PCB's"), which transformers or other containers are described
by location, serial or identification number, if any, volume and
depth.  Prior to Closing, J&J has provided to Cyprus a copy of
all notifications, permits, applications, authorizations or
licenses required for the ownership, use, repair, maintenance or
removal of such tanks, transformers or containers.  The
ownership, use, repair, maintenance or removal of such tanks,
transformers or containers by Windsor and Western has at all
times complied with all federal, state and local laws and
regulations, as the same have been modified from time to time.


3.24  Pension and Benefit Matters.  (a)  Exhibit Q lists
each "employee benefit plan," as defined in Section 3(3) of the
Employee Retirement Income Security Act of 1974 ("ERISA"), which
(i) is subject to any provision of ERISA, and (ii) is entered
into, maintained, administered or contributed to by Windsor or
Western, covers any employee or former employee of Windsor or
Western, or is a plan under which Windsor or Western has any
liability.  Such plans are hereinafter referred to collectively
as the "Employee Plans."  Each Employee Plan has been maintained

-23-

and administered in substantial compliance with its terms and with the requirements prescribed by any and all statutes, orders, rules, and regulations that are applicable to such Employee Plans. No prohibited transaction or other action or inaction has occurred with regard to such Employee Plans involving an amount in excess of Twenty Thousand Dollars ($20,000.00) which will give rise to liability of Windsor or Western or any officer or director thereof under Title I of ERISA. Each Employee Plan which constitutes an "employee pension benefit plan" as defined in Section 3(2) of ERISA (the "Retirement Plans") is identified as such in Exhibit Q. Each Employee Plan which constitutes a retirement plan subject to Title IV of ERISA (the "Pension Plans") is identified as such on Exhibit Q;

(b) Exhibit Q lists (i) each employment, severance or other similar contract, policy or plan, whether written or oral; and (ii) each contract, policy or plan, whether written or oral, under which Windsor or Western has or may have obligations or liability in excess of Five Thousand Dollars ($5,000.00) providing for insurance coverage (including any self-insured arrangements), disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits, deferred compensation, profit-sharing, bonuses, stock options, stock appreciation, or other forms of incentive compensation or post-retirement insurance, compensation, or benefits (other than state or federally mandated benefits of general applicability to all similarly situated employers); which contract, policy or plan in

AG8805B07

each case, (x) is not an Employee Plan, and (y) is entered into, maintained, administered or contributed to by Windsor or Western, covers any employee or former employee of Windsor or Western, or is a contract, policy or plan under which Windsor or Western has any liability.    Such contracts, policies and plans as are described above are hereinafter referred to collectively as the "Benefit Arrangements."    Each Benefit Arrangement has been maintained and administered in substantial compliance with its terms and with the requirements prescribed by any and all statutes, orders, rules and regulations that are applicable to such Benefit Arrangement.    Except as set forth in Exhibit Q and except as provided by law, by the Collective Bargaining Agreement between Windsor and the Cement, Lime, Gypsum and Allied Workers Division of the Brotherhood of Boilermakers International, AFL-CIO Local and Lodge D449, which expires May 11, 1990 (the "Collective Bargaining Agreement") or by any employment contract identified on Exhibit Q, the employment of all persons presently employed or retained by Windsor or Western is terminable at will;

(c) No Employee Plan is a "multiemployer pension plan" subject to Title IV of ERISA;

(d) Except as otherwise identified in Exhibit Q, no Employee Plan is maintained in connection with any trust described in Section 501(c)(9) of the Code;

(e)    As    of    the    Closing    Date,    no    "accumulated    funding

-25-

deficiency," as defined in Section 412 of the Code, has been incurred with respect to The Johnson & Johnson Retirement Plan for Hourly Employees of Windsor Minerals, Inc. (the "Windsor Hourly Plan") whether or not waived. J & J, Windsor and Western know of no "reportable event" with respect to said plan within the meaning of Section 4043 of ERISA, other than a "reportable event" for which the 30-day notice requirement has been waived under regulations published by the PBGC or announcements of general applicability made by appropriate governmental authorities. Neither Windsor nor Western has incurred any liability under Title IV of ERISA arising in connection with the termination of any plan covered or previously covered by Title IV of ERISA;

(f) J & J, Windsor and Western have no reason to believe that any Retirement Plan that is intended to be qualified under Section 401(a) of the Code is not so qualified, except as administratively permitted by the IRS. Each of the Retirement Plans that is intended to be qualified under Section 401(a) of the Code is the subject of an unrevoked, currently effective favorable determination letter issued by the Internal Revenue Service (the "IRS") as to its tax-qualified status upon which there can be continued reliance, and each such Plan has been administered in a manner that would not adversely affect its qualified status. J & J, Windsor and Western have no reason to believe that the Johnson & Johnson Master Trust (the "J&J Master Trust") maintained under that certain Agreement between J&J and Banker's Trust Company dated March 26, 1981, as amended, the

-26-

AG8805B07

trust forming a part of each Retirement Plan, is not exempt from tax pursuant to Section 501(a) of the Code. The J&J Master Trust has been determined by the IRS to be exempt from tax.

(g) Not used;

(h) Any Employee Plan that is a group health plan as defined in Code Section 213(d) has been administered in accordance with the requirements of Code Section 162(k);

(i) Windsor and Western have made on or before the Closing Date all required contributions on behalf of Windsor and Western employees to each Retirement Plan, excluding the Windsor Hourly Plan, the funding of which is provided for separately in Section 5.6(e), Employee Plan, and Benefit Arrangement for all completed fiscal years including contributions that may not by law have otherwise been required to be made until the due date for filing the tax return for any completed fiscal year.

The employer and employee contributions to the Johnson & Johnson Savings Plan (the "J&J Savings Plan") for all payroll periods completed on or before the Closing Date have been made on or before the Closing Date, or will be transferred thereto in accordance with the usual procedures with respect to the Plan and the terms of the Plan.

Except as disclosed in Exhibit Q, there has been and with respect to Windsor or Western employees, will be, as of the Closing Date,

-27-

no commitment or amendment by J&J, Windsor or Western, whether or not written, that would increase materially the expense of maintaining any Employee Plan or Benefit Arrangement above the level of the expense incurred in respect thereof for the fiscal year ended on December 31, 1987;

(j) J&J has or shall, or has caused or shall cause Windsor and Western to, maintain, hold, and provide Cyprus with true and complete copies of the governing instruments of the Employee Plans and the Benefit Arrangements. J&J has or shall, or has caused or shall cause Windsor and Western to, maintain, hold and make available to Cyprus true and complete copies of all currently existing or applicable (i) governmental filings, (ii) reports, opinions, determinations, and interpretations pertaining thereto, (iii) disclosure documents and notices to participants and beneficiaries thereof, including without limitation summary plan descriptions, (iv) statements and reports of assets, liabilities, or costs thereunder, and (v) other documents or records necessary to the orderly administration of the Employee Plans or Benefit Arrangements. J&J has provided or will provide, or has caused or will cause Windsor and Western to provide, Cyprus with complete age, salary, service and related data as of the Closing Date for employees and former employees of Windsor covered under the Windsor Hourly Plan and for employees of Windsor and Western on the Closing Date covered under the J&J Salaried Plan.

