# **EXHIBIT 3**

LONDON/2746.05

STOCK PURCHASE AGREEMENT

AMONG

CYPRUS MINES CORPORATION

CYPRUS MINERALS COMPANY

and

RTZ AMERICA INC.

Dated as of June 5, 1992

STOCK PURCHASE AGREEMENT dated as of June 5, 1992 (herein, together with the Schedules and Annexes attached hereto, referred to as the "Agreement") by and among Cyprus Mines Corporation, a Delaware Corporation ("Seller"), Cyprus Minerals Company, a Delaware corporation ("Cyprus") and RTZ America Inc., a Delaware corporation ("Buyer").

## W I T N E S S E T H:

WHEREAS, Seller is the sole record and beneficial owner of all issued and outstanding shares of capital stock (the "Shares") of Cyprus Talc Corporation, a Delaware corporation ("Newco");

WHEREAS, Newco is the sole record and beneficial owner of all issued and outstanding shares of capital stock of Cyprus Industrial Minerals Corporation, a Nevada corporation; Cyprus Windsor Minerals Corporation, a Vermont corporation, and its subsidiary Cyprus Western Source Corporation, a California corporation; and Green Mountain Talc Corporation, a Delaware Corporation; and is the record and beneficial owner of 95% of the issued and outstanding shares of DIMTA S.A., a company organized under the laws of Spain and is the record and beneficial owner of 60% of the issued and outstanding shares of Nihon Mistron Company, a Tokyo, Japan corporation (collectively the "Other Companies"); and

WHEREAS, upon the terms and conditions hereinafter set forth, Seller desires to sell or cause the sale of, and Buyer desires to purchase, the Shares;

NOW, THEREFORE, in reliance upon the representations and warranties made herein and in consideration of the mutual agreements herein contained, Buyer and Seller hereby agree as follows:

## ARTICLE 1

### DEFINITIONS

1.1 <u>Definitions</u>. For purposes of this Agreement, the following terms shall have the meanings set forth below:

"Accounting Principles" means the accounting principles, policies and procedures of the Companies set forth on Annex B hereto.

"Acquisition Proposal" shall have the meaning set forth in Section 7.10.

-1-

"<u>Active Employee</u>" shall have the meaning set forth in Section 7.4(a).

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person.

"<u>Assets of the Companies</u>" means all assets, properties and rights of the Companies recorded on the Reference Balance Sheet.

"<u>Breach</u>" shall have the meaning set forth in Section 11.1(a).

"<u>Business Liabilities</u>" shall have the meaning set forth in Section 7.6.

"<u>Buyer Indemnitee</u>" shall have the meaning set forth in Section 11.1.

"<u>Claims</u>" shall have the meaning set forth in Section 7.6.

"<u>Closing</u>" shall have the meaning set forth in Section 3.1.

"<u>Closing Date</u>" shall have the meaning set forth in Section 3.1.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Companies</u>" shall mean collectively Newco and the Other Companies and each and every one of them shall be a "Company".

"<u>Confidentiality Agreement</u>" shall have the meaning set forth in Section 7.1.

"<u>Control</u>" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Current Assets</u>" shall have the meaning set forth in Section 4.2.

"<u>Current Liabilities</u>" shall have the meaning set forth in Section 4.2.

-2-

"<u>Damages</u>" shall have the meaning set forth in Section 11.1(a).

"<u>Disputes Auditor</u>" means Ernst & Young or any other independent accounting firm mutually agreed upon by Seller and Buyer.

"<u>Encumbrances</u>" shall have the meaning set forth in Section 5.3.

"<u>Employee</u>" shall have the meaning set forth in Section 5.14(i).

"<u>Environmental Laws</u>" mean any federal, state, foreign and local law, statute, ordinance, rule, regulation, code, license, permit, authorization, approval, consent, order, judgment, decree, injunction, requirement or agreement with any governmental entity and any judicial interpretation thereof, in effect on the Closing Date relating to (x) the protection, preservation or restoration of the environment, (including, without limitation, air, water vapor, surface water, groundwater, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or (y) the exposure to, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, Release or disposal of Hazardous Substances. The term Environmental Law includes, without limitation, the federal Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act (SARA), the Federal Water Pollution Control Act of 1972, the federal Clean Air Act, the federal Clean Water Act, the federal Resource Conservation and Recovery Act of 1976 (including the Hazardous and Solid Waste Amendments thereto), the federal Solid Waste Disposal and the federal Toxic Substances Control Act, the federal Insecticide, Fungicide and Rodenticide Act, each as in effect on the Closing Date. However, notwithstanding anything in this Agreement to the contrary, "Environmental Laws" shall not include (i) laws relating to product liability; and (ii) laws and regulations regarding human health or safety including without limitation, federal and state Occupational Safety and Health and Mine Safety and Health Acts (collectively, "Non-Environmental Laws").

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended.

"<u>European Companies</u>" shall mean Cyprus Industrial Minerals de France SARL and Mistron Mineralien GmbH.

"Fee Property" shall have the meaning set forth in Section 5.8.

"Final Closing Statement" shall have the meaning set forth in Section 4.4.

"Financial Statements" shall have the meaning set forth in Section 5.5.

"Hamm Underground Mine Property" shall mean the property set forth on Annex C.

"Hazardous Substances" and "Hazardous Materials" mean any substance presently listed, defined, designated or classified as hazardous, toxic or radioactive under any Environmental Law, whether by type or by quantity, including any substance containing any such substance as a component. Hazardous Substance includes, without limitation, any toxic waste, pollutant, contaminant, hazardous substance, toxic substance, hazardous waste, special waste, industrial substance or petroleum or any derivative or by-product thereof, radon, radioactive material, asbestos containing material, urea formaldehyde foam insulation, lead and polychlorinated biphenyl.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Indemnifying Party" shall mean any party indemnifying an Indemnitee pursuant to the terms of this Agreement.

"Indemnitee" means any party indemnified pursuant to the terms of this Agreement.

"Intellectual Property Rights" shall have the meaning set forth in Section 5.15.

"Knowledge of Seller" means the actual or "Other Knowledge" of R.D. Baker, F.F. Beyl, R.J. Buettner, D.E. Huffman, J.D. Lessner, M.J. Lorang, L.J. Verkest, P.C. Wolf or B.R. Wright.

"Leased Property" shall have the meaning set forth in Section 5.8.

"Leases" shall have the meaning set forth in Section 5.8.

"Liabilities of the Companies" means all liabilities and obligations of the Companies recorded on the Reference Balance Sheet.

"Losses" shall have the meaning set forth in Section 11.3.

"Mineral Property" shall have the meaning set forth in Section 5.8.

"Non-Represented Employee" means any Employee who is not a Represented Employee.

"Other Companies" shall have the meaning set forth in the Preamble.

"Other Knowledge" means information which should have been acquired by a reasonable person in the position of R.D. Baker, F.F. Beyl, R.J. Buettner, D.E. Huffman, J.D. Lessner, M.J. Lorang, L.J. Verkest, P.C. Wolf or B.R. Wright and having his respective knowledge of facts (which shall be deemed to include the representations and warranties to be given by Seller to Buyer in this Agreement) which should have caused such reasonable person to make due enquiries, which enquiries would have provided such information.

"Permitted Exceptions" shall have the meaning set forth in Section 5.8.

"Person" means an individual, corporation, partnership, trust or unincorporated organization or a government or any agency or political subdivision thereof.

"Plan" shall have the meaning set forth in Section 5.14.

"Possessory Property" shall have the meaning set forth in Section 5.8.

"Pre-Closing Period" means any Tax period ending on or prior to the Closing Date; and a "Post-Closing Period" means any Tax period that is not a Pre-Closing Period.

"Preliminary Closing Statement" shall have the meaning set forth in Section 4.2.

"Purchase Price" shall have the meaning set forth in Section 2.2.

"Real Property" shall have the meaning set forth in Section 5.8.

"Reference Balance Sheet" means the combined balance sheet of the Companies and the European Companies as of March 31, 1992 included in the Financial Statements.

"<u>Release</u>" has the same definition as in 42 U.S.C. § 9601(22).

"<u>Represented Employee</u>" means any Employee who is a member of a unit of Employees covered by a collective bargaining agreement.

"<u>Returns</u>" means all returns, reports, estimates, declarations, information returns and statements of any nature with respect to Taxes, including, without limitation, consolidated federal income tax returns of the Seller's Group, declarations of estimated tax and tax reports required to be filed with respect to the Companies or their respective income, properties or operations.

"<u>Seller Indemnitee</u>" shall have the meaning set forth in Section 11.2.

"<u>Seller's Group</u>" shall mean any "affiliated group" (as defined in Section 1504(a) of the Code without regard to the limitations contained in Section 1504(b) of the Code) that includes the Seller or any predecessor of or successor to Seller (or another such predecessor or successor).

"<u>Seller's Insurance Policies</u>" shall have the meaning set forth in Section 7.6.

"<u>Shares</u>" shall have the meaning set forth in the Preamble.

"<u>Subsidiaries</u>" shall mean any Person (other than an individual) in which another person owns, beneficially or of record, securities or any other interest representing fifty percent (50%) or more of the aggregate voting power or equity interest in such Person.

"<u>Tax</u>" or "<u>Taxes</u>" means any federal, state, local or foreign income, gross receipts, profits, severance, franchise, license, transfer, sales, use, payroll, employment, withholding, property (real or personal), excise and similar taxes (including interest, penalties or additions to such taxes and any interest in respect of such penalties or additions), but excluding all sales, use, value added, transfer and similar taxes imposed in connection with the consummation of the transactions contemplated by this Agreement.

"<u>Working Capital of the Companies</u>" shall have the meaning set forth in Section 4.2.

## ARTICLE 2

### SALE AND PURCHASE OF SHARES

2.1. <u>Sale and Purchase</u>. Upon the terms and subject to the conditions contained herein, Seller will sell and transfer to Buyer, or cause the sale and transfer to Buyer of, and Buyer will purchase and accept, at the Closing, the Shares.

2.2. (a) <u>Purchase Price and Payment</u>. In consideration of the sale and transfer pursuant to Section 2.1, Buyer hereby agrees to pay to Seller a purchase price of (the "<u>Purchase Price</u>") U.S. $78,000,000, by wire transfer as provided in Section 3.2(b).

## ARTICLE 3

### CLOSING AND TERMINATION

3.1. <u>Closing</u>. The closing of the transactions provided for herein (the "<u>Closing</u>") will take place at the offices of Sullivan & Cromwell at 125 Broad Street, New York, New York at 10:00 a.m. (local time) on June 30, 1992 provided all conditions set forth in Articles 8 and 9 are satisfied or, if on such date such conditions are not satisfied, on the fifth business day following the satisfaction of all conditions set forth in Articles 8 and 9 (other than the conditions specified in Section 8.6 and 9.6, which shall be satisfied at the Closing), or at such other time and place as Buyer and Seller shall agree (the "<u>Closing Date</u>").

3.2. <u>Transactions on the Closing Date</u>. (a) At the Closing, Seller will deliver or cause to be delivered to Buyer the following:

(i) stock certificates evidencing the Shares, in each case endorsed in blank or with an executed blank stock power attached, and in form suitable for transfer of valid title thereto to Buyer or its assigns, free and clear of any Encumbrances.

(ii) resignations of each of the directors and officers of each Company (except as Buyer may specify to Seller prior to Closing);

(iii) resignations of such auditors for each Company as Buyer may specify to Seller prior to Closing; and

-7-

(iv)    each of the certificates and other documents required by Article 9 hereof.

(b)   At the Closing, Buyer will deliver to Seller the following:

(i)   the Purchase Price by wire transfer in immediately available funds in U.S. dollars to the following account:

Pittsburgh National Bank (PNB)
Pittsburgh, PA
ABA# 043000096
Cyprus Minerals Company
Account # 2-024604
Further Credit:  Cyprus Mines Corporation

the Closing shall not be deemed consummated until Seller shall have received confirmation from PNB of its receipt of the Purchase Price and;

(ii)   each of the certificates and other documents required by Article 8 hereof.

3.3. Termination.  Anything contained in this Agreement other than in this Section 3.3 to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing:

(a)   by mutual consent of Buyer and Seller;

(b)   by either Buyer or Seller, if the transactions contemplated hereby are not consummated on or before August 31, 1992 (or such later date as may be agreed upon in writing by the parties hereto);

(c)   by Buyer, if Seller shall breach in any material respect any of its representations, warranties or obligations hereunder and all breaches in the aggregate constitute a material adverse change, or unanticipated and undisclosed material liability previously unknown to Buyer which would have a material adverse effect, on the talc business taken as a whole and such breach shall not have been cured in all material respects or waived by Buyer and Seller shall not have provided reasonable assurance that such breach will be cured in all material respects on or before the Closing Date.

(d)   by Seller, if Buyer shall breach in any material respect any of its representations, warranties or obligations hereunder and such breach shall not have been cured in all material respects or waived and Buyer shall not

-8-

have provided reasonable assurance that such breach will be cured in all material respects on or before the Closing Date.

3.4  <u>Effect of Termination</u>.  Termination of this Agreement pursuant to this Article 3 shall terminate all provisions of this Agreement, except that Section 3.4, the last sentence of Section 7.1(a) and Sections 12.2, 12.3 and 12.11 shall survive any such termination; <u>provided</u>, <u>however</u>, that termination pursuant to Sections 3.3(c) or (d) shall not relieve the defaulting or breaching party hereunder from any liability to the other party hereto resulting from the default or breach hereunder of such defaulting or breaching party occurring prior to the date of termination.


