# **<u>EXHIBIT 4</u>**

CONFIDENTIAL

TALC SUPPLY AGREEMENT

BETWEEN

WINDSOR MINERALS INC.

AND

JOHNSON & JOHNSON BABY PRODUCTS COMPANY,
A DIVISION OF
JOHNSON & JOHNSON CONSUMER PRODUCTS, INC.

DATED

JANUARY 6, 1989

CONFIDENTIAL

Protected Document--Subject to Protective Order

JNJ 000066674

## TABLE OF CONTENTS

| Section | | | | Page |
|---|---|---|---|---|
| 1. | Seller's Covenants.............................................. | | | 3 |
| 2. | Term of Agreement............................................... | | | 4 |
| | (a) | Initial Term......................................... | | 4 |
| | (b) | Additional Terms..................................... | | 4 |
| 3. | Exclusivity: Minimum Purchases................................. | | | 5 |
| | (a) | Buyer's Requirements................................. | | 5 |
| | (b) | Shear Disc........................................... | | 6 |
| | (c) | Minimum Purchases.................................... | | 10 |
| | | (i) | Initial Term-First Five Years............. | 10 |
| | | (ii) | Initial Term-Second Five Years............ | 11 |
| 4. | Price ......................................................... | | | 11 |
| | (a) | Base Price........................................... | | 11 |
| | (b) | Annual Price Adjustment.............................. | | 12 |
| | | (i) | Definitions............................... | 13 |
| | | | (A) Adjusted Price................... | 13 |
| | | | (B) Base Deflator.................... | 13 |
| | | | (C) New Deflator..................... | 14 |
| | | | (D) Base Market Basket Price......... | 14 |
| | | | (E) New Market Basket Price......... | 14 |
| | | | (F) Market Basket Price Determination....................... | 14 |
| | | (ii) | Price Adjustment Factors.................. | 15 |
| | | | (A) GNP Factor....................... | 15 |
| | | | (B) Market Basket Factor............. | 15 |
| | | (iii) | Adjustment Formula........................ | 15 |
| | | (iv) | Substitute Deflators...................... | 16 |
| | | (v) | Resetting Deflators, Prices............... | 16 |
| | (c) | Additional Price Adjustment.......................... | | 17 |
| | (d) | Price Reopeners...................................... | | 17 |
| | (e) | Hardship............................................. | | 18 |
| | | (i) | Buyer's Hardship.......................... | 20 |
| | | (ii) | Seller's Hardship......................... | 23 |
| 5. | Orders; Payment................................................ | | | 23 |
| | (a) | Purchase Estimates................................... | | 23 |
| | (b) | Orders............................................... | | 24 |
| | (c) | Cooperation; Priority................................ | | 24 |
| | (d) | Title; Risk; Mode of Delivery........................ | | 25 |
| | (e) | Payment.............................................. | | 25 |

(i)

JNJ 000066675

| Section | | Page |
|---|---|---|

6.   Specifications; Quality..................................   25
     (a)   Source ...........................................   25
     (b)   Quality Standards.................................   27
     (c)   Good Manufacturing Procedures and Standard
           Operating Procedures..............................   28
     (d)   Price Adjustments.................................   28
           (i)     Final Product Specifications..............   28
           (ii)    Mining Regulations........................   29
           (iii)   Cost Savings..............................   30
           (iv)    Column Flotation..........................   32
     (e)   Ship-to-Stock Certification Requirements..........   32
     (f)   Inspection, Acceptance............................   33
           (i)     Non-Microbiological Specifications........   33
           (ii)    Microbiological Specifications............   34
           (iii)   Event of Non-Conformance..................   35
     (g)   Buyer's Remedies for Non-Conformance..............   36
     (h)   Future Collaboration..............................   37

7.   Secrecy    .............................................   37

8.   Termination ...........................................   38
     (a)   Bankruptcy........................................   38
     (b)   Breach ...........................................   39
     (c)   Sale of Assets or Business........................   39

9.   Force Majeure..........................................   41
     (a)   Events of Force Majeure...........................   41
     (b)   Buyer's Force Majeure.............................   42
     (c)   Seller's Force Majeure............................   43
     (d)   Limitation........................................   44

10.  Seller's Indemnity.....................................   44

11.  Buyer's Indemnity......................................   45

12.  Promotion .............................................   46

13.  Warranty; Apportionment ...............................   47
     (a)   Warranty..........................................   47
     (b)   Apportionment.....................................   47

14.  Product Development.....................................   49

15.  Miscellaneous..........................................   51
     (a)   Parties in Interest; Assignment...................   51
     (b)   Notices...........................................   51
     (c)   Entire Agreement..................................   52
     (d)   Modification......................................   53
     (e)   Waiver ...........................................   53
     (f)   Governing Law.....................................   53

(ii)

Protected Document--subject to Protective Order

JMJ 000066676

(g)    Severability.................................... 53
(h)    Headings....................................... 54
(i)    Mutual Negotiation............................. 54
(j)    Obligations of Buyer........................... 54

## EXHIBITS

Exhibit A   Good Manufacturing Procedures; Standard Operating
            Procedures
Exhibit B   Arbitration
Exhibit C   Sample Hardship Calculation
Exhibit D   Argonaut and Hammondsville Ore Bodies
Exhibit E   Quality Standards
Exhibit F   Ship-to-Stock Certification Requirements

Protected Document--Subject to Protective Order      JNJ 000066677

## TALC SUPPLY AGREEMENT

THIS TALC SUPPLY AGREEMENT, is made and entered into this sixth day of January, 1989 (the "Agreement"), between WINDSOR MINERALS INC., a Vermont corporation ("Seller"), and JOHNSON & JOHNSON BABY PRODUCTS COMPANY, a division of JOHNSON & JOHNSON CONSUMER PRODUCTS, INC., a New Jersey corporation ("Buyer").

## W I T N E S S E T H

WHEREAS, Johnson & Johnson, a New Jersey corporation (the parent of Buyer), has agreed to sell, and Cyprus Mines Corporation, a Delaware corporation, (the parent of Seller, referred to herein as "Cyprus") has agreed to purchase, all the capital stock of Seller, pursuant to an Agreement dated January 6, 1989 (the "Windsor Agreement");

WHEREAS, Seller, to date, has sold to Buyer and its corporate affiliates, all of Buyer's United States cosmetic talc requirements;



WHEREAS, Buyer sells cosmetic grade talc products in the consumer market which are manufactured from the talc Buyer purchases from Seller;

-2-

TC-29138

Protected Document--Subject to Protective Order

JNJ 000066678

WHEREAS, Buyer desires to maintain the quality of the cosmetic talc products it produces, and therefore desires to continue to receive high quality talc from ore sources which it has qualified, or from new sources which are owned or controlled by Seller or its affiliates and approved by Buyer, which high quality talc is used by Buyer for cosmetic applications, as the term "cosmetic" is defined in the Food, Drug and Cosmetic Act, 21 U.S.C.A. § 321 (1972) (the "Talc").

WHEREAS, Seller desires to continue to sell and deliver, and Buyer desires to continue to purchase, pay for and receive Buyer's domestic requirements for Talc on the terms and conditions herein set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Seller's Covenants. Seller covenants to Buyer that, during the term of this Agreement, Seller shall: (a) keep proper books of record and account relating to Buyer's purchases of Talc from Seller in which true entries shall be made of its transactions in accordance with generally accepted accounting principles and the provisions of this Agreement; and (b) maintain its mining properties and processing facilities in good repair, working

— 3 —

73A0680B

Protected Document--subject to Protective Order

order and condition to the extent necessary to perform Seller's obligations hereunder.

## 2. Term of Agreement.

(a)  Initial Term.  The initial term of this Agreement (the "Initial Term") shall commence on the later of the date first above written or the Closing Date specified in the Windsor Agreement (the "Commencement Date"), and, unless sooner terminated pursuant to the terms of Agreement, shall expire at the close of business on December 31, 1998. For the purposes of this Agreement, the term "Calendar Year" shall mean the twelve (12) month period commencing on any January 1 and ending on the subsequent December 31.

(b)  Additional Terms.  Prior to March 31, 1998, or such later date as the parties may agree, Buyer and Seller shall conclude good faith negotiations concerning amendments or modifications to this Agreement, if any, which shall apply to an additional term of five (5) years from and after January 1, 1999 (the "Additional Term").  In the event that the parties shall agree to enter into an Additional Term, the term of this Agreement may be extended for such Additional Term on the terms and conditions set forth in this Agreement, as modified by any valid amendment hereto.  In the event that Buyer and Seller fail to execute a valid amendment extending this Agreement for the Additional Term on or before March 31, 1998, Buyer shall have the

- 4 -

TSAG8R08

Protected Document--subject to Protective Order

JNJ 000066680

right to solicit bids from, and to negotiate (before July 31, 1998) a talc supply agreement to be effective from and after January 1, 1999, with any third party; provided, however, that prior to entering into a talc supply agreement with such third party, Seller shall have the right, on or before October 1, 1998, to meet the terms and conditions which Buyer has reached with such third party.   In the event that Seller's offer is substantially equivalent to or is more favorable than such third party's terms and conditions, Buyer shall enter into a talc supply agreement with Seller commencing January 1. 1999.

## 3.   Exclusivity; Minimum Purchases.

(a) _ Buyer's Requirements.  Subject to the provisions of Section 3(c) hereof, Buyer shall purchase from Seller, and Buyer shall cause all of its United States Affiliates (as such term is defined in Section 8(c) hereof) to purchase from Seller/ one hundred percent (100%) of the Talc requirements of Buyer and Buyer's Affiliates for products manufactured by Buyer and Buyer's Affiliates in the United States during the first five (5) years of the Initial Term, and not less than ninety-eight percent (98%) of the Talc requirements of Buyer and Buyer's Affiliates for products manufactured by Buyer and Buyer's Affiliates in the United States during the second five (5) years of the Initial Term.  (For the purposes of this Agreement, the term "Buyer" shall include Buyer's Affiliates; and the phrase "manufactured by Buyer" shall include, without limitation, the production or

- 5 -

Protected Document--subject to Protective Order

JMJ 000066081

manufacture by, for, or on behalf of, or by license or other authority of, Buyer or Buyer's Affiliates.)  The assignment of this Agreement to a third party purchaser shall be a precondition to any sale of Buyer's business or assets, or the business or assets of any of Buyer's Affiliates utilizing Talc in the manufacture of consumer products, or the sale of any line of consumer products belonging to Buyer or Buyer's Affiliates. Seller shall not unreasonably withhold its consent to the assignment of this Agreement by Buyer to a third party purchaser.    Provided that Buyer is not in default under the provisions of Section 5(b) hereof, Seller agrees to use its best reasonable commercial efforts to ensure Seller's ability to fill purchase orders submitted by Buyer pursuant to Section 5(b) hereof prior to committing to fill orders for third party purchasers of floated talc products from Seller's West Windsor Mill.    Buyer agrees to make available to Price Waterhouse, on a confidential basis, such documentation as may be necessary in order to permit such third party to verify Buyer's compliance with Buyer's purchase requirements pursuant to this Section 3(a).

(b)    Shear Disc.    The Talc heretofore sold by Seller to Buyer has been manufactured using a process referred to herein as the "Shear Disc Process".  That certain piece of equipment used to manufacture the Talc heretofore sold by Seller to Buyer is referred to herein as the "Shear Disc Device".    Title to the Shear Disc Process and the Shear Disc Device remained in Buyer pursuant to the Windsor Agreement, and Buyer hereby agrees to

- 6 -

15AG8508

JNJ 000066682

license the Shear Disc Process and the Shear Disc Device to Seller without fee, cost or royalty. The parties recognize that affiliates of Seller own equipment utilizing technology similar to that utilized by the Shear Disc Process. Notwithstanding the continued or future use of such similar equipment and technology by affiliates of Seller, Seller has agreed that during the Initial Term or any Additional Term hereof, Seller shall utilize Buyer's Shear Disc Device only in the manufacture of cosmetic tale products for sale to Buyer and Buyer's affiliates; provided, however, that Seller may use the Shear Disc Process or the Shear Disc Device at Seller's West Windsor Mill to produce talc products for any customer utilizing such products in non-cosmetic talc applications; and provided, further, that nothing contained herein shall preclude the use by Seller of any proprietary technology or intellectual property owned by Seller or Seller's Affiliates (as such term is defined in Section 8(c) hereof) for any purpose, whether such technology or intellectual property is similar or dissimilar to the Shear Disc Process or the Shear Disc Device.  In addition, nothing contained in this Section 3(b) shall in any way restrict or impair Seller's right to use, disclose, or otherwise deal with any trade secret, information, data or other intellectual property proprietary to Buyer which: (a) at the time of the disclosure is generally available to the public or thereafter becomes generally available to the public, by publication of otherwise, through no act of Seller; or (b) Seller can show was in its possession prior to the time of the disclosure to it and was not acquired, directly or indirectly,

- 7 -

TSAGR808

Protected Document--subject to Protective Order

JNJ 000066684

from Buyer or any other source bound by a confidentiality agreement with Buyer; or (c) Seller can show was received by it as a matter of lawful right after the time of disclosure from a third party who did not acquire it from Buyer or any of its parent, affiliate or subsidiary companies under an obligation of confidentiality.

During the Initial Term and any Additional Term hereof, Seller agrees to: (i) service, repair and maintain the Shear Disc Device as necessary to maintain it in good working order for the benefit of Buyer, to keep it free of all claims, pledges, liens, encumbrances, levies, attachments, security interests, or other claims affecting title thereto; and (ii) operate the Shear Disc Device in accordance with the Good Manufacturing Procedures and Standard Operating Procedures developed and practiced by Seller prior to the Commencement Date, a copy of which is attached hereto as Exhibit "A" and is by this reference incorporated herein. Such procedures may be amended from time to time as Buyer and Seller may mutually agree in writing in accordance with Sections 6(c) and 15(d) hereof.

