## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| IMERYS TALC AMERICA, INC., *et al.*,[1] | Case No. 19-10289 (LSS) |
| Debtors | (Jointly Administered) |
| IMERYS TALC AMERICA, INC. and IMERYS TALC VERMONT, INC., | |
| Plaintiffs, | Adv. Pro. No. 21-51006 |
| v. | |
| JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC., | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS' AND THE FUTURE CLAIMANTS' REPRESENTATIVE'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, GA 30076.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

    A.    J&J Agreed To Indemnify The Debtors For Talc Personal Injury Claims, But Has Repeatedly Refused To Honor Those Obligations. ..................................................... 4

    B.    J&J Has Threatened To File A "Texas Two-Step" Bankruptcy To Avoid Its Talc Liability.......................................................................................................................... 6

ARGUMENT ................................................................................................................ 8

    A.    Plaintiffs Are Reasonably Likely To Succeed On The Merits Of Their Claims. ........ 9

    B.    Plaintiffs Will Suffer Irreparable Harm If The Court Does Not Enjoin Defendants From Two-Stepping Or Otherwise Transferring Their Liabilities. ........................... 13

    C.    The Balance Of Hardships Weighs In Plaintiffs' Favor. ........................................... 15

    D.    The Public Interest Is Served By Temporarily Preventing A Texas-Two Step Or Other Transfer Of The Liabilities At Issue............................................................... 15

CONCLUSION............................................................................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.H. Robins Co. v. Piccinin*,
 788 F.2d 994, 1001 (4th Cir. 1986) ..................................................................12

*In re Bestwall, LLC*,
 Case No. 17-31795 (Bankr. W.D.N.C. 2017) ....................................................14

*Broadstripe, LLC v. Nat'l Cable Television Coop., Inc. (In re Broadstripe, LLC)*,
 402 B.R. 646 (Bankr. D. Del. 2009) .............................................................9, 12

*Counties Contracting & Const. Co. v. Constitution Life Ins. Co.*,
 855 F.2d 1054 (3d Cir. 1988).............................................................................13

*In re Feit & Drexler, Inc.*,
 760 F.2d 406 (2d Cir. 1985)...............................................................................14

*First Lutheran Church v. City of St. Paul*,
 326 F.Supp.3d 745 (D. Minn. 2018) ...................................................................8

*Gerardi v. Pelullo*,
 16 F.3d 1363 (3d Cir. 1994)...............................................................................14

*GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharm. Corp.*,
 197 F. App'x 120 (3d Cir. 2006) .........................................................................9

*Highmark, Inc. v. UPMC Health Plan, Inc.*,
 276 F.3d 160 (3d Cir. 2001)................................................................................9

*In re Imerys Talc America, Inc.*,
 Case No. 19-103 (D. Del. 2019) .....................................................................5, 12

*Kos Pharms., Inc. v. Andrx Corp.*,
 369 F.3d 700, 708 (3d Cir. 2004).........................................................................9

*In re Krystal Cadillac Oldsmobile GMC Truck, Inc.*,
 142 F.3d 631 (3d Cir. 1998)...............................................................................12

*Rare, LLC v. Marciano (In re Rare, LLC)*,
 298 B.R. 762 (Bankr. D. Colo. 2003) ................................................................14

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*,
 826 F.3d 1030 (8th Cir. 2016) .............................................................................8

ii

*Roland Machinery Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) ........................................................................14

*Sharp v. SKMP Corp. (In re SK Foods, L.P.)*,
    Adv. Proc. No. 11-2337-D, 2011 WL 10723414 (Bankr. E.D. Cal. Oct. 11,
    2011 .................................................................................................................15

*Singer Mgmt. Consultants, Inc. v. Milgram*,
    650 F.3d 223 (3d Cir. 2011)...........................................................................9

*Stanziale v. CopperCom, Inc. (In re Conex Holdings LLC)*,
    518 BR 792 (Bankr. D. Del. 2014) ...............................................................13

*Steward v. West*,
    449 F.2d 324 (5th Cir. 1971) ..........................................................................8

*Teradyne, Inc. v. Mostek Corp.*,
    797 F.2d 43 (1st Cir. 1986)...........................................................................14

*United Steelworkers of Am., AFL-CIO v. Fort Pitt Steel Casting*,
    598 F.2d 1273 (3d Cir. 1979).......................................................................13

*USACO Coal Co. v. Carbomin Energy, Inc.*,
    689 F.2d 94 (6th Cir. 1982) ..........................................................................15

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012)...........................................................................12

