# Exhibit 3



## MATERIAL PURCHASE AGREEMENT
### COVER SHEET

Johnson & Johnson Consumer Companies, Inc., a New Jersey Corporation ("BUYER"), and Luzenac America, Inc., a Delaware corporation ("SELLER"), intending to be legally bound, hereby covenant and agree to purchase and sell, respectively, the Material, on the following terms and conditions:

MATERIAL: The Material covered by this Agreement shall be the material (the "Material") set forth in Attachment A, attached hereto and incorporated herein by this reference.

QUANTITY: During the Term of this Agreement, BUYER shall purchase from SELLER one hundred percent (100%) of BUYER's and BUYER's Affiliates' collective talc requirements by purchasing the Material with respect to each of the locations listed in Attachment C (the "Facilities"). The percentage of BUYER's and BUYER's Affiliates' total requirements of the Material purchased from SELLER during the Term may be confirmed by SELLER as set forth in Attachment A. An "Affiliate" of BUYER shall mean any direct or indirect subsidiary of BUYER and any other person or entity controlled by, controlling or under common control of BUYER.

SELLER is not obligated to supply Material to BUYER (i) in any quarter in excess of 1/4 x the maximum annual quantity shown for such Material in Attachment A or (ii) in any month in excess of 1/12 x the maximum annual quantity shown for such Material in Attachment A.

CONTRACT TERM: January 1, 2010 through December 31, 2011, subject to earlier termination as provided herein (the "Term").

PRICE AND TERMS OF PAYMENT: The prices for the Material covered by this Agreement shall be as set forth in Attachment B, attached hereto and incorporated herein by this reference.

DELIVERY TERMS: The delivery terms for the Material shall be as set forth in Attachment C, attached hereto and incorporated herein by this reference.

BUYER'S LOCATION AND DELIVERY POINT: The Material covered by this Agreement shall be delivered to the Facilities specified in Attachment C pursuant to the Shipment Schedule described therein.

GENERAL TERMS AND CONDITIONS OF SALE; AGREEMENT: The General Terms and Conditions of Sale, attached hereto as Attachment D, are incorporated herein and made a part hereof by this reference. This Cover Sheet, the General Terms and Conditions of Sale, as modified or expanded by the terms of this Cover Sheet (including all Attachments hereto), are collectively referred to herein as the "Agreement". The Agreement shall constitute the agreed terms and conditions upon which BUYER is obligated to purchase and SELLER is obligated to sell the Material. In the event BUYER uses its own order acknowledgment form or any other form to accept this Agreement, such form shall be used for convenience only and any terms and conditions contained therein which are inconsistent with or in addition to those contained in this Agreement shall be and are rejected and shall be and are of no force and effect whatsoever between the parties unless expressly assented to in writing by the SELLER.

OTHER CONSIDERATIONS: BUYER will use commercially reasonable efforts to qualify SELLER's Australian ore as an alternate Material to be supplied under this Agreement by August 31, 2010.
**IN THE EVENT BUYER SUCCESSFULLY QUALIFIES AUSTRALIAN ORE:**
No later than August 31, 2010, BUYER and SELLER will discuss current costs and competitive pricing for such ore supply. Provided BUYER and SELLER can come to terms on acceptable pricing,

Protected Document--Subject to Protective Order

JNJ 000411776

SELLER will provide solely the Australian ore to BUYER through December 31, 2011 beginning on a date to be agreed to between the parties, which date shall represent a reasonable date to allow the parties to begin supplying and taking supply of the Australian ore. If Buyer and SELLER cannot come to terms on pricing for Australian ore supply by August 31, 2010, either party may terminate this Agreement on 30 days written notice.

**IN THE EVENT BUYER DOES NOT SUCCESSFULLY QUALIFY AUSTRALIAN ORE:**
If BUYER is unable to qualify SELLER's Australian ore by August 31, 2010 due to the ore not meeting BUYER's specifications as provided on Attachment A, BUYER or SELLER may terminate this Agreement at any time upon written 30 days written notice. SELLER may in its sole discretion continue to supply Chinese ore at the applicable prices stated on Attachment B through December 31, 2010, at which time this Agreement will automatically terminate.