AG8805B07

3.25  Intellectual Property.  Exhibit "R", attached hereto and by this reference incorporated herein, contains a complete list of all patents, trademarks, tradenames and licenses owned by or licensed to Windsor and Western.  Except as set forth in Exhibit "R":  (a) Windsor and/or Western own all such patents, trademarks or tradenames free and clear of all liens, claims and encumbrances of any type whatsoever;  (b) none of the patents, trademarks or tradenames are licensed to any third party; and (c) to J&J's knowledge, there are no infringements by third parties of any of such patents, trademarks or tradenames.  Except as set forth in Exhibit "R", there is no claim, demand or proceeding instituted, pending or, to J&J's knowledge, threatened alleging infringement by Western or Windsor of any patent, trademark or tradename owned by any other party other than Windsor or Western; and to J&J's knowledge, neither Windsor nor Western is infringing any such patent.  Prior to the date hereof, J&J has provided to Cyprus true and correct copies of all patents, trademarks, tradenames and licenses listed in Exhibit "R".  Windsor is not conducting its operations under any tradename not registered with the Vermont Secretary of State.

Exhibit "S", attached hereto and by this reference incorporated herein, contains a complete list of all license agreements whereby Windsor and Western license patents, trademarks, tradenames or other trade secrets or intellectual property of third parties.  Except as described in Exhibit "S", Windsor and Western have the right to use all such patents, trademarks, tradenames or other trade secrets or intellectual

-29-

property, subject only to the royalties or other payments set forth on Exhibit "S". The agreements listed on Exhibit "S" are all of the license agreements necessary to operate the businesses of Windsor and Western, as currently conducted. Prior to the Closing Date, J&J has provided to Cyprus true and correct copies of all license agreements described on Exhibit "S".

4.    **Representations and Warranties of Cyprus**. Cyprus represents and warrants to J&J as follows, which representations and warranties shall be true and correct as of the Closing Date:

4.1    **Organization and Existence**. Cyprus is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the corporate power to carry on its business as presently conducted by it.

4.2    **Authority and No Violations**. Cyprus has full corporate power to enter into, deliver and perform this Agreement and to consummate the transaction contemplated herein. Cyprus' execution, delivery and performance of this Agreement has been duly authorized by all requisite corporate action. This Agreement has been duly executed and delivered by Cyprus; and, assuming due authorization, execution and delivery by the other parties hereto, constitutes Cyprus' legal, valid and binding obligation. The execution and delivery of this Agreement does not, and consummation of the transaction contemplated herein will not: (i) violate any provision of the Articles of Incorporation or Bylaws of Cyprus; or (ii) require, to the best of Cyprus'

-30-

AG8805B07

knowledge, the approval, consent or authorization of any federal, state or local governmental authority other than the approval required by the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

4.3  **Brokers**.  Cyprus has not engaged or used the services of a broker, finder, or similar person in connection with the transaction contemplated herein; and no person shall be entitled to a brokerage commission, finder's fee or like payment in connection with this Agreement or in connection with the consummation of the transaction contemplated herein, based upon the actions of Cyprus or Cyprus' employees, officers, directors, agents, contractors or affiliates.

4.4  **Purchase for Investment**.  Cyprus is acquiring the Windsor Stock for its own account for investment and not with a view toward any resale or distribution thereof, and Cyprus agrees that it will not sell the Windsor Stock in contravention of Section 5 of the Securities Act of 1933, as amended.

4.5.  **Salaried Pension Plan**.  Cyprus has no reason to believe that the Retirement Plan for Salaried Employees of Cyprus Minerals Company (the "Cyprus Salaried Plan") is not qualified under Section 401(a) of the Code, except as administratively permitted by the IRS.  The Cyprus Salaried Plan is the subject of an unrevoked, currently effective favorable determination letter issued by the IRS as to its tax-qualified status upon which there can be continued reliance, and such Plan has been administered in

-31-

a manner that would not adversely affect its qualified status. Cyprus has no reason to believe that the Master Trust (the "Cyprus Master Trust") maintained under the Agreement of Master Trust between Cyprus Minerals Company and Boston Safe Deposit and Trust Company dated August 1, 1988 is not exempt from tax pursuant to Section 501(a) of the Code. The Cyprus Master Trust has been determined by the IRS to be exempt from tax.

5.    Covenants.

5.1    **Assumption of Obligations**.   On the Settlement Date, Cyprus and J&J shall agree upon the Closing Balance Sheet.  All liabilities determined to remain with J & J hereunder shall be the sole responsibility and liability of J & J, and J&J shall promptly pay and discharge all such liabilities as they become due.  Except as otherwise set forth in this Agreement, all other liabilities of Windsor and Western shall remain with Windsor and Western from and after the Closing.

5.2    **Windsor and Western Obligations**.   Prior to the Closing Date, J & J shall cause Windsor and Western to perform the obligations of Windsor and Western hereunder, and shall be solely responsible and liable for each representation made, and each warranty granted, by Windsor and Western, as if J & J had made such representation or granted such warranty itself.

AG8805B07

5.3    <u>Due and Uncollected Receivables; Petty Cash</u>.
Accounts and notes receivable of Windsor and Western which are
more than one hundred and eighty (180) days old as of the Closing
Date shall become the responsibility of J&J and shall be removed
from the Closing Balance Sheet.    Accounts and notes receivable
that are current on the Closing Date, but which become due and
uncollected after one hundred and eighty (180) days following the
Closing Date, shall be sold to J&J for cash at face value,
provided that such amounts exceed Five Thousand Dollars ($5,000)
in the aggregate.    Accounts receivable owed from affiliates of
J&J to Windsor shall be included in the Closing Balance Sheet.
Petty cash accounts existing at the operations of Windsor and
Western shall be included in the Closing Balance Sheet.

5.4    <u>Change of Ownership</u>.    Within thirty (30) days
following the Closing Date, Cyprus shall take all steps
reasonably necessary to notify the customers of Windsor and
Western of the change in ownership of Windsor and Western.

5.5    <u>Corporate Records</u>.    At Closing, J&J shall
provide Cyprus with all of the original corporate records of
Windsor and Western.

5.6    <u>Employee Matters</u>.    (a) Cyprus agrees that
Windsor and Western will accept on the Closing all salaried
employees employed by Windsor or Western respectively upon the
Closing, in the positions held immediately prior to the Closing,
on terms and conditions of employment, including benefit plans,

-33-

which will be consistent with the terms and conditions of employment of Cyprus salaried employees, which the parties understand to be such terms and conditions as Cyprus deems appropriate. Cyprus agrees that Windsor will accept on the Closing all hourly employees employed by Windsor on the Closing in the positions held immediately prior to Closing, on the then current terms and conditions of employment and the obligations attendant thereto. Cyprus agrees that Windsor will assume or retain the existing Collective Bargaining Agreement of Windsor with the Cement, Lime, Gypsum and Allied Workers Division of the Brotherhood of Boilermakers International, AFL-CIO Local and Lodge D449, which expires May 11, 1990 (the "Collective Bargaining Agreement");

(b) Cyprus agrees that Windsor and Western will retain or assume all liabilities and obligations relating to all hourly and salaried employees of Windsor and Western respectively (whether active, inactive, former or retired), their dependents and beneficiaries, including those relating to the Collective Bargaining Agreement, Employee Plans and Benefit Arrangements; provided, however, that, not withstanding the foregoing, after the Closing, J&J, and not Cyprus, Windsor or Western shall be solely liable for and shall pay or provide: (i) pension benefits under the Retirement Plan of Johnson & Johnson and Affiliated Companies (the "J&J Salaried Plan") for all salaried employees of Windsor and Western (whether active, inactive, former or retired) their dependents and beneficiaries; (ii) benefits under the J&J Savings Plan for all active, inactive, former or retired salaried

-34-

AG8805B07

employees of Windsor and Western, their dependents and beneficiaries; (iii) pension benefits, life insurance, medical benefits, supplemental pension benefits, short- and long-term disability benefits and all other benefits for those individuals listed on Exhibit Q hereto; (iv) any and all health care continuation coverage to which any current or former Windsor or Western salaried employee (or a dependent of such) is or becomes entitled in connection with a "qualifying event" (as defined in Code Section 162(k)(3)) occurring on or before the Closing Date; and (v) any and all stock options, stock appreciation, incentive compensation or other such benefits for Windsor and Western employees for periods prior to the Closing. Nothing stated in this Section 5.6(b) shall modify or alter the obligations of Cyprus and J&J to each other contained elsewhere in this Agreement.