ARTICLE 4

PRELIMINARY AND FINAL CLOSING
<u>STATEMENTS: ADJUSTMENTS</u>

4.1  <u>Working Capital</u>.  The parties intend that "Working Capital of the Companies", as defined in Section 4.2 below, shall be $35,000,000 as of the Closing.  Using the procedure set forth below, the parties shall determine the amount and manner by which Seller shall pay Buyer for any deficiency in Working Capital of the Companies below $35,000,000 or by which Buyer shall pay Seller for any excess in Working Capital of the Companies over $35,000,000 as of the Closing.

4.2  <u>Preliminary Closing Statement</u>.  (a) As soon as reasonably possible after the Closing Date but in any event within sixty (60) days thereafter, Buyer shall prepare and deliver to Seller a statement of combined Working Capital of the Companies derived from a combined balance sheet for the Companies and the European Companies as of the Closing (the "<u>Preliminary Closing Statement</u>").  "<u>Working Capital of the Companies</u>" shall for all purposes of this Agreement mean, as the context requires, the difference between total Current Assets and total Current Liabilities of the Companies and the European Companies reflected on the Reference Balance Sheet, the Preliminary Closing Statement or the Final Closing Statement.  "Current Assets" shall for all purposes of this Agreement mean, as the context requires, cash, money on deposit with banks and other financial institutions, securities (excluding the stock of its subsidiaries), accounts receivable from customers or employees of the Companies, other receivables, all crude, work-in-process, finished goods and other product inventories, materials and supplies, and prepaid expenses.  "Current Liabilities" shall

-9-

for all purposes of this Agreement mean, as the context requires, the amount of accounts payable, short-term debt, the current portion of long-term debt, and accrued liabilities due within one year other than liability for federal income taxes. Any current assets retained by Seller at Closing shall be excluded from Working Capital of the Companies. Any current liabilities assumed or retained by Seller at Closing shall be excluded from Working Capital of the Companies. Current Assets and Current Liabilities shall be recorded consistent with the Accounting Principles. Seller shall assist Buyer, as reasonably requested by Buyer, in the preparation of such statement.

(b)   The Preliminary Closing Statement and the Final Closing Statement shall be prepared in accordance with the Accounting Principles applied on a basis consistent with that applied in preparing the Reference Balance Sheet. In the determination of Working Capital of the Companies, finished product and crude talc inventories shall be valued in accordance with Seller's normal inventory valuation procedures and such valuation shall not be subject to adjustment.

(c)   Seller will make available to Buyer and its representatives, as reasonably requested by Buyer, all books, records and other documents pertaining to the businesses of the Companies deemed necessary or desirable by Buyer in preparing the Preliminary Closing Statement.

4.3.  Review of Statements.  Seller and its independent certified public accountants may review the Preliminary Closing Statement and the books of account of Buyer relating to the Companies and the European Companies and may make inquiry of the representatives of Buyer's accountants and Buyer. The Preliminary Closing Statement shall be binding and conclusive upon, and deemed accepted by, Seller unless Seller shall have notified Buyer in writing within thirty (30) days after receipt of the Preliminary Closing Statement of any objections thereto. A notice under this Section 4.3 shall specify in reasonable detail the items in the Preliminary Closing Statement which are being disputed, and a summary of the reasons for such dispute.

4.4.  Disputes; Final Closing Statement.  (a) At the request of either party, any dispute between the parties relating to the Preliminary Closing Statement which cannot be resolved by them within thirty (30) days after receipt of notice of any objections to such Preliminary Closing Statement pursuant to Section 4.3 shall be referred to the Disputes Auditor for decision, which decision shall be final and binding on both parties. The parties agree that they

-10-

will require the Disputes Auditor to render its decision
within thirty (30) days after referral of the dispute to the
Disputes Auditor for decision pursuant hereto.

(b)  Before referring a matter to the Disputes
Auditor, the parties shall agree on procedures to be
followed by the Disputes Auditor (including procedures for
presentation of evidence). If the parties are unable to
agree upon procedures before the end of thirty (30) days
after receipt of notice of any objections pursuant to
Section 4.3, the Disputes Auditor shall establish procedures
giving due regard to the intention of the parties to resolve
disputes as quickly, efficiently and inexpensively as
possible; the Disputes Auditor's procedures may be, but need
not be, those proposed by either party, provided, that such
procedure shall require the Disputes Auditor to render its
decision within thirty (30) days after referral of the
dispute to the Disputes Auditor for decision pursuant
hereto. The parties shall, as promptly as practicable,
submit evidence in accordance with the procedures agreed
upon or established by the Disputes Auditor, and the
Disputes Auditor shall decide the dispute in accordance
therewith as promptly as practicable. The fee of the
Disputes Auditor for, and relating to, the making of any
such decision shall be borne by the parties equally.

(c)  The Preliminary Closing Statement shall
become final and binding on both parties upon the earliest
of (i) if no such notice has been given, the expiration of
the period within which Seller may notify Buyer of any
objections thereto pursuant to Section 4.3, (ii) agreement
in writing by Seller and Buyer that such Preliminary Closing
Statement, together with any modifications thereto agreed by
Seller and Buyer, shall be final and binding and (iii) the
date on which the Disputes Auditor shall issue its decision
with respect to any dispute relating to such Preliminary
Closing Statement. The Preliminary Closing Statement, as
adjusted pursuant to any agreement between the parties or
pursuant to the decision of the Disputes Auditor, when final
and binding on both parties, is herein referred to as the
"Final Closing Statement".

4.5  Adjustment. Promptly after the Preliminary
Closing Statement having become final and binding on Seller
and Buyer pursuant to Section 4.4, but in no event later
than the fifth business day thereafter, the following shall
occur:

(a)  If the Working Capital of the Companies as
reflected on the Final Closing Statement exceeds
$35,000,000, Buyer shall pay to Seller, by wire transfer in
immediately available funds to the account designated by

-11-

Seller not less than three business days prior to the date
of such payment, an amount equal to such excess.

(b)  If the Working Capital of the Companies as
reflected on the Final Closing Statement is less than
$35,000,000, Seller shall pay to Buyer, by wire transfer in
immediately available funds to the account designated by
Buyer not less than three business days prior to the date of
such payment, an amount equal to such deficit.

4.6  <u>Effect of Payment</u>.  Notwithstanding any other
provision of this Agreement to the contrary, any payment
made by Seller to Buyer or Buyer to Seller under this
Article 4 shall have no effect upon either party's
obligations to the other party under any other provision of
this Agreement, including without limitation, Article 11.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF SELLER AND CYPRUS

Seller and Cyprus represent and warrant, jointly
and severally, to Buyer that:

5.1  <u>Organization of Seller, Cyprus and the
Companies; Authority</u>.  Seller, Cyprus and each of the
Companies is a corporation duly incorporated, validly
existing and in good standing under the laws of the
jurisdiction of its incorporation or organization, with, in
the case of Seller and Cyprus, the corporate power and
authority to enter into this Agreement and to perform their
respective obligations hereunder.  Each of the Companies is
qualified to do business in each jurisdiction in which the
nature of its business requires it to be so qualified except
where failure to be so qualified would not have a material
adverse effect on the assets, businesses, financial
condition, results of operations or prospects of such
Company.  The execution and delivery of this Agreement and
the consummation of the transactions contemplated hereby
have been duly authorized by all requisite corporate action
on the part of Seller and of Cyprus.  This Agreement has
been duly executed and delivered by Seller and Cyprus and
constitutes the valid, binding and enforceable obligation of
Seller and Cyprus.

5.2.  <u>Ability to Carry Out the Agreement</u>.  Except
as provided in Schedule 5.2, none of Seller, Cyprus or any
of the Companies is subject to or bound by any provision of

-12-

(i)  any law, statute, rule, regulation or judicial or administrative decision,

(ii)  any articles or certificates of incorporation or by-laws,

(iii)  any mortgage, deed to secure debt, deed of trust, lease, note, shareholders' agreement, bond, indenture, other instrument or agreement, license, permit, trust, custodianship or other restriction, or

(iv)  any judgment, order, writ, injunction or decree of any court, governmental body, administrative agency or arbitrator,

that would prevent or be violated by or under which there would be a default as a result of, nor is the consent of any Person under any material contract or agreement to which any of the Companies or any of its predecessors is a party, which consent has not been obtained, required for the execution, delivery and performance by Seller of this Agreement and the transactions contemplated hereby.

5.3. <u>Capitalization of the Companies; Ownership</u>. (a) The authorized, issued and outstanding capital stock of each of the Companies are set forth in Schedule 5.3. All of the issued and outstanding shares of capital stock of each of the Companies are duly authorized, validly issued, fully paid and nonassessable. Except as set forth in Schedule 5.3, there are no outstanding options, warrants or other rights of any kind to acquire any additional shares of capital stock of any of the Companies or securities convertible into or exchangeable for, or which otherwise confer on the holder thereof any right to acquire, any such additional shares, nor is any of the Companies committed to issue any such option, warrant, right or security.

(b)  The Shares are owned of record and beneficially by Seller. Seller has good and valid title to the Shares, free and clear of any and all liens, claims, restrictions, encumbrances, security interests or options ("<u>Encumbrances</u>") and good and valid title to the Shares, free and clear of any and all Encumbrances will pass to Buyer on the Closing Date. Except as set forth on Schedule 5.3, Newco owns all shares of capital stock of the Other Companies, free and clear of any Encumbrances.

5.4. <u>Equity Interests</u>. Except as set forth in Schedule 5.3, none of the Companies or the European Companies has, directly or indirectly, any equity interest

in any other corporation, joint venture, partnership or
other entity.

5.5. <u>Financial Statements</u>.  Seller has heretofore
furnished Buyer with copies of the following financial
statements:  (i) combined balance sheets for the Companies
and the European Companies as of December 31, 1991 and as of
March 31, 1992, and (ii) combined income statements and
statements of cash flow (or, if applicable, changes in
financial position) for the year ended December 31, 1991,
and the period ended March 31, 1992 (such balance sheets and
income statements and statements of cash flow (or, if
applicable, changes in financial position), together with
the comments thereto, being collectively referred to as the
"<u>Financial Statements</u>").  The Financial Statements are
attached hereto as Annex A.  To the Knowledge of Seller, the
Financial Statements have been prepared in conformity with
the Accounting Principles as applied by the Companies on a
consistent basis throughout the period covered by such
statements and the accounting principles used in the
preparation of the Financial Statements are consistent with
the accounting principles used by Seller and amended from
time to time in the preparation of its financial statements
for the years 1989, 1990 and 1991.  To the Knowledge of
Seller, except as disclosed in the Reference Balance Sheet
or in Schedule 5.5, as of March 31, 1992 there were no
actual or contingent debts, liabilities or obligations of
any of the Companies which were required to be disclosed on
the Reference Balance Sheet or any note thereto by the
Accounting Principles as applied by the Companies nor as of
the Closing, any contingent debts, liabilities or
obligations of any of the Companies which were required to
be disclosed on the Final Closing Balance Sheet or any note
thereto by the Accounting Principles as applied by the
Companies.

5.6. <u>Absence of Certain Changes or Events</u>.  To the
Knowledge of Seller, except as set forth on Schedule 5.6, or
specifically required by the Agreement to consummate the
transactions contemplated by the Agreement, since December
31, 1991, the Companies have conducted their businesses in
the ordinary and usual course, and there has not been (i)
any change or amendment to the charter, by-laws or other
organizational agreements of any of the Companies, (ii) any
issuance or sale of any shares of capital stock of any of
the Companies, or options, warrants or other rights of any
kind to acquire any such shares or securities convertible
into or securities exchangeable for, or which otherwise
confer on the holder thereof any rights to acquire, any such
shares, or enter into any agreement obligating it to do any
of the foregoing, (iii) any non-cash dividends declared, set
aside, paid or made with respect to the capital stock of any

-14-

of the Companies, except as provided in Section 7.3(b), (iv) any damage, destruction or other casualty loss of any asset or assets of the Companies (whether or not covered by insurance) which, singly or in the aggregate, has a Material Adverse Effect, (v) any increase in the compensation payable or to become payable by any of the Companies to any of its officers, directors or employees, or any increase in any bonus, insurance, pension or other employee benefit plan, payment or arrangement made by any of the Companies for or with any such officers, directors or employees, except in the ordinary course of business consistent with past practice (vi) any labor dispute, other than routine labor matters, (vii) any transaction between any of the Companies on the one hand and any of Seller, Cyprus or any of their Affiliates (other than the Companies) on the other hand, other than transactions in the ordinary and usual course of business, (viii) any acquisition or disposition of businesses or assets, other than in the ordinary course of business, (ix) any increased production or purchase of inventory in anticipation of the transactions contemplated by this Agreement, (x) any increase or decrease in the accounts receivable or accounts payable of the Companies in anticipation of the transactions contemplated by this Agreement or (xi) any other event or change of condition of any character which, singly or in the aggregate, has had or is reasonably likely to have a material adverse effect on the assets, businesses, financial condition, results of operations or, to the extent the event or change is caused by Seller, prospects, of the Companies taken as a whole.

5.7.  **Title to Personal Properties; Absence of Liens**.  To the Knowledge of Seller, except as set forth on Schedule 5.7, each of the Companies has good and valid title to, or valid and subsisting leasehold or other possessory interests in, all of its personal properties and assets reflected on the Reference Balance Sheet (except for property and assets disposed of since the date of the Reference Balance Sheet) or acquired since the date of the Reference Balance Sheet and required by the Accounting Principles to be recorded on the balance sheets of such Company, free and clear of any Encumbrances, except for Encumbrances which, individually or in the aggregate, do not exceed $100,000.