Seller recognizes that the Shear Disc Device and its use are confidential and proprietary to Johnson & Johnson, and constitute a valuable trade secret of Johnson & Johnson. In accordance with the provisions of Section 7 hereof, but subject to the pre-existing availability of similar technology, equipment and processes, Seller agrees to take reasonable precautions during

- 8 -

Protected Document--subject to Protective Order

the Initial Term hereof:   (A) to maintain such trade secret status; (B) not to license or disclose the Shear Disc Device or the Shear Disc Process to any third party; and (C) not to duplicate in whole or in part any portion of the Shear Disc Device except as may be required for the repair or maintenance of the same of the benefit of Buyer. Buyer agrees that during the Initial Term hereof, it shall not license or disclose the Shear Disc Device or the Shear Disc Process to any third party. In the event that the parties are unable before March 31, 1998 to extend/ this Agreement for an Additional Term, Buyer shall have the right to disclose to third parties the existence of the Shear Disc Device and the Shear Disc Process from and after April 1, 1998. In the event that Buyer concludes an agreement for the supply of Talc from a third party, Buyer shall grant Seller a perpetual license to use the Shear Disc Device and the Shear Disc Process for the purpose of continuing to produce talc products for non-cosmetic talc applications.   The consideration for such license shall be One Dollar ($1.00).

Buyer shall indemnify, defend and hold harmless Seller from and against all claims, actions, damages, costs and expenses (including attorneys' fees) arising out of any cause of action or proceeding against Seller claiming infringement, violation or other interference with any patent, trademark, trade name, trade secret or other intellectual property belonging to any third party.

- 9 -

(SAG860)

Protected Document--Subject to Protective Order

(c)    **Minimum Purchases**.

(i)    **Initial Term - First Five Years**.  Seller recognizes Buyer's difficulty in predicting its Talc requirements scheduling more than six (6) months in advance. However, so long as Seller is not in default hereunder, Buyer shall purchase one hundred percent (100%) of Buyer's United States requirements for cosmetic talc.  In no event shall Buyer purchase and receive less than fifty thousand (50,000) tons of Talc pursuant to this Agreement during the first five (5) years of the Initial Term.  In the event that Buyer shall fail to purchase and receive such minimum quantity within said period, then:  (A)  Seller shall be relieved of its obligation to give priority to Buyer's requirements as provided in Section 3(a) hereof; and (B) Buyer shall pay to Seller within thirty (30) days following the end of the fifth year of the Initial Term an amount of damages equal to the product of:  (1) the Base Price (as such term is defined in Section 4(b) hereof) applicable to purchases of less than ten thousand (10,000) tons of Talc per year during the fifth year of the Initial Term, multiplied by (2) the amount by which Buyer's minimum purchase obligation during the first five (5) years of the Initial Term (50,000 tons) exceeds the actual amount of Talc purchased by Buyer during the first five (5) years of the Initial Term, multiplied by (3) a factor of zero point six nine four (0.694).  The following mathematical equation describes the amount of the foregoing damages:

- 10 -

TSAC8808

Protected Document--subject to Protective Order

JNJ 000006686

Payment = Base Price in Year Five x (50,000 tons - Actual Total Purchases in Years One through Five) ⟨ 0.694. ⟩

However, in the event that Buyer shall notify Seller of Buyer's intent to cancel or terminate this Agreement during the first five (5) years of the Initial Term, the foregoing damages shall be payable upon the effective date of such cancellation or termination, and the Base Price applicable to the foregoing formula shall be the Base Price in effect upon the effective date of cancellation or termination.

(ii)   **Initial Term - Second Five Years.** During the second five (5) years of the Initial Term, Buyer shall have the right to purchase up to two percent (2%) of Buyer's United States cosmetic talc requirements from a supplier other than Seller, which supplier has qualified its ore source with Buyer in accordance with the provisions of Section 6(a) hereof.

4. **Price.**

' (a) ' **Base Price.** The price which Buyer shall pay to Seller for the first ten thousand (10,000) tons of Talc purchased by Buyer during the first year of the Initial Term shall be Four Hundred Dollars ($400) per ton (the "Base Price"). In any Calendar Year during the Initial Term, Buyer

- 11 -

TSAG8608

Protected Document--subject to Protective Order

JMJ 000006687

shall receive a discount from the Base Price of five percent (5%) per ton for each ton of Talc purchased in excess of ten thousand (10,000) tons per Calendar Year, but less than twelve thousand (12,000) tons per Calendar Year; and a discount from the Base Price of ten percent (10%) per ton for each ton of Talc purchased in excess of Twelve Thousand (12,000) tons per Calendar Year. The following table illustrates the Base Price in effect during the first Calendar Year of the Initial Term, and the discounts applicable thereto:

| Tons Per Year | 1989 Price |
|---|---|
| 0-10,000 | $400 |
| 10,001-12,000 | $400 less 5% (for ₹380 incremental tons) |
| 12,000+ | $400 less 10% (for ₹360 incremental tons) |

Any discount to which Buyer may be entitled shall be reflected in Seller's Invoices given in accordance with Section 5 (a) hereof.

(b)  **Annual Price Adjustment.**  Except as set forth in Section 8(d) hereof, the price to be paid by Buyer shall be increased or decreased as of the first day of each Calendar Year from and after January 1, 1990 (each such date to be referred to herein as an "Anniversary Date"), from the price paid by Buyer in the immediately preceding Calendar Year in accordance with a formula giving equal weight to:  (a) the proportionate increase or decrease in the published Gross National Product Implicit

– 12 –

Protected Document--subject to Protective Order

JNJ 000066688

Price Deflator (the "Deflator"), as most recently published for the third quarter of each Calendar Year in the Survey of Current Business by the United States Department of Labor, Bureau of Labor Statistics; and (b) the proportionate increase or decrease in the average price of those cosmetic, non-pharmaceutical talcs sold by Cyprus during the last six (6) months of any Calendar Year, excluding sales to Buyer, which products are represented by industry code "Z" in Cyprus' sales and accounting system (the "Market Basket"). Seller and Cyprus shall be responsible for calculating the annual price adjustment as of the Anniversary Date as soon after such Anniversary Date as possible, but in no event later than March 1 of each Calendar Year. The formula to be used to make the annual adjustment is set forth in Section 4(b)(iii) hereof.

(i)    Definitions. For the purposes of this Agreement, the following terms shall have the following meaning:

(A)    Adjusted Price. The "Adjusted Price" shall mean the price which results from the annual adjustment of the Base Price. The Adjusted Price shall be reset annually in accordance with Section 4(b)(iii) hereof.

(B)    Base Deflator. The "Base Deflator" shall mean the Deflator most recently published for the third

TSAG8808

Protected Document--subject to Protective Order

JNJ 000066689

quarter of 1988 to be 122.3, using the base figure 1982 = 100.    The Base Deflator shall be reset annually in accordance with Section 4(b)(v) hereof.

(C)    New Deflator.    The "New Deflator" is defined for the purpose of this Agreement to be the Deflator most recently published for the third quarter of the Calendar Year immediately preceding the Anniversary Date.

(D)    Base Market Basket Price.    The "Base Market Basket Price" shall be the average price of those products qualifying for inclusion in the Market Basket during the last six (6) months of the 1988 Calendar Year.    The Base Market Basket Price shall be reset annually in accordance with Section 4(b)(v) hereof.

(E)    New Market Basket Price.    The "New Market Basket Price" shall be the average price of those products qualifying for inclusion in the Market Basket during the last six (6) months of the Calendar Year immediately preceding the Anniversary Date.

(F)    Market Basket Price Determination.    The Base Market Basket Price and the New Market Basket Price shall be determined by dividing the gross sales revenue derived from Seller's shipments of products qualifying for inclusion in the Market Basket during the last six (6) months of the

- 18 -

TSAG8808

Protected Document--subject to Protective Order

JNJ 000066690

applicable Calendar Year by the total tonnage of such shipments. Such gross sales revenue shall exclude freight charges from Seller's plant or warehouse to customers. However, no deduction from gross sales revenue shall be made for sales commissions and distributor discounts. Seller shall be responsible for determining the Base Market Basket Price and New Market Basket Price; provided, however, that Buyer may request an audit of Seller's determinations. If requested by Buyer, Seller shall retain Price Waterhouse to perform such an audit, and all expenses thereof shall be borne equally by Seller and Buyer.

(ii) <u>Price Adjustment Factors.</u>

    (A)    <u>GNP Factor.</u>  The "GNP Factor" shall be determined by dividing the New Deflator by the Base Deflator.

    (B)    <u>Market Basket Factor</u>.  The "Market Basket Factor" shall be determined by dividing the New Market Basket Price by the Base Market Basket Price.

(iii) <u>Adjustment Formula.</u>  As of each Anniversary Date, subject to the exceptions set forth in Section 4(d) hereof, the Base Price shall be made equal to the product of: (a) the Base Price, multiplied by (b) one-half (1/2) of the arithmetic sum of the GNP Factor and the Market Basket

11AG5808

Protected Document--subject to Protective Order

JNJ 000006691

Factor.   The following mathematical equation describes the foregoing annual price adjustment:

Adjusted Price = Base Price x [(Market Basket Factor + GNP Factor) x 0.50];

Immediately after the annual price adjustment has been made as of the Anniversary Date in accordance with the foregoing equation, the Base Price shall be made equal to the Adjusted Price just determined.

(iv) Substitute Deflators.   If any Deflator is not reasonably susceptible to the application described in this Section 4, or if any Deflator is discontinued entirely, then the parties shall in good faith agree upon a suitable substitute Deflator which provides a substantially equivalent standard for annual price adjustment purposes.

(v) Resetting Deflators, Prices.   Immediately after the annual price adjustment has been made as of the Anniversary Date in accordance with Sections 4(b)(i) - (iv) hereof, the Base Deflator shall be made equal to the New Deflator which was in effect on such Anniversary Date; and the Base Market Basket Price shall be made equal to the New Market Basket Price which was in effect on such Anniversary Date.   Thus, the yearly increase or decrease in the GNP Factor shall always reflect the proportionate annual increase or decrease

- 16 -

TSAG8806

Protected Document--subject to Protective Order

JNJ 000066692

in the Gross National Product Implicit Price Deflator during
the preceding twelve (12) month period ending at the end of
the the third quarter of the Calendar Year just ending; and
the yearly increase or decrease in the Market Basket Factor
shall always reflect the proportionate increase or decrease
in the average price of the Market Basket during the last six
(6) months of the Calendar Year just ending, as compared to
the average price of the Market Basket during the last six
(6) months of the previous Calendar Year.

(c)   **Additional Price Adjustment**   Seller intends to close
its Hammondsville Mine during the term hereof. Upon the date on
which Hammondsville ore ceases to comprise at least twenty
percent (20%) of the Talc sold to Buyer, the Base Price shall be
reduced by the amount of Eight Dollars and Fifty Cents ($8.50)
per ton. If Hammondsville ore is subsequently re-introduced to
Talc sold to Buyer such that it comprises at least twenty percent
(20%) of the Talc sold to Buyer, and such re-introduction is made
at Buyer's request or in order for Seller to maintain the quality
of Talc sold to Buyer, then the Base Price shall be increased by
the amount of Eight Dollars and Fifty Cents ($8.50) per ton on
the effective date of such re-introduction.

(d)   **Price Reopeners.**   On the Anniversary Date in 1992,
1995 and 1998, the annual price adjustment procedure set forth in
Section 4(b) hereof shall be superseded by the reopener
provisions of this Section 4(d). On each such Anniversary Date,

- 17 -

TSAG880N

Protected Document--subject to Protective Order

JNJ 000066693

the Base Price effective on the Commencement Date shall be increased or decreased by the same ratio as the New Market Basket Price determined on such. Anniversary Date bears to the Base Market Basket Price effective as of the Commencement Date. The new Base Price determined in accordance with the foregoing sentence shall be referred to herein as the "Reopener Price." In no event shall the Reopener Price determined pursuant to this Section 4(d) in 1992, 1995 and 1998 exceed or fall below the Base Price applicable in 1991, 1994 and 1997, respectively, by more than twenty percent (20%). The following mathematical equation describes the foregoing price reopener formula:

Reopener Price = Base Price at Commencement Date × (New Market Basket Price at Anniversary Date/Base Market Basket Price at Commencement Date), subject to 20% limitation.

Immediately after the Reopener Price has been determined on the Anniversary Date in accordance with the foregoing equation, the Base Price shall be made equal to the Reopener Price just determined.

(e)    Hardship.    Buyer and Seller recognize that market and industry conditions change, and that the price adjustment formulae set forth in this Section 4 may inadvertently create substantial hardship for either party. If, at any time during the first calendar quarter of any Calendar Year from and after January 1, 1995, in the reasonable business judgment of one

- 18 -

Protected Document—subject to Protective Order

party, continued performance pursuant to such price adjustment formulae would cause substantial economic hardship to such party's business or operations, then the affected party shall give notice to the other party of such hardship. (For the purposes of this Section 4(e), the phrase "substantial economic hardship" shall mean, in the case of Seller, that the Base Price resulting from any adjustment required herein results in a price to Buyer which is less than the sum of: (a) Seller's fully-allocated operating cost to produce Talc at Seller's West Windsor mill facility, which cost shall include depreciation but exclude corporate overhead allocations from affiliates of Seller (the "Cost"), plus (b) fifteen percent (15%) of such Cost. Notice of hardship may be given only once by each party during the Initial Term of this Agreement, unless an arbitrator shall have determined that no hardship existed at the time of such party's previous notice. The provisions of this Section 4(e) shall not apply to the Additional Term, unless the parties shall so agree in accordance with Section 2(b) hereof.