**Statutes**

11 U.S.C. § 105(a) ...............................................................................................8

11 U.S.C. § 362(a)(3)..........................................................................................11

11 U.S.C. § 541(a)(1)..........................................................................................13

**Other Authorities**

Andrew Scurria & Alexander Gladstone, *Johnson & Johnson Taps Jones Day to
    Explore Talc Bankruptcy*, The Wall Street Journal, July 20, 2021....................6, 7, 8

Catherine Corey, *Johnson & Johnson Looks To Two-Step Its Way From Asbestos
    Liability*, Debtwire, July 21, 2021 ..................................................................7

Collier on Bankruptcy ¶ 362.03[5][a] (15th ed rev.) ..................................................15

Mike Spector et al., *J&J Exploring Putting Talc Liabilities Into Bankruptcy*,
    Reuters, July 18, 2021.....................................................................................7

The Official Committee of Tort Claimants (the "Committee") and the Future Claimants' Representative (the "FCR," together with the Committee, the "Plaintiffs-Intervenors"), as proposed intervenors,[2] respectfully submit this memorandum of law, together with the accompanying Declaration of Mark A. Fink, in support of their motion pursuant to Section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 65 of the Federal Rules of Civil Procedure, as made applicable by Rule 7065 of the Federal Rules of Bankruptcy Procedure, for (i) a temporary restraining order, substantially in the form attached hereto as **Exhibit A**, restraining and enjoining Defendants Johnson & Johnson ("JNJ") and Johnson & Johnson Consumer Inc. ("JJCI," and together with JNJ, "J&J"), pending a hearing on Plaintiffs-Intervenors' request for a preliminary injunction, from using a divisive merger or any other form of corporate transaction to separate themselves from the indemnification obligations they owe to Plaintiffs; and (ii) a preliminary injunction restraining and enjoining Defendants from using a divisive merger or any other form of corporate transaction to separate themselves from the indemnification obligations they owe to Plaintiffs pending the final adjudication of Plaintiffs' Complaint[3] (the "Motion").

## PRELIMINARY STATEMENT

The Debtors' rights to indemnity from J&J for talc liability may be the single most valuable asset of the Debtors' estates.  The automatic stay protects against interference with the Debtors' contractual rights.  Plaintiffs-Intervenors file this motion to prevent J&J from using a divisive merger or other corporate transaction to evade or hinder the Debtors' contractual right to indemnity for talc liability.  This threat is not theoretical: the press has widely reported that J&J is

---

[2]    The Committee has moved to intervene and the FCR intends to as well.

[3]    Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Complaint.

contemplating and preparing to use a "Texas two-step"—a divisive merger followed by a bankruptcy filing—to restructure its talc liability.  It would be a continuation of J&J's years'-long pattern of refusing to honor its contracts with the Debtors and attempting to avoid its obligations despite being a solvent non-debtor.  Absent immediate relief, J&J may transfer its contractual indemnity obligations (currently owed by solvent entities) into a new shell company that will file for bankruptcy.  The automatic stay imposed in the Debtors' chapter 11 cases prevents J&J from transferring those obligations absent stay relief from this Court.  Emergency relief is necessary to prevent J&J from violating the automatic stay in these cases and to preserve the status quo while the parties litigate the Complaint.

For decades, the Debtors were J&J's exclusive supplier of cosmetic talc.  They mined and processed talc that was incorporated into iconic J&J products such as Johnson's Baby Powder and Shower to Shower.  For approximately three decades, one of the Debtors was a J&J subsidiary and supplied talc directly to its parent.  J&J then spun that entity off, and in the process agreed to indemnify it and its affiliates for talc liability that arose prior to the spinoff.  For nearly thirty years after the spinoff, the Debtors continued to supply talc to J&J under a series of supply agreements.  In those supply agreements, J&J again agreed to indemnify the Debtors for talc liabilities.

In the years since, the Debtors have repeatedly demanded that J&J honor its commitments and indemnify and defend them against talc personal injury claims.  J&J's response has been consistent: avoidance and delay.  To date, they have not paid one cent of those obligations to the Debtors, nor have they assumed the Debtors' defense.  J&J's refusal to meet their contractual indemnity obligations is what drove the Debtors into bankruptcy.

After the Debtors filed for bankruptcy, J&J tried to use the Debtors' misfortune to its advantage.  First, it argued that the Debtors were obligated to indemnify J&J—not the other way

around—and that this provided a basis to transfer to the District of Delaware thousands of personal injury cases that had been pending against J&J in state and federal courts around the country. Federal courts remanded hundreds of cases following J&J's removal, and United States District Judge Noreika denied J&J's motion to fix venue, finding it "patently forum shopping" that would "grind the wheels of justice to a halt." Then J&J tried another tack—it offered to indemnify the Debtors for decades of talc liability, but only if this Court rewrote the parties' contractual obligations in its favor, and to the detriment of talc claimants, in the process. This Court denied that motion, and J&J simply continued to refuse to honor the indemnities.