IN WITNESS WHEREOF, the parties to this Agreement have executed the same as of the commencement date of the Term first above written.

SELLER
Luzenac America, Inc.

By /s/
Name Guy Gobbley
Title President

BUYER
Johnson & Johnson Consumer Companies, Inc.

By /s/ David J. Radeke
Name David Radeke
Title V.P. GPO Global Supply Chain

Protected Document--Subject to Protective Order

JNJ 000411777

### Attachment A

### MATERIAL SPECIFICATIONS

| Material | Grade | Maximum Purchase Quantity Metric Tons Per Year |
|---|---|---|
| *Grade 25* Talc* | As per J&J specification no. RM-008967 | 8,500 |

\* Manufactured from Guangxi Chinese Ore. Alternatively, the Material may be SELLER's Australian ore if the conditions in the "Other Considerations" Section of the Cover Sheet are met.

SELLER will consider filling orders in excess of the maximum purchase quantity on a case by case basis.

### CONFIRMATION PROCEDURES

BUYER shall keep full and complete records and books of account with respect to all purchases of Material covered by the Agreement for a period of four (4) years after the close of the calendar year to which such records and books of account pertain. The SELLER may, at any time or times during or after the Term of the Agreement, request an independent audit of such records and books of account for the sole purpose of verifying that the total amount of each Material required to be purchased by BUYER from SELLER pursuant to the terms of the Agreement has been met. Any nationally recognized firm of independent certified public accountants designated by the SELLER and accepted by the BUYER shall, at any reasonable time or times and at the SELLER's expense, have the right to examine and audit such records and books of account maintained by the BUYER.

3

Protected Document--Subject to Protective Order

JNJ 000411778

### Attachment B

### PURCHASE PRICE

| Chinese Ore | January 1 – March 31, 2010 | April 1 – June 30, 2010 | July1 – August 31, 2010 | September 1, 2010 – October 31, 2010 | November 1, 2010 – December 31, 2010 |
|---|---|---|---|---|---|
| Bulk Price ($/mt) | $522/mt | $570/mt | $617/mt | $712/mt | $750/mt |
| 25 kg bag price | Bulk plus $75/mt | Bulk plus $75/mt | Bulk plus $75/mt | Bulk plus $75/mt | Bulk plus $75/mt |
| Superbag price | Bulk plus $45/mt | Bulk plus $45/mt | Bulk plus $45/mt | Bulk plus $45/mt | Bulk plus $45/mt |

Prices based on FCA Houston plant plus freight. Freight will be arranged by SELLER and added to the invoice at prevailing rate. BUYER has the right to book freight carriers on request.
Prices based on Chinese Guangxi Ore.

OTHER PRICING CONSIDERATIONS:
SELLER may also adjust pricing based on the increases or decrease in Chinese ore costs based on proof of such increases or decrease to BUYER.

**THE PRICES SET FORTH IN THIS <u>ATTACHMENT B</u> ARE BASED ON DELIVERY OF THE MATERIAL FCA (INCOTERMS 2000) SELLER'S HOUSTON, TX. FACILITY IN 25 KG BAGS, SUPERSAC BAGS OR BY TRUCK. ORDERS OF MATERIAL UNDER THE AGREEMENT SHALL BE FOR MINIMUM QUANTITIES OF NOT LESS THAN 20TONS.**

4

Protected Document--Subject to Protective Order

JNJ 000411779

## Attachment C

### DELIVERY TERMS

| | |
|---|---|
| Terms of Sale: | FCA (Incoterms 2000) SELLER's Houston, TX facility |
| Delivery Points: | As determined by BUYER |

### SHIPMENT SCHEDULE

No later than ten (10) days before the beginning of each month during the Term, BUYER shall furnish to SELLER a schedule (the "Schedule") indicating the dates and quantities to be delivered to each of BUYER's Facilities for the next three (3) succeeding months. The first month of each Schedule shall represent a firm purchase order, subject to change or withdrawal only as provided herein. The remaining portion of the Schedule (second and third months) shall represent forecasts of BUYER's anticipated quantities and dates of delivery, which shall be used by SELLER for planning purposes only and does not represent a commitment by BUYER to purchase the Material on the dates or in the quantities indicated.