In respect of all life insurance, medical, supplemental pension and other benefits (except benefits under the J&J Salaried Plan) for all salaried employees of Windsor and Western who have retired on or before the Closing Date, J&J shall pay or provide such benefits and Cyprus shall fully and promptly reimburse J&J the actual out of pocket identified cost of such benefits on a quarterly basis, in each case following receipt of a statement from J&J specifying such actual cost in reasonable detail. In respect of life insurance, Cyprus shall reimburse J&J for only the amount of any premiums paid by J&J in respect of such salaried retiree. In respect of medical benefits, Cyprus shall reimburse J&J for ASO fees and medical expenses covered under the

-35-

Johnson & Johnson Salaried Health Care Plan. In respect of supplemental pension benefits, Cyprus shall reimburse J&J for benefits paid pursuant to the J & J Supplemental Pension Plan. In respect of all of the above, Cyprus also shall reimburse J&J for the actual cost to J&J of performing the services described above. Cyprus shall have the right to review, during normal office hours and upon reasonable notice, such records of J&J as may be necessary to verify any charges imposed upon Cyprus under this Section. Upon 30 days notice to J&J, Cyprus shall have the right to assume the obligations of any or all of such benefits directly, and to provide or cause an affiliate to provide any or all of such benefits, at which time J&J shall be relieved of its obligations hereunder in respect of such benefit.

J&J shall assist Cyprus by continuing to be responsible for pension payments under and administration of the Windsor Hourly Plan until such time as the related assets and liabilities are transferred to the Cyprus Master Trust.

J&J will keep confidential, and will not disclose to any other person, all confidential information given to J&J by Cyprus, Windsor or Western, or their employees, in order to allow J&J to provide the services contemplated under this Agreement. J&J shall use or disclose such confidential information only as may be necessary in order to provide services hereunder, as otherwise provided by law or required by any government agency, or with the written consent of Cyprus.

-36-

AG8805807

All liabilities of Windsor and Western for medical, dental and life insurance benefiits incurred prior to the Closing Date and presented to J&J or the appropriate agent of J&J for payment on or before the Settlement Date shall be paid by J&J.    Such liabilities not presented to J&J for payment on or before the Settlement Date shall remain the obligations of Windsor and Western;

    (c) Effective as of the Closing, Cyprus will amend or cause to be amended the Cyprus Salaried Plan to include as eligible employees all salaried employees of Windsor and Western who continue as employees of Windsor and Western after the Closing. For each such salaried employee, the accrued benefits attributable to the period of service of such employee with J&J or a subsidiary of J&J on and prior to the Closing Date shall be determined under the terms of the J&J Salaried Plan as in effect on the Closing Date, on the basis of the compensation of such employee on and before the Closing Date and service of such employee through the last day of the calendar month in which the Closing Date occurs, and without regard to any compensation of such employee after the Closing Date and service of such employee after the last day of the calendar month in which the Closing Date occurs.    For each such salaried employee, the accrued benefits attributable to the period of service of such employee with Cyprus or a subsidiary of Cyprus following the Closing shall be determined under the terms of the Cyprus Salaried Plan or a

-37-

successor plan, if any, on the basis of the compensation of such employee after the Closing Date and service after the last day of the calendar month in which the Closing Date occurs and without regard to any compensation and service of such employee on or before the Closing Date; provided, however that each such employee shall receive credit under the Cyprus Salaried Plan or a successor plan, if any, for purposes of vesting and determination of eligibility to participate and to receive benefits, but not for purposes of benefit accrual, for all service of such employee on or before the Closing in the employment of J&J or any affiliated company of J&J that was credited for such purposes under the J&J Salaried Plan;

(d) effective as of the Closing Date, Cyprus agrees to amend the Cyprus Minerals Company Savings Plan and Trust (the "Cyprus Savings Plan") to include as eligible employees all active salaried employees of Windsor and Western on the Closing Date and to credit, only for purposes of vesting and determination of eligibility to participate in the Cyprus Savings Plan, all service of such employees before the Closing Date in the employment of J&J and any affiliated company of J&J that was credited for such purposes under the J&J Savings Plan.

J&J shall cause the account balances in the J&J Savings Plan of all active salaried employees of Windsor and Western on the Closing Date to be distributed in accordance with the terms of that Plan, the provisions of applicable law and the election of

-38-

the participant or beneficiary. J&J shall provide such individuals with the required 402(f) notice;

(e) Cyprus agrees that Windsor will assume or retain the assets, liabilities and sponsorship of the Windsor Hourly Plan as of the Closing Date. J&J agrees that within 60 days of the Closing Date, J&J will transfer in cash from the J & J Master Trust to the Cyprus Master Trust all assets of the Windsor Hourly Plan, determined in accordance with the usual procedures used under the Johnson & Johnson Master Trust for the determination of the separate shares of a single plan thereunder. Until the date of any segregation of the assets of the Windsor Hourly Plan pursuant to the transfer, such assets shall share pro rata in the investment experience, including expenses, of the J&J Master Trust. Upon segregation, such assets shall be liquidated to cash, and from the date of such liquidation to the date of transfer of possession of the assets will be invested in the Bankers Trust Commingled Short-Term Investment Fund, a qualified fund for qualified plans for which Bankers Trust Company acts as Trustee.

J&J shall cause Windsor and Western to make on or before the Closing Date all required contributions under the Windsor Hourly Plan for all completed fiscal years, including contributions that may not by law have otherwise been required to be made until the due date for filing the tax return for any completed fiscal year. All contributions and payments accrued under the Windsor

AG8805807

Hourly Plan, determined in accordance with prior funding and accrual practices, as adjusted to the extent required to include proportional accruals for service for periods prior to the Closing Date, will be discharged and paid by Windsor to the Plan on or prior to the Closing Date.

In addition, J&J, and not Windsor or Western, shall pay to the Windsor Hourly Plan, on or before the date of the actual transfer of the assets, any amount necessary so that, as of the date of the actual transfer of the assets, the fair market value of the assets of the Windsor Hourly Plan (including for these purposes any accrued but unpaid contributions) equalled or exceeded the present value of all "benefit liabilities" (as defined in ERISA Section 4001(a)(16)) under the Windsor Hourly Plan determined on a termination basis using the assumptions used for reporting purposes in Note 13 to the 1987 corporate financial statements of Windsor and J&J, including without limitation an assumed interest rate of 8.75 percent.