5.8  **Real Property Matters**:

(a)  **Title to Real Properties; Absence of Liens**. To the Knowledge of Seller, the Companies (i) own good and valid fee simple title in and to those certain real properties more particularly identified by parcel on Schedule 5.8 (the "**Fee Property**"), free and clear from any and all Encumbrances other than those identified as

-15-

Permitted Exceptions on Schedule 5.8 (the "Permitted Exceptions"), (ii) own good and valid fee simple title to certain mineral rights pursuant to certain Deeds more particularly identified by parcel on Schedule 5.8 (the "Mineral Property") (iii) hold valid and subsisting leasehold estates in and to those certain real properties more particularly identified by parcel on Schedule 5.8 (the "Leased Property"), pursuant, in each case, to a valid and subsisting lease (individually, "Lease" and collectively, the "Leases") identified, as to each Leased Property, on Schedule 5.8. and (iv) hold a possessory interest in certain unpatented mining claims subject to the paramount title of the United States Government as set forth on Schedule 5.8 (the "Possessory Property"). The Fee Property, the Mineral Property, the Leased Property and the Possessory Property are hereinafter referred to as the "Real Property". To the Knowledge of Seller, Schedule 5.8 also includes a complete and accurate list of all patented and unpatented mining claims of the Companies.

(b)   Wetlands. To the Knowledge of Seller, except as set forth on Schedule 5.8, there does not exist any written survey, study or report which claims specifically that any portion of the Real Property is a wetland as that term is used and defined in The Clean Water Act, 33 U.S.C. §§ 1251 et seq., as amended, which would render previously disclosed talc reserves unrecoverable.

(c)   Real Property Records. Seller has made available to Buyer, to the extent in Seller's possession or control, or in the possession or control of one of the Companies, copies of any documents directly relating to the Real Property, including, without limitation, copies of any and all title insurance policies, title commitments, title abstracts; deeds and options; leases and pipeline documents; plans and surveys; and environmental studies, surveys and reports. In addition, in the event any additional items become available to Seller during the term of this Agreement, Seller shall promptly make such items or copies of such items available to Buyer.

(d)   Preservation of Mineral Rights. To the Knowledge of Seller, except as set forth in Schedule 5.8, the Companies have good and valid title or possessory interest (where indicated) to the mineral rights located on the Real Property and each of them and its respective immediate predecessors have complied in all material respects with the requirements of any

and all federal, state or local laws or ordinances related to the preservation of such mineral rights.

(e) _Operations Within Boundary Lines_. To the Knowledge of Seller, except as set forth in Schedule 5.8, the activities conducted by any of the Companies and the improvements located on the Real Property are in all material respects within the boundary lines of the Real Property as described in Schedule 5.8 and there are no material encroachments by others onto the Real Property.

(f) _Condemnation_. To the Knowledge of Seller, there is not now pending any condemnation or similar proceeding which affects the Real Property or any portion thereof. Seller has received no notice that any such proceeding or taking by condemnation is contemplated.

5.9 _Litigation_. To the Knowledge of Seller, except as set forth on Schedule 5.9, there is no action, suit, proceeding or investigation pending or threatened against any Company or relating to any Company's properties, at law, in equity or otherwise, in, before, or by any court or governmental agency or authority. To the Knowledge of Seller, there are no unsatisfied judgments or outstanding orders, injunctions, decrees, stipulations or awards (whether rendered by a court, an administrative agency or by an arbitrator) against any of the Companies or against any Real Property or any other of their properties, assets or businesses.

5.10 _Compliance with Law_. To the Knowledge of Seller, except as with respect to matters set forth in Section 5.16 which are covered therein, and except as set forth on Schedule 5.10, the business of each Company is being conducted, and has at all times during the last three years been conducted by a Company or its predecessor, in material compliance with all laws, ordinances and regulations of any governmental entity, common law and equitable doctrines applicable to such Company (including, without limitation, Non-Environmental Laws). To the Knowledge of Seller, all material governmental approvals, permits and licenses required by any Company in connection with the conduct of its business have been obtained and are in full force and effect and are being complied with in all material respects.

5.11 _Contracts_. (a) To the Knowledge of Seller, Schedule 5.11 sets forth each written contract or agreement outstanding as of the date hereof to which any Company is a party or to which any of its properties are bound and which,

-17-

(i)  involves future payment or receipt of in excess of $100,000 or future performance or receipt of services or delivery or receipt of goods and materials, in each case with an aggregate value in excess of $100,000, including, but not limited to, sale and purchase agreements, distributorship agreements and loan agreements, notes and other financing documents;

(ii)  is a guarantee in respect of indebtedness of any Person (other than a Company) which may involve future payment by a Company in excess of $100,000, or is a mortgage, security agreement or other collateral arrangement securing indebtedness of any Person (other than a Company) and creating Encumbrances on properties and assets of a Company;

(iii)  is a lease providing for monthly rental payments by a Company in excess of $10,000 (exclusive of charges for taxes, insurance, utilities, maintenance and repair);

(iv)  is an employment or consulting contract or is a collective bargaining agreement;

(v)  is a technology license agreement;

(vi)  contains a change of control provision or provisions of similar effect;

(vii) is between any Company and Seller or any of Seller's Affiliates (other than any Company);

(viii) is not an arm's-length agreement; or

(ix) contains any restriction on the Companies ability to compete with any other business.

(b)  To the Knowledge of Seller, there is no material default by any Company or any other party, under any contract or agreement set forth or described in Schedule 5.11.

5.12.  _Brokers and Intermediaries_.  Except for Dillon Read & Co., neither Seller nor any Company has employed any broker, finder, advisor or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to a broker's, finder's or similar fee or commission in connection therewith or upon the consummation thereof.  Seller shall be responsible for making any payments to which Dillon Read & Co. shall be entitled.

-18-

5.13.  <u>Tax Matters</u>.  (a)  Except as set forth in Schedule 5.13, (i) all Returns with respect to Taxes that are required to have been filed by or with respect to the Seller's Group prior to the date of this Agreement, including any of the Companies, have been duly filed, (ii) all Taxes shown to be due on the Returns referred to in clause (i) or in assessments received have in either case been paid in full, (iii) the Returns referred to in clause (i) have been examined by the Internal Revenue Service or the appropriate state, local or foreign taxing authority or the period for assessment of the Taxes in respect of which such Returns were required to be filed has expired, (iv) all deficiencies asserted or assessments made as a result of such examinations have been paid in full, (v) no issues that have been raised by the relevant taxing authority in connection with the examination of any of the Returns referred to in clause (i) are currently pending, (vi) no waivers of statutes of limitation have been given or requested by or with respect to any Taxes of the Seller's Group or any of the Companies, (vii) there are no adjustments required by Section 481 of the Code or similar carryover items that would affect the income tax liability of any of the Companies for a tax year that ends after the Closing Date, and (viii) no adjustments have been made or proposed by the Internal Revenue Service or the appropriate state, local or foreign taxing authority with respect to any of the Returns referred to in clause (i) which would in any way affect the liability for Taxes of any of the Companies for any taxable year or periods ending after the Closing Date.

(b)  No tax is required to be withheld pursuant to Section 1445 of the Code as a result of the transfer contemplated by this Agreement.

(c)  As a result of Buyer's purchase of the Shares, neither Buyer nor any Company will be obligated to make a payment to an individual that would be a "parachute payment" to a "disqualified individual" as those terms are defined in Section 280G of the Code, without regard to whether such payment is reasonable compensation for personal services performed or to be performed in the future.

5.14.  <u>Employee Benefits</u>.

(i)  All benefit plans, contracts or arrangements having a benefit value exceeding, in present value terms (determined using a discount rate of 8-1/2% per annum), $25,000 (regardless of whether they are funded or unfunded, foreign or domestic, contractual or not) covering current employees or former employees of the Companies (the "Employees"), including, but not limited to, "employee

benefit plans" within the meaning of Section 3(3) of ERISA, and plans of deferred compensation (the "Benefit Plans"), are listed in Schedule 5.14.  True and complete copies of all Benefit Plans including, but not limited to, any trust instruments and insurance contracts forming a part of any Benefit Plans, summary plan descriptions and all amendments thereto have been made available to Buyer.

(ii)  To the Knowledge of Seller, all employee benefit plans, other than "multiemployer plans" within the meaning of Section 3(37) or 4001(a)(3) of ERISA, covering Employees (the "Plans"), to the extent subject to ERISA, are in substantial compliance with ERISA.  To the Knowledge of Seller, except as set forth on Schedule 5.14, each Plan which is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA ("Pension Plan") and which is intended to be qualified under Section 401(a) of the Code, has received a favorable determination letter, or is currently the subject of a request for a determination letter, from the Internal Revenue Service, and Seller is not aware of any circumstances likely to result in refusal or revocation of any such favorable determination letter.  To the Knowledge of Seller, there is no material pending or threatened litigation relating to the Plans.  To the Knowledge of Seller, the Companies have not engaged in a transaction with respect to any Plan that, assuming the taxable period of such transaction expired as of the date hereof, could subject the Companies to a tax or penalty imposed by either Section 4975 of the Code or Section 502(i) of ERISA in an amount which, individually or in the aggregate, would be material.

(iii)  To the Knowledge of Seller, no liability under Subtitle C or D of Title IV of ERISA has been or is expected to be incurred by the Companies with respect to any ongoing, frozen or terminated "single-employer plan", within the meaning of Section 4001(a)(15) of ERISA, currently or formerly maintained by any of them, or the single-employer plan of any entity which is considered one employer with any Company under Section 4001 of ERISA or Section 414 of the Code (an "ERISA Affiliate").  To the Knowledge of Seller, the Companies have not incurred and do not expect to incur any withdrawal liability with respect to a multiemployer plan under Subtitle E of Title IV of ERISA (regardless of whether based on contributions of an ERISA Affiliate).  To the Knowledge of Seller, no notice of a "reportable event", within the meaning of Section 4043 of ERISA for which the 30-day reporting requirement has not been waived, has been required to be filed for any Pension Plan or by any ERISA Affiliate within the 12-month period ending on the date hereof.

-20-

(iv)  To the Knowledge of Seller, all contributions required to be made under the terms of any Benefit Plan have been timely made.  Neither any Pension Plan nor any single-employer plan of an ERISA Affiliate has an "accumulated funding deficiency" (whether or not waived) within the meaning of Section 412 of the Code or Section 302 of ERISA and no ERISA Affiliate has an outstanding funding waiver.  To the Knowledge of Seller, the Companies have not provided, or are required to provide, security to any Pension Plan or to any single-employer plan of an ERISA Affiliate pursuant to Section 401(a)(29) of the Code.

(v)  To the Knowledge of Seller, except as previously disclosed in writing to the Buyer, under each Pension Plan which is a single-employer plan, as of the last day of the most recent plan year ended prior to the date hereof, the actuarially determined present value of all "benefit liabilities", within the meaning of Section 4001(a)(16) of ERISA (as determined on the basis of the actuarial assumptions contained in the Plan's most recent actuarial valuation), did not exceed the then current value of the assets of such Plan, and there has been no material change in the financial condition of such Plan since the last day of the most recent plan year.  To the Knowledge of Seller, the withdrawal liability of the Companies under each Benefit Plan which is a multiemployer plan to which the Companies or an ERISA Affiliate has contributed during the preceding 12 months, determined as if a "complete withdrawal", within the meaning of Section 4203 of ERISA, had occurred as of the date hereof, does not exceed $30,000.

(vi)  To the Knowledge of Seller, the Companies have no obligations for post retiree health and life benefits under any Benefit Plan, except as set forth on Schedule 5.14.  To the Knowledge of Seller, there are no restrictions on the rights of the Companies to amend or terminate any such Benefit Plan or any post retirement medical plan covering Active Employees without incurring any liability thereunder, except for any restrictions set forth in the Plan or arising under a collective bargaining agreement.

5.15.  <u>Patents and Trademarks</u>.  To the Knowledge of Seller, the Companies own or have the rights to use, without payment of any  consideration, all patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, licenses and rights which are necessary for use in connection with the businesses of the Companies (collectively, the "<u>Intellectual Property Rights</u>").  The Intellectual Property Rights owned by the Companies are described on Schedule 5.15 hereto.  To the Knowledge of  Seller, the use and registration of the

-21-

Intellectual Property Rights do not conflict with the intellectual property rights of any other person, firm or corporation and no other person's, firm's or corporation's operations conflict with the use and registration of the Intellectual Property Rights. To the Knowledge of Seller, there are no suits pending or threatened by any of the Companies claiming a conflict by such Company with any intellectual property rights of third parties or a conflict by any third party claiming a conflict by such third party with any of the Intellectual Property Rights.

5.16. Environmental Matters. For the purpose of this Section 5.16 only, and expressly not for the purpose of Section 11.3 hereof, "Predecessors" shall mean the companies that operated Seller's talc business immediately prior to the creation of Newco. Except as set forth on Schedule 5.16:

(a) Each of the Companies has obtained all material permits, licenses and other such authorizations required to be obtained by it for the operation of its business under all applicable Environmental Laws.

(b) Each of the Companies is, and each of the Companies and its Predecessors has been, in material compliance with all applicable Environmental Laws.

(c) None of Seller, any Company or any of their respective Predecessors have received any written notice during the last six years of any material violation of any Environmental Law by the Companies or their respective Predecessors, and there are no civil, criminal or administrative actions, suits, hearings, proceedings, written notices of violations, claims or demands pending or, to the Knowledge of Seller, threatened against any Company or with respect to any property owned or previously owned by any Company or its Predecessor under any Environmental Law. None of the Companies has received any written notice of any actual or threatened Release of any Hazardous Substance in violation of any Environmental Law.