Each party shall continue to abide by the price adjustment formulae set forth in this Section 4 for a period of one (1) year following such notice of hardship. During such one (1) year period, Buyer and Seller may investigate potential purchases and sales of talc from and to third parties; provided, however, that no firm contractual obligations are entered into therefor. In addition, during such one (1) year period, Buyer and Seller shall enter into good faith negotiations to determine a mutually

- 19 -

Protected Document--subject to Protective Order

agreeable Base Price and adjustment formulae to be effective from and after the conclusion of such negotiations. In the event of dispute between Buyer and Seller as to the existence of the hardship claimed by the other party, the parties shall submit such question for arbitration in accordance with the terms and conditions set forth in Exhibit "B" attached hereto and by this reference incorporated herein. Such submission shall be made within thirty (30) days following the date of notice of hardship given by the affected party. The only issue which the arbitrator shall determine shall be the existence or non-existence of the hardship claimed by the affected party.

(i)   Buyer's Hardship.   In the event that mutually acceptable price adjustments and adjustment formulae have not been determined within six (6) months from the date of Buyer's notice of hardship, Buyer, at its sole option, shall give notice of its intent to: (A) continue to perform in accordance with the Base Price and the price adjustment formulae as re-negotiated by the parties; or (B) terminate this Agreement on the first anniversary of Buyer's notice of hardship. In the event that Buyer gives notice of its intent to continue to perform in accordance with the Base Price and the price adjustment formulae as re-negotiated by the parties, then the Base Price and price adjustment formulae as re-negotiated shall be effective retroactively to the date of Buyer's notice of hardship, and Seller shall issue a credit

- 20 -

TSAQNSON

to Buyer in the form mutually agreed to by Buyer and Seller
as part of their negotiations.

In the event that Buyer elects to terminate this Agreement,
it shall pay to Seller a lump sum amount equivalent to
seventy percent (70%) of Seller's discounted lost profits
through the expiration of the Initial Term. Seller's annual
lost profits shall be discounted by a factor of fifteen
percent (15%) per annum (the "Discount Factor"). Such
payment shall be made within thirty (30) days following the
effective date of termination, and shall be equivalent to
seventy percent (70%) of:   (I) the product of (a) the
proposed Base Price last offered by Seller during
negotiations with Buyer which is applicable to purchases of
nine thousand eight hundred (9,800) tons of Talc per Calendar
Year (the "Offer Price") escalated by a factor of four
percent (4%) multiplied by (b) the amount by which Buyer's
purchases of Talc in the Calendar Year in which Buyer's
termination of this Agreement is effective falls below nine
thousand eight hundred (9,800) tons multiplied by a factor of
0.694 (the "Lost Profit Factor"); plus (II) for each Calendar
Year remaining in the Initial Term, the product of (y) the
Offer Price escalated by a factor of four percent (4%) per
annum multiplied by (z) nine thousand eight hundred (9,800)
tons multiplied by the Lost Profit Factor multiplied by the
Discount Factor.   The Discount Factors applicable to the
foregoing formula shall be 0.85 as of the second anniversary

- 21 -

Protected Document--subject to Protective Order

JNJ 000066697

of Buyer's notice of hardship, and 0.6775 as of the third anniversary of Buyer's notice of hardship. The following mathematical equation describes the amount payable to Seller by Buyer within thirty (30) days following the effective date of termination: -

(A) Payment = 0.70 x {[(Offer Price x 1.04$^1$) x (9,800 tons – Actual Total Purchases in Calendar Year of Termination) x 0.694]}, in the event that Buyer's notice of termination is given during the first calendar quarter of 1997;

(B) Payment = 0.70 x {[(Offer Price x 1.04$^1$) x (9,800 tons – Actual Total Purchases in Calendar Year of Termination) x 0.694] + [(Offer Price x 1.04$^2$) x 9,800 tons x 0.694 x 0.85]}, in the event that Buyer's notice of termination is given during the first calendar quarter of 1996; and

(C) Payment = 0.70 x {[(Offer Price x 1.04$^1$) x (9,800 tons – Actual Total Purchases in Calendar Year of Termination) x 0.694] + [(Offer Price x 1.04$^2$) x 9,800 tons x 0.694 x 0.85] + [(Offer Price x 1.04$^3$) x 9,800 tons x 0.694 x 0.675]}, in the event that Buyer's notice of termination is given during the first calendar quarter of 1995.

Two sample calculations of the amount payable to Seller by Buyer in the event of Buyer's termination of this Agreement pursuant to

- 22 -

15AG8800

Protected Document--subject to Protective Order

JNJ 000066698

this Section 4(e)(1) are set forth on Exhibit "C" attached hereto and by this reference incorporated herein.

(ii) **Seller's Hardship.** In the event that mutually acceptable price adjustments and adjustment formulae have not been determined within six (6) months from the date of Seller's notice of hardship hereunder, Seller, at its sole option, shall give notice of its intent to: (a) terminate this Agreement on the first anniversary of Seller's notice of hardship; or (b) continue to perform in accordance with the Base Price and the price adjustment formulae as re-negotiated by the parties. In the event that Seller shall give notice of its intent to continue to perform in accordance with the Base Price and the price adjustment formulae as negotiated by the parties, then the Base Price and price adjustment formulae as re-negotiated shall be effective retroactively to the date of Seller's notice of hardship, and Buyer shall issue a credit to Seller in the form mutually agreed to by the parties as part of their negotiations.

5. **Orders; Payment.**

(a) **Purchase Estimates.** In order to assist Seller in its production planning, prior to the first day of each calendar quarter, Buyer shall provide Seller with a non-binding good faith estimate of Buyer's talc requirements for the subsequent twelve month period.

- 23 -

Protected Document--subject to Protective Order

JNJ 000066699

(b)    -Orders.    Not less than five (5) calendar days prior to the first business day of each calendar month, Buyer shall submit to Seller binding purchase orders covering the next succeeding six (6) months. Orders for the first three (3) months of such six (6) month period may not be cancelled or modified by Buyer; provided, however, that Buyer and Seller may agree to minor scheduling or delivery modifications. Buyer may modify any of such six (6) month orders with respect to only the last three (3) months of such six (6) month period by delaying acceptance of Seller's Talc deliveries by not more than forty-five (45) days. The parties intend for the procedure set forth in this Section 5(b) to provide a rolling six month order schedule.    To the extent possible, consistent with Buyer's production requirements, Buyer's six (6) month purchase orders shall specify deliveries by Seller representing approximately equal monthly shipments over such six (6) month period.

(c)    Cooperation; Priority.    Seller shall use its best reasonable commercial efforts to provide Buyer with priority in Seller's production scheduling from Seller's West Windsor Mill in accordance with Section 3(a) so long as Buyer is not in default hereunder and has satisfied its order requirements as set forth in this Section 5, and its minimum purchase requirements as set forth in Section 3(c) hereof.

- 24 -

TSAC8606

Protected Document--subject to Protective Order

JMJ 000066700

(d)   Title; Risk; Mode of Delivery.  Title to and risk of loss of Talc shall pass from Seller to Buyer upon loading of Talc into rail cars F.O.B. Ludlow, Vermont, or into bulk trucks F.O.B. West Windsor, Vermont.  Buyer may, at its election, take delivery of Talc in flexible intermediate bulk bags at an additional price to be negotiated by the parties; provided, however, that Seller has available both the equipment and the capacity necessary to supply Talc in flexible intermediate bulk bags.  Any increase in the price which results from Buyer's acceptance of Talc in flexible intermediate bulk bags shall be realized by Buyer as a direct addition to the Base Price for Talc sold to Buyer in flexible intermediate bulk bags.  Buyer shall be solely responsible for the quality and cleanliness of any transportation vessel supplied to Seller by Buyer at Ludlow, Vermont or elsewhere for loading and transportation of Talc purchased by Buyer.

(e)   Payment.  Seller shall invoice Buyer on the date of each shipment of Talc from Ludlow, Vermont or West Windsor, Vermont.  Buyer shall pay Seller the purchase price for all Talc purchased by it not later than thirty (30) days following the date of Seller's invoice.

6.   Specifications; Quality.

(a)   Source.   Seller covenants that all Talc sold to Buyer hereunder shall be produced solely from the Argonaut or

- 25 -

TSAG8806

Protected Document--subject to Protective Order

JMJ 00000701

Hammondsville ore bodies (as the same are described in Exhibit "D" attached hereto and by this reference incorporated herein), or from such other deposits as may be approved by Buyer, in all cases employing selective mining techniques carefully designed to avoid ore contaminants. Buyer and Seller acknowledge that the Argonaut and Hammondsville ore bodies are qualified and approved by Buyer for Buyer's cosmetic talc applications, subject to such selective mining techniques. Ore bodies or ore sources which may in the future become qualified and approved by Buyer shall be shown on a revised Exhibit "D" hereto. Buyer and Seller agree to cooperate in the qualification and approval of new ore sources suitable for the production of Buyer's consumer talc products. Seller shall provide Buyer with samples and laboratory test data showing that ore from one or more new sources meets Buyer's specifications, and Buyer shall use its best reasonable efforts to verify and confirm such data and to qualify and approve such new ore sources as may meet Buyer's requirements, including, without limitation, Buyer's organoleptic requirements. Buyer shall grant such qualification or approval as expeditiously as possible, and in no event shall any such approval or qualification be unreasonably withheld. All testing by Buyer in the qualification of new ore sources shall be performed in good faith in accordance with those methods and procedures heretofore developed by Buyer to identify desirable attributes of talc ore bodies, which methods and procedures shall not be changed by Buyer without Seller's prior written consent, which consent shall not be unreasonably withheld. Seller shall have the right to

- 26 -

J54C8808

Protected Document--subject to Protective Order

JMJ 000006702

request that testing for qualification of any new ore source be repeated. Notwithstanding the foregoing, Buyer shall have the right to test talc product samples supplied by Seller's competitors at any time during the term of this Agreement, and to qualify the ore source from which such sample derives; provided, however, that in the event Buyer qualifies an ore source owned or controlled by a third party, Buyer shall inform Seller of such event within thirty (30) days thereof. Nothing set forth in this Section 6(a) shall limit: (a) Seller's right to attempt to qualify ore sources owned or controlled by Seller; or (b) Buyer's obligations to purchase Talc pursuant to the terms of this Agreement.

(b) **Quality Standards.** Seller covenants that all Talc sold to Buyer shall conform to the quality standards set forth in Exhibit "E" attached hereto and by this reference incorporated herein, including without limitation the specifications set forth in SPC specification #8-006, a copy of which is included in Exhibit "E". Buyer and Seller recognize that the standards set forth in Exhibit "E" may require modification from time to time to conform to applicable governmental regulations. Such specifications may also be modified by the mutual agreement of the parties as evidenced by a writing made and entered into in accordance with Section 15(d) hereof.

- 27 -

Protected Document--Subject to Protective Order

JMJ 000006701

(c)    **Good Manufacturing Procedures and Standard Operating Procedures**.  Seller covenants that all Talc sold to Buyer shall have been manufactured in conformance with the Good Manufacturing Procedures and Standard Operating Procedures set forth in Exhibit "A", as the same are required to be modified from time to time to conform to applicable governmental regulations.    Such specifications may also be modified to meet the reasonable needs of Buyer or Seller, which modifications shall be determined by the mutual agreement of the parties as evidenced by a writing made and entered into in accordance with Section 15(d) hereof.

(d)    **Price Adjustments**.    Buyer and Seller have agreed that certain costs of meeting and complying with changes in Buyer's specifications shall be allocated to the parties as follows:

(i)    **Final Product Specifications**.    All costs incurred by Seller in meeting and complying with changes in Buyer's final product specifications, which changes are required by rules or regulations promulgated by federal, state or local governmental agencies or bodies having the authority to do so, shall be for Buyer's account in the form of price increases sufficient to offset Seller's annual increased out-of-pocket expenses, or higher unit costs from lost productivity, plus additional depreciation.  Buyer and Seller agree to negotiate in good faith price adjustments to compensate Seller for additional costs incurred by Seller in

- 28 -

Protected Document--subject to Protective Order

JMJ 000000704

meeting and complying with changes in Buyer's final product specifications, which changes are required or requested by Buyer for reasons other than that such changes are required by governmental agencies. Any price adjustment made pursuant to this Section .6(d)(i) shall be in the form of a permanent increase to the Base Price; and the amount of any such increase shall be included in the Base Price for escalation or reopener purposes pursuant to Sections 4(b) and 4(d) hereof.

(ii) Mining Regulations. All costs incurred by Seller in meeting and complying with any newly-promulgated regulations pertaining directly and solely to mining, mine safety and health practices and procedures, shall be for Seller's account. However, Buyer and Seller shall share equally, on a case-by-case basis, all costs incurred by Seller in meeting and complying with any rule or regulation promulgated by federal, state or local governmental agencies or bodies having the authority to do so, which requires Seller to conduct more difficult or more expensive mining, milling or other beneficiation methods, procedures or practices in order to meet Buyer's specifications; provided, however, that Buyer shall have no obligation to share such costs until such costs exceed, on a cumulative basis, Ten Dollars ($10) per ton of beneficiated talc; and provided, further, that Buyer shall have no obligation to share such costs once Buyer's portion

- 29 -

15408808

Protected Document--subject to Protective Order

JMJ 000066703

of such costs exceed, on a cumulative basis, Forty Dollars ($40) per ton of beneficiated talc. Buyer shall realize its portion of such costs in the form of a permanent increase to the Base Price, and the amount of Buyer's portion of such costs shall be included in the Base Price for escalation and reopener purposes pursuant to Sections 4(b) and 4(d) hereof. Within sixty (60) days following the effective date of an increase to the Base Price pursuant to this Section 6(d)(ii), Buyer may request that Price Waterhouse verify that the sum of Buyer's and Seller's portions of such increase reasonably reflects the cost of complying with any such newly-promulgated rule or regulation.