Now J&J has apparently turned to a new strategy. Over the last few days, it has been widely reported in the press that J&J—a solvent company with a market capitalization of over $450 billion—may transfer its talc liabilities to a new shell company that will file for bankruptcy protection. If accurate, this could allow all of J&J's businesses to continue as usual outside of bankruptcy, protected from J&J's talc-related liability, while a shell company with no business to protect gains the benefit of the automatic stay without an incentive to quickly and fairly restructure. Significantly, this would also mean that J&J would transfer its liabilities under the Debtors' indemnity agreements—potentially the largest asset of the Debtors' estates—to the shell company. A temporary restraining order and preliminary injunction are necessary to preserve the status quo by preventing J&J from using a Texas two-step or other corporate transaction to interfere with the Debtors' contractual rights and violate the automatic stay.

## FACTUAL BACKGROUND

A more complete history of the relationship between the Debtors and J&J, and the indemnities in particular, is set forth in the accompanying Complaint. To avoid repetition, Plaintiffs-Intervenors incorporate by reference all allegations and exhibits from the Complaint, and briefly summarizes below the facts most relevant to this Motion.

3

A.    **J&J Agreed To Indemnify The Debtors For Talc Personal Injury Claims, But Has Repeatedly Refused To Honor Those Obligations.**

Historically, the Debtors have been J&J's sole supplier of the talc used in J&J products, such as Johnson's Baby Powder and Shower to Shower.  Prior to 1989, ITV was a subsidiary of J&J and supplied talc to its parent.  After a 1989 spinoff, the Debtors supplied talc to J&J through four supply agreements relevant here:  (i) the "1989 Supply Agreement," (ii) the "2001 Supply Agreement," (iii) the "2010 Supply Agreement," and (iv) the "2011 Supply Agreement" (Exhibits 1-4).[4]  The Debtors continued to supply talc to J&J until partway through these chapter 11 cases.  Taken together, the contractual indemnities under the 1989 SPA (Exhibit 5) and the four Supply Agreements (the "Indemnification Agreements") require J&J to indemnify the Debtors against all product liability claims arising from exposure to J&J talc-containing products manufactured and distributed to consumers prior to 1989, between 1989 and December 2000, and during the 2011 calendar year, and for certain of those claims arising from exposure to talc manufactured from April 2001 through December 2010.

Since 2009, J&J and the Debtors have been sued in state and federal court by tens of thousands of individual tort plaintiffs alleging personal injury and wrongful death claims arising from exposure to J&J's talc-containing products ("Talc Personal Injury Claims").  Because the Debtors have historically been J&J's sole supplier of talc, prior to the Petition Date and the imposition of the automatic stay, one or more of the Debtors had been named as a co-defendant in most or all of these actions.  The Talc Personal Injury Claims pose substantial liabilities to the Debtors and J&J, as indemnitor and tort defendant.  Indeed, J&J has admitted that its

---

[4]    References to numerical exhibits are to the exhibits attached to the Declaration of Mark A. Fink, dated July 27, 2021, filed herewith.

4

indemnification obligations with respect to such claims amount to "billions of dollars in potential liability." (*In re Imerys Talc America, Inc.*, Sept. 22, 2020 Hr'g Tr. at 10:22 [Dkt. No. 2252].)

Prior to seeking chapter 11 protection, the Debtors repeatedly demanded—by letter and in numerous in-person meetings and phone calls—that J&J indemnify them for the Talc Personal Injury Claims arising out of exposure to J&J's products.  However, J&J refused to honor any of its indemnification obligations.  As a direct result of J&J's breach of the Indemnification Agreements, the Debtors commenced these chapter 11 proceedings, seeking to resolve all of their liabilities for the Talc Personal Injury Claims and fund a trust pursuant to Sections 105(a) and 524(g) of the Bankruptcy Code.