BUYER may reschedule or cancel the delivery dates of Material on order without charge upon the SELLER receiving seventy-two (72) hours notice prior to the scheduled delivery date set forth in BUYER's Schedule. Any originally scheduled delivery date may be rescheduled only once, for a delay of no more than thirty (30) days beyond the originally scheduled delivery date.

5

Protected Document--Subject to Protective Order

JNJ 000411780

## Attachment D

## GENERAL TERMS AND CONDITIONS OF SALE

1. Price; Taxes and Customs Duties; Conditions of Payment. The price for the Material is as set forth on the face hereof. All prices are quoted, orders accepted, and billings rendered FCA Seller's facility and are exclusive of all federal, state and local excise, sales, use and similar taxes, and all import, export or customs duties, tariffs, or like charges, all of which shall be the responsibility of Buyer. Payment for Material shipped on approved credit is due net 30 days, or as stated on the face hereof, from date of invoice. Past due balances are subject to a late payment charge of 1.5% per month, or the maximum amount permitted by applicable law, whichever is less. Buyer shall pay all charges, costs and legal fees incurred in collecting amounts owed. Seller has the right to reschedule or cancel any order with Buyer if accounts are delinquent. If in the judgment of Seller the financial condition of Buyer at any time does not justify delivery upon the payment terms specified, Seller may require full or partial payment in advance.

2. Delivery and Risk of Loss. All Material shall be delivered to Buyer as provided on the face hereof. Title shall pass to Buyer, and Buyer assumes all risk of loss, from the time the Material is loaded by Seller onto railcar or truck for shipment to Buyer at Seller's facility. In the absence of specific written instructions, Seller may exercise in its discretion the method of shipment. Unless otherwise agreed by the parties in writing, Seller shall have the exclusive right to arrange and book all freight for the transportation of the Material to Buyer. Delivery dates are the dates the Material is shipped from Seller's facility. Buyer shall be responsible for payment of all freight and transportation charges from Seller's point of loading to the delivery address specified on the face hereof. Delivery dates are approximate and are predicated on the prompt receipt by Seller of all necessary information and documentation from Buyer.

3. Quantity. Actual weight of individual bags and other packaging may vary due to variations in the manufacturing process and packing equipment tolerances. Any claim for shortage must be made in writing to Seller within 30 days after Buyer's receipt of the Material. Seller is not obligated to deliver in any month more than a proportionate part of the maximum quantity specified, determined by dividing such maximum quantity by the total number of months included in the period of performance. When, in the opinion of Seller, there is a period of shortage of supply of said Material for any reason, Seller may allocate its available supply among any or all of its various customers upon such basis as it shall deem fair and practicable, with no liability on its part for failure to deliver the quantity or any portion therein specified.

4. Quality and Warranties. Seller warrants that (1) the Material meets both Seller's general, published specifications and any additional specifications set forth on the face hereof; (2) Seller has good and sufficient title to the Material; and (3) the Material, as manufactured by Seller according to Seller's specifications, does not infringe any U.S. patent. Buyer has determined that Material with the quality characteristics conforming to such specifications will satisfy its contemplated use of the Material. Upon Buyer's request, Seller shall prepare for Buyer for each shipment of Material a certificate of analysis describing the quality characteristics of such shipment pursuant to the sampling procedures specified in Section 5. Buyer agrees that packaging material, which includes but is not limited to bags, supersacks, containers, shrink wrap, plastic wrap, dunnage bags and pallets ("Packaging Material"), shall only be used for shipment of Material from Seller to Buyer and that such Packaging Material shall be disposed of by Buyer in a manner that complies with all applicable laws. Material on pallets in transport or in storage must be stored on a flat, load-bearing surface and bound to prevent shifting of the load. Pallets are not suitable for and are not to be used for edge racking or stacking. Buyer acknowledges that Material and Packaging Material must be protected from damage, moisture, excessive heat and ignition sources, and that personnel must be kept out of the path of any bags or pallets which may fall or shift during handling. Buyer assumes all risk of handling the Material at the point of delivery and Buyer agrees to indemnify Seller for claims by it or by third parties arising from such handling.