(f)  J&J shall be solely liable and responsible for all claims made by employees of Windsor and Western pursuant to applicable workmen's compensation laws, if such claims arise out of any act, event or occurrence occurring prior to the Closing Date and such claims are filed prior to the Settlement Date. J&J's liability pursuant to the foregoing sentence shall include, without limitation, all costs, damages, expenses and settlements payable after the Closing. Windsor and Western shall retain all

-40-

liability and responsibility for all claims made by their respective employees pursuant to applicable workman's compensation laws if such claims: (i) arise out of any act, event or occurrence occurring on or after the Closing Date; or (ii) arise out of any act, event or occurrence occurring prior to the Closing Date, but were not properly filed on or prior to the Settlement Date.

5.7   **Tax Matters Agreement.**   On or before the Closing Date, Cyprus and J&J shall enter into a Tax Matters Agreement substantially in the form of Exhibit "T", attached hereto and by this reference incorporated herein (the "Tax Matters Agreement"). Cyprus and J&J each acknowledge and confirm the content of the Tax Matters Agreement, and agree to perform all obligations required thereunder.

5.8   **Tax Liabilities and Refunds.**   Any tax liability determined to be due and owing on behalf of Windsor and/or Western, or any tax refund determined to be due and owing Windsor and/or Western, for periods prior to the Closing Date as a result of an audit performed by any taxing authority after the Closing Date, shall be the sole responsibility and liability of, or shall be paid over to, J & J, as the case may be. All Land Gains Tax determined to be due to the Vermont Tax Department as a result of the transaction contemplated herein shall be the sole liability and responsibility of J & J. Prior to the Closing Date, Cyprus and J & J shall negotiate in good faith to determine J & J's

-41-

basis in such Real Property, and the amount of the Base Purchase Price allocable to each parcel of Real Property. Cyprus shall be responsible for performing an appraisal of the Real Property prior to any negotiations between Cyprus and J & J concerning the foregoing.

      5.9   __Insurance__.   Windsor and Western have been included, since the acquisition or incorporation thereof by J&J, as additional insureds on all general liability, employee liability, workers' compensation, and other insurance policies held by J&J. On and after the Closing Date, J&J agrees to use its best efforts to make such coverages and policies (including excess coverage policies) available to Cyprus, Windsor and Western, and their affiliates, up to the limits specified in such policies, and to cooperate with Cyprus and its affiliates in making claims against such policies. In the event of a claim, Windsor and Western shall be responsible for the balance of any applicable deductibles and retentions, and for the amount of any claim or claims made against Windsor or Western in excess of applicable coverage limits, and for the costs of defending any claim or claims made against Windsor or Western to the extent to which such insurance coverages do not cover such costs or do not apply. For the purposes of this Section 5.9, the term "deductibles" shall include the amount of any captive insurance underwritten or reinsured in whole or in part by J&J or its affiliates. To the extent that the amount of any proposed insurance settlement given serious consideration by Cyprus or its

AG8805B07

affiliates, or to the extent that a potential trial judgment, would exhaust the coverage available to J&J, Cyprus and its affiliates agree to permit J&J to participate in such settlement negotiations, or in the defense of such litigation, as the case may be.  Cyprus shall have the final authority in the event of any dispute between J&J and Cyprus concerning the foregoing matters; provided, however, that Cyprus and J&J shall cooperate in the event of litigation against J&J's insurance carriers to establish coverage.  J&J shall be solely liable for its cost in any such litigation to establish coverage.

5.10  **Articles and Bylaws.**  From the date hereof through the Closing Date, Windsor shall not amend its Articles of Association or Bylaws, and Western shall not amend its Articles of Incorporation or Bylaws without the prior written consent of Cyprus.

5.11  **Financial Statements of Windsor and Western.**  On the Settlement Date, the Closing Balance Sheet shall fairly present the combined financial position of Windsor and Western as of the Closing Date, and shall be prepared in conformity with generally accepted accounting principles consistently applied, subject to the adjustments described in Section 2.2 hereof. Between the date hereof and the Closing Date, neither J & J, nor Windsor nor Western shall do or perform any act, or shall omit to act, which act or omission will result in a material adverse change in the financial condition, assets, or liabilities of

-43-

Windsor and Western, and Windsor and Western shall conduct their businesses in the normal, customary manner, except as required to consumate the transaction contemplated herein, and except as requested by Cyprus. In addition, from the date hereof through the Closing Date, neither Windsor nor Western shall issue any shares, warrants, or options respecting its stock, or distribute any dividend, capital, surplus, or profit with respect to its shares, except that Windsor and Western may continue to issue dividends to J&J as is or has been customary in the ordinary course of the business of J&J, Windsor and Western, and as may be necessary or required to eliminate cash and cash equivalents balances above normal petty cash balances existing at Windsor's and Western's operations.

5.12 **Sale of Real Property or Personal Property.** Neither the Real Property or Personal Property, nor any part thereof, nor any interest therein, shall be sold, conveyed, leased, subleased, or otherwise transferred to any third party prior to the Closing Date.

5.13 **Permits.** All Permits which are issued from the date hereof through the Closing Date shall be delivered on the Closing Date by J&J to Cyprus.

5.14 **Banking and Personnel Matters.** There shall be no change in the information set forth in Exhibit "M" from the

-44-

AG8805B07

date hereof through the Closing Date without the prior written consent of Cyprus.

### 5.15  Additional Permits.

(a)    Air Permit.    Windsor discloses that it has not received an amendment (the "Amendment") to its State of Vermont air quality permit (the "State Permit"), which Amendment may be required to operate the most recently constructed talc processing mill at Windsor's Columbia milling facility located in Ludlow, Vermont (hereinafter referred to as the "Gamma Mill"). Shortly after the Closing, Windsor anticipates filing an application with the United States Environmental Protection Agency (the "U. S. EPA") for a federal air quality permit covering the entire Columbia milling facility (the "U. S. Permit"), which Windsor presently believes would supersede or replace the State Permit, and therefore would eliminate the necessity of obtaining the Amendment. Windsor has no reason to believe that the U. S. Permit will not be issued within a reasonable period following application therefor. After the Closing Date, J&J agrees to provide Windsor with all required or necessary assistance to secure the U. S. Permit, or in the event that such effort is unsuccessful, the Amendment. Windsor shall use its best reasonable efforts to minimize the costs and expenses incurred in securing the same, and agrees to pay for the first Ten Thousand Dollars ($10,000) of any such costs and expenses associated therewith incurred following the Closing

AG8805B07

Date.    Windsor and J&J agree to share equally all costs and expenses incurred in securing the U. S. Permit or the Amendment in excess of the first Ten Thousand Dollars ($10,000), until J&J shall have contributed Five Hundred Thousand Dollars ($500,000).    Such costs and expenses shall include, without limitation, all ordinary costs and expenses associated with securing a U. S. Permit or an Amendment, attorneys' and consultants' fees, and all consequential damages attributable to Windsor's failure to secure the same, or attributable to the closure of the Gamma Mill by an appropriate state or federal agency as a result thereof.    After J&J has contributed Five Hundred Thousand Dollars ($500,000), any further costs and expenses shall be the sole responsibility of Windsor.    J&J's obligation of contribution pursuant to this Section 5.15(a) shall survive the Closing for a period of one (1) year; provided, however, that if good faith negotiations between Windsor and the U. S. EPA or the appropriate agency of the State of Vermont shall be ongoing at such time, J&J's obligation of contribution shall continue until the earlier of six (6) months after such good faith negotiations have ceased, or the date upon which the U. S. Permit or the Amendment has issued; and provided, further, that in no event shall J&J's obligation of contribution survive the Closing for a period in excess of three (3) years following the Closing Date.