(d) None of the Companies or any of its Predecessors have generated, transported, or disposed, and none of the Companies is generating, transporting or disposing, of any Hazardous Substances to, in, upon, about, or under any property wherever situated, which have resulted in a Release giving rise to any material claims, losses, damages (including consequential and other damages), liabilities, penalties, expenses, demands, fines, or cleanup or monitoring costs; under and as a result of a violation of any Environmental Law.

-22-

(e)   None of the Companies and no other party has been involved in any activity in, upon, about, or under the Real Property or any parcel or portion thereof, and none of the Companies or any of its Predecessors have been involved in any activity in, upon, about, or under any property previously owned by any Company or its Predecessors, in connection with the generation, use, handling, treatment, removal, storage, clean up, transport, or disposal of any Hazardous Substances which have resulted in a Release giving rise to any claims, losses, damages (including consequential and other damages), liabilities, penalties, expenses, demands, fines or cleanup or monitoring costs; under and as a result of a violation of any Environmental Law.

(f)   To the Knowledge of Seller, there are not now any underground storage tanks (as such term is defined in 40 CFR § 280.12) in, upon, about or under any of the Real Property or any parcel or portion thereof.

(g)   Seller has made available in writing to Buyer which equipment of the Companies contain PCB and Seller has made available to Buyer all reports relating thereto.

(h)   There are not now, nor has there ever to the Knowledge of Seller been, any areas in, upon, about, or under the Real Property or any parcel or portion thereof which should have been permitted as treatment, storage, or disposal facilities under the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq.

5.17  Improper Payments.  To the Knowledge of Seller, no improper payment has been made by or on behalf of any of the Companies which is in violation of any applicable federal, state, local or foreign law.

5.18  Insurance.  Full and complete copies of all property and casualty insurance policies which currently insure each of the Companies have been made available to Buyer.

5.19  Talc Reserves.  Seller has made available its talc reserve written data to Buyer.  To the Knowledge of Seller, Seller's reporting of talc reserves is consistent with the reserve reporting requirements of the U.S. Securities and Exchange Commission.

5.20  Entire Business.  The Companies and the European Companies conduct all of the talc business of Seller and its Affiliates and own (without any right, title or encumbrance in favor of Seller or any of its Affiliates other than the Companies) all of the assets, rights or interests relating to such business, other than Cyprus logos

-23-

and the Hamm Underground Mine Property, that are owned by Seller or any of its Affiliates. The assets of the Companies as of the Closing Date will be sufficient to enable the Companies to carry out the talc business of Seller and its Affiliates as presently conducted by Seller and its Affiliates.

5.21 <u>Mining and Technical Matters</u>. (a) For the purposes of this representation and warranty, "<u>Mineral Rights</u>" means all rights, leases, concessions, licenses and other entitlements to explore for, mine and extract all and any minerals.

(b) To the Knowledge of Seller, except as set forth on Schedule 5.8, each Company is duly authorized to carry on production of minerals in each jurisdiction where it presently carries on such activities, has good and valid title to all Mineral Rights required in connection with its current operations and possesses all rights of access, easements, rights to water, power and other services necessary for the said operations.

(c) To the Knowledge of Seller, each Company is duly authorized to carry on exploration for minerals (where such exploration is currently in progress) in each jurisdiction where it carries on such activities.

(d) To the Knowledge of Seller, all Mineral Rights held by a Company are in full force and effect and, free from cancellation, forfeiture or any accrued right of termination and there has been no material adverse change in the condition of or rights under the same except depletion of ore reserves due to operations in the ordinary course of business; provided, however, that with respect to cancellation of possessory interests, Seller only represents and warrants that it has not received any written notice of cancellation.

(e) To the Knowledge of Seller, no Company has received any notice of default or claim of default or of any current or threatened expropriation, withdrawal or cancellation of any Mineral Rights nor are there any suits or proceedings in progress or pending or threatened against or affecting any Mineral Rights or the minerals produced therefrom which, if decided adversely, would materially prejudice the Mineral Rights or the rights enjoyed thereunder.

(f) To the Knowledge of Seller, except as set forth on Schedule 5.8, none of the Mineral Rights nor the production of minerals thereunder is subject to any royalty, production payment, lien, charge, security interest or other

-24-

encumbrance, and no Company is obliged by virtue of any prepayment under any contract providing for the sale of any such minerals or under any similar arrangement to deliver any of such minerals at any future date without then or in due course thereafter receiving full payment therefor.

(g)  To the Knowledge of Seller, the records supplied to Buyer relating to:

(i)  geological, geophysical, geochemical, drilling and other engineering data;

(ii)  maps and drawings showing mining operations carried out;

(iii)  ore reserve estimates and production data; and

(iv)  metallurgical test work,

are true and accurate, within the standards of the industry, in all material respects.

5.22  Disclosure.  To the Knowledge of Seller, all written information which has been given by Seller or any representative of Seller to Buyer or any representative of Buyer, is true, complete and accurate in all material respects and there are no facts, matters or circumstances which render any such information inaccurate or misleading in any material respect.

5.23  Inventory.  All inventories of the Companies are of a quality and specification conforming to the usual standards used by the Companies, and except as set forth on Schedule 5.23, all inventories are reflected on the Reference Balance Sheet in accordance with the Accounting Principles to realizable value on a going-concern basis. There are no talc ores included in the inventories of the Companies that can not produce products in conformity with the Companies existing product specifications and existing production methods.

5.24  Condition of the Assets of the Companies. To the Knowledge of Seller, all of the physical assets of the Companies, including machinery and equipment, are in reasonable operating condition required for the current conduct of the business of the Companies, normal wear and tear excepted.

5.25  Accounts Receivable.  To the Knowledge of Seller, all accounts receivable of the Companies and the European Companies shown on the Reference Balance Sheet, and

-25-

all accounts receivable arising thereafter and prior to the Closing shown in the books of the Companies, arose and will arise in the ordinary course of business and are fully collectible, except to the extent a bad debt reserve has been established for such accounts receivable in accordance with the Accounting Principles.

5.26 <u>Formation of Newco.</u> Newco was incorporated on April 1, 1992 in the State of Delaware. Since its date of incorporation, Newco has not engaged in any activity other than activities contemplated and disclosed to Buyer in connection with the restructuring of the talc business of Seller and its Affiliates.

5.27 <u>Working Capital of the Companies</u>. To the Knowledge of Seller, no individual working capital item set forth on the Reference Balance Sheet has changed by more than $1,000,000 since the date of the Reference Balance Sheet, except for changes in the ordinary course of business of the Companies.

5.28 <u>Disclaimer.</u> No representations or warranties have been made to Buyer by Seller other than those expressly set forth in this Agreement.


ARTICLE 6

<u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>

Buyer represents and warrants to Seller that:

6.1 <u>Organization and Authority of Buyer</u>. Buyer is a Delaware corporation, with the corporate power and authority to enter into this Agreement and to perform its obligations hereunder. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and, constitutes the valid, binding and enforceable obligation of Buyer.

6.2 <u>Ability to Carry Out the Agreement</u>. Buyer is not subject to or bound by any provision of

     (i)  any law, statute, rule, regulation or judicial or administrative decision,

     (ii)  any articles or certificates of incorporation or by-laws,

-26-

(iii)  any mortgage, deed to secure debt, deed of trust, lease, note, shareholders' agreement, bond, indenture, other instrument or agreement, license, permit, trust, custodianship, other restriction, or

(iv)  any judgment, order, writ injunction or decree of any court, governmental body, administrative agency or arbitrator,

that would prevent or be violated by or under which there would be a default as a result of, nor is the consent of any Person under any material contract or agreement which has not been obtained required for, the execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby.

6.3.  <u>Brokers and Intermediaries</u>.  Buyer has not employed any broker, finder, advisor or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to a broker's, finder's, or similar fee or commission in connection therewith or upon the consummation thereof.

6.4.  <u>Investment</u>.  Buyer is acquiring the Shares for its own account for investment, without a view to, or for resale in connection with, the distribution thereof in violation of federal or state securities laws and with no present intention of distributing or reselling any part thereof.  Buyer will not so distribute or resell any Shares in violation of any such law.


ARTICLE 7

CERTAIN COVENANTS AND AGREEMENTS
<u>OF SELLER, CYPRUS AND BUYER</u>

7.1.  <u>Access and Information; Testing of Reserves;</u> <u>Notice of Breaches</u>.  (a)  Seller shall permit Buyer and its representatives (including, without limitation, its public accountants, counsel and other advisors) after the date of this Agreement to have access during normal business hours, upon reasonable advance notice to Seller to the officers and directors of the Companies and/or the Seller (as appropriate), the auditors of the Companies and any and all of the premises, properties, contracts, books, records and data of or relating to each of the Companies.  Without limiting the foregoing, Buyer, its public accountants, counsel and other advisors shall have the right at any time and from time to time prior to Closing to enter the Real

-27-

Property, or any portion or parcel thereof, for the purpose of obtaining a survey, either boundary or as-built, of such Real Property, conducting Phase I environmental audits and property audits of Real Property, surveying and otherwise examining the physical, hydrological and topographical nature of the Real Property. "Phase I environmental audits" shall be understood to consist of walk-throughs of any of the Real Property or facilities thereon, review of documents relating to environmental issues, interviews of personnel with knowledge relating to environmental issues, and review of public records.  Such access shall be conducted by Buyer and its representatives in such a manner as not to interfere unreasonably with the business or operations of Seller or any Company.  All information provided to Buyer pursuant hereto shall be subject to that certain confidentiality agreement executed by an affiliate of Buyer and dated April 24, 1991 (the "Confidentiality Agreement").

(b)  From the date hereof through and including the Closing Date, Seller shall cause the Companies to give full access to Buyer and its representatives for the purpose of testing Seller's talc reserves, using standard industry testing techniques.  Such access shall be conducted by Buyer and its representatives in such a manner as not to interfere unreasonably with the business or operations of Seller or any Company.

7.2  Regulatory Filings.  Each party hereto will furnish to the other party hereto such necessary information and reasonable assistance as such other party may reasonably request in connection with its preparation of necessary filings or submissions to any government agency related to this transaction.

7.3  Conduct of Business; Intercompany Accounts.
(a) Prior to the Closing, and except as set forth in Schedule 7.3 or otherwise contemplated by this Agreement or consented to or approved by Buyer in writing, Seller covenants and agrees that:

(i)  it will cause the businesses conducted by the Companies to be operated only in the ordinary and usual course and use all reasonable efforts to preserve the properties and relationships with suppliers and customers of such businesses;

(ii)  it will cause each Company not to issue or sell any shares of capital stock of such Company, or issue or sell any options, warrants or other rights of any kind to acquire any such shares or securities convertible into or exchangeable for, or which otherwise confer on the holder thereof any right to

-28-

acquire, any such shares, or enter into any agreement obligating it to do any of the foregoing;

(iii) except for the contemplated transfer of assets from Seller to Newco, it will not, other than in the ordinary course of business, cause the transfer of any material assets or contracts, or hire, fire or transfer any key employees to or from any subsidiary, division or other business unit within or among the Companies;

(iv)  it will cause each of the Companies not to change or amend its charter, by-laws or other organization agreements;

(v)   it will cause the Companies not to acquire or to dispose of any property, right or other asset employed in the business of the Companies, other than in the ordinary course of business (it being understood that the purchase or sale of talc reserves shall not be considered in the ordinary course of business for purposes of this paragraph (v));

(vi)  it will cause the Companies to or will itself keep in full force and effect insurance on assets and Real Property and other property of the Companies or for the benefit of employees of the Companies, liability and other casualty insurance related to the Companies, and bonds on personnel of the Companies in accordance with the past practices of the Companies, and it will ensure that all proceeds received under such insurances will remain assets of the Companies at the Closing or will be transferred to the Companies prior to the Closing;

(vii) it will cause the Companies not to enter into or to amend any employment, bonus, severance or retirement contract or arrangement or any employee benefit plan with regard to the Companies;

(viii) it will cause the Companies not to increase any salary or other form of compensation payable or to become payable to any of the executives or employees of the Companies, or to pay any bonuses to any of such executives or employees, except for payments made in the ordinary course and for such payments to be made pursuant to the bonus or profit sharing provisions of the employment agreements listed on Schedule 5.14 hereto;

(ix)  it will cause the Companies not to enter into, make, agree upon or to agree to enter into

-29-

(A) other than in the ordinary course, any contract, purchase or sale order, or other commitment, or (B) any real property lease requiring an expenditure or payment in excess of $100,000 per annum or which cannot be terminated by the relevant Company within a period not exceeding 12 months;

(x)   it will cause the Companies not to incur any debt or obligation for borrowed funds and not to extend credit in the sale of products, collection of receivables or otherwise, other than in the ordinary and regular course of business;

(xi)  it will cause the Companies not to take any action and not to cause any action to be taken by any party, which action would materially and adversely affect the businesses of any of the Companies, including, without limitation, the state of title of any of the Companies in and to any material portion of the Real Property.  It will not permit any Company to fail to exercise any option to extend or exercise any option to terminate any Lease between the date hereof and the Closing without Buyer's prior written consent as to each such non-extension or termination of any Lease, or amend or modify any such Lease except in the ordinary course;

(xii) it will not permit any of the Companies to wind up, liquidate or dissolve or to enter into any transaction of merger or consolidation; and

(xiii) it will not, and it will not permit any of the Companies to, agree to take any of the foregoing actions.

(b)   Seller and Buyer agree that all intercompany accounts between Seller or any Affiliate of Seller (other than a Company) and any Company shall be settled with payment effective prior to the Closing and to the extent such settlement is not feasible at or prior to the Closing, shall be settled as soon as practicable after Closing, and such settlement shall be effective as of prior to Closing.