(iii) Cost Savings. One Hundred Percent (100%) of any cost savings realized as a result of operating efficiencies or productivity gains made by Seller after the Commencement Date, or as a result of any other operating changes instituted by Seller which do not require Buyer's prior approval hereunder, shall be for Seller's sole account. However, in the event that Seller realizes cost savings by virtue of Seller's utilization of ore sources qualified pursuant this Section 6 but not located in Vermont, or by virtue of its implementation of changes in the Good Manufacturing Procedures and Standard Operating Procedures set forth in Exhibit "A", or in the BPC specification #B-006, which changes were suggested by either party and accepted by

- 30 -

TXAGA608

both parties, then such cost savings shall be allocated as follows on a case-by-case basis:

(A)    Where no capital investment is necessary to implement a particular cost-saving change, or where the capital investment necessary to implement such change is less than Ten Thousand Dollars ($10,000), Seller shall realize one hundred percent (100%) of such cost savings for the first twelve (12) months following that date which the parties agree to have been the date of permanent implementation of such cost-saving change. After such initial twelve (12) month period, or after Seller has recovered the full cost of such capital investment, whichever is later, Buyer and Seller shall share equally in such cost savings, with Buyer realizing such cost savings through a permanent reduction in the Base Price.

<10,000

(B)    Where the capital investment necessary to implement a particular cost-saving change exceeds Ten Thousand Dollars ($10,000), Buyer and Seller agree to negotiate in good faith an equitable sharing of the realized cost savings, recognizing that the party or parties making such capital investment must recover the investment made.

>10,000 Capitol

The amount of any cost savings which permanently reduces the Base Price pursuant to this Section 6(d)(iii) shall be included in the

- 31 -

Protected Document--subject to Protective Order

JMJ 000006707

Base Price for escalation and reopener purposes pursuant to Sections 4(b) and 4(d) hereof.

(iv)  Column Flotation.  As of the date first above written, Seller is installing and/or testing a flotation system at its West Windsor grinding facility which is different from that historically utilized by Seller, which flotation system may result in quantifiable cost savings to Seller. Notwithstanding any other provision of this Section 6(d), after Seller, in its reasonable judgment, shall have recovered the full cost of the design, construction, installation and testing of such flotation system (assuming Seller's cost of capital to be ten percent (10%) per annum), then Seller shall share such cost savings with Buyer. After Seller shall have recovered such costs, Buyer shall realize such cost savings through a one time, permanent reduction in the Base Price equivalent to thirty-three percent (33%) of the realized unit cost savings as reasonably determined by Seller.

(e)  Ship-to-Stock Certification Requirements.  Seller shall comply with the ship-to-stock certification requirements attached hereto as Exhibit "F", and by this reference incorporated herein.

- 32 -

TS*G6800

Protected Document--subject to Protective Order

JNJ 000066708

(f)    Inspection, Acceptance.

(1)    Non-microbiological Specifications.    Seller shall take and prepare a composite sample from those silos at Seller's West Windsor milling facility which are or which will be dedicated to the storage of Talc prior to final shipment of such to Buyer (the "Certification Sample"), in accordance with the methods and procedures practiced by Seller on the date of this Agreement, or as refined or codified pursuant to Section 5(h) hereof. The Certification Sample shall be split into three (3) sealed portions and retained for use in the event of dispute concerning the conformity of any shipment to Buyer's non-microbiological specifications. Two (2) sealed portions of the Certification Sample shall be retained by Seller, and one sealed portion shall be forwarded immediately to Buyer. Buyer shall test each sample for contamination immediately upon receipt of the same in accordance with Buyer's practices on the date of this Agreement, as such practices may be modified from time to time by the mutual agreement of the parties. Such testing shall be at Buyer's sole expense. All sealed portions of the Certification Sample shall be retained by Buyer and Seller in accordance with their respective established practices.

In the event that Buyer conducts analytical testing on the Certification Sample for non-microbiological parameters, Buyer shall forward the results of such tests to Seller as soon as possible. In the event of dispute between the parties concerning

- 33 -

TX4Q8808

Protected Document--subject to Protective Order

JMJ 000006709

conformance to any of Buyer's non-microbiological specifications as described on Exhibit "E", Buyer shall give written notice of such dispute to Seller as soon as possible. Immediately after such notice, each party agrees to submit its sealed portion of the Certification Sample to a mutually satisfactory third party laboratory. Seller shall also submit to the laboratory a third untested, sealed portion of the Certification Sample. Such laboratory shall determine, in its judgment, whether the shipment conforms with Buyer's specifications as evidenced by the Certification Sample. The decision of the third party laboratory shall be final, and all costs and expenses pertaining to such testing by the third party laboratory shall be shared equally.

(ii)     Microbiological Specifications.  On a daily basis, Seller shall take and prepare for microbiological examination samples from each production shift at Seller's West Windsor milling facility (the "Shift Sample"), in accordance with the methods and procedures practiced by Seller on the date of this Agreement, or as refined or codified pursuant to Section 6(h) hereof, and shall send a portion of the Shift Sample to Buyer.  Buyer shall give written notice of any non-conformance of the Shift Samples to any of Buyer's microbiological specifications as described on Exhibit "E" as soon as possible, but in no event later than fourteen (14) calendar days following shipment of each Shift Sample to Buyer, or shall waive its right to claim any non-conformance of Seller's Talc with Buyer's microbiological specifications.  Seller shall not release for

- 34 -

TSAC6608

JMJ 00006671O

shipment to Buyer any Talc contained within a silo for which Seller has not received Buyer's approval for all Shift Samples relating to such silo.

(iii) Event of Non-Conformance. Seller, within a reasonable period of time after the final determination of a non-conformance, shall: (i) arrange for return to Seller or an Affiliate of Seller (as such term is defined in Section 8(c) hereof), at Seller's sole cost and expense, such Talc as is finally determined to be out of conformance with Buyer's specifications; (ii) replace such Talc as is finally determined to be out of conformance with Buyer's specifications; and (iii) compensate Buyer for the freight costs of any truckload or carload rejected for non-conformance in accordance with this Section 6(f). Upon return of non-conforming Talc to Seller or Seller's Affiliates, Seller or Seller's Affiliates may: (a) sell such non-conforming Talc to any third party utilizing talc in non-cosmetic applications; or (b) re-process such non-conforming Talc, or blend such non-conforming Talc with other talcs manufactured by Seller or Seller's Affiliates, and sell such re-processed or blended talc to any third party customer, including those customers utilizing talc in cosmetic applications; provided, however, that in either of the foregoing cases, such resold, reprocessed or blended talc no longer shall be: (i) identifiable as talc once supplied to Buyer; or (ii) otherwise associated with the name of Buyer or Buyer's Affiliates. No Talc rejected by Buyer shall be resold to

- 35 -

TSAG8808

Protected Document--subject to Protective Order     JMJ 00006671l

Buyer. Upon the resale or other disposal of non-conforming Talc to a third party, Seller shall provide written verification to Buyer that such sale or other disposal was made in accordance with this Section 6(f).

(g)   Buyer's Remedies for Non-Conformance. In the event that Talc sold by Seller fails to conform to the quantity or quality requirements set forth in Section 5 hereof and this Section 6, and said non-conformity is not corrected within forty-five (45) days following notice by Buyer, Seller may elect, if commercially practicable, to substitute product from those other approved sources described in Exhibit "D", whether or not such sources are owned or leased by Seller or Seller's affiliates, at a delivered price equal to Buyer's delivered cost for Talc from Seller's West Windsor Mill. Such substitution shall be made with Buyer's prior written consent, which consent shall not be unreasonably withheld. In the event that Seller is unable to supply an acceptable substitute Talc: (a) Buyer may be relieved of its obligations under Section 3(a) hereof to buy Talc exclusively from Seller; (b) Buyer's minimum purchase obligations pursuant to Section 3(c) hereof shall be reduced by the amount of Talc thereafter bought from third parties during such period of non-conformance; and (c) Seller may, at Seller's sole option terminate this Agreement without liability for such termination. Except in the case of Seller's fraud, willful misconduct or gross negligence, and except as otherwise provided in Section 13(b) hereof, Buyer's remedies for non-conformance of goods as set

- 36 -

YS-GBADA

Protected Document--subject to Protective Order

JNJ 000000712

forth in this Section 6(g) shall be the sole and exclusive remedy for non-conformance available to Buyer.

(h)     Future Collaboration.  The parties recognize that the operation of Seller as a business entity no longer under common ownership with Buyer may necessitate adjustments in the methods used to assure the quality of Talc delivered hereunder. Accordingly, Buyer and Seller agree that for a two-year period after the Commencement Date, they will collaborate to refine and codify current methods and practices such that the quality standards described on Exhibit "E" in effect from time to time may be reliably achieved and verified.  Any such refinements and codifications shall be made by the mutual agreement of Buyer and Seller in accordance with Sections 6(c) and 15(d) hereof.

7.  Secrecy.  Except as otherwise provided in this Agreement or as otherwise required by law, each party shall hold as confidential, and shall neither use for its own benefit nor disclose, directly or indirectly, to third parties any information disclosed by or received from the other party and pertaining to the other party's business and affairs, including without limitation:   raw materials and finished product specifications, standards and tests; procedures, methods and costs involved in mining and manufacture; prices and quantities of product purchased; quantities of raw materials and quantities of finished product held in inventory at any location; manufacturing schedules; quantity of unfilled purchase orders on

- 37 -

TSAG8808

Protected Document--subject to Protective Order

JMJ 00006671J

hand from time to time; purchase volume forecasts and/or plans; new or proposed products; and experience data on product and manufacturing performance.. The provisions of this Section 7 shall survive the termination or expiration of this Agreement for a period of five (5) years following such termination or expiration. Nothing contained in this Section 7 shall in any way restrict or impair the right of either party to use, disclose, or otherwise deal with any information or data which: (a) at the time of the disclosure is generally available to the public or thereafter becomes generally available to the public, by publication or otherwise, through no act of either party; or (b) the party can show was in its possession prior to the time of the disclosure to it and was not acquired, directly or indirectly, from the other party or any other source bound by a confidentiality agreement with the other party; or (c) the party can show was received by it as a matter of lawful right after the time of disclosure from a third party who did not acquire it from the other party or any of its parent, affiliate or subsidiary companies under an obligation, the party is free to disclose it to other.

8. **Termination.**   This Agreement may be terminated by either party in the following circumstances:

     (a)    **Bankruptcy.**     Termination shall be effective immediately upon notice to the terminated party if the terminated party:   (i) files or has filed against it a petition under the

- 38 -

TSAG860R

Federal Bankruptcy Code or any other comparable law which is not dismissed or stayed within thirty (30) days; (ii) makes an assignment for the benefit of creditors or has a receiver appointed for it; or (iii) otherwise takes advantage of laws designed for the relief of debtors.

(b)  **Breach.**  In the event that one party materially breaches any representation, warranty, covenant or agreement in this Agreement (except for the minimum purchase requirements set forth in Section 3(c) hereof) or fails to conform to the quantity and quality requirements set forth in Sections 5 and 6 hereof, the non-breaching party may give notice of its intent to terminate, stating therein the grounds therefor.  The party receiving the notice shall have ninety (90) days from the date of receipt thereof to cure said breach.  In the event such breach is cured, such notice of termination shall be of no force or effect.  In the event such breach is not cured, and is not the result of an Event of Force Majeure (as such term is defined in Section 9 hereof), and does not give rise to remedies available to the parties elsewhere in this Agreement, this Agreement shall, without more, terminate at the end of said ninety (90) day period.

(c)  **Sale of Assets or Business.**  For the purpose of this Agreement, the term "Parent" shall mean Johnson & Johnson, a New Jersey corporation, or Cyprus Minerals Company, a Delaware corporation; and the term "Affiliate" shall mean any entity which

- 39 -

1SAGR808

is fifty percent (50%) or more owned by a Parent, any entity which is fifty-percent (50%) or more owned by an Affiliate, or any operating division of any Parent or Affiliate.

This Agreement may be terminated by Buyer in the event that Cyprus Minerals Company or any of its Affiliates, shall transfer or sell all or a substantial portion of the assets of, or the business of, its United States Talc business to a third party who is not a Parent or an Affiliate; provided, however, that Buyer's notice of termination therefor must be given at least one (1) year prior to the effective date of such termination, and must be given within one (1) year from the date on which such transfer or sale shall close; and provided, further, that Buyer shall not terminate this Agreement unless and until it shall have determined, in the good faith exercise of its reasonable and prudent business judgment that such transfer or sale would create a substantial possibility of a material and adverse affect on the security and quality of Buyer's long term talc supply. The factors which Buyer may consider in the good faith exercise of its reasonable and prudent business judgment shall include, without limitation: the quality of maintenance of, and level of continued capital investment in, Seller's mines and mills; the quality of cosmetic Talc sold by Seller; the quality and experience of Seller's key management, including production and quality assurance personnel; and the effect of such sale or transfer upon the public's perception of Johnson & Johnson, the

– 40 –

Protected Document--subject to Protective Order

JNJ 000000716

Affiliates of Johnson & Johnson, or the end-use products of such entities.