Far from complying with its obligations as indemnitor, J&J has repeatedly sought to delay and disrupt the Debtors' bankruptcy cases in an effort to evade its liabilities.  For example, two months after the Petition Date, J&J tried, unsuccessfully, to transfer to the District of Delaware thousands of cases that had been pending against J&J in other federal and state courts, on the theory that those cases were "related to" the Debtors' bankruptcy.  Courts around the country remanded hundreds of those cases.  United States District Judge Noreika denied J&J's motion to fix venue, finding that J&J's suggestion that transferring the cases "would increase the efficiency of handling these issues defies common sense and logic." (Memorandum Opinion at 17–18, *In re Imerys Talc America, Inc.*, Case No. 19-103 (D. Del. 2019) [Dkt. No. 96].)  Regarding J&J's argument that the claims were related to the bankruptcy because ***the Debtors*** had to indemnify ***J&J***, the court held that J&J "fail[ed] to make a cogent argument supporting a clearly established and accrued right to indemnification or defense from the Debtors" and that J&J "has no right to indemnification from Debtors if the liabilities relate to the acts or omissions of [J&J] or those directed by [J&J]." (*Id*. at 5–6.)

5

Then J&J tried a new approach.  It moved to lift the automatic stay to assume the defense and indemnify the Debtors for certain Talc Personal Injury Claims, but only if this Court were to rewrite the terms of the indemnities.  (Dkt. No. 1567 (the "Lift Stay Motion").)  The Debtors objected that the Lift Stay Motion was procedurally improper and its proposed terms deficient.  The Court denied the motion.  (Dkt. No. 2253.)

That was last September.  In the ten months since, J&J has continued to refuse to honor its contractual obligations to the Debtors and has continued to attempt to block the Debtors' emergence from this bankruptcy that J&J caused through its own wrongful conduct.  Meanwhile, J&J faces a series of large-scale product liability issues, including talc personal injury claims (which prompted J&J to discontinue talc-based baby powder in the U.S. and Canada), the presence of benzene in certain sunscreens (which prompted J&J to issue a recall), and opioid claims (which prompted J&J to agree to permanently cease manufacturing or distributing opioids).

**B.     J&J Has Threatened To File A "Texas Two-Step" Bankruptcy To Avoid Its Talc Liability.**

Faced with mounting tort liability, including a $2.2 billion final judgment in a Missouri talc personal injury case, reputable news sources have recently reported that J&J intends to undertake a "Texas two-step" bankruptcy filing and that it has engaged Jones Day, the law firm that pioneered the Texas two-step.  (*See* Exhibit 6 (Andrew Scurria & Alexander Gladstone, *Johnson & Johnson Taps Jones Day to Explore Talc Bankruptcy*, The Wall Street Journal, July 20, 2021).)  In a Texas two-step, a solvent non-debtor reincorporates in Texas and undergoes a divisive merger pursuant to Texas Business Organization Code § 1.002(55)(A), purporting to divide itself into two companies, one that takes significant liabilities and another that takes most

6

of the assets, free of those same liabilities.  Then the company that takes the liabilities files for bankruptcy.[5]

According to *Reuters*, "Johnson & Johnson is exploring a plan to offload liabilities from widespread Baby Powder litigation into a newly created business that would then seek bankruptcy protection, according to seven people familiar with the matter."  (Exhibit 7 (Mike Spector, et al., *J&J Exploring Putting Talc Liabilities Into Bankruptcy*, Reuters, July 18, 2021).)

As the first step in the process, a J&J entity would undergo a divisive merger in Texas. *Debtwire* explained, "Reports have recently circulated that Johnson & Johnson is considering a restructuring plan that would place its liabilities from widespread baby powder litigation into a newly created business that would then seek bankruptcy protection, a process also known as a 'Texas two-step' bankruptcy."  (Exhibit 8 (Catherine Corey, *Johnson & Johnson Looks To Two-Step Its Way From Asbestos Liability*, Debtwire, July 21, 2021).)  As the second step in the process, the J&J entity that receives the talc liabilities in the divisive merger would then file for bankruptcy. According to *The Wall Street Journal*, "Johnson & Johnson has engaged law firm Jones Day to advise the company as it explores placing a subsidiary in bankruptcy to help settle thousands of personal injury claims linking talcum-based baby powder to cancer[.]"  (Exhibit 6 (*Johnson & Johnson Taps Jones Day to Explore Talc Bankruptcy*).)

---

[5]  On July 31, 2017, Georgia-Pacific LLC converted from a Delaware LLC to a Texas LLC.  After converting, Georgia-Pacific LLC engaged in a divisive merger transaction, forming Georgia-Pacific LLC (which immediately converted back to a Delaware LLC) and Bestwall LLC (which immediately converted from a Texas LLC to a North Carolina LLC).  On November 2, 2017—ninety-three (93) days after domiciling in North Carolina—Bestwall LLC filed a Chapter 11 bankruptcy petition in the Western District of North Carolina.  Among other things, the structure of the Bestwall transaction appears to have been an exercise in forum shopping, and specifically an effort to avoid the Third Circuit, where Georgia-Pacific had long been venued, and Third Circuit jurisprudence.  This was the first of what has come to be known as the "Texas two-step."  Since then, CertainTeed, Ingersoll-Rand/Trane Technologies and Trane US have each engaged in virtually identical transactions.  While the details of what J&J is reportedly contemplating are unknown, theses prior transactions undoubtedly foreshadow the future.