**SELLER HEREBY EXPRESSLY DISCLAIMS (AND THEREFORE IS HEREBY EXCLUDED FROM THIS AGREEMENT) ANY OTHER WARRANTY, EXPRESS OR IMPLIED, AS TO THE MATERIAL AND PACKAGING MATERIAL, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SELLER SHALL NOT BE LIABLE FOR ANY DAMAGE, LOSS, COST OR EXPENSE, OR BREACH OF WARRANTY, EXCEPT AS SET FORTH IN THIS SECTION 4. BUYER HEREBY WAIVES ALL CLAIMS FOR GENERAL, CONSEQUENTIAL, INCIDENTAL, OR SPECIAL DAMAGES AND AGREES THAT SELLER'S LIABILITY AND BUYER'S EXCLUSIVE REMEDY ARE EXPRESSLY LIMITED TO REPLACEMENT OF ANY MATERIAL AND PACKAGING MATERIAL WHICH DOES NOT MEET THE WARRANTY SET FORTH IN THIS SECTION 4, AND SUCH LIABILITY SHALL IN NO EVENT EXCEED THE PURCHASE PRICE FOR SUCH MATERIAL AND PACKAGING MATERIAL; PROVIDED THAT, NOTHING IN THIS PARAGRAPH SHALL BE DEEMED TO EXCLUDE OR LIMIT ANY LIABILITY UNDER ANY APPLICABLE LAW OR STATUTE WHICH, UNDER SUCH LAW OR STATUTE, CANNOT BE EXCLUDED OR LIMITED.**

5. Sampling and Analysis. At the time the Material is loaded or packaged by Seller, whichever is earlier, Seller, at its expense, shall sample the Material in accordance with its normal sampling procedures. The results of sampling and analysis by Seller shall be final and conclusive for all purposes. Buyer's sole and exclusive remedy in the event delivered Material does not meet the quality standards set forth in Section 4 shall be to contact Seller and afford the Seller the opportunity to inspect and sample the Material. If Seller agrees that the Material is nonconforming, Seller shall give instructions as to where to send the Material, at Seller's expense, and Buyer shall receive replacement Material in like quantities in lieu thereof. Rejection of such nonconforming Material shall be made not later than thirty (30) days after receipt by Buyer.

6. Defaults and Remedies. If Seller defaults in any of its obligations hereunder, Buyer's sole remedy shall be refusal of delivery of Material or termination of this Agreement on the terms set forth below; if Buyer defaults in any of its obligations hereunder, Seller's remedies shall include suspension of performance together with all other rights and remedies at law or in equity which Seller may have as a result of Buyers default. If, despite any default by Buyer, Seller elects to continue to make deliveries, its action shall not constitute a waiver of any default by Buyer or in any way affect Seller's legal remedies for any such default. If Buyer defaults under this Agreement and the matter is placed in the hands of an attorney for collection, or suit is brought at law or in equity to enforce the provisions herein, Buyer agrees to pay attorneys' fees together with costs in addition to the amounts due hereunder. Seller shall indemnify, defend and hold harmless Buyer from any and all liability, claims, judgments or damages relating to any claims that the Material, as manufactured by Seller according to Seller's published specifications, violates any U.S. patent. Buyer agrees to indemnify, defend and hold harmless Seller from any and all liability, claims, judgments or damages relating to claims of patent infringement due to Buyer's alteration, use, reformulation or processing of the Material.

7. Force Majeure. All obligations of either party hereunder (except the payment of money) shall be suspended while, but only so long as and to the extent that, such party is prevented from complying with such obligations in whole or in part by acts of God or of the public enemy, strikes, lockouts and other labor disputes, fire, flood, accidents, epidemics, quarantine restrictions, freight embargoes, earthquake, unusually severe weather, acts of war, terrorism, insurrection or mob violence, unforeseen shutdown or unavailability of major sources of supply, breakage of machinery or apparatus, laws, requirements, regulations or action of or the failure to act of any state, federal or local government, or

6

Protected Document--Subject to Protective Order

JNJ 000411781

any other matters beyond the reasonable control of said party which cannot be overcome by said party by means normally employed in the performance of this Agreement, whether similar to the matters herein specifically enumerated or otherwise. In the event of Seller's inability due to any of the above circumstances to supply all of the Material provided for hereunder, Seller reserves the right to allocate its available supply of Material among its purchasers, or any of them, as Seller, in its sole discretion, elects without liability to Buyer for any failure of performance which may result therefrom. The party affected by force majeure shall promptly and timely notify the other of the existence thereof, the expected delays, and the estimated effect upon its performance hereunder.