AG8805807

(b)     **Building Permit**.  Windsor discloses that
the building permit or amendment thereto issued to Windsor dated
June 28, 1988 (the "Building Permit") conditions Windsor's
operations at its milling facility located at Ludlow, Vermont
(hereinafter referred to as the "Columbia Mill"), upon the
employment of not more than twelve (12) employees at the Columbia
Mill, and the entrance to and exit from the Columbia Mill of not
more than thirteen (13) trucks per day.  Windsor, after the date
of the Building Permit and prior to the date of this Agreement,
has:  (i) regularly employed more than twelve (12) employees at
the Columbia Mill; (ii) from time to time permitted the entrance
and exit of more than thirteen (13) trucks per day; and (iii)
notified the appropriate agency of the State of Vermont of its
expectation that the number of employed persons at, and the
number of trucks entering and exiting, the Columbia Mill will
exceed twelve (12) and thirteen (13), respectively.  Windsor has
no reason to believe that any amendment to the Building Permit
allowing such increase, if required and applied for, would not be
issued, or that any other appropriate administrative action
required by the Town of Ludlow will not be forthcoming.  After
the Closing Date, J&J agrees to provide Windsor with all required
or necessary assistance to secure the Building Permit, in the
event that Windsor shall deem the application therefor to be
advisable or required.  Windsor shall use its best efforts to
minimize the costs and expenses incurred in securing the Building
Permit, and agrees to pay for the first Ten Thousand Dollars
($10,000) of any such costs and expenses incurred following the

-47-

Closing Date.  Windsor and J&J agree to share equally all costs
and expenses incurred in securing the same in excess of the first
Ten Thousand Dollars ($10,000), until J&J shall have contributed
Five Hundred Thousand Dollars ($500,000).   Such costs and
expenses shall include, without limitation, all ordinary costs
and expenses associated with securing a Building Permit or other
required administrative action, attorneys' and consultants' fees,
and all consequential damages attributable to Windsor's failure
to secure the same, or attributable to the closure of the
Columbia Mill by an appropriate state or federal agency as a
result thereof.  After J&J has contributed Five Hundred Thousand
Dollars ($500,000), any further costs and expenses shall be the
sole responsibility of Windsor.  J&J's obligation of contribution
pursuant to this Section 5.15(b) shall survive the Closing for a
period of one (1) year; provided, however, that if good faith
negotiations between Windsor and the appropriate agency of the
State of Vermont shall be ongoing at such time, J&J's obligation
of contribution shall continue until the earlier of six (6)
months after such good faith negotiations have ceased or the date
upon which such Building Permit has issued; and provided,
further, that in no event shall J&J's obligation of contribution
survive the Closing for a period in excess of three (3) years
following the Closing Date.

     5.16  **Railroad Right-of-Way.**  In 1974, Windsor, at its
Columbia Mill, constructed a private railroad siding and a
portion of two talc storage silos and a portion of the shipping

-48-

center upon a portion of a railroad right-of-way presently owned by the State of Vermont, which right-of-way adjoins the Columbia Mill.   Although Windsor believes that it had the consent and authority of the Green Mountain Railroad acting under the authority of the State of Vermont to so construct such siding, silos and shipping center, no written side track agreement or other written instrument was obtained from the Green Mountain Railroad or the State of Vermont expressly granting Windsor such rights.   After the Closing Date, J&J agrees to provide Windsor with all required or necessary assistance to secure such side track agreement or other written instrument.   Windsor shall use its best reasonable efforts to minimize the cost and expense incurred in securing such side track agreement or other written instrument, and to avoid the necessity of physically moving the existing silos or other structures from the right-of-way.   The annual fee or lump sum payment given by Windsor as consideration for the rights granted in such side track agreement or other written instrument shall be the sole responsibility of Windsor so long as such annual fee does not exceed Five Thousand Dollars ($5,000) per annum, or so long as such lump sum payment does not exceed Ten Thousand Dollars ($10,000).   J&J agrees to share equally in any consideration payable by Windsor in excess of the foregoing amounts, and further agrees to share equally any cost, loss or damage, including attorneys' fees, consequential damages and the cost of any survey, removal, reclamation or reconstruction, suffered by Windsor as a result of any survey, removal, reclamation or reconstruction required by the State of

-49-

Vermont, or as a result of litigation with the appropriate agency of the State of Vermont; provided, however, that the total of the foregoing contributions by J & J shall not exceed Five Hundred Thousand Dollars ($500,000); and after J & J has contributed a total of Five Hundred Thousand Dollars ($500,000) in accordance with this sentence, any further costs and expenses shall be the sole responsibility of Windsor.    J&J's obligations of contribution and indemnification pursuant to this Section 5.16 shall survive the Closing for a period of one (1) year; provided, however, that if good faith negotiations between Windsor and the appropriate agency of the State of Vermont shall be ongoing at such time, or if Windsor shall be diligently conducting any survey, removal, reclamation or reconstruction required by the State of Vermont at such time, J&J's obligations of contribution and/or indemnification shall continue until this matter is resolved to the mutual satisfaction of Windsor and the appropriate agency of the State of Vermont; and provided, further, that in no event shall J&J's obligations of contribution and/or indemnification survive the Closing for a period in excess of three (3) years following the Closing Date.


6.    Access to Records.


    6.1    Cyprus' Access.    During the period from the August 31, 1988 Letter of Intent, a true and correct copy of which is attached hereto as Exhibit "U" and by this reference is

AG8805B07

incorporated herein, to the Closing, J&J shall afford representatives of Cyprus free access to J&J's, Windsor's and Western's offices, records, files, books of account and tax returns and the records of J&J, Windsor and Western that relate to Windsor's and Western's business and operations (the "Records"). Access to the Records shall be made during normal business hours and upon reasonable advance request from Cyprus. All examinations and inspections shall be subject to the provisions of the Confidentiality Agreement between Cyprus and J & J dated December 18, 1987 (the "Confidentiality Agreement"). No such visit, inspection, examination, excerpting or receipt of information shall affect in any manner any of the representations, warranties, covenants, agreements or stipulations of J&J under this Agreement or constitute any waiver thereof by Cyprus.

6.2  **J & J's Access**.  Within sixty (60) days following the Closing Date, J&J shall deliver to Cyprus the originals or copies, as the parties may agree in each case, of the Records.  J&J shall deliver to Cyprus, in lieu of originals of the records of J&J that relate to the Windsor and Western operations, copies thereof.  J&J shall have the right to make and retain copies of those Records necessary to support the tax returns of Windsor and Western for tax years prior to the Closing Date (the "Tax Records"), and Cyprus shall retain the Tax Records for a period of at least three (3) years after the Closing Date; provided, however, that in the event Cyprus desires not to retain

the Tax Records for more than three (3) years, Cyprus shall deliver the Tax Records to J & J. After the Closing, Cyprus shall provide J&J with access to the assets and operations of Windsor and Western and to persons knowledgeable therewith, and shall give J&J access to those Records retained by Cyprus, and permit J&J to make copies thereof at all reasonable times and upon reasonable prior notice to Cyprus, in order to permit J&J to prepare its tax returns and financial statements, to investigate or defend any indemnity claim under Section 11 hereof and for any other reasonable purpose.