7.4. Employee Matters.  (a) Ongoing Employment. Buyer shall ensure that all persons who were employed by any Company immediately preceding the Closing Date, including those on vacation, leave of absence or disability (whether short-term or long-term disability or workers's compensation) and those subject to or on lay-off (but only, in the case of employees subject to or on lay-off, to the extent a collective bargaining agreement providing for

-30-

recall rights is applicable to such employees) ("Active Employees", which term shall be defined as those individuals identified above), will be employed by Buyer or any Affiliate of Buyer (including but not limited to the Companies) on the Closing Date, on substantially the same terms (regarding salary, job responsibility and location but excluding retirement and welfare benefits) as those provided to such Active Employees immediately prior to the Closing Date.  The employment of any Active Employee by Buyer on the Closing Date does not create a right to ongoing employment with Buyer other than as may exist under a collective bargaining agreement or an individual agreement.

      (b)   <u>Welfare Benefit Plans</u>.

         (i)   Seller shall retain the responsibility for providing for payment of all (A) claims of Employees under any medical, dental, hospital or health plans for previously documented physical or mental conditions in existence on the Closing Date, and provided that a claim for such condition is made within one year of the Closing Date, and (B) claims incurred under any life insurance plans for death occurring prior to the Closing Date.

         (ii)   Seller shall retain the responsibility for providing for payments of all long-term disability claims (including long-term disability claims that result from continuous short-term disability claims in existence on the Closing Date) arising from disabilities of Employees that occurred prior to the Closing Date and up until such time as the Employee returns to work with the relevant Company on a full-time, unrestricted basis for at least 30 days.  Buyer shall assume the responsibility for providing for payments of all short-term disability claims arising from such disabilities.

         (iii)   Seller shall retain the responsibility for providing for payments of all worker's compensation claims made on or before the Closing Date, <u>provided</u>, <u>however</u>, that Seller shall only be liable under this paragraph (iii) for payments in excess of the amount accrued with respect thereto on the Final Closing Statement.  Buyer shall assume the responsibility for providing for payments of all worker's compensation claims made after the Closing Date.

         (iv)   Seller shall retain the responsibility for providing Non-Represented Employees who retired (or if applicable who terminated with vested benefits) prior to the Closing Date with retiree health and life

benefit under the Benefit Plan(s) which covered such
Employees prior to the Closing Date.  As of the Closing
Date, Buyer assumes all liabilities for vested and non-
vested post-retirement medical and life insurance
benefits with respect to Non-Represented Employees who
are Active Employees.

(v)  Seller shall retain the responsibility
for providing Employees who terminated employment with
the relevant Company prior to the Closing Date (and
their "qualified beneficiaries" within the meaning of
Section 4980B of the Code) with the continuation of
group health coverage required by Section 4980B of the
Code.

(vi)  Buyer shall assume Seller's obligations
and responsibilities under all collective bargaining
agreements covering Employees.

(c)  <u>Pension Plans</u>.

(i)  Effective as of the Closing Date, Buyer
shall amend an appropriate pension plan to be
designated by Buyer (the "Buyer Pension Plan") to
provide that (A) upon the transfer of assets referred
to below, the service of Active Employees who
participated in the Retirement Plan for Salaried
Employees of Cyprus Minerals Company or the Cyprus
Industrial Minerals Company Division Pension Plan for
Yellowstone Mine Hourly Employees (the "Seller Pension
Plans") shall be recognized for all purposes thereunder
(including benefit accrual) to the extent such service
was recognized under the relevant Seller Pension Plan
and (B) upon such transfer, the accrued benefits under
the Buyer Pension Plan of Active Employees who
participated in either of the Seller Pension Plans
shall in no event be less than their accrued benefits
under such Seller Pension Plan as of the Closing Date.

As soon as reasonably practicable, but in any
event (unless both Buyer and Seller otherwise agree)
within 180 days after the Closing Date, Seller shall
cause to be transferred from the trusts under the
Seller Pension Plans to the trust under the Buyer
Pension Plan an amount in cash equal to the actuarial
present value of the "benefit liabilities" (within the
meaning of Section 4001(a)(16) of ERISA) as of the
Closing Date of Active Employees who participated in
either of the Seller Pension Plans, together with
interest at the rate of 8½% per annum from the Closing
Date to the date of transfer.  Determination of such
actuarial present value shall be the Base Present

-32-

Value, provided, however, that if the Alternate Present
Value exceeds the Base Present Value by more than
$250,000, the actuarial present value shall be the Base
Present Value plus 50% of the difference between the
Alternate Present Value and the Base Present Value.  As
used herein, the "Base Present Value" shall mean the
actuarial present value determined on the basis of the
actuarial assumptions used in preparing the Cyprus
Minerals Company Annual Report and 10K as of December
31, 1991 plus 10% of the actuarial present value so
determined, and the "Alternate Present Value" shall
mean the actuarial present value based on the actuarial
assumptions used in preparing the Cyprus Minerals
Company Annual Report and 10K as of December 31, 1991,
modified to (x) assume that a proportion of Employees
will receive benefits upon termination or retirement
under the lump sum option based upon the calculation
practices currently used by Seller (including any non-
qualified supplements that may be applicable) and upon
deferred (or immediate, if applicable) Pension Benefit
Guaranty Corporation interest rates, and (y) base the
proportion of Employees assumed to take the lump sum
option on the actual experience under the Seller
Pension Plans over the last two years, taking into
account the age and service of the Employees at
termination or retirement.  Such actuarial present
values shall be calculated as at the Closing Date by an
actuary appointed by Seller and agreed to by an actuary
appointed by Buyer, and shall be reduced by the amount
of any benefit payments made with respect to Active
Employees after the Closing Date but prior to the date
of transfer.

          Pending completion of the transfers described
in this paragraph (i), Seller and Buyer shall make
arrangements for any required benefit payments to
Employees from the relevant Seller Pension Plan.
Seller and Buyer shall provide each other with access
to information reasonably necessary in order to carry
out the provisions of this Section.

          (ii)    Effective as of the Closing Date,
Seller shall amend the Retirement Plan for Employees of
Windsor Minerals Corporation Represented by Cement,
Lime, Gypsum and Allied Workers Division of the
Brotherhood of Boilermakers International, A.F.L.-
C.I.O., local lodge D449 (the "Windsor Plan") and
Cyprus Industrial Minerals Company Division Pension
Plan for Three Forks Plant Hourly Employees (the "Three
Forks Plan") to make the Buyer the "plan sponsor" (as
such term is defined in Section 3(16)(B) of ERISA
thereunder.  Seller shall cause to be transferred, as

-33-

soon as reasonably practicable, but in any event
(unless both Buyer and Seller otherwise agree) within
180 days after the Closing Date, to a trust established
by Buyer under the Windsor Plan and the Three Forks
Plan, all assets attributable to such Plans held under
the Cyprus Minerals Company Master Trust.

        (iii)  Seller shall continue to make
contributions to these plans when due as required until
the Closing Date.  Buyer shall be responsible for
making required contributions when due to these plans
after the Closing Date.  With respect to the Three
Forks Plan and the Windsor Plan, the required
contributions for 1991 and 1992 for purposes of this
Agreement shall be the minimum required contribution
under Section 412 of the Code as determined by an
actuary appointed by Seller.  Seller's share of the
required contribution for 1991 will be the entire
required contribution for 1991.  Seller's share of the
required contribution for 1992 shall be determined by
multiplying the total required contribution for 1992 by
the fractional portion of 1992 preceding the Closing
Date.  Buyer's share of the required contribution for
1992 shall be the total required contribution for 1992
minus Seller's share of the required contribution for
1992.  If actual contributions to these plans by Seller
exceeds Seller's share of the required contributions
then Buyer shall reimburse Seller for the amount of
such excess.  If Seller's share of the required
contributions exceeds Seller's actual contributions
then Seller shall reimburse Buyer for the amount of
such excess.

        (iv)  Buyer shall assume Seller's liability
under the Grand Island, Nebraska Multiemployer Pension
Plan for Members of General Drivers and Helpers Local
Union #544 Affiliated with the International
Brotherhood of Teamsters Afl-CIO.

        (d)  _European Pension Liabilities_.  Buyer shall
assume all liabilities and assets for all Benefit Plans
listed on Schedule 5.14 that cover foreign employees of the
Companies or the European Companies.

        (e) Buyer shall assume responsibility for all
liabilities, including but not limited to severance benefit
liabilities and any withdrawal liabilities, arising because
of Buyer's actions or omissions regarding Seller's then
former Employees after the Closing Date.

(f) <u>Savings Plan</u>.

(i)  Effective as of the Closing Date, Buyer shall amend an appropriate savings plan to be designated by Buyer (the "Buyer Savings Plan") to provide that (A) the service of Active Employees who participated in the Cyprus Minerals Company Savings Plan and Trust (the "Seller Savings Plan") shall be recognized for all purposes thereunder to the extent such service was recognized under the Seller Savings Plan and (B) the account balances of such Employees which are transferred from the Seller Savings Plan to the Buyer Savings Plan in accordance with this paragraph shall be fully vested at all times.

As soon as reasonably practicable, but in any event (unless both Buyer and Seller otherwise agree) within 180 days after the Closing Date, Sellers shall cause to be transferred from the Seller Savings Plan to the Buyer Savings Plan the liability for the account balances of Active Employees who participated in the Seller Savings Plan, together with assets the fair market value of which is equal to such liability.

(ii)  Pending the completion of the transfer described in paragraph (i), Seller and Buyer shall make arrangements for any required benefit payments to Employees from the Seller Savings Plan.  Seller and Buyer shall provide each other with access to information reasonably necessary in order to carry out the provisions of this Section.

(g) <u>ESOP</u>.  Seller shall take all necessary actions to provide that all Active Employees are fully vested in the amounts credited to their accounts under the Cyprus Minerals Company Amended and Restated Employee Stock Ownership Plan as of the Closing Date.

(h)  <u>Indemnity</u>.  Seller agrees to defend, indemnify and hold harmless the Buyer Indemnitees against and in respect of any Damages caused by, resulting or arising from or otherwise relating to any Breach of any of Seller's responsibilities or obligations under this Section 6.4, and Buyer agrees to defend, indemnify and hold harmless the Seller Indemnities against and in respect of any Damages caused by, resulting or arising from or otherwise relating to any Breach of any of Buyer's responsibilities or obligations under this Section 6.4.  The obligations of this Section 6.4 shall survive the Closing Date without limitation as to time.  For purposes of this paragraph (h), the terms Buyer Indemnitees, Damages, Breach and Seller

Indemnities have the respective meanings ascribed thereto in Section 11.1.

7.5.  Tax Matters.  (A)  Section 338(h)(10). Neither Buyer nor Seller nor any of their respective Affiliates shall make any election pursuant to Section 338(h)(10) of the Code.  Seller understands that, Buyer may make and may cause each member of its affiliated group (as defined in Section 338(h)(5) of the Code) to join in a protective carryover basis election as provided for by regulations under Section 338(e) of the Code.  With regard to this election, Seller will fully cooperate and join in the election, if necessary.

(B)  Liability for Taxes and Related Matters.

(i)  Liability for Taxes.  Seller shall be liable for and indemnify Buyer for all Taxes (including, without limitation, any obligation to contribute to the payment of a tax determined on a consolidated, combined or unitary basis with respect to a group of corporations that includes or included any of the Companies and Taxes resulting from any of the Companies ceasing to be a member of the Seller's Group) (a) imposed on Seller's Group (other than any Taxes described in the following clause (b) of the Companies for any taxable year), (b) imposed on any of the Companies or for which any of the Companies may otherwise be liable (i) for any taxable year or period that ends on or before the Closing Date and, (ii) with respect to any taxable year or period beginning before and ending after the Closing Date, for that portion of such taxable year ending on and including the Closing Date.  Except as set forth in (v), Seller shall be entitled to any refund of Taxes of any of the Companies received for such periods.

(ii)  Buyer shall be liable for and indemnify Seller for the Taxes of any of the Companies for any taxable year or period that begins after the Closing Date and, with respect to any taxable year or period beginning before and ending after the Closing Date, for that portion of such taxable year beginning after the Closing Date.  The Buyer shall be entitled to any refund of Taxes of any of the Companies received for such periods.

(iii)  Taxes for Short Taxable Year.  For purposes of paragraphs (B)(i) and (B)(ii), whenever it is necessary to determine the liability for Taxes of any of the Companies for a portion of a taxable year or period that begins before and ends after the Closing

Date, the determination of the Taxes of any Company for the portion of the year or period ending on, and the portion of the year or period beginning after, the Closing Date shall be determined by assuming that such Company had a taxable year or period which ended at the close of the Closing Date, except that exemptions, allowances or deductions that are calculated on an annual basis, such as the deduction for depreciation, shall be apportioned on a time basis.

(iv)  If, as a result of a challenge by any taxing authority to any transaction that had been treated or a tax-free transaction under Section 351 of the Code or any similar provision under state tax law, such taxing authority determines the adjusted tax basis in an asset of Newco, including the stock in any of the Other Companies, as of the Closing Date to be less than the Carryover Basis (as defined below), then Seller shall indemnify Buyer to the extent that the Carryover Basis of such asset would have produced greater tax benefits to Buyer.  Payment under this paragraph shall be made at the time the adjusted tax basis in an asset of Newco is determined to be other than the Carryover Basis and shall equal the highest marginal corporate tax rate in effect on the Closing Date multiplied by the difference between the Carryover Basis and the redetermined adjusted tax basis; provided, however, that for the purposes of computing such payment, a reduction in the basis of one or more assets shall not be taken into account to the extent that the determination that resulted in a reduction in the basis of such assets also resulted in the increase in the basis in inventory, receivables or other current assets, or any asset that is amortizable, depreciable or depletable under the applicable tax law in effect on the date that such determination is made.  As used herein, the term "Carryover Basis" means the adjusted tax basis in the asset as of December 31, 1991 reduced by any depreciation, depletion or other such allowance (or, in the case of stock in any of the Other Companies, by the adjustments provided for in section 1.1502-32 of the income tax regulations) properly attributable to the period between December 31, 1991 and the Closing Date.