9. **Force Majeure.**

(a)   **Events of Force Majeure.**   If either party shall be prevented by any Event of Force Majeure (as defined below) from the timely performance of any of its obligations hereunder, save and except the making of payments as provided herein, the obligation of performance shall be excused and shall not be a ground for cancellation or termination or default.   The party suffering the Event of Force Majeure shall use reasonable diligence to remedy such, but shall not be required to contest the validity of any law or regulation or any action or inaction of civil or military authority, or to prevent or settle any strike or labor dispute.   As used herein, the term "Event of Force Majeure" shall mean any cause, act or occurrence beyond a party's reasonable control, including, without limitation:   laws or regulations, action or inaction of civil or military authority; inability to obtain any license, permit or other authorization that may be required; unusually severe weather; mining casualty; unavoidable mine or mill shutdown; damage to, or destruction of mine or mill, plant or facility; fire, explosion, or flood; insurrection; riot; labor disputes; delay in transportation; and acts of God.   Should any of these events occur to Seller, Seller may reduce the quantities of Talc it is obligated to deliver hereunder and allocate the reduced supply,

– 41 –

TSACBSOB

Protected Document--subject to Protective Order

JNJ 000066717

whenever practical on a pro rata basis, among all of its cosmetic talc customers as Seller in its sole discretion deems appropriate, or cease deliveries entirely without any liability whatsoever for any such delivery of reduced amounts of Talc or no delivery of Talc; provided, however, that Buyer may purchase, from any third party sources approved by Buyer, such portion of Buyer's normal requirements as may be unfulfilled as a result of Seller's pro rata allocation and Seller's inability to supply Talc from alternate sources pursuant to Section 9(c) hereof. Such purchases shall reduce Buyer's minimum purchase obligations pursuant to Section 3(a) and 3(c) hereof by the amount of such purchases.

(b)    Buyer's Force Majeure.    Should Buyer suffer an Event of Force Majeure thereby affecting Buyer's ability to accept deliveries of Talc, Buyer may reduce the quantities of Talc it orders or accepts.    In the event Buyer reduces the quantity of Talc it accepts for a period of greater than sixty (60) days, Seller may reduce the quantities of Talc it is obligated to deliver hereunder or cease deliveries entirely in an amount equal to such reduction by Buyer without any liability for such delivery of reduced amounts of Talc or no delivery of Talc.    In the event that Buyer reduces the quantity of Talc it accepts for a period of greater than one hundred and eighty (180) days, Seller, at its option, may terminate this Agreement.    Buyer's minimum purchase obligation pursuant to Section 3(a) hereof shall not be reduced by the quantity of Talc not accepted by Buyer

TS4C8808

Protected Document--subject to Protective Order

JNJ 000066718

during an Event of Force Majeure; provided, however, that the Initial Term of this Agreement shall be extended for a period equal to the duration of Buyer's Event of Force Majeure, if necessary, to enable Buyer to meet such minimum purchase obligations.

(c)   **Seller's Force Majeure.** Should Seller suffer an Event of Force Majeure thereby affecting Seller's ability to make deliveries of Talc from Seller's West Windsor Mill, Seller shall use reasonable efforts to supply Buyer with Talc for Buyer's domestic talc requirements from another source qualified by Buyer in accordance with Section 6(a) hereof, whether or not owned or controlled by Seller; provided, however, that in the event that more than one such source of Talc has been qualified by Buyer, Buyer may prioritize such sources and accept deliveries of alternate Talc from such sources in accordance with such prioritization; and provided, further, that Seller shall have no liability in the event of its inability, by reason of unavailability, to supply Talc from an alternate source with a priority higher than that from which Seller is able to supply alternate Talc.   Seller's obligation to supply Talc from alternate sources shall be limited to the extent to which Talc is commercially available from qualified sources in quantities sufficient to meet Buyer's requirements.   For a period of one hundred and twenty (120) days, the price of alternate Talc to be delivered to Buyer shall be the same as the delivered price to Buyer of Talc delivered from Seller's West Windsor Mill on the

- 43 -

TSAGR606

Protected Document--subject to Protective Order

JMJ 000066719

calendar day preceding the cessation or reduction of deliveries therefrom. " On or before the expiration of such one hundred and twenty (120) day period, Seller shall notify Buyer of: (i) its intent to continue supplying Buyer with alternate Talc at the delivered price for Talc delivered from the West Windsor Mill, or (ii) its intent to declare an Event of Force Majeure and indicate Seller's permanent inability to supply Talc. In the event that Seller shall declare an Event of Force Majeure in accordance with this Section 9(c): (A) Seller shall continue to supply alternate Talc to Buyer at the price in effect during the preceding one hundred and twenty (120) day period for an additional sixty (60) days; (B) this Agreement shall then terminate at the close of business on such sixtieth (60th) day; and (C) Seller shall have no further obligation or liability whatsoever pursuant to this Agreement.

(d)    **Limitation.**    The provisions of this Section 9 shall not be invoked merely to delay or suspend deliveries of Talc to Buyer, or to delay or suspend acceptance of, or payment for, Talc delivered to Buyer, absent, in the good faith estimation of the party invoking such provisions, an Event of Force Majeure.

10. **Seller's Indemnity.** Seller shall indemnify, defend and hold harmless Buyer, and its affiliates, and each of their respective directors, officers, employees, and agents from and against all liabilities arising out of any violation by Seller of any law, ordinance, regulation or rule or the order of any court or

- 14 -

Protected Document--subject to Protective Order

administrative agency, and from and against all liabilities arising out of any claim by an employee, agent, or contractor of Seller arising in connection with this Agreement; provided, however, that Seller shall not indemnify Buyer for any such liabilities to the extent that such liabilities arise from: (i) the acts or omissions of Buyer; or (ii) the acts or omissions of Seller which were directed by Buyer. The provisions of this Section 10 shall survive the termination or expiration of this Agreement.

11. Buyer's Indemnity. Buyer shall indemnify, defend and hold harmless Seller, and its affiliates, and each of their respective directors, officers, employees, and agents from and against all liabilities arising out of any violation by Buyer of any law, ordinance, regulation or rule or the order of any court or administrative agency, and from and against all liabilities arising out of any claim by an employee, agent, or contractor of Buyer arising in connection with this Agreement; provided, however, that Buyer shall not indemnify Seller for any such liabilities to the extent that such liabilities arise from: (a) the acts or omissions of Seller; or (b) the acts or omissions of Buyer which were directed by Seller. In addition, Buyer shall indemnify, defend and hold harmless Seller, and its affiliates, and each of their respective directors, officers, employees and agents from and against all liabilities arising out of any product liability-based claim, suit, demand or cause of action directed against Seller or any of Seller's affiliates: (i)

– 45 –

TS+G5806

Protected Document--subject to Protective Order                                   JMJ 000066721

arising out of the sale of cosmetic talc products to consumer markets, which products were manufactured by Seller prior to the date first above written; or (ii) for which Buyer is directly or indirectly responsible as a result of Buyer's possession, use or processing of Talc delivered to Buyer pursuant to this Agreement, or as a result of Buyer's manufacture, shipment and sale of Talc-containing product (including without limitation, baby powder and adult powder) derived from Talc delivered to Buyer pursuant to this Agreement; provided, however, that Buyer shall have no obligation of indemnification pursuant to this Section 11 in the event that the Talc delivered to Buyer hereunder did not conform to the specifications for such Talc then in effect, and such variance from such specifications was a material contributing factor in the claim, suit, demand or cause of action being asserted. For the purposes of this Section 11, the term "Buyer" shall include Buyer and Buyer's Parent and Affiliates as such terms are defined in Section 0(c). The provisions of this Section 11 shall survive the termination or expiration of this Agreement.

12. Promotion. Each party hereby warrants that it will not use any trademark, trade name or representation of the products or services of the other party or its affiliates, or refer directly or indirectly to the other party, its affiliates, or the products or services of the other party or its affiliates, without in any case obtaining the prior written permission of the other party.

- 46 -

TSAG8808

Protected Document--subject to Protective Order JNJ 000066722

The provisions of this Section 12 shall survive the termination
or expiration of this Agreement.

13. Warranty; Apportionment.

(a) Warranty. Seller represents and warrants that all
Talc sold by Seller shall conform to the quality standards set
forth in Exhibit "E." SELLER MAKES NO OTHER WARRANTY OF ANY
KIND, EITHER EXPRESSED OR IMPLIED, IN FACT OR BY LAW, WHETHER OF
MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE OR
OTHERWISE. Buyer represents and warrants, based on its expertise
in the industry and its intimate familiarity with selective
mining techniques of qualified ore bodies, the Good Manufacturing
Procedures and Standard Operating Procedures described on Exhibit
"A", and the sampling and testing methods described therein, as
the same may be modified by the mutual agreement of the parties
pursuant to Section 6(c) hereof, that such mining practices,
processing procedures and testing methods, if practiced by Seller
in the manner practiced by Seller on the date of this Agreement,
are adequate to produce talc products meeting the specifications
for Talc set forth in Exhibit "E".

(b) Apportionment. Buyer and Seller agree that liability
for damages alleged to have been suffered by Buyer and Seller
arising out of an alleged breach of the foregoing warranty shall
be apportioned as follows:

– 47 –

TSAGB8C8

Protected Document--subject to Protective Order

JNJ 000066724

(i)   Seller shall indemnify Buyer for any cost, loss, damage or expense suffered by Buyer in the event that Buyer can demonstrate that either: (A) the Certification Sample proves that Seller's Talc did not meet the specifications therefor as described on Exhibit "E" except for the microbiological specifications set forth therein, before title to such Talc passed to Buyer, and the variance from such specifications was a material contributing factor in the claim, suit, demand or cause of action being asserted; or (B) that Seller failed to sample and test Talc in accordance with the sampling and testing methods described on Exhibit "A" in the manner practiced by Seller on the date of this Agreement or as modified by the mutual agreement of the parties pursuant to Section 6(c) hereof, and that Seller's failure to so sample and test Talc was a material contributing factor in the claim, suit, demand or cause of action being asserted; provided, however, that Seller's obligation to indemnify Buyer shall not exceed Twenty Million Dollars ($20,000,000) in the absence of Seller's gross negligence or willful misconduct, and Forty Million Dollars ($40,000,000) in the event of Seller's gross negligence or willful misconduct;

(ii)   Seller shall be solely liable in the event that Buyer can demonstrate a shipment of Seller's Talc failed to conform,' as evidenced by the Shift Sample, to the microbiological quality standards set forth in Exhibit "E" before title to such Talc passed from Seller to Buyer;

- 48 -

"SAG8848

Protected Document--subject to Protective Order

JNJ 000066724

provided, however, that Seller's liability pursuant to this Section 13(b)(ii) shall be limited to replacement of Talc and reimbursement of certain of Buyer's freight costs in accordance with Sections 6(f) and 6(g) hereof;——

(iii) Buyer shall be solely liable for, and shall indemnify Seller for, any cost, loss, damage or expense suffered by Buyer or Seller arising out of the failure of Buyer's finished products to conform to the microbiological quality standards established therefor, as the same may be amended from time to time; and

(iv) Buyer shall indemnify Seller for any cost, loss, damage or expense suffered by Seller in the event that the Certification Sample proves that Seller's Talc met the specifications therefor, as described on Exhibit "E", before title to such Talc passed to Buyer.

Nothing contained in this Section 13(b) shall be construed to limit or conflict with the terms and conditions set forth in Sections 10 and 11 hereof, which shall be construed consistently with or in addition to the obligations set forth in this Section 13(b).

14. Product Development.    Buyer and Seller acknowledge that Buyer's talc marketing expertise and Seller's technical expertise may be used to the mutual benefit of the parties.    Therefore,

- 49 -

TSAGB508

JNJ 000066723

Buyer and Seller may agree to collaborate in the development of new body powders, toiletries or other talc-containing consumer products. In the event that Seller shall develop a new, proprietary, talc-containing body powder or toiletry, Seller shall provide to Buyer under mutually satisfactory obligations of confidentiality, sufficient information concerning such application to permit Buyer to determine Buyer's interest in further collaboration therein. Buyer shall have ninety (90) days following the date of Seller's disclosure to determine Buyer's interest in such collaboration. In the event Buyer and Seller collaborate in the development of a new application, Buyer shall have the exclusive right to market the same, and Seller shall be the exclusive supplier of talc therefore pursuant to the terms and conditions set forth herein. Any additional terms which may be required by the parties but which are not addressed herein shall be negotiated to the mutual satisfaction of Buyer and Seller. In the event that Buyer and Seller fail to agree upon any material additional term, Buyer and Seller may proceed independently with the development, marketing and sale of the new product in question, subject to any patent, trade mark, trade secret or other intellectual property rights or interests of Seller in such new product, and subject further to any obligation of confidentiality between the parties.

- 50 -

TSAOBBOW

Protected Document--subject to Protective Order

JMJ 00000726

## 15. Miscellaneous

(a)    Parties in Interest; Assignment.    This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and permitted assigns. This Agreement is not made for the benefit of any person, firm, corporation or other entity not a party hereto, and nothing in this Agreement shall be construed to give any person, firm, corporation or other entity, other than the parties hereto and their respective successors and permitted assigns, any right, remedy or claim under or in respect of this Agreement or any provision hereof.    This Agreement may not be assigned or transferred in whole or in part by any party hereto without the prior written consent of the other party, and any attempt to assign or transfer this Agreement or any part thereof in violation of this Section 15(a) shall render such attempted assignment or transfer void and of no effect.    Notwithstanding the foregoing, Seller may assign this Agreement to any of its Affiliates upon giving notice of such assignment to Buyer.