This risk is not theoretical.  Press reports indicate that in settlement negotiations with talc victims, J&J has threatened to Texas two-step its talc liability.  According to *The Wall Street Journal*, "[i]n discussions with lawyers for personal-injury claimants, J&J has said it could split talc-related liabilities tied to its Johnson & Johnson Consumer Inc. unit away from income-producing assets and file a newly formed unit for bankruptcy, people familiar with the matter said." (*Id.*)  The purpose of that process is to enable J&J to abandon its substantial liabilities to Plaintiffs under the indemnities, which J&J itself has stated in this Court may be in the billions, while the remainder of J&J's businesses and assets continue unaffected outside of bankruptcy.

## **ARGUMENT**

Federal Rule of Civil Procedure 65(b), made applicable to this proceeding by Rule 7065 of the Federal Rules of Bankruptcy Procedure, provides that the Court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney if specific facts show that immediate and irreparable injury, loss or damage will result before the adverse party can be heard in opposition.[6]  This Court also has the power pursuant to Section 105(a) of the Bankruptcy Code to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  *See* 11 U.S.C. § 105(a).

---

[6]    Courts have broad discretion to waive Fed. R. Civ. P. 65(c)'s requirement that the movant seeking a preliminary injunction or temporary restraining order post a bond or other security.  *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (waiver of bond requirement warranted "where the damages resulting from a wrongful issuance of an injunction have not been shown.") (internal citations omitted); *Steward v. West*, 449 F.2d 324, 325 (5th Cir. 1971) (finding that no injunction bond need be posted when "it is very unlikely that the defendant will suffer any harm"); *First Lutheran Church v. City of St. Paul*, 326 F.Supp.3d 745, 769 (D. Minn. 2018) (waiving bond requirement).  Fed. R. Bankr. P. 7065 expressly provides that this requirement is waived when the movant is a debtor, trustee, or debtor in possession.  Here, waiver is likewise appropriate where the Plaintiffs are debtors and the movants stand in the shoes of the estate and seek relief ensuring compliance with the Bankruptcy Code's automatic stay.  *Cf. Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1043 (collecting cases) (finding it permissible for the district court to waive the bond requirement based on its evaluation of public interest in the enforcement of National Environmental Policy Act).

8

The standards for issuing a temporary restraining order and a preliminary injunction are essentially the same. *See Broadstripe, LLC v. Nat'l Cable Television Coop., Inc. (In re Broadstripe, LLC)*, 402 B.R. 646, 655 (Bankr. D. Del. 2009). A temporary restraining order or preliminary injunction will issue where a plaintiff shows: (1) a reasonable likelihood of success on the merits; (2) a likelihood that it will suffer irreparable harm if relief is denied; (3) that the nonmoving party will not suffer even greater harm if the injunction is granted; and (4) that the public interest favors such relief. *Id.* (citing *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)). In deciding a motion for temporary restraining order or preliminary injunction, no one factor is determinative. Instead, courts "must *weigh* the appropriate factors, rather than mechanically apply them." *GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharm. Corp.*, 197 F. App'x 120, 124 (3d Cir. 2006). Here, all four factors weigh in favor of granting a temporary restraining order and preliminary injunction.

### A.    Plaintiffs Are Reasonably Likely To Succeed On The Merits Of Their Claims.

To demonstrate a likelihood of success on the merits, a "plaintiff need only prove a prima facie case, not a certainty that he or she will win." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001). In other words, it is not necessary for a plaintiff to show that it is "more likely than not" to prevail, but merely that it has "a reasonable chance, or probability, of winning." *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011). Here, Plaintiffs have at least a reasonable chance of prevailing on their claims in the Complaint.

In the Complaint, Plaintiffs assert claims for (i) declaratory judgments as to Plaintiffs' rights to defense and indemnification from J&J under the Indemnification Agreements; and (ii) damages for J&J's breaches of the Indemnification Agreements. The central dispute underlying each of the claims is with respect to the rights and duties of the parties under the

9

Indemnification Agreements.  In the contracts, J&J unequivocally agreed to indemnify and defend one or both of the Plaintiffs against certain claims arising out Plaintiffs' supply of talc to J&J.