8. Product Safety and Product Stewardship Program. Buyer understands and acknowledges that as part of Seller's product stewardship program, Seller from time to time will issue notices regarding the safe use of Seller's products, including appropriate and inappropriate end uses of Seller's products. Seller has the right to refuse to sell Material to unlawful or inappropriate end-uses as determined by Seller. Buyer agrees to comply with such safety policies and end use restrictions in its use and sale of Seller's products. Buyer further agrees upon written request from Seller to confirm in writing that Buyer is complying with Seller's safety policies and end use restrictions. In no event shall Seller be responsible for any damage, injury or loss occasioned by the misuse of Material or Buyer's negligence.

9. Buyer as End User; No Assignment. Unless Buyer is duly authorized to distribute the Material pursuant to a written distribution agreement with Seller, it is agreed and understood that the Material is being purchased by Buyer for its internal use and, without the express written authorization of Seller, Buyer may not repackage, resell, or otherwise distribute the Material to third parties. In addition, Buyer shall have no right to assign or transfer (whether by operation, by law or otherwise) all or any part of its rights or obligations under this Agreement except with the prior written consent of the Seller and no delegation of any obligation of Buyer shall be made without the prior written consent of Seller; provided, however, that Buyer shall be permitted to assign this Agreement in its entirety in connection with a merger, consolidation, sale of all or substantially all of Buyer's assets or equity interests or similar business combination or reorganization involving Buyer and another corporation or entity. Any attempted assignment or delegation of Buyer shall be void and ineffective for all purposes unless made in conformity with this paragraph. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

10. Compliance with Laws; Export. Both parties shall comply with all applicable laws and regulations. Buyer shall not sell, ship or allow trans-shipment of any Material in any manner contrary to the export laws of the United States of America, including without limitation, to any prohibited individual, firm or entity appearing in Denied Party Lists published by the U.S. government, such as the list of Specially Designated Nationals published by the U.S. Department of Treasury OFAC, or to any country subject to economic or trade sanctions imposed by the U.S., except as otherwise authorized by U.S. law. Buyer shall also comply with all applicable laws and regulations of any destination country.

11. Notices. Any notices, payments, or other information herein contemplated to be given, made or delivered to Seller or Buyer hereunder shall be sufficient if personally delivered, mailed, or sent by electronic facsimile at the address of such party set forth on the face hereof or to such other address as such party may from time to time designate to the other in writing.

12. Incorporation By Reference. Terms appearing on the face hereof that in any way alter, condition or explain these General Terms and Conditions are incorporated herein by this reference. All terms so incorporated shall supersede any conflicting or contrary provision contained in these printed General Terms and Conditions.

13. Entire Agreement; Interpretation; Amendment. This Agreement contains the entire agreement between the parties, and there are no oral understandings, representations or agreements relative to this Agreement which are not fully expressed herein. Any terms appearing on any Order or other form used by Buyer which would modify or conflict with the terms and conditions set forth herein are expressly rejected. Except for the purpose of negating implied warranties, no course of prior dealings between the parties and no usage of the trade shall be relevant to supplement or explain any term used in this Agreement. If any provision of this Agreement, or the application thereof to any person, place, or circumstance, shall be held by a court of competent jurisdiction to be invalid, unenforceable, or void, the remainder of this Agreement and such provisions as applied to other persons, places, and circumstances shall remain in full force and effect. No amendment, modification, or waiver of any provision of this Agreement shall be effective unless in writing and signed by the parties hereto.

14. Governing Law. This Agreement shall be governed by the laws of the State of Colorado.

RTM US GTC of Sale 2007.doc

7

Protected Document--Subject to Protective Order

JNJ 000411782