7.    **Closing**. The closing of the transaction contemplated in this Agreement (the "Closing") shall take place at 9:00 a.m. on January 6, 1989 (the "Closing Date"), at the offices of Cyprus in Englewood, Colorado; provided, however, that the parties may, by mutual prior written agreement, accelerate or extend the Closing Date beyond January 6, 1989, in order to obtain such governmental approvals or third party consents as may be reasonably required to consummate the transaction contemplated herein, or for such other good cause as the parties may mutually determine (such date shall also be a "Closing Date").

8.    **Mutual Conditions Precedent to Closing**. The obligations of Cyprus and of J&J pursuant to this Agreement are subject to the satisfaction, at or before the Closing, of all the conditions set forth in this Section 8; provided, however, that

-52-

Cyprus or J&J may waive any or all of such conditions, in whole or in part, at such party's sole discretion.

8.1   No Injunctions.   On the Closing Date, no action or proceeding shall have been instituted or threatened to set aside the transactions provided for herein, and there shall be no effective injunction, writ or temporary restraining order or any order of any nature issued by a court or governmental agency of competent jurisdiction, directing the transaction provided for herein not be consummated as herein provided.

8.2   Approvals; Consents.   Any and all approvals and authorizations of, filings and registrations with, and notifications to any governmental or regulatory authority, and any and all approvals or consents by any third party, required for the execution, delivery and performance of this Agreement by both parties, and the consummation of the transactions contemplated herein, shall have been duly obtained or made and shall be in full force and effect.

8.3   Board Approval.   This Agreement and the transaction contemplated herein shall have been approved by the Board of Directors of Cyprus Mines Corporation and by the Executive Committee of J&J, which Board and which Committee may decline such approval at the sole and exclusive discretion of such Board or Committee, as the case may be, for any reason whatsoever.

-53-

AG8805B07

8.4   **Due Diligence**.   Cyprus shall have completed its due diligence investigation prior to the Closing Date, and shall have verified to its satisfaction:  (i) the quantity, quality and recoverability of the talc reserves owned and operated by Windsor and Western; (ii) the satisfactory physical and operating condition of the Personal Property; (iii) the satisfactory state of title to Personal Property and Real Property; (iv) the risk associated with any actual or threatened litigation to which J&J or any of its affiliates may be a party concerning exposure to talc is, in Cyprus' sole opinion, an acceptable risk; and (v) the talc inventories of Windsor and Western are, in Cyprus' sole opinion, saleable and recoverable and shall be stated on the Closing Balance Sheet at the lower of cost or market.

8.5   **Talc Supply Agreement**.   Cyprus shall not acquire or purchase the Windsor Stock pursuant to this Agreement, and the transaction contemplated herein shall not close, unless, on or before Closing, Cyprus and J&J, or affiliates of Cyprus and J&J, shall have executed a mutually satisfactory Talc Supply Agreement, wherein Cyprus agrees or affiliates of Cyprus agree to supply, and J&J or affiliates of J&J agree to purchase, cosmetic grade talc pursuant to the terms and conditions set forth therein (the "Talc Supply Agreement").   The Talc Supply Agreement shall be in substantially the form attached as Exhibit "V" hereto and by this reference incorporated herein.

AG8805B07

8.6   **Tax Matters Agreement.**  Cyprus shall not acquire or purchase the Windsor Stock pursuant to this Agreement, and the transaction contemplated herein shall not close, unless Cyprus and J&J shall have executed the Tax Matters Agreement on or before the Closing Date.

8.7   **Roger Miller Agreement.**   Cyprus shall not acquire or purchase the Windsor Stock pursuant to this Agreement, and the transaction contemplated herein shall not close, unless Windsor and Mr. Roger N. Miller shall have executed an Employment Agreement providing for Mr. Miller's continued employment by Windsor.

9.   **Conditions to Obligations of Cyprus**.  The obligations of Cyprus hereunder shall be subject to the following conditions, any or all of which may be waived in writing by Cyprus:

9.1   **Representations and Warranties True.**   That each of the representations and warranties of J&J set forth in Section 3 hereof shall be true and correct on and as of the Closing Date with the same effect as if made at such time; and that J&J shall have in all respects performed and complied with each of the agreements, covenants, stipulations, terms and conditions hereof applicable to J&J, including the covenants and agreements set forth in Section 3 hereof.

-55-

9.2    <u>No Adverse Change</u>.    That since the date of the 1987 Balance Sheet, and on or prior to the Closing Date there shall have been no material adverse change in the financial condition, assets or liabilities of Windsor or Western, except for changes in the ordinary course of business.

9.3    <u>No Loss</u>.    That since the date of the 1987 Balance Sheet, and on or prior to the Closing Date, neither Windsor nor Western shall have suffered any loss on account of fire, flood, accident, strike or other calamity which has a material adverse effect upon the combined financial condition or the assets of Windsor and Western, whether or not such loss shall have been covered by insurance.

9.4    <u>Certificates</u>.    That J&J shall have executed and delivered to Cyprus on the Closing Date a certificate, dated the Closing Date, to the effect of each of the provisions of Sections 9.1, 9.2 and 9.3 hereof, and that the President of Windsor and Western shall have executed and delivered to Cyprus on the Closing Date a certificate confirming to the best knowledge, information and belief of such person that such certificate of J&J is true and correct in every respect.

9.5    <u>Opinion of Counsel</u>.    That J&J shall have furnished to Cyprus on the Closing Date an opinion of J&J's General Counsel in form and substance reasonably satisfactory to

-56-

AG8805807

Cyprus, to the effect stated in Sections 3.1, 3.2, 3.3, 3.4, 3.5, and 3.6.

9.6  **Resignations**.    That  J&J  shall  cause  to  be delivered at the Closing the resignations of all of the officers and directors of Windsor and Western, except for those officers and directors continuing to perform services for Windsor and Western after the Closing.   With respect to the employees, if any, of J&J performing services for Windsor and/or Western, who are directly compensated for such services by Windsor and/or Western, J&J shall deliver at Closing and in accordance with Section 5.6 hereof, a relinquishment of all remuneration and benefits accruing to them on and after the Closing Date, and waivers of all rights which they may have against Windsor and Western.

9.7  **Stock Certificates**.    That the certificate or certificates  representing  the  Windsor  Stock  shall  be  in transferable form, duly endorsed in blank or accompanied by appropriate stock powers duly executed in blank, by J&J, with signatures guaranteed by a domestic commercial bank or trust company, with all necessary sales or stock transfer taxes or other similar revenue stamps, acquired at J&J's expense, affixed and cancelled.

AG8805B07

9.8    **J&J Certificate of Good Standing**.    That the certificate of good standing for J&J for the State of New Jersey shall be furnished to Cyprus.    Such certificate shall be dated not more than two (2) days prior to the Closing Date.

9.9    **Windsor Certificate of Good Standing**.    That the certificates of good standing for Windsor for the State of Vermont shall be furnished to Cyprus.    Such certificate shall be dated not more than two (2) days prior to the Closing Date.

9.10    **Western Certificate of Good Standing**.    That the certificates of good standing for Western for the State of California shall be furnished to Cyprus.    Such certificate shall be dated not more than two (2) days prior to the Closing Date.