(v)  Adjustment to Purchase Price.  Any payment by Buyer or Seller under this Section will be an adjustment to the Purchase Price.

(vi)  Refunds from Carrybacks.  If Seller becomes entitled to a refund or credit of Taxes for any period for which it is liable under paragraph (B)(i) to

-37-

indemnify Buyer and such refund or credit is
attributable solely (or in part) to the carryback of
losses, credits or similar items from either a taxable
year or period that begins after the Closing Date or in
the case of a taxable year or period that begins before
and ends after the Closing Date, that portion of the
taxable year or period that begins after the Closing
Date (determined under the principles of paragraph
(B)(iii)), and is attributable to any of the Companies,
Seller shall promptly pay to the Buyer the amount of
such refund or credit (or a pro-rata share of such
refund or credit if due only in part to the carryback
of such losses, credits or similar items) together with
any interest thereon.  In the event that any refund or
credit of Taxes for which a payment has been made is
subsequently reduced or disallowed, the Buyer shall
repay any amounts paid to it by the Seller pursuant to
this paragraph and indemnify and hold harmless the
Seller for any interest and penalties assessed against
Seller by reason of the reduction or disallowance.
Provided, however, that the preceding sentence shall
not apply if the reduction or disallowance is caused by
Seller's computational error.

      (vii)  <u>Returns</u>.  Seller shall file or cause
to be filed when due all Returns with respect to Taxes
that are required to be filed by or with respect to any
of the Companies for taxable years or periods ending on
or before the Closing Date and shall pay any Taxes due
in respect of such Returns, and Buyer shall file or
cause to be filed when due all Returns with respect to
Taxes that are required to be filed by or with respect
to any of the Companies for taxable years or periods
ending after the Closing Date and shall remit any Taxes
due in respect of such Returns.  Each of the Companies
shall retain an officer of Seller for the sole purpose
of signing the Returns that Seller is required to file
pursuant to this paragraph.  Seller shall pay Buyer the
Taxes for which Seller is liable pursuant to paragraph
(B)(i) but which are payable with Returns to be filed
by Buyer pursuant to the previous sentence not less
than two business days prior to the due date for the
payment of such Taxes.  Buyer shall provide Seller with
its then best estimate of these taxes 10 business days
prior to the due date for payments of such Taxes.
Notwithstanding the foregoing, with regard to taxes for
periods that begin before but end after the Closing
Date, Seller shall be entitled to reduce its payment
under this paragraph to Buyer to the extent of the
amount accrued by the Company making the payment on the
Company's balance sheet as of the Closing Date.  With
regard to taxes for periods that begin before but end

after the Closing Date, Buyer shall pay Seller, within five (5) business days of making a payment for the applicable taxes to a tax authority, any amounts accrued on the Final Closing Statement of the Company making the payment, for the particular liability for tax, in excess of the applicable tax.

(viii) <u>Contest Provisions</u>. Buyer shall promptly notify Seller in writing upon receipt by Buyer, any of its Affiliates or any of the Companies of notice of any pending or threatened audit or assessment by any federal, state, local or foreign taxing authorities which may affect the tax liabilities of any of the Companies for any periods for which Seller would be required to indemnify Buyer pursuant to paragraph (B)(i), provided that failure to comply with this provision shall not affect Buyer's right to indemnification hereunder.  Seller shall have the sole right to represent any Company's interests in any tax audit or administrative or court proceedings relating to taxable periods ending on or before the Closing Date, and to employ counsel of its choice at its expense.  Notwithstanding the foregoing, Seller shall not be entitled to settle, either administratively or after the commencement of litigation, any claim for Taxes which would adversely affect the liability for Taxes of the Buyer or any of the Companies for any period ending after the Closing Date to any extent (including, but not limited to, the imposition of income tax deficiencies, the reduction of asset basis or cost adjustments, the lengthening of any amortization or depreciation periods, the denial of amortization or depreciation deductions, or the reduction of loss or credit carryforwards) without the prior written consent of Buyer.  Such consent shall not be unreasonably withheld, and shall not be necessary to the extent that Seller has indemnified the Buyer against the effects of any such settlement.  Buyer shall have the sole right to represent any Company's interest in any tax audit or administrative or court proceeding for any taxable year or period that begins before but ends after the Closing Date.  Neither Buyer nor any of the Companies may agree to settle any tax claim for the portion of the year or period ending on the Closing Date which may be the subject of indemnification by Seller under paragraph (B)(i) without the prior written consent of Seller, which consent shall not be unreasonably withheld.

(ix) <u>Termination of Tax Allocation Agreements</u>.  Any tax allocation or sharing agreement or arrangement, whether or not written, that may have been

-39-

entered into by Seller or any member of Seller's Group and any of the Companies shall be terminated as to each of the Companies as of the Closing Date, and no payments which are owed by or to any of the Companies pursuant thereto shall be made thereunder.

(C) <u>Transfer Taxes</u>. Seller and Buyer shall each be liable for one half the transfer, sales, use or other similar taxes arising under any state, local or foreign law from the sale of the Shares, including any real property transfer taxes. Buyer and Seller shall cooperate fully in making any payment, withholding any amount or filing any return or information which is required with respect to a transfer, sales, use or other similar tax described in the preceding sentence. The party responsible under state, local or foreign law for making such payment, withholding such amount or filing such return or information with respect to such transfer, sales, use or other similar taxes shall undertake to fulfill that responsibility; provided, however, that Seller must inform Buyer of any payment that must be made by Buyer, amount that must be withheld by Buyer or return or information that must be filed by Buyer with respect to such transfer, sales, use or other similar taxes.

(D) <u>Information to be Provided by Buyer</u>. With respect to the periods in 1992 prior to the Closing Date, Buyer shall promptly cause each of the Companies to prepare and provide to Seller a package of tax information materials (the "Tax Package"), which shall be completed in accordance with past practice including past practice as to providing the information, schedules and work papers and as to the method of computation of separate taxable income or other relevant measure of income of each of the Companies. Buyer shall cause the Tax Package described in this paragraph to be delivered to Seller by December 31, 1992.

(E) <u>Assistance and Cooperation</u>. After Closing Date, each of Seller and Buyer shall:

(i) assist (and cause their respective Affiliates to assist) the other party in preparing any Returns or reports with such other party is responsible for preparing and filing in accordance with this Section;

(ii) cooperate fully in preparing for any audits of, or disputes with taxing authorities regarding any Returns of any of the Companies;

(iii) make available to the other and to any taxing authority as reasonably requested all

-40-

information, records, and documents relating to Taxes
of any of the Companies;

      (iv)  provide timely notice to the other in
writing of any pending or threatened tax audits or
assessments of any of the Companies for taxable periods
for which the other may have a liability under this
Section; and

      (v)  furnish the other with copies of all
correspondence received from any taxing authority in
connection with any tax audit or information request
with respect to any such taxable period.

    (F)  <u>Record Retention</u>.  Seller will continue to
store and maintain the original copies of any federal,
state, local or foreign tax return or report for any year
still open for audit by any taxing authority for any period
up to and including the taxable years or periods ending on
or before the Closing Date and any work papers prepared
exclusively for purposes of filing such returns.  Seller
will provide Buyer with copies of all such returns and work
papers that have been prepared within 10 days after the
Closing Date and with copies of subsequent returns and work
papers as soon as possible after such returns and work
papers are prepared.  Seller will notify Buyer prior to the
destruction of any records mentioned in this subsection (F)
and provide Buyer with the option of continuing to store and
maintain such records on its own behalf.

    (G)  <u>Survival of Obligations</u>.  The obligations of
the parties set forth in this Section shall be unconditional
and absolute and shall remain in effect without limitation
as to time.

    7.6.  <u>Insurance</u>.  To the extent that (i) there are
third-party insurance policies maintained by Seller and its
Affiliates (other than the Companies) ("<u>Seller's Insurance
Policies</u>") insuring against any loss, liability, damage or
expense relating to the assets, businesses, operations,
conduct, products and employees (including former employees)
of the business of any Company (all such losses,
liabilities, claims, damages or expenses, regardless of the
availability of insurance coverage, are herein referred to
collectively as the "<u>Business Liabilities</u>") and relating to
or arising out of occurrences prior to the Closing, and (ii)
Seller's Insurance Policies continue after the Closing to
permit claims ("<u>Claims</u>") to be made with respect to such
Business Liabilities relating to or arising out of
occurrences prior to the Closing, Seller agrees to cooperate
and cause such Affiliates to cooperate with Buyer and the
Companies in submitting Claims on behalf of Buyer or such

-41-

Companies under Seller's Insurance Policies with respect to such Business Liabilities relating to occurrences prior to the Closing.

7.7.  <u>Books and Records</u>.  Except for tax records covered by Section 7.6(F), Buyer will, and will cause each Company to, for a period of six years after the Closing, retain all books, records and other documents pertaining to the businesses of the Companies in existence on the Closing Date and to make the same available after the Closing Date for inspection and copying by Seller or any Affiliate of Seller at Seller's expense during the normal business hours of Buyer or such Company, as applicable, upon reasonable request and upon reasonable notice.  Without limiting the generality of the foregoing, Buyer will, and will cause each Company to, make available to Seller, the Affiliates of Seller and their respective representatives all information deemed necessary or desirable by Seller or such Affiliates in preparing their respective financial statements and Tax returns and conducting any audits in connection therewith.

7.8.  <u>Announcements</u>.  Prior to the Closing, neither Seller nor Buyer will issue any press release or otherwise make any public statement with respect to this Agreement and the transactions contemplated hereby without the prior written consent of the other (which consent shall not be unreasonably withheld), except as may be required by applicable law, stock exchange regulation or in connection with Buyer obtaining the approval of its shareholders.

7.9.  <u>Interim Use of Names</u>.  Except as provided in this Section 7.9, no interest in or right to use the name "Cyprus" or any derivation or logo thereof is being transferred hereunder.  The parties agree that Buyer shall, as promptly as practicable but in any event within forty-five (45) days following the Closing Date, file an amendment with the appropriate authorities to eliminate the name Cyprus from the name of each Company, and within one year following the Closing Date, remove or obliterate all such trade names, trademarks and logos from all signs, purchase orders, invoices, sales orders, packaging stock, labels, letterheads, shipping documents and other materials used by it or any of its Affiliates (including but not limited to the Companies).  For a period of sixty (60) days after the Closing Date, Buyer and its Affiliates (including the Companies) may continue to use any purchase orders, invoices, sales orders, letterheads or shipping documents which bear the name Cyprus, provided that after such sixty (60) days' period, Buyer and its Affiliates (including the Companies) shall cease to use (i) any purchase orders, invoices, sales orders, letterheads or shipping documents existing on the date hereof, which bear the name "Cyprus" or

-42-

any name confusingly similar thereto, without first obliterating or covering such name, mark or logo, or (ii) any such materials not in existence on the Closing Date which bear such name, mark or logo. Except to the extent contemplated above, Buyer will not, and will cause each of its Affiliates (including but not limited to the Companies) not to, misappropriate, misrepresent or otherwise infringe, abuse or diminish the value of said names.

7.10.   <u>No Shopping</u>.  Between the date hereof and the earlier of the Closing Date and the termination of this Agreement, neither Seller nor any of its Affiliates shall, directly or indirectly, through any officer, director or agent or otherwise, in any manner solicit, initiate, encourage, or participate in any negotiation in respect of or cooperate with any person making an Acquisition Proposal (as hereinafter defined). The term "<u>Acquisition Proposal</u>" means any proposal for a merger with the Companies or for the acquisition of all or substantially all the assets of the Companies or the Shares.

7.11.   <u>Computer Technology and Other Interim Services</u>.  For a period not to exceed six months following the Closing, Seller will provide to the Companies such computer services of the types and of substantially the same standard of service that Seller has provided prior to the date hereof, as and to the extent Buyer shall require, at Seller's cost. Buyer shall only be billed for such services to the extent Seller's cost for such services exceeds $300,000. Buyer shall be responsible for obtaining all required software licenses that are necessary for Seller to provide such computer services to the Companies after Closing. Buyer shall be responsible for all costs associated with obtaining the software licenses required by the Companies and for all costs associated with establishing such computer services separate from Seller's processing systems to provide for adequate security, efficient processing, and transfer of historical data as may be required by Buyer. Nothing herein shall prevent Buyer from contracting directly with Seller's computer services vendor. Buyer, Seller and the Companies, shall use reasonable efforts to minimize data processing costs including costs associated with the utilization of transitional operational systems and software packages. Other transitional support services provided to Buyer and the Companies by Seller after the Closing will be performed at Buyer's expense but at an amount equal to Seller's cost.

7.12.   <u>Barite Tolling Agreement</u>.  For as long as the Companies operate the Houston Mill lease, or for a maximum of one year from the Closing, if the operation continues after such one year period, Buyer shall provide to

-43-

Seller reasonable barite toll grinding services at the Houston Mill on negotiated fair market value terms. Buyer shall provide Seller, and a purchaser and subsequent purchaser of Seller's facilities to the extent of using it only with respect to such facility, with a non-assignable perpetual, royalty free license to utilize the Nichols classifier technology.