(b)    Notices.    Any notice, request, consent, waiver or other communication required or permitted to be given hereunder shall be effective only if made or given in writing and shall be deemed sufficiently given only if delivered in person or sent by telegram, cable, telecopier, or by certified or registered mail, postage prepaid, return receipt requested, addressed as follows:

- 51 -

TSAG8808

Protected Document--subject to Protective Order

JNJ 000066727

If to Seller:

Windsor Minerals Inc.
c/o Cyprus Mines Corporation
9100 East Mineral Circle
Englewood, Colorado   80112
Attn:  Vice President - Industrial Minerals


With concurrent copy to:

Cyprus Mines Corporation
9100 East Mineral Circle
Englewood, Colorado  80112
Attn:  General Counsel


If to Buyer:

J & J Baby Products Company
c/o Johnson & Johnson Consumer Products, Inc,
501 George Street
New Brunswick, New Jersey  08903
Attn:  Director of Procurement


With concurrent copy to:

Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, New Jersey 08933
Attn:  General Counsel


or to such other person or address as such party may have specified in a notice duly given as provided herein. Such notice or communication shall be deemed to have been given as of the date of delivery or transmission.


(c)   Entire Agreement.   This Agreement (including the Exhibits attached hereto and incorporated herein) constitutes the entire agreement and understanding of the parties relating to the subject matter hereof, and the same shall supersede all prior and

- 52 -

Protected Document--Subject to Protective Order

contemporaneous agreements and understandings, representations and warranties, whether oral or written, relating to the subject matter hereof.

(d)   Modification.  This Agreement cannot be changed and no performance, term or condition may be waived in whole or in part except by a writing executed by a duly authorized officer of Buyer and Seller.

(e)   Waiver.   Except as specifically set forth herein, failure or delay by either party hereto to require performance of any provision of this Agreement shall not affect its right to require full performance thereof at any time thereafter, and the waiver of a breach of any provision shall not constitute a waiver of any breach of any other provision or of the same provision at any time thereafter.

(f)   Governing Law.   The terms and conditions of this Agreement shall be interpreted in accordance with and construed pursuant to the Uniform Commercial Code as from time to time in effect in the State of Vermont.

(g)   Severability.   The unenforceability or invalidity of any Section or provision of this Agreement shall not affect the enforceability or validity of the balance of this Agreement.

T5408808

Protected Document--subject to Protective Order

JMJ 000000729

(h)    **Headings.**    All headings of this Agreement have been inserted for convenience of reference only, and are not to be considered a part of this Agreement, and shall in no way affect the interpretation of any of the provisions of this Agreement.

(i)    **Mutual Negotiation.**    This Agreement and the language contained herein have been arrived at by the mutual negotiation of the parties.    Accordingly, no provision hereof shall be construed against one party or in favor of another party merely, by reason of draftsmanship.

(j)    **Obligations of Buyer.**    With respect to any covenant, obligation or agreement to be performed hereunder by Buyer, Buyer shall perform, or cause an affiliate of Buyer to perform, the same.

IN WITNESS, WHEREOF, the parties have caused this Agreement to be executed effective as of the day and year first set forth above.

WINDSOR MINERALS INC.,
a Vermont corporation

By: _____

Title: Executive Vice President

JOHNSON & JOHNSON BABY PRODUCTS COMPANY, a division of JOHNSON & JOHNSON CONSUMER PRODUCTS, INC., a New Jersey corporation

By: _____

Title: President

- 56 -

7S4G8808

Protected Document--subject to Protective Order

JMJ 000066730

"EXHIBIT A"

AG8801281

Protected Document--Subject to Protective Order

WINDSOR MINERALS, INC.

Current

Good Manufacturing Procedures

and

Standard Operating Procedures

November 25, 1987

Good Manufacturing Procedures — Bagging

| | |
|---|---|
| Bagging Procedures | 001 |
| Decontamination of Pallets | 002 |
| Cosmetic Bulk Loading | 003 |
| Transfers of Bagged Product | 005 |
| Fuller Kenyon Microbiologic | 006 |
| Cleaning the Inline Magnet (Cosmetic Grade Bag/Bulk Conveying Line | 007 |
| Cleaning Bag Machine Air Pads | 008 |
| Export Container Capacities | 009 |
| Silo Change Procedures | 010 |

Good Manufacturing Procedures - Clerk

| | |
|---|---|
| Bagging and Shipping Orders | 002 |
| Sample Requests | 016 |
| Shipping | 018 |
| Silo Book and Silos | 019 |
| Silo Clearance Forms | 020 |
| Talc Transfer Slips | 021 |

Good Manufacturing Procedures — Crusher

| | |
|---|---|
| Argonaut Ore Blending with Hammondsville ore | 001 |

Good Manufacturing Procedures - Flotation

| | |
|---|---|
| Flotation Start-up | 001 |
| Flash Dryers | 002 |
| Additional Cleaning Responsibilities for Flotation Operators | 004 |
| Shut-Down Chlorination | 006 |
| Start-up Chlorination | 009 |

Good Manufacturing Procedures — General

| | |
|---|---|
| Handling of Confidential Information | 005 |
| Accidents — First-Aid | 010 |
| Foreign Material in 66 Product | 011 |
| Control of Foreign Material in 66 Product | 012 |

A-1

Protected Document--subject to Protective Order

JMJ 000000732

## Good Manufacturing Procedures – Maintenance

Start-up of Repaired Equipment                          005
Handling of Chlorine Tanks and Related Equipment        006
Handling Procedures for Chlorine Leakage                007
Microbial Filter Inspection and Maintenance             009
Microbial Control for Flash Dryer Dust Collector        011
Maintenance for 1 and 2 Dust Collector                  012
Maintenance of Ultraviolet Units                        015

## Good Manufacturing Procedures – Quality Control & Mill

Changing Existing Mill and Quality Control Assurance
   Policies and Procedures                               001

## Good Manufacturing Procedures – Supervision

Supervisor's Responsibilities                           001
Operations for Supervisors                              002
Production Quality Control – Grade 66 – Color           007
Samples – Missing                                       008
Operational Checks Dust Collectors                      009
Production Quality Control – Grade 66 – Insols          010
Filling and Emptying Grade 66 Silos                     011
Production Quality Control – Grade 96 – Color           012
Production Quality Control – Grade 96 – Insols          013
Silo Conditions                                         017
Overseas Container Inspection                           018

## Good Manufacturing Procedures – Warehousing

Inventory Parts and Supplies – Need                     001
Inventory Parts and Supplies – Withdrawal               002
Inventory Parts and Supplies – Control                  003
Material Requisition                                    008

## Good Manufacturing Procedures – Wet Mill

Wet Mill Chlorination                                   001
Wet Mill Start-up procedure                             002
Cleaning AB & CD Third Stage Cleaner Concentrate Magnet 005
Shut-down Chlorination                                  008
Start-up Chlorination                                   009

## Standard Operating Procedures

Arsenic Testing                                         QA-001
Chlorine                                                QA-002
Washing and Care of SPEC 20 CUVETS                      QA-003
Shift End Lab Clean-up                                  QA-004
Orion Analog pH Meter Electrode                         QA-005
Water Still Cleaning                                    QA-006

Protected Document--subject to Protective Order

JMJ 000000711

Filter Cake Color ............................................. QA-007
Color (Reflectance) ........................................... QA-008
Lab Printouts and Distribution ................................ QA-009
Laboratory Supervisor ......................................... QA-010
Laboratory Technician ......................................... QA-011
Laboratory Personnel Training ................................. QA-012
Lab Notebook Use .............................................. QA-013
Quality Assurance Department .................................. QA-014
Reporting Test Analysis Results ............................... QA-015
Silo "C" of "A" Batch File .................................... QA-016
Acid Insols – Tails and Ore ................................... QA-017
Insol, MgC)3 – Leco Determinator .............................. QA-018
Water Soluble Iron ............................................ QA-019
Brainweigh Electronic Balance – PM ............................ QA-020
LABCONCO Fume Hood – PM ....................................... QA-021
LECO Routine Maintenance ...................................... QA-022
Calibration of pH Meter ....................................... QA-023
Sartorius Analytical Balance – PM ............................. QA-024
Alpine Air Jet Sieve – PM ..................................... Qa-025
Ro-Tap Testing Sieve Shaker – PM .............................. QA-026
Sub-Sieve Sizer – Calibration and Maintenance ................. QA-027
Bausch and Lomb Spectronic 20 – PM ............................ QA-028
Scott Volumeter – PM .......................................... QA-029
Monitek Trubidimeter Maintenance .............................. QA-030
Filter Cake Moisture .......................................... QA-031
Ore Moisture .................................................. QA-032
pH of Talc .................................................... QA-033
Daily 66 Preparation and Testing .............................. QA-034
Bagged Shipments – 66 and 96 Grade ............................ QA-035
Sample Collection ............................................. QA-037
MSHA Parallel Samples for Fiber ............................... QA-038
Microbial Samples for Royston ................................. QA-039
Railcar Shipments ............................................. QA-040
Silo Composites ............................................... QA-041
Asbestos – Transmission Electron Microscopy ................... QA-042
NPDES Water Quality Monitoring ................................ QA-043
Asbestos – X-Ray Diffraction Samples .......................... QA-044
Frequency of Analysis – Cosmetic .............................. QA-045
Ro-Tap Sieve Analysis ......................................... QA-048
Oil Absorption of Pigments .................................... QA-049
pH – Water Sample ............................................. QA-050
Total Suspended Solids ........................................ QA-051
Turbidity ..................................................... QA-052
Master Equipment List ......................................... QA-053

A-3

Protected Document--subject to Protective Order

JNJ 000000734

"EXHIBIT B"

AG6801281

Protected Document--Subject to Protective Order

JNJ 000066735

TALC SUPPLY AGREEMENT
EXHIBIT B — 3 Pages

## ARBITRATION

All matters submitted for arbitration in accordance with Section
4(e) of the Agreement to which this Exhibit B is attached (the
"Agreement") shall be determined as follows:

1. **Notice.**   The party desiring arbitration shall give written
notice of its desire to the other party.   The parties shall
promptly exchange all documents and information relevant to the
dispute and the issue presented.   Except as otherwise provided
herein, arbitration shall be held under the commercial Rules of
the American Arbitration Association then in effect.

2. **Appointment of Arbitrator.**   Within fifteen (15) calendar days
following the expiration of the aforementioned thirty (30) day
period, Buyer and Seller shall agree on a single arbitrator (the
"Arbitrator").     The  arbitrator   shall   be   impartial   and
disinterested and qualified by training and experience in the
particular matter which is the subject of arbitration.   In the
event Buyer and Seller do not agree upon the Arbitrator within
such fifteen (15) calendar days, the parties shall jointly
request, immediately upon expiration of such fifteen (15)
calendar day period, that the Arbitrator be appointed by a Judge
of the United States District Court for the District of Vermont.

B-1

7510880B

Protected Document--subject to Protective Order

JMJ 000000736

3. <u>Rules of Procedure</u>.   Upon appointment the Arbitrator shall promptly proceed to investigate, hear, and arbitrate the issues raised by the parties under Section 4(a) of the Agreement, completing the same within sixty (60) calendar days after appointment.   The Arbitrator may follow any rules of procedure which he deems appropriate, including the rules for discovery, pleadings and briefs.   The Arbitrator may order reasonable discovery, including presentation of evidence and testimony by independent experts or witnesses, or establish any other procedure which will aid in the expedited resolution of the dispute.

4. <u>Hearing and Award</u>.   The Arbitrator may, on reasonable notice to the parties, hold hearings of witnesses or arguments and copies of all documents to be considered by the Arbitrator shall be furnished to each party; provided, however, that the other party may request that documents designated as confidential be viewed <u>in camera</u> by the Arbitrator and disclosed only as necessary to allow the other party full opportunity to respond. The Arbitrator may conduct the hearing or hearings in such manner as he deems necessary to hear and understand the dispute, and to ensure that each party is given equal opportunity to present evidence on the dispute.   The Arbitrator may hear any witnesses and consider any exhibits presented by either of the parties or may call his own witnesses.   A stenographic record of the hearing will be taken; and the Arbitrator shall base his decision upon

3-2

*SAC8808

Protected Document--subject to Protective Order

JMJ 000006737

the terms of the Agreement, applicable law, and the testimony, briefs and documentation supplied by the parties. Each party shall, within twenty (20) calendar days following receipt of the stenographic record, submit its post-hearing brief setting forth its proposed findings of fact and conclusion. The Arbitrator shall make a written determination of the existence of hardship within fifteen (15) calendar days after receipt of such briefs, setting forth in reasonable detail the Arbitrator's basis for his determination. The decision of the Arbitrator shall be conclusive and binding on each party and may be enforced by any court having jurisdiction thereof.

5. Expense of Arbitration. All expenses incurred by the Arbitrator, including reasonable compensation to the Arbitrator, and the fees and expenses of attorneys or experts who may be retained by the Arbitrator, and any investigation which may be made by the Arbitrator, shall be borne equally by the parties hereto.

6. Continuation of Agreement. The pendency of any such arbitration shall not in any manner or to any extent affect or abridge the respective rights and obligations of the parties under the Agreement, including but not limited to the continued performance thereof.

3-3

Protected Document--Subject to Protective Order

JNJ 000066738

"EXHIBIT C"

AG8801281

Protected Document--Subject to Protective Order    JNJ 000066739

TALC SUPPLY AGREEMENT
EXHIBIT C - 2 PAGES

## SAMPLE HARDSHIP CALCULATION

(For use in the event of termination of the Agreement
pursuant to Section 4(e)(i) thereof.)