For example, in the 1989 SPA and the 1989 Supply Agreement, J&J agreed to broad indemnification provisions under which it would retain responsibility and indemnify Plaintiffs for product-liability-based claims.  Specifically, under the 1989 SPA, JNJ agreed to indemnify ITA and ITV against "any product liability-based claim, suit, demand or cause of action directed against [Cyprus Mines], [ITV] or Western or any of their affiliates arising out of the sale of talc or talc-containing products manufactured by [ITV], Western, J&J or the affiliates of [ITV], Western or J&J, prior to [January 6, 1989]."  (1989 SPA § 11.2.)  Similarly, under the 1989 Supply Agreement, JJCI agreed to:

> indemnify, defend and hold harmless [ITV], and its affiliates, and each of their respective directors, officers, employees, and agents from and against all liabilities arising out of any product liability-based claim, suit, demand or cause of action directed against [ITV] or any of [ITV]'s affiliates: (i) **arising out of the sale of cosmetic talc products to consumer markets, which products were manufactured by [ITV] prior to [January 6, 1989]**; (ii) **for which [JJCI] is directly or indirectly responsible as a result of [JJCI's] possession, use or processing of Talc delivered to [JJCI] pursuant to this Agreement, or as the result of [JJCI's] manufacture, shipment and sale of Talc-containing product** (including, without limitation, baby powder and adult powder) derived from Talc delivered to [JJCI] pursuant to this Agreement;

(1989 Supply Agreement § 11 (emphasis added).)  Subsequently, in the 2011 Supply Agreement, JJCI agreed to "indemnify, defend and hold harmless [Debtor ITA] for any third party claims brought against [Debtor ITA] based on the use of Materials by [J&J]."  (Attachment D § 6.)

The indemnity provisions, by their plain terms, establish a *prima facie* case favoring Plaintiffs' declaratory judgment and breach of contract claims.  Moreover, based on its actions in this bankruptcy, J&J clearly recognizes that it has significant indemnity obligations to the Debtors. After its initial efforts to disrupt these proceedings, J&J reversed course and filed its Lift Stay

Motion, in which it proposed to indemnify and defend the Debtors against Talc Personal Injury Claims based on exposure to J&J products.

Although J&J continues to dispute the parameters of its contractual obligations, and asserts that it has defenses to indemnity, J&J has already publicly admitted that the Indemnification Agreements impose at least *some* indemnity obligations on J&J with respect to the Debtors' talc liability.   For example, J&J has conceded that at least "[c]ertain of [the Indemnification Agreements] include provisions requiring J&J to indemnify the Debtors for certain losses," including the 1989 SPA, the 1989 Supply Agreement, and the 2011 Supply Agreement.  (*Johnson & Johnson's Motion Pursuant to 11 U.S.C. §362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 for Entry of Order Modifying Automatic Stay to Permit J&J to Send Notice Assuming Defense of Certain Talc Claims and to Implement Talc Litigation Protocol* [Dkt. No. 1567] ¶¶ 11–13.)  Similarly, J&J has described claims alleging injury arising from exposure to J&J products containing talc supplied prior to December 31, 2000 as the "J&J-Covered Years" under the Indemnification Agreements.  (*Id.* ¶¶ 12, 19.)  Those admissions demonstrate that J&J understands the danger posed to it based on Plaintiffs' *prima facie* case, and show that J&J owes at least *some* liability that it should be restrained from evading pending the outcome of this litigation.

Moreover, J&J's transfer of its indemnity obligations would violate the automatic stay because the Debtors' indemnity rights (and J&J's corresponding obligations) constitute "property of the estate" within the meaning of 11 U.S.C. § 362(a).  The Bankruptcy Code stays, among other conduct, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  The Third Circuit applies a stay pursuant to Section 362(a)(3) of the Bankruptcy Code if: (i) there is a property interest

involved; (ii) the interest is property of the estate; and (iii) the property interest is at risk of being altered in a manner contrary to the estate. *See In re Krystal Cadillac Oldsmobile GMC Truck, Inc.*, 142 F.3d 631, 636-38 (3d Cir. 1998). Indeed, where, as is the case here, the debtor faces substantial liability for claims that are covered by an indemnity agreement, such indemnity rights may be the most important asset of a debtor's estate. *See, e.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 149 (D. Del. 2012), *aff'd*, 729 F.3d 332 (3d Cir. 2013), *aff'd*, 532 F. App'x 264 (3d Cir. 2013), *aff'd*, 729 F.3d 311 (3d Cir. 2013), *aff'd*, 729 F.3d 332 (3d Cir. 2013) (citing *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1001 (4th Cir. 1986)).