9.11    **Release of Escrowed Funds**.    That J & J has executed a document substantially in the form of Exhibit "W" attached hereto and by this reference incorporated herein, requesting that the United Bank of Denver release the Escrowed Funds, as such term is defined in the Escrow Agreement between J&J, Cyprus and the United Bank of Denver dated as of September 7, 1988, a true and correct copy of which is attached hereto as Exhibit "X" and is by this reference incorporated herein.

10.    **Conditions to Obligations of J&J**.    The obligations of J&J hereunder shall be subject to the following conditions, any or all of which may be waived in writing by J&J:

-58-

AG8805B07

10.1  **Payment.**  That on the Closing Date, Cyprus shall deliver the Base Purchase Price in the amount and in the manner provided for in Section 2.1 of this Agreement.

10.2  **Representations and Warranties True.**  That each of the representations and warranties of Cyprus set forth in Section 4 hereof shall be true and correct on and as of the Closing Date with the same effect as if made at such time; and that Cyprus shall have in all respects performed and complied with each of the agreements, covenants, stipulations, terms and conditions hereof applicable to Cyprus, including the covenants and agreements set forth in Section 4 hereof.

10.3  **Certificate.**  That Cyprus shall have executed and delivered to J&J on the Closing Date a certificate of an executive officer of Cyprus, dated the Closing Date, to the effect of the provisions of Section 10.2 hereof.

10.4  **Opinion of Counsel.**  That Cyprus shall have furnished to J&J on the Closing Date an opinion of Cyprus' General Counsel in form and substance reasonably satisfactory to J&J, to the effect stated in Sections 4.1 and 4.2 hereof.

AG8805B07

11.    Survival and Indemnification

    11.1  Survival.        To    the    extent    that    the
representations and warranties set forth in Section 3.24 hereof
relate   to   ERISA,   such   representations   and   warranties   shall
survive the Closing for a period of two (2) years following the
Closing Date.   The representations and warranties set forth in
Section 3.24(h) shall survive the Closing for a period of two (2)
years   following   the   Closing   Date.   The   representations   and
warranties set forth in Section 3.9 hereof relating to the "Shear
Disc" shall survive until the termination or expiration of the
Talc Supply Agreement.   All other representations and warranties
contained in Sections 3 and 4 hereof shall survive the Closing
for a period of one year following the Closing Date.   With
respect to the obligations, covenants and agreements contained in
Sections 2.2, 3.24(j), 5.2, 5.3, 5.4, 5.6, 5.7, 5.8, and 5.11,
such obligations, covenants or agreements shall survive until the
same   shall   have   been   duly   performed.   With   respect   to   the
obligations, covenants and agreements contained in Sections 5.15
and 5.16, such obligations, covenants and agreements, as between
Windsor and J&J, shall survive the Closing for the periods set
forth therein.   With respect to the obligations, covenants and
agreements contained in Sections 5.1, 5.9, 11.2(v) and 11.2(vi)
hereof, such obligations, covenants and agreements, as between
Cyprus  and  J&J,  shall  survive  the  Closing  forever.   Any
representation, warranty, covenant or obligation contained in
this Agreement relating to taxes shall survive the Closing for

the period of the applicable Statute of Limitations, including all extensions thereof.

11.2  **Indemnification by J&J.**  Consistent with the provisions of Section 11.1 hereof, J&J hereby agrees to indemnify and hold harmless Cyprus from and against any and all claims, demands, penalties, suits, proceedings, judgments, losses, liabilities, damages, costs and expenses of every kind and nature (including, but not limited to, reasonable attorneys' fees and any and all related litigation costs and expenses arising after Closing from or as a consequence of any such proceeding described in this Section 11.2, including such attorneys' fees and costs incurred in connection with pursuing claims under this Section 11.2) (collectively referred to in this Section 11.2 as "Costs") imposed upon or incurred by Cyprus or its affiliates as a result of or in connection with or arising out of:  (i) any and all inaccurate representations or material breaches of covenants, warranties, stipulations, agreements and certifications made by or on behalf of J&J, Windsor or Western in this Agreement or in any document delivered hereunder; (ii) any material breach of or material default in the performance by J&J of any covenant, agreement or obligation contained in this Agreement; (iii) any tax liability or obligation determined in accordance with Sections 3.17 and 5.8 hereof to be due and owing on behalf of Windsor and/or Western for periods prior to the Closing Date; (iv) any liabilities related to the J & J Salaried Plan; (v) any debt, liability or other financial obligation not consistent with

-61-

the business of Windsor or Western which:    (A) is the legal
obligation of Windsor or Western; (B) was undertaken on behalf of
or at the request or direction of J&J; and (C) creates or gives
rise to any liability which Cyprus would not assume but for the
consummation of the transaction contemplated herein; and (vi) any
product liability-based claim, suit, demand or cause of action
directed against Cyprus, Windsor or Western or any of their
affiliates arising out of the sale of talc or talc-containing
products manufactured by Windsor, Western, J&J or the affiliates
of Windsor, Western or J&J, prior to Closing. J&J's obligation of
indemnification pursuant to Sections 11.2(v) and 11.2(vi) shall
survive the Closing forever.


        11.3  Indemnification by Cyprus.  Cyprus hereby agrees
to indemnify and hold J&J harmless from and against any and all
claims, demands, penalties, suits, proceedings, judgments,
losses, liabilities, damages, costs and expenses of every kind
and nature (including, but not limited to, reasonable attorneys'
fees and all related litigation costs and expenses arising after
Closing from or as a consequence of any such proceeding described
in this Section 11.3, including such attorneys' fees and costs
incurred in connection with pursuing claims under this Section
11.3) (collectively referred to in this Section 11.3 as "Costs")
imposed upon or incurred by J&J or its affiliates as a result of
or in connection with or arising from:    (i) any and all
inaccurate representations or material breaches of covenants,
warranties, stipulations, agreements and certifications made by

-62-

or on behalf of Cyprus in this Agreement or in any document delivered hereunder; (ii) any material breach of or material default in the performance by Cyprus of any covenant, agreement or obligation contained in this Agreement; and (iii) any tax refund obligation determined in accordance with Section 5.8 hereof to be due and owing J&J for periods prior to the Closing Date.

11.4  Indemnification Procedure; Defense.    In the event that any indemnified party determines that it is entitled to indemnification under this Agreement, it shall promptly thereafter so notify the indemnifying party in writing, which writing shall set forth in detail the amount of and the basis for such claim.   Promptly after receipt by the indemnified party of notice of the commencement of any action involving the subject matter of the foregoing indemnity provisions, such indemnified party shall, if any claim in respect thereof is to be made against the indemnifying party under Section 11.2 or 11.3, notify the indemnifying party in writing of the commencement thereof. In case any such action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party shall have the right to participate therein, and to the extent that it may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof, with counsel reasonably satisfactory to such indemnified party; provided, however, that if the

-63-

defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and other indemnified parties which are different or are in addition to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert, at the cost and expense of the indemnified party or parties, such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties, subject to reimbursement of such costs and expenses to the indemnified party or parties upon a final determination that such defense is within the indemnification obligations set forth in this Section 11. In the event that the indemnifying party shall assume the defense of a lawsuit as provided herein, the indemnifying party, after consultation with the indemnified party, shall have reasonable control over the decision to try, settle, compromise or otherwise terminate such lawsuit.