7.13. <u>Best Efforts</u>. Subject to the terms and conditions herein provided, each of Buyer and Seller agree to cooperate and to use their respective best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, including, without limitation, obtaining consents under all contracts and agreements, requiring consent to be assigned to Buyer.

7.14. <u>Covenant Not to Compete</u>. (a) Subject to Seller's right to engage in the barite business, for a period of five years after the Closing, Seller will not, and will cause each of its Affiliates not to engage in any talc business that directly, or indirectly, competes with the businesses of the Companies, as conducted on the Closing Date; <u>provided</u>, <u>however</u>, that nothing contained in this Section 7.14(a) shall prohibit Seller or any of its Affiliates from acquiring any company or business which has, as a non-primary business, a talc business.

(b) For a period of five years after the Closing, Buyer will not, and will cause each of its Affiliates not to engage in any barite business that directly, or indirectly, competes with the barite business of Seller, as conducted on the Closing Date; <u>provided</u>, <u>however</u>, that nothing contained in this Section 7.14(b) shall prohibit Buyer or any of its Affiliates from acquiring any company or business which has, as a non-primary business, a barite business.

(c) After the Closing, Seller will not, and will cause each of its Affiliates not to, utilize the trade secrets to be transferred to Buyer pursuant to this Agreement to engage in any business that directly, or indirectly, competes with the businesses of the Companies, or disclose to any Affiliate or any other person any such trade secrets or, within five years after the Closing, any other confidential information relating to the Companies or its properties, except that Seller may make disclosures, after consultation with Buyer, as required by law or applicable rules of a stock exchange. It is understood that confidential information does not include information which is or becomes publicly available without Seller's fault.

-44-

(d)  For a period of three years after the Closing Date, Seller will not and will cause each of its Affiliates not to, except with Buyer's prior written consent (which consent shall not be unreasonably withheld), hire or employ, or solicit the hiring or employment of, any employee of the Companies.

(e)  Seller and Buyer agree that, if any provision of this Section 7.14 should be adjudicated to be invalid or unenforceable, such provision shall, to the extent permitted by law, be deemed deleted herefrom with respect, and only with respect, to the operation of such provision in the particular jurisdiction in which such adjudication was made; provided, however, that to the extent any such provision may be made valid and enforceable in such jurisdiction by limitation of the scope of the activities, geographical area or time period covered, Seller and Buyer agree that such provision instead shall be deemed limited to the extent, and only to the extent, necessary to make such provision enforceable to the fullest extent permissible under the laws and public policy applied in such jurisdiction.

7.15  Nihon Mistron.  Pursuant to the Agreement of Transfer and Assumption dated June 5, 1992 between Seller and Newco, Seller has agreed to transfer to Newco, its record and beneficial ownership of 60% of the issued and outstanding shares of Nihon Mistron Company.  If Seller is unable to transfer such shares to Newco because the other parties in the joint venture exercise their preemptive right to purchase such shares, the proceeds from such sale shall immediately be delivered to Buyer.

7.16  Hamm Underground Mine Property.  The parties have agreed that Seller shall retain title to the Hamm Underground Mine Property and shall be responsible for all costs associated with any required clean up of such property.  Any required clean up shall be performed as soon as reasonably practicable.  At such time as such property is in material compliance with all applicable Environmental Laws, Buyer shall have the option to purchase such property for one dollar in cash.

7.17  Buyer's Insurance.  For as long as Seller may be liable to indemnify Buyer pursuant to this Agreement, Buyer agrees to maintain business interruption insurance for the Companies in a manner and amount reasonable for a Company engaged in the same business as the Companies in the same area.

## ARTICLE 8

### CONDITIONS PRECEDENT OF SELLER

The obligation of Seller to consummate the transactions described in Article 2 hereof is subject to the fulfillment of each of the following conditions prior to or at the Closing:

8.1.   Representations and Warranties.   The representations and warranties of Buyer made hereunder shall be true in all material respects at and as of the Closing Date, with the same force and effect as though made at and as of the Closing Date, except for changes permitted or contemplated by this Agreement and except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true in all material respects as of such date.

8.2.   Agreements.   Buyer shall have performed and complied in all material respects with all its undertakings and agreements required by this Agreement to be performed or complied with by Buyer prior to or at the Closing.

8.3.   Buyer Certificate.   Seller shall have been furnished with certificates of an authorized officer of Buyer, dated the Closing Date, certifying to the effect that the conditions contained in Sections 8.1 and 8.2 have been fulfilled.

8.4.   No Injunction.   No injunction, restraining order or decree of any nature of any court or governmental or regulatory authority shall exist against Buyer, Seller, Cyprus, any Company or any of their respective Affiliates, or any of the principals, officers or directors of any of them, that restrains, prevents or materially changes the transactions contemplated hereby.

8.5.   Consents.   All material consents, approvals and authorizations of governmental and regulatory authorities, and all material filings with and notifications of governmental authorities and regulatory agencies or other entities which regulate the business of Seller, any Company or Buyer, necessary on the part of Seller, any Company or Buyer, or their respective Affiliates, to the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, shall have been obtained or effected (and all applicable waiting periods, if any, including any extensions thereof, under any applicable law, statute, regulation or rule, including but not limited to the HSR Act shall have expired or terminated, as applicable).

-46-

8.6.  <u>Miscellaneous Closing Deliveries</u>.  Seller shall have received such evidence as Seller may reasonably request in order to establish (i) the power and authority of Buyer to consummate the transactions contemplated by this Agreement and (ii) compliance with the conditions of Closing set forth herein.


ARTICLE 9

<u>CONDITIONS PRECEDENT OF BUYER</u>

The obligation of Buyer to consummate the transactions described in Article 2 hereof is subject to the fulfillment of each of the following conditions prior to or at the Closing:

9.1.  <u>Representations and Warranties</u>.  The representations and warranties of Seller and Cyprus made hereunder shall be true in all material respects at and as of the Closing Date, with the same force and effect as though made at and as of the Closing Date, except for changes permitted or contemplated by this Agreement and except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true in all material respects as of such date; provided that Buyer may not invoke this Section 9.1, unless the untruthfulness of the representations and warranties in the aggregate constitute a material adverse change, or unanticipated and undisclosed material liability previously unknown to Buyer which would have a material adverse effect, on the talc business of the Companies as a whole.

9.2.  <u>Agreements</u>.  Seller shall have performed and complied in all material respects with all of its undertakings and agreements required by this Agreement to be performed or complied with by it prior to or at the Closing; provided that Buyer may not invoke this Section 9.2, unless the non-compliance, in the aggregate would have a material adverse effect, on the talc business of the Companies as a whole.

9.3.  <u>Seller Certificate</u>.  Buyer shall have been furnished with a certificate of an authorized officer of Seller, dated the Closing Date, certifying to the effect that the conditions contained in Sections 9.1 and 9.2 have been fulfilled.

9.4.  <u>No Injunction</u>.  No injunction, restraining order or decree of any court or governmental or regulatory

-47-

authority shall exist against Buyer, Seller, Cyprus, any Company or any of their respective Affiliates, or any of the principals, officers or directors of any of them, that restrains, prevents or materially changes the transactions contemplated hereby.

9.5.  <u>Consents</u>.  All material consents, approvals and authorizations of governmental and regulatory authorities, and all filings with and notifications of governmental authorities and regulatory agencies or other entities which regulate the business of Seller, any Company or Buyer, necessary on the part of Seller, any Company or Buyer, or their respective Affiliates, to the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, shall have been obtained or effected (and all applicable waiting periods, if any, including any extensions thereof, under any applicable law, statute, regulation or rule, including but not limited to the HSR Act shall have expired or terminated, as applicable); provided that Buyer may not invoke this Section 9.5 unless the failure to obtain or effect such consents, approvals and authorizations, in the aggregate would have a material adverse effect, on the talc business of the Companies as a whole.

9.6.  <u>Miscellaneous Closing Deliveries</u>.  Buyer shall have received such evidence as Buyer may reasonably request in order to establish (i) the power and authority of Seller and Cyprus to consummate the transactions contemplated by this Agreement and (ii) compliance with the conditions of Closing set forth herein.

9.7.  <u>Newco Closing</u>.  The Closing of the transactions contemplated in the Agreement of Transfer and Assumption dates June 5, 1992 between Seller and Newco shall have occurred to Buyer's reasonable satisfaction.

9.8.  <u>J&J Non-Termination</u>.  Johnson & Johnson Consumer Products, Inc. ("J&J") shall not have given notice of termination to Cyprus or its Affiliates or to Buyer pursuant to the Talc Supply Agreement by and between Windsor Minerals Inc. and J&J, dated January 6, 1989.

## ARTICLE 10

### SURVIVAL OF REPRESENTATIONS
### AND WARRANTIES

10.1.  <u>Survival of Representations and Warranties</u>.
(a)  Except as specified in Section 10.1(b) hereof, all representations and warranties of Seller

-48-

included or provided for herein or in any schedule or in any certificate or other document delivered pursuant to this Agreement shall survive for a period of one year after the Closing Date and shall thereafter expire except with respect to breaches and violations theretofore specified, in writing in accordance with Section 11.5, to Seller by Buyer, the Companies or their successors.

(b)   The representations and warranties contained in Sections 5.1, 5.3. 5.4 and 5.13 of this Agreement shall survive the Closing Date until the expiration of the limitation period under the applicable statutes of limitations (or any extensions thereof) and thereafter shall expire except with respect to breaches or violations theretofore specified, in writing in accordance with Section 11.5, to Seller by Buyer, the Companies or their successors.   The representations and warranties contained in Section 5.16 of this Agreement shall survive for a period of thirty (30) months after the Closing and shall thereafter expire except with respect to breaches or violations theretofore specified, in writing in accordance with Section 11.5, to Seller by Buyer, the Companies or their successors.

## ARTICLE 11

### INDEMNIFICATION

11.1.   Indemnification of Buyer and its Affiliates.   Subject to Section 11.4, Seller and Cyprus, jointly and severally, agree to defend, indemnify and hold harmless Buyer, its Affiliates and its successors and assigns (individually, a "Buyer Indemnitee", and collectively, the "Buyer Indemnities") against and in respect of:

(a)   any and all losses, claims, damages, liabilities, costs and expenses ("Damages") caused by, resulting or arising from or otherwise relating to (i) any failure by Cyprus or Seller to perform or otherwise fulfill or comply with any provision of this Agreement; (ii) any breach or violation ("Breach") of any representation or warranty of Cyprus or Seller hereunder, or (iii) any claim arising out of or relating to the operation of the businesses of any of the Companies or either of the European Companies prior to the Closing as to which Buyer has given written notice to Seller within one year of the Closing Date;

-49-

(b) any and all actions, suits, proceedings, claims, liabilities, demands, assessments, judgments, costs and expenses, including reasonable attorneys' fees, directly relating to such indemnification.

11.2. <u>Indemnification of Seller and Its Affiliates</u>. Subject to Section 11.4, Buyer agrees to defend, indemnify and hold harmless Seller and Seller's Affiliates, and their respective successors and assigns (individually, a "<u>Seller Indemnitee</u>", and collectively, the "<u>Seller Indemnities</u>") against and in respect of:

(a) any and all Damages caused by, resulting or arising from or otherwise relating to (i) any failure by Buyer to perform or otherwise fulfill or comply with any provision of this Agreement, or (ii) any Breach of any representation or warranty of Buyer hereunder;

(b) any and all actions, suits, proceedings, claims, liabilities, demands, assessments, judgments, costs and expenses, including reasonable attorneys' fees, directly relating to such indemnification.

11.3. (a) <u>Environmental Indemnification</u>. Subject to Section 11.3(c), and except to the extent disclosed in Schedule 11.3 or to the extent Dr. Graham B. Lawson, J. Stevenson, Richard Gaunt or John Paulson has actual knowledge on the date hereof of a matter that would give rise to a valid claim under (ii), (iii) or (iv) below, with respect to any written claim, specifying in reasonable detail to the extent known, made by Buyer within thirty (30) months of the Closing Date, Seller and Cyprus shall jointly and severally indemnify and hold Buyer Indemnitee harmless from and against any and all damages, losses, liabilities, actions, claims, costs and expenses (including, without limitation, removal costs, remediation costs, fines, penalties, expenses of investigation and ongoing monitoring, and reasonable attorney's fees) ("<u>Losses</u>") directly or indirectly based upon, arising out of, resulting from or relating to (i) any action taken by Seller with respect to the Hamm Underground Mine Property or any liability under Environmental Law relating to a present condition at the Hamm Underground Mine Property, (ii) any violation of any Environmental Law by the Companies or their predecessors or any of its employees, representatives, agents or any other person or entity acting on behalf of the Companies prior to the Closing (including, without limitation, any failure to obtain or comply with any permit, license or other approval or authorization under the provisions of any Environmental Law), (iii) any and all liabilities under any Environmental Law arising on or prior to the Closing out of or otherwise in respect of any act, omission, event, condition or

-50-

circumstance occurring or existing in connection with the Companies or the properties owned or operated by the Companies or their predecessors at any time prior to the Closing (including, without limitation, liabilities relating to investigation, removal, remediation, containment, cleanup or abatement of the presence, Release or threatened Release of any Hazardous Substance, whether on-site or off-site) and (iv) any and all expenditures required to be incurred by the Companies (x) to enable them to operate in compliance with all applicable Environmental Laws and (y) to repair and restore all damage to any building, land or property of the Companies arising out of or relating to the removal, remediation, cleanup or abatement of the presence of any Hazardous Substance in violation of any Environmental Law existing on or prior to the Closing in connection with the Companies or the properties owned or operated by the Companies or their predecessors at any time prior to the Closing; provided, however, that Seller shall not have any liability pursuant to this Section 11.3(a) for claims brought by private individuals where there is no violation or liability under any Environmental Law. The indemnity provided in this Section 11.3 shall be without regard to any purported availability of insurance.