### Example No. 1.

1. Assume notice of hardship is given on January 1, 1995, and is
followed by notice of termination.   Termination is effective on
January 1, 1996.

2. Assume the Offer Price is $400.00 per ton, and no deliveries
of Talc are made on January 1, 1996.

3. Buyer's payment to Seller, due within thirty days following
January 1, 1996, shall be:

$$0.70 \times [[(\$400 \times 1.04^1) \times (9,800 - 0) \times 0.694) + ((\$400 \times 1.04^2) \times 9,800 \times 0.694 \times 0.85] + [(\$400 \times 1.04^3) \times 9,800 \times 0.694 \times 0.6775]] = \$5,182,564$$

C-1

TC-5940B

Protected Document--Subject to Protective Order

JNJ 000066740

### Example No. 2.

1. Assume notice of hardship is given on March 31, 1996, and is followed by notice of termination. Termination is effective on March 31, 1997.

2. Assume the Offer Price is $400.00 per ton, and Buyer purchases 2500 tons of Talc between January 1, 1997 and March 31, 1997.

3. Buyer's payment to Seller, due within thirty days following March 31, 1997, shall be:

$0.70 \times \{[(\$400 \times 1.04^1) \times (9,800 - 2500) \times 0.694] + [(\$400 \times 1.04^2) \times 9,800 \times 0.694 \times 0.85]\} = \$3,326,048$

C-2

Protected Document--Subject to Protective Order

JNJ 000066741

"EXHIBIT D"

AG880'281

Protected Document--Subject to Protective Order

Talc Supply Agreement
Exhibit D - 1 page

## WINDSOR MINERALS, INC.
### ARGONAUT AND HAMMONDSVILLE ORE BODIES

| MINING PROPERTY | M-Tons – As of Nov. 25, 1987 | | |
| --- | --- | --- | --- |
| | PROVEN | PROBABLE | POSSIBLE |
| Argonaut | | | |
| Smith Lease | | | |
| West | 500 | 500 | - |
| East | 1100 | 500 | 400 |
| Hammondsville | | | |
| Fee | 1744 | 2535 | - |
| Gallowhur Lease | 500 | - | - |
| TOTAL | 1844 | 3535 | 400 |

D-1

Protected Document--Subject to Protective Order

JNJ 000066743

"EXHIBIT E"

AGBBD1281

Protected Document--Subject to Protective Order

WINDSOR MINERALS, INC.

Requirements Regarding Production and Testing of Grade 66 Talc

_____QUALITY STANDARDS_____

The agreement of the Johnson & Johnson Baby Products Company (BPC) to purchase Grade 66 is additionally conditioned on the following requirements:

1. It is important to recognize that Grade 66 Talc as provided to BPC faces some uniquely restrictive limits which affect the methods and chemicals used in its preparation. In addition, restrictive Vermont water quality standards impinge on the use of processing aids in the beneficiation process.

   Johnson & Johnson cosmetic talc is currently and must continue to be asbestos free as defined from time to time by appropriate governmental agencies and the Cosmetic Toiletries Fragrance Association (CTFA) and
   No experimentation in reagentry, Ph modifiers, flocculants de-foamers, etc. may be conducted which leads to contamination of certified product in the least degree.

2. All of the talc is to be produced via the methods and process currently used by Windsor Minerals including the avoidance of contaminating materials by means of carefully controlled selective mining of qualified ore bodies and the proprietary methodology known as the shear disc. The Good Manufacturing Procedures (GMP's) and the Standard Operating Procedures (SOP's) developed and in use by Windsor Minerals at the time this Agreement is concluded must continue to be followed and the necessary records of proof must be maintained and made immediately available on request to an appropriate representative of the BPC.

3. All of the talc is to be produced solely from ore bodies which have been approved by the BPC. Currently, the Hammondsville and Argonaut ore bodies are approved for carefully controlled selective mining for ore for use in the preparation of Grade 66 Talc.

4. All talc shipments are to be handled in the manner and utilizing the dedicated silos, trailers, and transfer systems currently used at Windsor Minerals. The Standard Operating Procedures as to microbiological safety must be followed and certification of compliance provided. The silos and bulk trailers may not be used for storage or transport of any other material and are to be carefully protected against water and or microbiological contamination.

E-1

Protected Document--Subject to Protective Order

JNJ 000000743

5. Shipments may only be made from silos whose contents:

    a. Strictly conform to the physical, chemical, microbiological standards expressed in BPC Raw Material Specification #21005, Windsor V-86 Talc, which may be revised from time to time as conditions require. ~?

    b. Have been tested for conformance to specifications through the use of test methods (TM'S) and techniques provided in detail by the BPC as referenced in the talc specification above. Records of all tests and results are to be compiled in bound notebooks and retained as the GMP'S and SOP'S require.

    c. Have been held in impound pending the receipt of all relevant approvals and the release of the material via a silo release form signed by any appropriate representative of the producing company.

    The details of analytical and microbiological assays and tests for each examination made during the course of production shall be cross-referenced to silo numbers and retained for not less than 36 months.

6. Representative samples of the ground ore feeding the process and finished product produced therein shall be taken on a continuous composite basis, accumulated as monthly samples and a split of these samples, retained and the balance appropriately marked and coded, sent to:

    McCrone Environmental Services, Inc.
    1412 Oakbrook Drive, Suite 100
    Norcross, GA. 30093
    Attention of James R. Millette, Ph.D.

McCrone Services is to conduct examination for the presence of deleterious minerals species via Transmission Electron Microscopy.

The testing to follow the practice as conducted for Windsor Minerals in the past. A copy of the resulting McCrone report is to be provided directly from the McCrone organization to the Manager of Quality Assurance, Johnson & Johnson Baby Products, Royston, Georgia.

E-2

Protected Document--subject to Protective Order

JNJ 000000746

7.  If State or Federal regulations or anticipated regulations
    in the judgement of the BPC require testing for additional
    or different mineral species, the appropriate tests will
    be added to the above requirement upon request of the BPC.

8.  If in the judgement of the BPC new or different tests or
    examinations become necessary to insure the safety and
    quality of Grade 66 Talc, the BPC and the seller will meet
    together to determine the methods and reporting
    requirements.

9.  Changes in water supplies or fuels may not be made without
    thorough examinations relative to microbiological and
    chemical factors and prior approval of the BPC.

10. Grade 66 Talc when supplied in bags must be handled
    following the methods established and in use by Windsor
    Minerals for bacteriscidal treatment of pallets, papers,
    and containers or trucks.

E-3

Protected Document--Subject to Protective Order

PAGE  1A of 4

## MATERIAL SPECIFICATION

U         0 ··········

**BABY PRODUCTS COMPANY**

S·. .ECT:  WINDSOR 66 TALC

LICABLE PRODUCT(S):   See Below          ~ .          LOCATION:    Royston, PCR, Kolmar

INTERIM(S) AFFECTED:                                                                      -

| REVISION DATE | DESCRIPTION OF CHANGE | AUTHORIZATION |
|---|---|---|
| 1/29/87 | Page 2, Section 13, Packaging and Q.A. page 2 updated. Johnson's Baby Lotion with Baby Powder added as an applicable product. | BCR DO9656 |
| 6/10/87 | Page 2, Section 12, Microbial Requirement revised. | BCR GO9822 |
| 6/16/87 | Page 2, Section 12, Microbial Requirement Test Method updated. | BCR DO9987 |
| 3/1/88 | Q.A. page 1 of 2, Section 2A, updated. | BCR C10629 |
| 10/14/88 | Specification updated. | BCR D11080 |
| 11/2/88 | Specification updated.  MSDS added.  Q.A. page added. | BCR C11111 |

APPLICABLE PRODUCTS

Baby Lotion w/Baby Powder
Baby Powder
Shower to Shower

z-4

Protected Document--subject to Protective Order

JNJ 000000748

*Johnson&Johnson*

**BABY PRODUCTS COMPANY**

M' ~IAL SPECIFICATION

' ECT: WINDSOR 66 TALC

## DESCRIPTION / PROPERTIES & REQUIREMENTS

1. A hydrous magnesium silicate (also called magnesium acid metasilicate), a fine white lustrous powder, slippery, adherent to skin with no foreign odor or grittiness.

2. ASBESTOS (CTFA/J4-1)(TM 7024).......... None detected. Asbestos is defined to be the fibrous serpentine, chrysotile and the fibrous forms of the amphibole group as represented by amosite, anthophyllite, crocidolite, tremolite and actinolite.

3. MOISTURE (TM 7164) ................... NMT 0.15%

4. SOLUBILITY BY ACID (TM 7165) ........ NMT 2.0%

5. MAGNESITE ($MgCO_3$)$\%$................... NMT 1.10% $MgCO_3$ (TM 7171 or TM 7077)

6. BULK DENSITY (TM 7166) .............. 20.5 to 25.5 lb./cu. ft. or metric equivalent at Windsor Minerals.

   COLOR (TM 7170 or TM 7071)........... White as compared to a previously accepted lot or minimum of 85.5 reflectance reading.

   FINENESS (TM 7070 or TM 7167)....... Through 60 mesh, 100%. Through 100 mesh, at least 99.7%, through 200 mesh, at least 98.5%.

9. HEAVY METALS (TM 7168) .............. NMT 10 ppm

10. ARSENIC (TM 7169) ................... NMT 2 ppm

11. WATER SOLUBLE IRON (USP) ........... Pass Test

12. MICROBIAL REQUIREMENT (TM 7807) ..... Samples taken from Windsor trucks or bags shall contain no detectable harmful microorganisms and the total count shall be no greater than 50 microorganisms per gram of product.

13. PACKAGING ........................... In suitable bags to protect contents from loss, contamination and deterioration in normal shipment and storage. Pallets of bagged material must be either stretch wrapped or covered with corrugated and secured with straps. Each bag shall contain 50 lbs. or metric equivalent. Bulk shipments will be made in BPC approved railcars and trailers.

E-5

Protected Document--subject to Protective Order

JNJ 000066749

PAGE 3

MATERIAL SPECIFICATION

**BABY PRODUCTS COMPANY**

SUBJECT: WINDSOR 66 TALC

14. MARKING ............................... Each bag shall be marked with:

Contents Name, Supplier Name, Supplier Lot No.
Net Weights
Purchaser's Code

Bulk shipments are identified by the individual
number of the particular trailer or railcar.

15. STORAGE ............................... If stored in bags, keep in dry area. Suitable
bulk silos (for BPC): Buttler electro-fused
polymer utilizing white flint-flex powder
#531-7010 manufactured by DuPont.

16. RAILCAR LOADING & SAMPLING .......... Railcar loading, unloading and sampling shall be
in accordance with the approved Baby Products
Procedure BQCP #85..

17. CERTIFICATE OF ANALYSIS ............. A silo source analytical certificate will provide
numerical analytical results required in items 3,
4, 5, 6, 7, 8 and 10 of this specification.
Items # 9 and 11 will be reported as pass/fail.
These results are obtained from a silo composite
sample which is comprised from samples taken at
eight hour intervals during the filling of the
silo.  The silo source analytical certificate
will reference the railcar or trailer number(if a
trailer is used to ship directly to Royston).

The certificate of analysis and the railcar/ or
trailer seal log required as per BQCP #85 will
accompany the preshipment samples to Royston and
will be sent to the Royston Microbiology
Laboratory.

E-6

Protected Document--Subject to Protective Order

JNJ 000066750

Johnson-Johnson

SPEC. NO. ...

PAGE 4

**BABY PRODUCTS COMPANY**

4A   FINAL SPECIFICATION

SUBJECT:   WINDSOR 66 TALC

18. FREQUENCY OF CHARACTERISTICS TO BE TESTED

| No. | Characteristic | T.M. | Frequency |
|-----|----------------|------|-----------|
| 2A. | Asbestos(a) | CTFA/J4-1 | Per Note 1A |
| 2B. | (b) | TM 7024 | Per Note 1B |
| 3. | Moisture | 7164 | Certified per 2 |
| 4. | Solubility by Acid | 7165 | Certified per 2 |
| 5. | Magnesite (MgCO₃)% | 7171 or 7077 | Certified per 2 |
| 6. | Bulk Density | 7166 | Certified per 2 |
| 7. | Color | 7170 or 7071 | Certified per 2 |
| 8. | Fineness | 7167 or 7070 | Certified per 2 |
| 9. | Heavy Metals | 7168 | Certified per 2 |
| 10. | Arsenic | 7169 | Certified per 2 |
| 11. | Water Soluble Iron | USP | Certified per 2 |
| 12. | Microbial Requirement | 7807 | Every lot-See 3 |

NOTE:

1A. A composite sample is made from every two completed silos, labeled with silo numbers and production dates and forwarded to J & J Baby Products for x-ray diffraction. Results are reported to Windsor Minerals.

1B. Quarterly composite samples of above silo samples will be evaluated by TM 7024 by BPC and data reported to Windsor Minerals.

2. Certificates of Analysis are received from Windsor Minerals with each pre-shipment microbial sample. Analytical testing frequencies.

   Tested on silo composite after each silo is filled.

3. Microbial

   a. Microbial testing performed on flash dried sample every 8 hrs. ( Royston is used as the testing lab.)

   b. Microbial testing will be conducted on the pre-shipment composite sample of each railcar taken as per BQCP #85.

19. ACCEPTANCE .................. There shall be no change in the supplier's process or composition of the material without prior notification to and approval of JOHNSON & JOHNSON. Any non-conformance to the specified Description / Properties & Requirements, shall be cause for rejection.