Here, J&J has admitted that "*if* J&J must indemnify Debtors pursuant to the 1989 and 2011 Agreements, then these obligations would still impact (specifically, expand) the estate[.]" (Reply Memorandum of Law in Further Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b) at 15 n.27, *In re Imerys Talc America, Inc.*, Case No. 19-103 (D. Del. 2019) [Dkt. No. 81].) J&J's transfer of those rights and obligations, or other effort to interfere with those rights against the defendants here, would thus interfere with property of the estate, violating the automatic stay under section 362(a)(3). *See In re Broadstripe, LLC*, 402 B.R. 646 at 657 ("[E]xecutory contracts and leases are considered a form of property of the estate. As property of the estate, the debtor's interests in such contracts or leases are protected against termination or other interference that would have the effect of removing or hindering the debtor's rights in violation of Section 362(a)(3).'") (quoting Collier on Bankruptcy ¶ 362.03[5][a] (15th ed rev.)).

Property rights that are disputed, like the indemnity rights at issue here, are nevertheless property of the estate. "Property of the estate" is broadly defined and includes all legal and equitable interests of the debtor in property as of the commencement of the bankruptcy case,

including contingent rights. 11 U.S.C. § 541(a)(1); *see Counties Contracting & Const. Co. v. Constitution Life Ins. Co.*, 855 F.2d 1054, 1057 (3d Cir. 1988) ("An interest is not outside the reach of [Section] 541 because it is novel or contingent or enjoyment must be postponed."). "In fact, every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of [section] 541." *Stanziale v. CopperCom, Inc. (In re Conex Holdings LLC)*, 518 BR 792, 810 (Bankr. D. Del. 2014).   Thus, unless and until this Court determines that the Debtors have no rights to the indemnities, the Debtors' claim to those rights is property of the estate.

### B.    Plaintiffs Will Suffer Irreparable Harm If The Court Does Not Enjoin Defendants From Two-Stepping Or Otherwise Transferring Their Liabilities.

Without an injunction, J&J can use a Texas two-step or other corporate transaction to transfer property of the Debtors' estate and irreparably harm Plaintiffs.  As J&J's tort litigation counsel acknowledged before this Court, its indemnification obligations amount to "billions of dollars in potential liability."  (*In re Imerys Talc America, Inc.*, Sept. 22, 2020 Hr'g Tr. 10:22 [Dkt. No. 2252].)  If J&J is able to evade those obligations by dividing its assets and liabilities in a divisive merger and restructuring those liabilities in a subsequent bankruptcy proceeding, the Debtors and their estates will suffer substantial, permanent damage.  Most critically, JNJ and JJCI—the defendants here and the parties to the Indemnification Agreements—would almost certainly argue that ***they*** no longer owe any indemnification obligations to Plaintiffs (that would be the point of a divisive merger or transfer), and that no relief could be obtained against them through this action.

Nor is the fact that the remedies that Plaintiffs seek include money damages (in addition to declaratory relief) sufficient to mitigate this risk.  *See United Steelworkers of Am., AFL-CIO v. Fort Pitt Steel Casting*, 598 F.2d 1273, 1280 (3d Cir. 1979) ("[T]he fact that the payment of monies

13

is involved does not automatically preclude a finding of irreparable injury.").  Here, the purpose of a Texas two-step would be to transfer property of the Debtors' estate to a different entity to frustrate any judgment or remedy against ***these defendants***.  Among the benefits to J&J of such a bankruptcy would be delay (for example, Texas two-step bankruptcy *In re Bestwall, LLC*, Case No. 17-31795 (Bankr. W.D.N.C. 2017) was filed nearly four years ago and remains unresolved, with an estimation scheduled to begin in 2022) and the ability to attempt to deny recovery to creditors such as the Debtors.  That is sufficient to justify injunctive relief.  *See Gerardi v. Pelullo*, 16 F.3d 1363, 1373 (3d Cir. 1994) ("there is ample authority for the proposition that the unsatisfiability of a money judgment can constitute irreparable injury for the purposes of granting a preliminary injunction") (internal citations omitted); *see also Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43 (1st Cir. 1986) (upholding a preliminary injunction issued to protect a potential damages remedy); *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985) ("[E]ven where the ultimate relief sought is money damages, federal courts have found preliminary injunctions appropriate where it has been shown that the defendant intended to frustrate any judgment on the merits by transfer[ring its assets] out of the jurisdiction.") (internal citations omitted); *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (noting preliminary injunction may be necessary where "[d]amages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected").