11.5   **Exclusive Remedy**.   J&J and Cyprus acknowledge and agree that the indemnity provisions of this Section 11 shall be the exclusive remedy for either party for any matter for which either party may be indemnified.

12.   **Operation of Business**.   Between the date hereof and the Closing Date, J&J shall cause Windsor and Western to operate their businesses in the ordinary course.   Neither Windsor nor

-64-

Western shall enter into or amend any material contract, or otherwise adversely affect in any material respect the financial conditions, ownership or operations of Windsor and Western without the prior written consent of Cyprus, which consent shall not be unreasonably withheld. With respect to capital investments and expenditures, and the ongoing operation of Windsor and Western facilities, J&J shall cause Windsor and Western to operate the business and facilities in the ordinary course, and shall make such capital investments and expenditures as may be required therefor; provided, however, that no capital investment or expenditure in excess of One Hundred Thousand Dollars ($100,000) shall be made or approved without the prior written consent of Cyprus, which consent or approval shall not be unreasonably withheld. After the Closing, Windsor shall have the right to manage its business and all aspects of it, and J & J shall have no right, except as set forth in the Talc Supply Agreement, to manage Windsor's business or any aspect of it.


13. **Miscellaneous**.


13.1 **Parties in Interest; Assignment**. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and permitted assigns. This Agreement is not made for the benefit of any person, firm, corporation or other entity not a party hereto, and nothing in this Agreement shall be construed to give any person,

AG8805B07

firm, corporation or other entity, other than the parties hereto
and their respective successors and permitted assigns, any right,
remedy or claim under or in respect of this Agreement or any
provision hereof.   Without limiting the foregoing, no provision
of this Agreement shall be construed to affect Cyprus' right or
the right of Windsor or Western to change the terms and
conditions of employment, as permitted by law.   This Agreement
may not be assigned or transferred in whole or in part by any
party hereto without the prior written consent of the other
party, and any attempt to assign or transfer this Agreement or
any part thereof in violation of this Section 13.1 shall render
such attempted assignment or transfer void and of no effect.

      13.2  **Expenses**.   Each of the parties hereto shall be
responsible for and shall pay all of its own expenses incurred in
connection with this Agreement and the transaction contemplated
herein, including without limitation, all legal fees and other
expenses incident to the negotiation and preparation of this
Agreement.

      13.3  **Confidentiality**.   Prior to and after the Closing
Date, the parties shall maintain this Agreement and the terms and
conditions hereof confidential, and neither party shall disclose
the same without the prior written consent of the other party,
except as may be contemplated by this Agreement or required by
court orders, applicable federal, state, and local laws, rules or
regulations or the rules of any stock exchange.   Notwithstanding

AG8805B07

the foregoing, the parties may disclose the terms and conditions of this Agreement to their respective lenders or other financial institutions under conditions of confidentiality similar to those contained in the Confidentiality Agreement between Cyprus and J & J dated December 18, 1987, a true and correct copy of which is attached hereto as Exhibit "Y" and by this reference incorporated herein.

13.4 **Notices.** Any notice, request, consent, waiver or other communication required or permitted to be given hereunder shall be effective only if made or given in writing and shall be deemed sufficiently given only if delivered in person or sent by telegram, cable, telecopier, or by certified or registered mail, postage prepaid, return receipt requested, addressed as follows:

If to Cyprus:

        Cyprus Mines Corporation
        9100 East Mineral Circle
        Englewood, Colorado 80112
        Attn: Vice President - Industrial Minerals

With concurrent copy to:

        Cyprus Mines Corporation
        9100 East Mineral Circle
        Englewood, Colorado 80112
        Attn: General Counsel

If to J&J:

        Johnson & Johnson Consumer Products Inc.
        501 George Street
        New Brunswick, New Jersey 08903
        Attn: Vice President - Finance

AG9805B07

With concurrent copy to:

> Johnson & Johnson
> One Johnson & Johnson Plaza
> New Brunswick, New Jersey  08933
> Attn:  General Counsel

or to such other person or address as such party may have specified in a notice duly given as provided herein.  Such notice or communication shall be deemed to have been given as of the date of delivery or transmission.

13.5  **Further Assurances.**  Cyprus and J & J agree to do all things and to take all actions, including the execution of any other documents, reasonably necessary or appropriate to carry out the purposes of this Agreement and to consummate the transactions contemplated herein.

13.6  **Entire Agreement.**  This Agreement (including the Exhibits attached hereto and incorporated herein) and the documents referred to herein as having been or to be entered into by any of the parties hereto, or delivered or to be delivered by a party hereto to another party hereto, constitute the entire agreement and understanding of the parties relating to the subject matter hereof, and the same shall supersede all prior and contemporaneous agreements and understandings, representations and warranties, whether oral or written, relating to the subject matter hereof.

13.7  **Modification.**  This Agreement cannot be changed and no performance, term or condition may be waived in whole or

-68-

in part except by a writing executed by a duly authorized officer of the party against whom enforcement of the change or waiver is sought. Any term or condition of this Agreement may be waived at any time by the party hereto entitled to the benefit thereof, and any such term or condition may be modified at any time, by an Agreement in writing executed by a duly authorized officer of each of the parties hereto.

13.8 **Delay**. No delay or failure on the part of any party in exercising any rights hereunder, and no partial or single exercise thereof, shall constitute a waiver of such rights or of any other rights hereunder.

13.9 **Governing Law**. The terms and conditions of this Agreement shall be interpreted in accordance with and construed pursuant to the laws of the State of Vermont, and any dispute of fact or law hereunder shall be resolved in the appropriate state court of Vermont or the United States District Court for the District of Vermont.

13.10 **Severability**. The unenforceability or invalidity of any Section or provision of this Agreement shall not affect the enforceability or validity of the balance of this Agreement.

13.11 **No Merger**. Except as otherwise stated herein, all covenants, agreements and obligations contained in this

-69-

AC8805807

Agreement shall survive the Closing and there shall be no merger of the terms and conditions of this Agreement into any instrument of conveyance or transfer.

13.12 <u>Obligations of Windsor and Western</u>.    With respect to any covenant, obligation or agreement to be performed hereunder by Windsor or Western prior to the Closing, Windsor or Western shall perform or J&J shall cause Windsor or Western to perform, the same.    With respect to any covenant, obligation or agreement to be performed hereunder by Windsor or Western following the Closing, Windsor or Western shall perform, or Cyprus shall cause Windsor, Western, or affiliates of Windsor or Western to perform, the same.

13.13 <u>Headings</u>.    All headings of this Agreement have been inserted for convenience of reference only, and are not to be considered a part of this Agreement, and shall in no way

\*

\*

\*

\*

\*            THIS SPACE INTENTIONALLY LEFT BLANK

\*

\*

\*

\*

AG8805B07

affect the interpretation of any of the provisions of this Agreement.

13.13 14 **Mutual Negotiation.** This Agreement and the language contained herein have been arrived at by the mutual negotiation of the parties. Accordingly, no provision hereof shall be construed against one party or in favor of another party merely by reason of draftsmanship.

IN WITNESS, WHEREOF, the parties have caused this Agreement to be executed effective as of the day and year first set forth above.

CYPRUS MINES CORPORATION,
a Delaware corporation

By: _____

Title: Vice PRESIDENT

JOHNSON & JOHNSON,
a New Jersey corporation

By: _____

Title: _____