(b)    If any governmental authority (whether federal, foreign, state or local) or if any Environmental Law shall require Buyer or any Company to effect or take any removal, remedial, corrective or similar actions ("Remedial Action"), or if any third party makes any other claim which is to be the basis for a claim for indemnification under Section 11.3 ("Other Environmental Claim"), then Buyer shall prior to taking any Remedial Action or having discussions with or reporting to the governmental authority (except in situations requiring immediate action under the applicable Environmental Law or emergency situations to preserve life or property) give prompt written notice to Seller of the required Remedial Action or the Other Environmental Claim. Seller, at its option, by notice to Buyer given within thirty (30) days of Buyer's notice to Seller of the Remedial Action or Other Environmental Claim (or such shorter periods specified in Buyer's notice if the ordering governmental agency requires that action be taken more promptly than such thirty (30) day notice period would allow, or if Buyer reasonably determines that the existing condition which is the subject of the Remedial Action or Other Environmental Claim requires that action be taken more promptly than such thirty (30) day period would allow) shall (i) assume control of and effect such Remedial Action or defend such Other Environmental Claim at its cost and expense, or (ii) permit Buyer to control and effect such Remedial Action or defend such Other Environmental Claim at Seller's cost and expense. Any and all costs and expenses incurred or paid by Seller or

by Buyer on Seller's account hereunder shall be considered within the term Losses and be subject to the limitations set forth in Section 11.3(c). Buyer and Seller shall cooperate with each other and shall have a right to participate in discussions with applicable government authorities in effecting any Remedial Action with a view toward promptly completing any Remedial Action, minimizing the disruptive effect of any Remedial Action on the conduct of the businesses of the Companies, avoiding the incurrence of additional environmental liabilities with respect to the existing condition as to which the Remedial Action is taken and performing any Remedial Action at the lowest reasonable cost. All Remedial Action performed by Buyer shall be performed at the lowest reasonable cost, taking into consideration the matters set forth in the preceding sentence, and subject to audit by Seller. Costs in excess of such lowest reasonable cost shall be for Buyer's account. Seller may not settle or compromise any claim by any governmental authorities relating to a Remedial Action or Other Environmental Claim, without Buyer's prior written consent (which consent may not be unreasonably withheld). Buyer may not settle or compromise any claim by any governmental authorities relating to a Remedial Action or Other Environmental Claim, without Seller's prior written consent (which consent may not be unreasonably withheld). If Seller elects to assume control of a Remedial Action, Buyer shall provide Seller reasonable access to the relevant properties to allow Seller to complete such Remedial Action. Buyer shall, at Seller's expense, provide reasonable access to the properties of the Companies, to the extent reasonably required by Seller in order for Seller to take Remedial Action with respect to the Hamm Underground Mine Property, provided that such access shall not have any disruptive effect on the businesses of the Companies or expose the Companies to any potential material liability.

(c)   With respect to the operating sites of the Companies set forth on Schedule 11.3A, Seller's liability for Losses pursuant to Section 11.3(a) shall not include any liability for closure costs or reclamation costs, and shall not in the aggregate exceed an amount equal to the Purchase Price; provided, however, that no claim for any single item may be made under this Section 11.3, unless and until the amount of such claim exceeds $100,000 in which case Seller and Cyprus shall be liable for the whole amount of such claim. With respect to the sites of the Companies not set forth on Schedule 11.3A, Seller's liability for Losses pursuant to Section 11.3(a) shall include all liabilities for closure and reclamation costs, and shall not be limited to any amount; provided, however, that no claim for any single item may be made under this Section 11.3 unless and until the amount of such claim exceeds $100,000, in which

-52-

case Seller and Cyprus shall be liable for the whole amount of such claim; provided, further, however, that if the cost of any Remedial Action on such property is clearly shown, by Seller to the reasonable satisfaction of Buyer, to be in excess of its fair market value, Seller shall instead of taking such Remedial Action have the option to reacquire such property from Buyer for one dollar and shall be solely liable for any costs associated with such property.

11.4.  Limitations on Indemnifications.  The provisions for indemnity under Sections 11.1(a)(i),(ii) and (b) and 11.2 shall be effective only when the aggregate amount of all claims for which Seller or Buyer is liable under Sections 11.1(a)(i), (ii) and (b) or 11.2, respectively, exceeds $500,000, in which case such party shall be liable for all such amounts; provided, however, that in no event shall either Buyer or Seller be liable for more than an amount in the aggregate equal to $50,000,000 for all claims made against it under Sections 11.1(a)(i), (ii) and (b) or 11.2, respectively; provided, further, however, that no claim for any single item may be made, nor shall Seller or Buyer be liable, under Sections 11.1(a)(i), (ii) and (b) or 11.2, respectively, if the amount of such claim is less than $100,000 provided, further, however, that no claim may be made for indemnity to the extent the Indemnitee can reasonably, and does actually recover pursuant to an existing business interruption insurance.

11.5.  Claims.  Any claim for indemnity under Section 11.1 or 11.2 hereof shall be made by written notice from the Indemnitee to the Indemnifying Party specifying in reasonable detail the basis of the claim.  Except as otherwise provided herein, when an Indemnitee seeking indemnification under Section 11.1 or 11.2 receives notice of any claims made by third parties ("Third Party Claims") which is to be the basis for a claim for indemnification hereunder, the Indemnitee shall give prompt written notice thereof to the Indemnifying Party reasonably indicating (to the extent known) the nature of such claims and the basis thereof. Upon notice from the Indemnitee, the Indemnifying Party may, but shall not be required to, assume the defense of any such Third Party Claims, including its compromise or settlement, and the Indemnifying Party shall pay all reasonable costs and expenses thereof and shall be fully responsible for the outcome thereof; provided, however, that in such case, the Indemnifying Party shall have no obligation to pay any further costs or expense of legal counsel of the Indemnitee in connection with such defense and, provided, further, that the Indemnifying Person may not settle or compromise any Third Party Claims without the Indemnitee's prior written consent (which consent shall not be unreasonably withheld).  The Indemnifying Party shall

-53-

give notice to the Indemnitee as to its intention to assume the defense of any such Third Party Claims within twenty (20) business days after the date of receipt of the Indemnitee's notice in respect of such Third Party Claims. If an Indemnifying Party does not, within twenty (20) business days after the Indemnitee's notice is given, give notice to the Indemnitee of its assumption of the defense of the Third Party Claims, the Indemnifying Party shall be deemed to have waived its rights to control the defense thereof.  If the Indemnitee assumes the defense of any Third Party Claims because of the failure of the Indemnifying Party to do so in accordance with this Section 11.4, the Indemnifying Party shall pay all reasonable costs and expenses of such defense and shall be fully responsible for the outcome thereof.  The Indemnifying Party shall have no liability with respect to any compromise or settlement thereof effected without its prior written consent (which consent shall not be unreasonably withheld).

11.6.  <u>Survival</u>.  Notwithstanding anything in this Agreement to the contrary, this Article 11 shall survive termination of this Agreement without limitation.

## ARTICLE 12

### MISCELLANEOUS

12.1.  <u>Further Assurances</u>.  From time to time after the Closing, Seller will execute and deliver, or cause to be executed and delivered, such documents to Buyer as Buyer shall reasonably request in order to vest more effectively in Buyer good title to the Shares or otherwise consummate more effectively the transactions contemplated by this Agreement, and from time to time after the Closing, Buyer will execute and deliver, or cause to be executed and delivered, such documents to Seller as Seller shall reasonably request in order to consummate more effectively the transactions contemplated by this Agreement.

12.2.  <u>Expenses</u>.  Each of the parties hereto shall pay the fees and expenses of its respective counsel, accountants and other experts and shall pay all other expenses incurred by it in connection with the negotiation, preparation and execution of this Agreement and the consummation of the transactions contemplated hereby. Seller shall pay all expenses, including, without limitation, all taxes, duties and registration fees, incurred by it or the Companies in connection with the restructuring of the talc business of Seller and its

-54-

Affiliates, including, without limitation, those relating to the creation of Newco.

12.3.  _Applicable Law_.  This Agreement shall be governed by, and construed in accordance with, the law of the State of New York without reference to choice of law principles, including all matters of construction, validity and performance.

12.4.  _Notices_.  All notices, requests, permissions, waivers, and other communications hereunder shall be in writing and shall be deemed to have been duly given if signed by the respective persons giving them (in the case of any corporation the signature shall be by an officer thereof) and delivered by hand, or by United States mail (registered, return receipt requested), properly addressed and postage prepaid:

> If to Seller, to:
>
> Cyprus Mines Corporation
> 9100 Mineral Circle
> P.O. Box 3299
> Englewood, Colorado 80155
>
> Attention:  President
>
> with a copy to:
>
> Cyprus Mines Corporation
> 9100 Mineral Circle
> P.O. Box 3299
> Englewood, Colorado 80155
>
> Attention:  General Counsel
>
> If to Buyer, to:
>
> RTZ America, Inc.,
> 150 East 58th Street
> New York, New York  10155
>
> Attention: President
>
> with copies to:
>
> Borax Consolidated Limited
> Borax House
> Carlisle Place
> London
> SW1P 1HT

-55-

Attention:  Mr. F. Alan S. Lesser

RTZ Corporation PLC
6 St. James's Square
London SW1Y 4LD

Attention:  Charles H.H. Lawton Esq.

Sullivan & Cromwell
St Olave's House
9a Ironmonger Lane
London EC2V 8EY

Attention:  David M. Kies, Esq.

Such names and addresses may be changed by such notice.

12.5.  Entire Agreement.  This Agreement (including the Schedules attached thereto, all of which are a part hereof) and the Confidentiality Agreement contains the entire understanding of the parties hereto with respect to the subject matter contained herein, supersedes and cancels all prior agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

12.6.  Amendments.  This Agreement may be amended only by a written instrument executed by the parties or their respective successors or assigns.

12.7.  Headings; References.  The article, section and paragraph headings and table of contents contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  All references herein to "Articles", "Sections", or "Schedules" shall be deemed to be references to Articles or Sections hereof and Schedules hereto unless otherwise indicated.

12.8.  Counterparts.  This Agreement may be executed in one or more counterparts and each counterpart shall be deemed to be an original.

12.9.  Parties in Interest; Assignment.  This Agreement shall inure to the benefit of and be binding upon Seller and Buyer and their respective successors.  Nothing in this Agreement, express or implied, is intended to confer upon any Person not a party to this Agreement any rights or remedies under or by reason of this Agreement.  No party to this Agreement may assign or delegate all or any portion of its rights, obligations or liabilities under this Agreement without the prior written consent of the other party to this

-56-

Agreement; provided, however, that Seller shall have the right to assign or delegate any portion of its rights, obligations or liabilities hereunder to any Affiliate of Seller, so long as Seller and Cyprus shall remain fully liable for the fulfillment of all of its obligations and liabilities hereunder; and provided, further, that Buyer shall have the right to assign or delegate any or all of its rights, obligations or liabilities hereunder to any Affiliate of Buyer, so long as Buyer shall remain fully liable for the fulfillment of all of its obligations hereunder.

12.10.   Severability; Enforcement.  The invalidity of any portion hereof shall not affect the validity, force or effect of the remaining portions hereof.  If it is ever held that any restriction hereunder it too broad to permit enforcement of such restriction to its fullest extent, each party agrees that a court of competent jurisdiction may enforce such restriction to the maximum extent permitted by law, and each party hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to enforce such restriction.

12.11.   Jurisdiction.  Buyer, Seller and Cyprus hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, The City of New York, for any actions, suits, or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby (and Buyer, Seller and Cyprus agree not to commence any action, suit or proceeding relating thereto except in such courts), and further agree that service of any process, summons, notice or document by U.S. registered mail to its address set forth above shall be effective service of process of any action, suit or proceeding brought against it in any such court.  Buyer, Seller and Cyprus hereby irrevocably and unconditionally waive any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in such state or federal courts as aforesaid and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

12.12.   Waiver.  Any of the conditions to Closing set forth in this Agreement may be waived at any time prior to or at the Closing hereunder by the party entitled to the benefit thereof.  The failure of any party hereto to enforce at any time any of the provisions of this Agreement shall in no way be construed to be waiver of any such provision, nor in any way to affect the validity of this Agreement or any

-57-

part hereof or the right of such party thereafter to enforce each and every such provisions.  No waiver of any breach of or non-compliance with this Agreement shall be held to be a waiver of any other or subsequent breach of non-compliance.

12.13.  <u>Interest</u>.  If any party to this Agreement defaults in the payment when due of any sum payable under this Agreement (whether determined by agreement or pursuant to an order of a court or otherwise), the liability of such party shall be increased to include interest on such sum from the date when such payment shall be due until the date of actual payment at a rate per annum (but not in excess of the maximum lawful rate) of three percent above the rate for three-month deposits in the London interbank market in the currency of payment, as announced by Citibank N.A. as of 11:00 A.M., London time, on the date when such payment shall be due.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

CYPRUS MINES CORPORATION

By _____
Name:
Title: *Senior Vice President*

CYPRUS MINERALS COMPANY

By _____
Name:
Title: *Senior Vice President and Chief Financial Officer*

RTZ AMERICA INC.

By _____
Name: Arthur L Glass
Title: President

-59-