E-7

Protected Document--Subject to Protective Order

JNJ 000066751



P.O. Box 580  Windsor, Vermont 05089
Phone  (802) 484-7763

## MATERIAL SAFETY DATA SHEET

| CODE 29 CFR | DATE ISSUED | ISSUED BY |
|---|---|---|
| Per OSHA 1910.1200 | 9/13/85 | R.N. Miller |

### SECTION I - IDENTIFICATION OF MATERIAL

| CHEMICAL NAME OR COMPOSITION | HAZARD RATING |
|---|---|
| Beneficiated Grade Talc Product | PER H.M.I.S OF N.P.C.A. |

| | |
|---|---|
| **TRADE NAME & SYNONYMS** | [1] |
| **GRADE 66 TALC** | [0] |
| | REACTIVITY - - - -  [0] |

| CHEMICAL FAMILY | MOLECULAR FORMULA | |
|---|---|---|
| Hydrous Magnesium Silicate | H₂O, 3MgO.4SiO₂ | PERSONAL PROTECTION  E |
| Magnesium Carbonate | Mg CO₃ | *AVOID MASSIVE INHALATION |

Molecular Formula: $H_2O, 3MgO.4SiO_2$   $Mg CO_3$

### SECTION II - SIGNIFICANT COMPONENTS AND CONTAMINANTS

| COMPONENTS | WEIGHT PERCENT | EXPOSURE LIMITS TWA (8 HOUR) |
|---|---|---|
| **COMPOUND NAME** <br> N/A | | TLV |
| **COMPOSITION AND CONTAMINANTS** <br> Talc - Non fibrous CAS# - 14807-96-6 | ± 98.0 | 20MPPCF - OSHA <br> 2mg/M³ - ACGIH |
| Magnesite CAS #-546-90-0 | ± 2.0 | 5mg/M³ - OSHA <br> 5mg/M³ - ACGIH as <br> Nuisance Dust |
| NOTE: Does not contain asbestiform minerals and contains less than 1% Crystalline Silica. | | |

### SECTION III - PHYSICAL DATA

| APPEARANCE AND ODOR | | | |
|---|---|---|---|
| Fine White Powder - Slight Earthy Odor | | | |

| BOILING POINT | FREEZING POINT | SPECIFIC GRAVITY | ODOR THRESHOLD |
|---|---|---|---|
| N/A | N/A | ± 2.8 | Not Known |

| VAPOR PRESSURE (MM OF MERCURY) | PH | EVAPORATION RATE |
|---|---|---|
| N/A | ± 8.4 | N/A |

| VAPOR DENSITY (AIR = 1) | SOLUBILITY IN WATER |
|---|---|
| | Insoluble |

### SECTION IV - FIRE AND EXPLOSION HAZARD DATA

| FLASH POINT (SPECIFY METHOD) | FLAMMABILITY CLASS | FLAMABLE (EXPLOSIVE) LIMITS (PERCENT BY VOLUME) | |
|---|---|---|---|
| | | LOWER LIMIT | UPPER LIMIT |
| N/A | Nonflammable | N/A | N/A |

| FIRE EXTINGUISHING MEDIA |
|---|
| Will not burn. |

| SPECIAL FIRE FIGHTING PROCEDURES |
|---|
| N/A |

| UNUSUAL FIRE AND EXPLOSION HAZARDS | Σ-8 |
|---|---|
| None. | |

Protected Document--subject to Protective Order

JMJ 000066752

## SECTION V - HEALTH HAZARD DATA

TOXICITY

Acute oral toxicity (rat) produced no toxic effects at maximum gavage levels of 40 ml/kg of 15% suspension

| HEALTH EFFECTS/ FIRST AID PROCEDURES | EYES — As particulate can cause irritation if introduced into the eye — flush eyes with water or normal saline — if irritation persists, see physician. |
| | SKIN — No adverse effects from contact during use — may have drying effect. As with any mineral, should not be in contact with broken skin. |
| | INHALATION — Massive accidental powder aspiration has been treated with parenteral cortico steroids and antibiotics with supportive therapy sympathiomatic drugs and oxygen. Get prompt medical attention. |
| | INGESTION |
| | Non-Toxic |

## SECTION VI - REACTIVITY DATA

GENERAL REACTIVITY

Inert/Stable

INCOMPATABILITY (MATERIALS TO AVOID)

None

HAZARDOUS DECOMPOSITION PRODUCTS

Does Not Decompose

| HAZARDOUS POLYMERIZATION | CONDITIONS TO AVOID |
| ☐ WILL OCCUR   ☒ WILL NOT OCCUR | None Known |

## SECTION VII - SPILL PROCEDURES DISPOSAL REQUIREMENTS

STEPS TO BE TAKEN IN CASE MATERIAL IS RELEASED OR SPILLED

Dry vacuuming is preferred. Sweeping should be done so as to avoid excessive dust generation.

WASTE AND CONTAINER DISPOSAL METHODS

Wet down, store with other non-hazardous waste. Dispose in accordance with prevailing regulations.

## SECTION VIII - SPECIAL PROTECTION INFORMATION (SPECIFY IN DETAIL)

| | EYE PROTECTION | RESPIRATORY PROTECTION | GLOVES | VENTILATION | OTHER |
|---|---|---|---|---|---|
| ROUTINE | Safety Glasses | Not Required | Not Required | Maintain Use Area Below TLV Standard | |
| NON-ROUTINE OR EMERGENCY | Sealed Safety Glasses | OSHA or NIOSH Approved NOSP Mouth Respirator | Not Required | Avoid Massive Inhalation Use Respirator | |

## SECTION IX - SPECIAL REQUIREMENTS

STORAGE REQUIREMENTS / LABELING / MEDICAL AND ENVIRONMENTAL SURVEILLANCE

No Special Requirements

## SECTION X - NOTES

| MANUFACTURERS NAME | EMERGENCY PHONE NUMBER |
| Windsor Minerals, Inc. | (802) 484-7763 |
| P.O. Box 680 | INFORMATION PHONE NUMBER |
| Windsor, VT 05089          E-9 | (802) 484-7761 |

Protected Document--subject to Protective Order

JMJ 000066751

johnson-johnson                                   PAGE 1 of 1

**BABY PRODUCTS COMPANY**

Ω   TY ASSURANCE PAGE - RESTRICTED FOR J & J USE ONLY

: ECT:  WINDSOR 66 TALC

1. FREQUENCY OF CHARACTERISTICS TO BE TESTED

| No. | Characteristic | T.M. | Frequency |
|-----|----------------|------|-----------|
| 2A. | Asbestos(a) | CTFA/J4-1 | Per Note 1A |
| 2B. | (b) | TM 7024 | Per Note 1B |
| 3. | Moisture | 7164 | Certified per 2 |
| 4. | Solubility by Acid | 7165 | Certified per 2 |
| 5. | Magnesite (MgCO₃)% | 7171 or 7077 | Certified per 2 |
| 6. | Bulk Density | 7166 | Certified per 2 |
| 7. | Color | 7170 or 7071 | Certified per 2 |
| 8. | Fineness | 7167 or 7070 | Certified per 2 |
| 9. | Heavy Metals | 7168 | Certified per 2 |
| 10. | Arsenic | 7169 | Certified per 2 |
| 11. | Water Soluble Iron | USP | Certified per 2 |
| 12. | Microbial Requirement | 7807 | Every lot-See 3b |

NOTE:

1A. A composite sample is made from every two completed silos, labeled with silo numbers and production dates and forwarded to J & J Baby Products for x-ray diffraction.  Results are reported to Windsor Minerals.

1B. Quarterly composite samples of above silo samples will be evaluated by TM 7024 by BPC and data reported to Windsor Minerals.

2. Certificates of Analysis are received from Windsor Minerals with each pre-shipment microbial sample.  Analytical testing frequencies.

    Tested on silo composite after each silo is filled.

3. Microbial

    a. Microbial testing performed on flash dried sample every 8 hrs.( Royston is used as the testing lab.)

    b. Microbial testing will be conducted on the pre-shipment composite sample of each railcar taken as per BQCP #85.

4. Baby Products acceptable limit on samples taken from railcars or trucks at the receiving point is between 20.5 to 27.0 lb./cu. ft.

5. The microbial requirements on page 2, item 12 are not an accept/reject criteria for talc received in bags at PCA for use in Johnson's Baby Lotion with Baby Powder.

E-10

"EXHIBIT F"

AC8501281

Protected Document--Subject to Protective Order

JNJ 000066755

WINDSOR MINERALS, INC.
## Johnson & Johnson Ship To Stock Certification Requirements

### I. Partnership

The most important requirement for a successful Ship to
Stock Program is the establishment of a quality partnership
between the two companies. The establishment of close
interface and mutual trust must be created.

In this partnership, the Supplier must accept total
responsibility for the material he is supplying. Both
parties must demonstrate a willingness to work together.
Also they must understand that sound, strictly enforced
management systems combined with team attitude can be the
prime contributor to product acceptance and use.

As part of this partnership, STS representatives at both
locations will be selected to manage the program.

### II. Access

Customer access to the Supplier's plant is an absolute for
Ship to Stock. A definition of total access is that the
customer be given complete access to any part of the
Supplier's operations which pertains to the manufacture,
control, and distribution of the material being supplied.

Agreement must be reached that with reasonable
notification, customer representatives will be allowed
access to conduct applicable audits, surveys, inspections,
etc. that are necessary to determine if the systems are in
place to support the receipt of material without inspection.

Areas covered include:

- The Physical Plant
- The Manufacturing/Quality Systems
    SOP's
    Quality Procedures and Testing
    Control Procedures
    Proprietary Information (Subject to Secrecy
        Agreements)
- Internal Audits
- Documentation Systems

F-1

Protected Document--subject to Protective Order

JMJ 000000796

Ship to Stock Certification Requirements

### III. Manufacturing/Quality Systems

A Ship to Stock Supplier must be able to demonstrate having the control systems in place to consistently supply acceptable material on every lot such that incoming inspection is not necessary.

During the Supplier Survey, the Survey Team will review each component of the control system and determine if the systems are adequate.

Examples of the systems surveyed are:

- Specification control
- Raw Material control
- Processing control
- Product acceptance control
- Material storage control
- Shipping procedures
- Documentation retention/retrieval
- Lot traceability
- Quality program management
- Testing capability
- GMPS
- Personnel training and certification

### IV. Corrective Action Systems

The Supplier shall have a corrective action system for responding to problems. Corrections to problems are to be documented. Operating procedures are to be designed to activate corrective action.

### V. Supplier Responsiveness

The Supplier shall have an excellent history for responsiveness > problems. He must have an organized system for responding to problems and he must have the technical expertise to provide the proper support.

### VI. Systems Design

An indicator of what constitutes a Ship to Stock Supplier is how his systems are designed.

Systems must be preventative to become a Certified Supplier. Statistical process control and process validation will be used where applicable. Internal audits are to be conducted to verify the systems.

F-2

Protected Document--subject to Protective Order

JMJ 000000757

Ship to Stock Certification Requirements

## VII. Certificate of Analysis

The Supplier must supply all pertinent material characteristic data currently used to release the product at the customers facility. This includes all analytical and microbial data.

The Certificate of Analysis must arrive prior to or with the shipment of material and must have lot traceability.

## VIII. Quality Improvement Process

For a company to be certified, an organized system for quality improvement will be in evidence.

## IX. Training

The ability to show evidence of a trained work force is another requirement to become certified as a STS Supplier.

Individuals in critical decision-making positions must be trained and qualified for those functions. Personnel must undergo a formal training program and be certified. Personnel should also be recertified at set intervals. Certification must be documented.

## X. Audits

As part of the program maintenance requirements, the customer must be allowed to conduct review audits of the procedures and systems agreed upon during qualification. (Ex: release procedures, documentation procedures, manufacturing quality plan, etc.)

F-3

Protected Document--Subject to Protective Order

JNJ 000066758

PROHI                    FAX1                    Nav-17-9+ Tue 13:10          PAGE: 43

## CONSENT, ASSIGNMENT, AND ASSUMPTION

Reference is made to the Talc Supply Agreement between Cyprus Windsor Minerals Corporation, a Vermont corporation ("Assignor"), and Johnson & Johnson Baby Products Company, dated January 6, 1989 (the "Agreement"). Assignor hereby assigns its rights and delegates the performance of its duties under the Agreement to RTZ America, Inc., a Delaware corporation ("Assignee"). Johnson & Johnson Consumer Products, Inc., a New Jersey corporation ("CPI"), as successor in interest to Johnson & Johnson Baby Products Company, hereby consents to the assignment of rights and the delegation of performance of duties under the Agreement by Assignor to Assignee.

The consent of CPI granted hereby shall not release Assignor from any liability or responsibility under the Agreement and does not constitute a waiver or an estoppel with respect to any rights that CPI may have by reason of Assignor's past performance or failure to perform. The consent of CPI granted hereby is granted subject to the condition that Assignee has agreed, and hereby agrees, to assume and perform all of the obligations, covenants and agreements of Assignor in the Agreement and to comply with all the terms and conditions of the Agreement.

No provision of this consent, assignment, and assumption shall be deemed to alter or modify any term or condition of the Agreement.

In witness whereof, the parties have caused this consent, assignment, and assumption to be executed effective as of the __31__ th day of June, 1992.

JOHNSON & JOHNSON                         RTZ AMERICA, INC.
PRODUCTS, INC.

By: _____              By: _____
Name: Brian T. McGrath                    Name: Arthur L Glass
Title: Director of Purchasing &           Title: President
       Package Engineering

CYPRUS WINDSOR MINERALS CORPORATION

By: _____
Name: Philip C. Wolf
Title: President

0623.DEH

Protected Document--Subject to Protective Order

JNJ 000066759