Courts have enjoined apparent violations of the automatic stay in other circumstances to protect the estate.  *See Rare, LLC v. Marciano (In re Rare, LLC)*, 298 B.R. 762, 769 (Bankr. D. Colo. 2003) (issuing injunction because the debtor would "suffer irreparable harm if the apparent violations of the automatic stay are not enjoined").

14

At bottom, J&J cannot seriously dispute that the purpose of transferring its indemnity obligations is to evade and postpone those liabilities. Unless the Texas two-step advantaged J&J and harmed its creditors, there would be no reason for the machinations and no force behind the threats.

### C.    The Balance Of Hardships Weighs In Plaintiffs' Favor.

Without an injunction, Plaintiffs may be left litigating against defendants who claim to no longer hold the contractual obligations at issue. J&J, on the other hand, will suffer no harm if this Court enters a temporary order preserving the status quo. While a temporary restriction on transfers may, at worst, be inconvenient for J&J, that is not a countervailing hardship. *See USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 99 (6th Cir. 1982) (affirming entry of preliminary injunction "prevent[ing] . . . the dissipation and concealment of defendants' assets that would render the litigation meaningless" where "the competing interests involved" were balanced by "specifically accommodat[ing] the legitimate business concerns of defendants"). Moreover, such a transfer is currently enjoined by operation of the automatic stay. J&J's use of the Texas two-step process can have no legitimate purpose—it is intended solely as a means to hinder, delay, and ultimately shirk liabilities to Plaintiffs.

### D.    The Public Interest Is Served By Temporarily Preventing A Texas-Two Step Or Other Transfer Of The Liabilities At Issue.

The public interest weighs in favor of protecting Plaintiffs as creditors of J&J and preventing J&J from evading its obligations through the artifice of a divisive merger or other corporate transaction. *See Sharp v. SKMP Corp. (In re SK Foods, L.P.)*, Adv. Proc. No. 11-2337-D, 2011 WL 10723414, at *36 (Bankr. E.D. Cal. Oct. 11, 2011*)* ("[I]t is certainly in the public interest to prevent fraudulent transfers of assets for the purpose of avoiding the claims of creditors."). There is simply no public interest in allowing a solvent company with a market

capitalization of over $450 billion to shed its contractual obligations before this Court has an opportunity to rule on the scope of those obligations.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs-Intervenors respectfully request that this Court issue: (i) a temporary restraining order, substantially in the form attached as **Exhibit A** to the Motion, restraining and enjoining Defendants, pending a hearing on Plaintiffs-Intervenors' request for a preliminary injunction, from using a divisive merger or any other form of corporate transaction to separate themselves from the indemnification obligations they owe to Plaintiffs; and (ii) a preliminary injunction restraining and enjoining Defendants from using a divisive merger or any other form of corporate transaction to separate themselves from the indemnification obligations they owe to Plaintiffs pending the final adjudication of the Complaint.

Dated: July 27, 2021
Wilmington, Delaware

Respectfully submitted,

*/s/ Natalie D. Ramsey*
**ROBINSON & COLE LLP**
Natalie D. Ramsey (No. 5378)
Mark A. Fink (No. 3946)
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Tel:        (302) 516-1700; Fax:  (302) 516-1699
nramsey@rc.com
mfink@rc.com

Michael R. Enright (admitted *pro hac vice*)
280 Trumbull Street
Hartford, CT 06103
Tel:  (860) 275-8290; Fax: (860) 275-8299
menright@rc.com

**WILLKIE FARR & GALLAGHER LLP**
Rachel C. Strickland (admitted *pro hac vice*)
Jeffrey B. Korn (admitted *pro hac vice*)
Stuart R. Lombardi (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000; Fax: (212) 728-8111
rstrickland@willkie.com
jkorn@willkie.com
slombardi@willkie.com

**GILBERT LLP**
Kami E. Quinn (admitted *pro hac vice)*
Heather Frazier (admitted *pro hac vice*)
700 Pennsylvania Avenue, SE ; Suite 400
Washington, DC 20003
Telephone:(202) 772-2200
quinnk@gilbertlegal.com
frazierh@gilbertlegal.com

*Counsel to the Official Committee of Tort Claimants*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Jared W. Kochenash*
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Kevin A. Guerke (No. 4096)
Sharon M. Zieg (No. 4196)
Jared W. Kochenash (No. 6557)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
eharron@ycst.com
kguerke@ycst.com
szieg@ycst.com
jkochenash@ycst.com

*Counsel to the Future Claimants' Representative*